## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ROBERT F. COCKERILL and CHRISTOPHER WILLIAM NEWTON, individually and as representatives on behalf of a class of similarly situated persons,**<br><br>      **v.**<br><br>**CORTEVA, INC.; DUPONT SPECIALITY PRODUCTS USA, LLC; DUPONT DE NEMOURS, INC.; E.I. DU PONT DE NEMOURS AND COMPANY; THE PENSION AND RETIREMENT PLAN; THE ADMINISTRATIVE COMMITTEE** | **CIVIL ACTION**<br><br>**NO. 21-3966** |

**MEMORANDUM RE: DEFENDANTS' MOTION TO DISMISS**

**Baylson, J.**                                                        **August  4, 2022**

    This putative class action arises from the alleged denial of retirement benefits to certain employees following the employer's spin-off of these employees to a different entity. Plaintiffs Robert F. Cockerill and Christopher W. Newton, individually and as representatives on behalf of a class of similarly situated persons, bring various claims pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, et seq. ("ERISA") against Defendants Corteva, Inc.; Dupont Specialty Products USA, LLC; DuPont de Nemours, Inc.; E.I. DuPont de Nemours and Company; The Pension and Retirement Plan; and the Administrative Committee (collectively, "Defendants").

    Before the Court is Defendants' Motion to Dismiss Plaintiffs' claims in their entirety. For the following reasons, the Court will deny Defendants' motion.

I.     **Relevant Alleged Facts**

Based on the allegations in Plaintiffs' Complaint, which this Court must accept as true for the purposes of Defendants' Motion to Dismiss, the relevant facts are as follows:

A.  **Corporate Structures**

On December 11, 2015, E.I. DuPont de Nemours and Company ("Historical DuPont"), which was founded over 200 years ago, announced its intent to merge with Dow Chemical Company ("Dow Chemical").  See Compl. ¶¶ 8, 13.  On August 31, 2017, the Historical DuPont-Dow Chemical merger closed, to create a combined entity, DowDuPont.  See id. at ¶ 16.

On June 1, 2019, DowDuPont spun-off into three separate entities: Corteva, Inc. (focusing on agricultural chemicals); Dow, Inc. (focusing on materials science); and DuPont de Nemours, Inc. ("New DuPont") (focusing on specialty product industries).  Id. at ¶¶ 17, 39.  Corteva, which has approximately 21,000 employees, is the parent company of what remains of Historical DuPont. Id. at ¶ 4 (noting that Historical DuPont is a "paper subsidiary" of Corteva).  Most of what had been Historical DuPont's businesses operate now under New DuPont.  Id. at ¶ 8.

Specialty Products USA, LLC ("Specialty Products") had been a subsidiary of Historical DuPont prior to the Historical DuPont-Dow Chemical merger, at which point it became a subsidiary of DowDuPont.  Id. at ¶ 7.  Following the spin-offs in 2019, it became a subsidiary of New DuPont.  Id.

### B.  History of the Plan

The Pension and Retirement Plan, sponsored by E.I. DuPont de Nemours and Company

("Historical DuPont"), was originally adopted effective September 1, 1904.  See Compl. ¶ 8, 12;

Mot., Durkovic Decl. at Ex. 1.[1]

In November 2016, following the announcement of the Historical DuPont-Dow Chemical

merger, but prior to the merger, Plan participants were notified of Historical DuPont's intent to

freeze the Plan "so that no new benefits would accrue to participants in the Plan and no new

employees would become eligible to participate in the Plan."  Id. at ¶ 14.  Plan participants received

"frequently asked questions" concerning the freeze, to include the following two questions and

answers:

> "What is changing with the Pension Plan?" (Question 9)
>
>> The Pension Plan benefit is calculated using pay and years of
>> service.  The pay and service amounts used to calculate your pension
>> benefit will stop growing on November 30, 2018.  Your Pension
>> Plan benefit formula will use your pay and years of service as of
>> November 30, 2018 to calculate your benefit.  Your Pension Plan
>> will continue to recognize growth in age and service with the
>> company after November 30, 2018 to determine any applicable early
>> retirement reduction factors.  Continuing service with the company,
>> even after November 30, 2018, may ensure you receive 100% of
>> your benefit.
>
> "How do I find out if early retirement reduction factors will be applied to my
> Pension Plan benefit?" (Question 10)
>
>> Depending on the age at which you retire and your years of service,
>> you may receive less than 100% of the value of your benefit
>> (reduced pension).  The amount by which your Pension Plan benefit

---

[1]     The Court may take judicial notice of the Plan document.  See Buck v. Hampton Twp. Sch.
Dist., 452 F.3d 256, 260 (3d Cir. 2006) (in resolving a motion to dismiss, courts generally may
consider "documents that are attached to or submitted with the complaint, and any matters
incorporated by reference or integral to the complaint, items subject to judicial notice, matters of
public record, orders, and items appearing in the record of the case"); Corman v. Nationwide Life
Ins. Co., 396 F. Supp. 3d 530, 537 (E.D. Pa. 2019) (Beetlestone, J.) (taking judicial notice of plan
documents in ERISA action).

is reduced to reflect early commencement is known as an early retirement reduction factor.  Continuing service with the company, even after November 30, 2018, may ensure you receive 100% of your benefit.  Generally, as an employee who participates in the DuPont (parent company) section of the Pension Plan, you can receive a reduced pension at age 50 and 15 years of service and may be able to receive 100% of the value of your benefit as early as age 58 depending on your service when you terminate employment and your age when you begin payments.  The table below illustrates how the early retirement reduction factors are applied to your Pension Plan benefit.

**DuPont (Parent Company) Early Retirement Reduction Factor Chart**

| AGE AT PAYMENT DATE | 15-20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 and over |
|---|---|---|---|---|---|---|---|---|
| 65 | 100% | | | | | | | |
| 64 | 95 | 100% | | | | | | |
| 63 | 90 | 95 | 100% | | | | | |
| 62 | 85 | 90 | 95 | 100% | | | | |
| 61 | 80 | 85 | 90 | 95 | 100% | | | |
| 60 | 75 | 80 | 85 | 90 | 95 | 100% | | |
| 59 | 70 | 75 | 80 | 85 | 90 | 95 | 100% | |
| 58 | 65 | 70 | 75 | 80 | 85 | 90 | 95 | 100% |
| 57 | 60 | 65 | 70 | 75 | 80 | 85 | 90 | 95 |
| 56 | 55 | 60 | 65 | 70 | 75 | 80 | 85 | 90 |
| 55 | 50 | 55 | 60 | 65 | 70 | 75 | 80 | 85 |
| 54 | 50 | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 53 | 50 | 50 | 50 | 55 | 60 | 65 | 70 | 75 |
| 52 | 50 | 50 | 50 | 50 | 55 | 60 | 65 | 70 |
| 51 | 50 | 50 | 50 | 50 | 50 | 55 | 60 | 65 |
| 50 | 50 | 50 | 50 | 50 | 50 | 50 | 55 | 60 |

**YEARS OF SERVICE**

Id. at ¶¶ 14-15.

In 2018, following the announcement of DowDuPont's spin-off, a "question and answer" concerning the spin-off's effect on Plan participants, as to Specialty Products, asked:

"I am currently a participant in DuPont's U.S. Pension Plan and will be an employee of Specialty Products in the US.  How does this affect my pension?"

The spin of DuPont and Corteva Agriscience will impact Specialty Products employees as follows:

Since Corteva Agriscience will be the ongoing sponsor of the Plan, Specialty Products employees who participate in the Plan will be eligible to commence their pension, at spin, if they meet the Plan commencement requirements in terms of age and service.

4

> At spin, future service for Specialty Products employees who participate in the Plan will no longer be recognized in determining eligibility for pension benefits and any applicable early retirement reduction factors.  For those employees who qualify for retirement by meeting the Plan's age and service requirements, growth in age will continue to be recognized allowing those participants to age into an improved reduction factor prior to commencing their pension.

Id. at ¶ 18.

In March 2019, Plan participants who were "hired or rehired" as "Full-Service Employees prior to January 1, 2007, and who had, or would have, obtained at least age 50 with 15 years of service as of May 31, 2019" received a presentation regarding their benefits under the Plan in light of the spin-off.  See id. at ¶ 19.  Pursuant to the presentation, those qualifying individuals would be considered a "retiree" as of June 1, 2019.  "[E]mployees who had the age and service for an unreduced pension benefit as of June 1, 2019 . . . could commence their benefit immediately." Id. at ¶ 20.  "Participants who were age 50 but who would receive a reduced pension benefit as of June 1, 2019, could wait until they reached an age where the benefit was no longer reduced." Id. at ¶ 21 (including screenshot of presentation slide, stating: "If you are entitled to an immediate early reduced pension, your monthly benefit payments will be reduced due to commencing benefits early.  You may choose to defer the benefit to decrease or eliminate the reduction.  In that case, you will get a larger monthly benefit when you commence your payments in the future.").  No "similar presentation" was provided to "similar participants who had not yet obtained age 50 as of May 31, 2019." Id. at ¶ 19.

As of June 1, 2019, the Plan, including pension liabilities, transferred to Corteva.  Corteva maintains responsibility for funding and administering the pension benefits for over 100,000 participants, most of whom have never worked for Corteva.  Id. at ¶ 23.  Historical DuPont, as a subsidiary of Corteva, remains the Plan sponsor.  Id. at ¶ 24.

**C. Applicable Plan Provisions**

The applicable Plan provisions, as amended and restated effective December 16, 2015, and including certain amendments thereafter are alleged as follows:

- Section III "provides that normal retirement age under the Plan is the later of age 65 or, for employees who commence participation in the Plan after age 60, the 5th anniversary of the time Plan participation commenced." Id. at ¶ 82(a).

- Section IV A (1) ("Normal Retirement Eligibility") states that "[a]n employee will be eligible for Normal Retirement after reaching age 65 with at least 15 years of service." Id. at ¶ 82(b).

- Section IV B (1) ("Early Retirement Eligibility") states that "[a]n employee will be eligible for Early Retirement after reaching age 50 and prior to reaching age 65 with at least 15 years of service." Id. at ¶82(c).

- Section IV B ("Percentage Factor for Early Retirement") sets forth the percentage factor for early retirement as it pertains to service years and age at commencement of payment. See id. at ¶ 82(d).

- Section IV D (1) ("Optional Retirement Eligibility") provides that:

  > (a) An employee will be eligible for Optional Retirement after reaching age 50 with at least 15 years of service if his employment would otherwise be involuntarily terminated for reasons other than discharge for dishonesty, insubordination or other misconduct. (b) An employee will be eligible for Optional Retirement after reaching age 45 and prior to reaching age 50 with at least 25 years of service if his employment would otherwise be involuntarily terminated due to lack of work. The length and service required for eligibility shall be reduced by two months, or a proportionate part thereof, for each month or portion thereof which has elapsed since the employee reached age 45.

Id. at ¶ 82(e).  Pursuant to the Eighth Amendment to the Plan, signed

November 30, 2020, this section was amended as follows:

> "(a)      An employee will be eligible for Optional Retirement after reaching age 50 with at least 15 years of service if his employment would otherwise be involuntarily terminated due to lack of work~~for reasons other than discharge for dishonesty, insubordination or other misconduct~~."

Id. at ¶ 85.

- Section IX K ("Right to Modify Plan") states:

> "K.    Right to Modify Plan
>
> The Company reserves the right to change or discontinue this Plan in its discretion. Upon the complete or partial termination of this Plan, an employee who is affected by such termination and is not otherwise entitled to benefits under this Plan shall acquire a vested right to benefits accrued under this Plan to the date of such termination, to the extent then funded.  **Prior to January 1, 2021,** any change which has the effect of reducing or terminating benefits under this Plan will not be effective until one year following announcement of such change by the Company, unless the Company deems that the change is necessary or appropriate to qualify or maintain the Plan as one meeting the requirements of the Code with respect to qualified pension plans. Pensions granted pursuant to this Plan, to former employees who were retired or otherwise terminated prior to any such change many not be reduced, cancelled or suspended except as provided under Section VII and paragraph F of this Section. "

Id. at ¶ 83 (citing the Seventh Amendment to the Plan, signed December 19, 2019).

- Section IX N ("Transfer of Employment and Multiple Titles") states:

> "N.  Transfer of Employment and Multiple Titles
>
> Participation in this Title I shall continue for any employee who transfers on or after January 1, 2012 to an employer who participates in another Title of the ~~DuPont~~ Pension and Retirement Plan unless such transfer is to an employer participating under Title V in which case the effective date to this rule governing transfers (and continuance under Title I) will be on or after January 1, 2009.  Such transfer shall not be considered a transfer to an affiliated group company. **Beginning June 1, 2019, participation in this Title I shall continue for an employee for so long as the employee is continuously employed by a U.S. or Puerto Rico legal entity which is wholly owned by Corteva, Inc.**"

Id. at ¶ 84 (citing the Seventh Amendment to the Plan, signed December 19, 2019).

- The January 2020 Summary Plan Description sets forth amounts payable under the

Optional Retirement at Involuntary Termination.  See id. at ¶¶ 86-87.

### D.  Robert F. Cockerill

Robert F. Cockerill started with DuPont in 1992, out of college, as a Chemical Engineer. Id. at ¶ 28.  He is the third generation of his family to work for Dupont, following in the footsteps of his paternal grandparents, maternal grandfather, and his father.  Id. at ¶¶ 25-27.  Since 1992, he has held many positions with DuPont, to include having over twenty (20) years of experience in a leadership position.  Id. at ¶¶ 28, 53.  He has been relocated seven (7) times to five (5) different states, and has traveled "extensively" for work, "in some years spending as much as 35% of his time away from his family."  Id. at ¶ 28.  Cockerill and his family currently live in Landenberg, Pennsylvania.  Id. at ¶ 36.

Cockerill had designed his career around an early retirement, and he and his family had made personal, professional, and financial sacrifices for him to qualify for this benefit under the Plan.  See, e.g., id. at ¶¶ 29-38.  At the time of the Plan freeze in 2018, Cockerill's earliest opportunity to apply for unreduced early retirement, under the Rule of 85, was at the age of 58.5 years.  Id. at ¶ 42.  Cockerill believed that, so long as he was not fired or left his employment, he would qualify for an unreduced Early Retirement Benefit at that age.  Id.

At the time of the spin-off on June 1, 2019, Cockerill was 49.85278 years old and had over 26 years of qualified service with Historical Dupont and DowDuPont.  Id. at ¶ 39.  According to Cockerill, and unbeknownst to him at the time,

> the spin-off was intended to divest him of his early retirement benefits because, according to Corteva's interpretation of the spin-off as it relates to the Plan, the spinoff terminated [his] employment from the Plan Sponsor ([H]istorical DuPont/Corteva) even though he continued in the same job at the same location with DuPont Specialty Products under the former DowDuPont and was certainly not "terminated" in the typical way that termination is understood by an employee.

Id. at ¶ 40 (emphasis added).  In early 2020, he learned that his earliest unreduced retirement date had been changed from 2027 to 2034, with any retirement prior to 2034 resulting in a 5% reduction for each year.  Id. at ¶ 48.  He assumed this date was in error and called costumer service, who directed him to human resources at DuPont.  Id. at ¶ 49.  He met with a Dupont corporate human resources employee who confirmed that the date was correct based on changes made at the spin-off.  Id. at ¶ 50.  Upon learning that he had been "terminated," he requested approval to qualify for benefits under the Optional Retirement at Involuntary Termination provision of the Plan but was denied because he was "divested," not "terminated," so the Optional Retirement provision did not apply.  Id. at ¶ 55.  His Level I appeal for benefits was denied on May 11, 2020.  Id. at ¶ 56.  His denial letter stated in part that,

> your eligibility service that determines reduction factors stopped on May 31, 2019, when your employment ended with DuPont (Corteva) with your age below 50 at the time of termination. Therefore as per the rule 85 (age + service = 85), you will not qualify for an unreduced pension at the age of 58, and your request is dnied [sic].

Id.  His Level II appeal was denied on September 4, 2020.  Id. at ¶ 57.

### E.  Christopher W. Newton

Christopher W. Newton stated at Historical DuPont on September 7, 1999 in the Advanced Fibers Systems business, which became a subsidiary of Specialty Products following the spin-off. Id. at ¶ 59.  On May 23, 2019, 8 days prior to the spin-off, Newton was declared "excess" and was terminated for lack of work.  Id. at ¶ 67.  Although he stopped working and was cut-off from company facilities and property at that time, his "official termination date" was set at July 31, 2019.  Id. at ¶¶ 70-71.  During a meeting with human resources and management on May 23, 2019, he was presented with a "Career Transition Package" and informed of his entitlement to an enhanced pension under the Plan due to involuntary termination.  Id. at ¶ 68.  At the time, he was

given a matrix showing percentages of retirement based on age at payment state date and years of services. Id. Using the matrix, he determined that his optimal date to begin receiving payments, to receive the maximum value, would be at the age of 50. Id. at ¶ 69. On June 26, 2019, he emailed management and human resources reading that that he was hired in 1999 and requesting an adjustment to his service date. Id. at ¶¶ 73-74.

He waited approximately one year to apply for benefits, to commence with an effective date of July 1, 2020. Id. at ¶ 75. Corteva provided him with a Pension Estimate Calculation Statement listing him as "Deferred Vested" and "only entitled to 25% of his normal retirement benefit rather than the 60% he had expected to receive upon turning 50." Id. Newton's appeal was denied on the ground that his CTP was sponsored under New DuPont. Id.at ¶ 76. He filed a Level II appeal on March 19, 2021, which was likewise denied on the ground that he had been "voluntarily terminated" as a result of the spin-off, and had not been terminated for a "lack of work" because his official termination was subsequent to the spin-off. Id. at ¶ 79.

## II.   Procedural History

On September 3, 2021, Plaintiffs filed the instant action against all Defendants, alleging that the merger and spin-offs allowed Dow and New DuPont "to divest themselves of any future funding obligations and liabilities of the Plan." Id. at ¶ 22. Plaintiffs, as individuals and as representatives on behalf of a class of similarly situated persons, brought five claims:

- Count I: Claim for early retirement benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) by Plaintiffs and the Class, against the Administrative Committee

- Count II: Claim for benefits under 29 U.S.C. § 1132(a)(1)(B) by Newton and Sub-Class A, against the Administrative Committee, in the alternative to Count I

- Count III: Claim for breach of fiduciary duty pursuant to 29 U.S.C. § 1104 and breach of co-fiduciary duty pursuant to 29 U.S.C. § 1105, against all Defendants except the Plan, in the alternative to Count I

- Count IV:  Claim for interference with protected rights pursuant to 29 U.S.C. § 1140, against all Defendants except the Plan, in the alternative to Counts I & II

- Count V: Promissory Estoppel under Pennsylvania law, against all Defendants except the Plan, in the alternative to Counts I-III

See id. at ¶¶ 95-123.  Defendants moved to dismiss the Complaint in its entirety on November 10, 2021.  See Motion to Dismiss (ECF 21).  Plaintiffs filed a response on November 24, 2021, see ECF 22, and Defendants filed a reply on December 8, 2021, see ECF 24.

## III.    Legal Standard[2]

In considering a motion to dismiss under Rule 12(b)(6), the Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff."  Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  To survive the motion, a plaintiff must "plead 'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for misconduct alleged.'"  Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir.2009)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

---

[2]    This Court has jurisdiction over Plaintiffs' ERISA claims pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, and over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

## IV.   Discussion

### A.  Civil Enforcement Under § 1132(a)(1)(B)

Section 1132(a)(1)(B) empowers a "participant" or "beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."[3]  A claim arising under § 1132(a)(1)(B) "stands or fails by 'the terms of the plan,' . . . a straightforward rule of hewing to the directives of the plan documents that lets employers '"establish a uniform administrative scheme, [with] a set of standard procedures to guide processing of claims and disbursement of benefits."'"  Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan, 555 U.S. 285, 300 (2009) (quoting Egelhoff v. Egelhoff, 532 U.S. 141, 148 (2001)).  A plaintiff seeking to recover benefits under § 1132(a)(1)(B) "must demonstrate that the benefits are actually 'due'; that is, he or she must have a right to benefits that is legally enforceable against the plan."  Hooven v. Exxon Mobil Corp., 465 F.3d 566, 574 (3d Cir. 2006).  "Benefits must have 'vested' in order to be legally 'due.'"  Id.

### 1.  Standard of Review

Although ERISA does not set out the standard of review for actions brought under § 1132(a)(1)(B) challenging a denial of benefits, "courts have established certain principles in determining what standard of review applies depending on the circumstances."  See Saltzman v. Indep. Blue Cross, 634 F. Supp. 2d 538, 546-47 (E.D. Pa. 2009) (Baylson, J), aff'd, 384 F. App'x.

---

[3]  A "participant" is "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit."  29 U.S.C. § 1002(8).  A "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."  Id. at § 1002(7). There is no dispute that the Plan is governed by ERISA.  See 29 U.S.C. § 1002(2).

107 (3d Cir. 2010) (citing <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 108-09 (1989)).

Courts must conduct <u>de novo</u> review of a denial of benefits under a plan, "unless the benefit plan

endows the administrator or the fiduciary with discretionary authority to construe terms of the

plan, in which case courts must then review a denial of benefits under an arbitrary and capricious

standard."  <u>Id.</u> (citing <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 110-11 (2008)); <u>see also</u>

<u>Bergamatto v. Bd. of Trustees of the NYSA-ILA Pension Fund</u>, 933 F.3d 257, 263-64 (3d Cir.

2019) (noting that a review under an "arbitrary and capricious" standard, in the context of a claim

arising under § 1132(a)(1)(B), is "effectively the same" as that under an "abuse of discretion"

standard).

A denial of benefits is arbitrary and capricious "if it is without reason, unsupported by

substantial evidence or erroneous as a matter of law."  <u>Fleisher v. Standard Ins. Co.</u>, 679 F.3d 116,

121 (3d Cir. 2012) (quoting <u>Miller v. Am. Airlines, Inc.</u>, 632 F.3d 837, 847 (3d Cir. 2011)).  Courts

must first look to whether the plan's language is ambiguous, <u>i.e.</u>, "subject to reasonable alternative

interpretations."  <u>Bergamatto</u>, 933 F.3d at 264 (quoting <u>Bill Gray Enters., Inc. Emp. Health &</u>

<u>Welfare Plan v. Gourley</u>, 248 F.3d 206, 218 (3d Cir. 2001)).  "If the plan's language is

unambiguous, 'we will not set aside the administrator's interpretations . . . as long as those

interpretations are 'reasonably consistent' with the plan's text[.]"  <u>Id.</u> (quoting <u>Dowling v. Pension</u>

<u>Plan for Salaried Emps. of Union Pac. Corp. & Affiliates</u>, 871 F.3d 239, 245 (3d Cir. 2017)).  "If

the reviewing court determines the terms of a plan document are ambiguous, it must take [an]

additional step and analyze whether the plan administrator's interpretation of the document is

reasonable."  <u>Id.</u> (quoting <u>Bill Gray Enters., Inc.</u>, 248 F.3d at 218).  "The determination of whether

a term is ambiguous is a question of law."  <u>Fleischer</u>, 679 F.3d at 121 (quoting <u>Taylor</u>, 933 F.2d at

1333)).

### 2.   Principles of Plan Interpretation

In determining whether rights are "due" under a benefit plan pursuant to § 1132(a)(1)(B), courts are guided by a number of principles.  As an initial matter, it is the burden of the plan participant to prove, by a preponderance of the evidence, "that the employer intended the welfare benefits to be vested."  Saltzman, 634 F. Supp. 2d at 561 (quoting In re Unisys Corp. Retiree Med. Ben. ERISA Litig., 58 F.3d 896 (3d Cir. 1995)).  Second, "ERISA plans, like contracts, are to be construed as a whole."  Id. (quoting Kemmerer v. ICI Ams., Inc., 70 F.3d 281, 288-89 (3d Cir.1995)).  Third, "breach of contract principles, applied as a matter of federal law, govern claims for benefits due under an ERISA plan . . . and straightforward language in an ERISA plan document 'should be given its natural meaning.'"  Id. (citing Bill Gray, 248 F.3d at 220 n.13).  Finally, a "specific provision controls a general one."  Id. (citing Aramony v. United Way of America, 254 F.3d 403 (2d Cir. 2001)).

### B.   An "Arbitrary and Capricious" Standard of Review is Appropriate

As an initial matter, the Court must determine the appropriate standard of review.  Plaintiffs allege that the Plan is a "defined benefit pension plan" within the meaning of 29 U.S.C. § 1002(35), see Compl. ¶ 1, 11, and the Administrative Committee is (1) the "Administrator" of the Plan, within the meaning of 29 U.S.C. § 1002(16)(A)(i); (2) a fiduciary of the Plan, "with discretionary authority to manage and administer the plan," pursuant to 29 U.S.C. § 1002(21)(A); and (3) "a named fiduciary of the Plan with the authority and control to manage the operation and administration of the Plan within the meaning of 29 U.S.C. § 1102(a)," id. at ¶ 11.  Defendants make no argument to the contrary.  See, e.g., Mot. 3 (providing background on the Plan).  An arbitrary and capricious review of the denial of Early Retirement benefits is appropriate.  See Firestone Tire & Rubber Co., 489 U.S. at 108-09; Saltzman, 634 F. Supp. 2d at 546-47.

### C.  Plaintiffs Have Stated a Claim for Violations of ERISA

Pursuant to Count I, Plaintiffs seek a ruling under § 1132(a)(1)(B) that the Administrative Committee "acted arbitrarily and capriciously in interpreting the Plan to extinguish their right to age into an Early Retirement or Rule of 85 unreduced early retirement under the Plan."  Compl. ¶ 98 (Count I).

According to Defendant Administrative Committee, Plaintiffs' claim should be dismissed with prejudice because the Plan's language is "clear and unambiguous" that Plaintiffs "did not (and do not) quali[f]y for Early Retirement benefits."  Mot. 6.  Specifically, the Administrative Committee argues that Plaintiffs have never qualified for Early Retirement benefits because they: (1) are not "employees" of the "Company," and (2) had not reached the age of 50 prior to the spin off.  Id. at 7.

Plaintiffs counter that the Plan's definition of "employee" is not "clear and unambiguous." Resp. 10.  They contend that the definition of "employee" includes former employees.  In support, they point to the fact that the definition of "employee" includes in it a hiring date ("hired on or before December 31, 2016"), but not a termination date.  Id.  They also suggest that interpreting the Plan to include former employees within the definition of "employee" is consistent with the term's scope elsewhere in the Plan.  For example, Plaintiffs point to the use of "employee" in the "Optional Retirement" section.  Id. at 10-11.  They argue that the "Optional Retirement" provision applies only to terminated employees, so "employee" under that provision must also include former employees, and therefore, because identical terms in the contract should be read to have the same meaning, "employee" in the Early Retirement section must also include former employees.  Id. at 11.  Additionally, Plaintiffs argue that, even if "employee" was clear and unambiguous in some circumstances, the definition of "employee" suffers from a latent ambiguity

due to the Administrative Committee's prior allowances, over the course of decades, for "employees who terminated prior to age 50 to age into early retirement benefits." Id. (citing Moon v. E.I. DuPont de Nemours & Co., No. 19-1856, 2021 WL 2555503, at *1 (D. Del. June 21, 2021)).

### 1. The Plan's Definition of "Employee" May Be Ambiguous

For the reasons stated above, the Court rejects, at the pleading stage, Defendants' argument that the Court can and should construe the Plan as a matter of law in favor of Defendants.  The Supreme Court has held that the word "employee" can be subject to different interpretations.  See Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318 (1992).

### 2. Plaintiffs Have Pled Sufficient Facts to Adequately Allege that the Administrative Committee Acted Unreasonably in Denying Early Retirement Benefits

Given that term "employee" may be ambiguous under the Plan, the next question is whether the Plan Administrator acted reasonably in the denial of Plaintiffs' Early Retirement benefits. Plaintiffs have pled sufficient facts to allege that the Administrative Committee did not act reasonably in terminating their rights to Early Retirement or Rule of 85 unreduced early retirement under the Plan, and that they had a legally enforceable right to benefits under the Plan.  See Glaziers & Glassworkers Union Loc. No. 252 Annuity Fund v. Newbridge Sec., Inc., 93 F.3d 1171, 1182 (3d Cir. 1996).

Additionally, this reasonability inquiry is best left for a Rule 56 motion or for a jury, as the trier of fact; at the Rule 12(b)(6) stage is premature.  See Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 77-78 (3d Cir. 2011); Jordan v. Fed. Express Corp., 116 F.3d 1005, 1016-17 (3d Cir. 1997); Spear v. Fenkel, No. 13-02391, 2015 WL 3643571, *8 (E.D. Pa. June 12, 2015) (Lloret, J.).

The Court rules that the same conclusions are required as to Plaintiffs' claims pursuant to:

      a.      29 U.S.C. § 1132(a)(1)(B), claim for benefits (Count II);

b.      29 U.S.C. § 1104 and 29 U.S.C. § 1105, breach of fiduciary duty and co-

fiduciary duty (Count III); and

c.      29 U.S.C. § 1140, interference with protected rights (Count IV).

## V.    Conclusion

The Court will not discuss or rule on the Defendants' assertion that the state law claims

(Count V) are preempted, although this result may be required at a later stage of the proceedings.

Likewise, the Court will not discuss or rule on Defendants' arguments as to whether the Settlement

Agreement and General Release allegedly executed between Specialty Products and Newton bars

any of the claims, although, again, this result may be required at a later stage.

Reading the Complaint fairly, Plaintiffs have alleged conduct by the Defendants that could

be in violation of ERISA, depending on the quality of proof, and rulings on the interpretation of

the Plan, after discovery.  From Third Circuit precedent, as cited by Plaintiffs, the Court must

allow discovery on ERISA allegations that suggest misleading conduct and misrepresentations, as

plaintiffs have done here.  The so-called "spin off" might have been a strategy to deprive long-

term employees of benefits they had reason to expect.  ERISA provides for equitable remedies if

plaintiffs are able to prove their claims.

Reviewing the Defendants' Reply brief, the arguments which Defendants make may have

validity, but only after the close of discovery.  Given the specific allegations, and the Third Circuit

jurisprudence on ERISA cases, Plaintiffs deserve an opportunity for discovery.  There may be

factual and/or legal issues as to who is included as an "employee" and whether Plaintiffs have any

claim for equitable relief based on statements and representations made by Defendants over the

years.  However, the Court rejects Defendants' arguments that Plaintiffs have failed to sufficiently

allege reasonable reliance on representations and related arguments by Defendants.  Whether

17

Plaintiffs are eligible for early retirement or for "optional retirement benefits" may require interpretation of language in the Plan and other issues which might benefit from discovery.

For the foregoing reasons, Defendants' motion to dismiss will be denied.  An appropriate Order follows.

O:\CIVIL 21\21-3966 Cockerill et al v. Corteva, Inc\Memorandum_Motion to Dismiss.docx