## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT F. COCKERILL, CHRISTOPHER WILLIAM NEWTON, and OLIVER MAJOR, individually and as representatives on behalf of a class of similarly situated persons,<br><br>Plaintiffs,<br><br>vs.<br><br>CORTEVA, INC.; DUPONT SPECIALTY PRODUCTS USA, LLC; DUPONT DE NEMOURS, INC.;<br>E.I. DU PONT DE NEMOURS AND COMPANY; THE PENSION AND RETIREMENT PLAN; THE BENEFIT PLANS ADMINISTRATIVE COMMITTEE<br><br>Defendants. | Case No.: 2:21-cv-03966-MMB<br><br>**Complaint – Class Action**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA AND STATE LAW**<br><br>**JURY TRIAL DEMANDED AS TO STATE LAW CLAIMS** |

Plaintiffs, Robert F. Cockerill, Christopher Newton, and Oliver Major ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following:

### I.       PRELIMINARY STATEMENT

1.       Plaintiffs are participants in the Pension and Retirement Plan, formerly titled the U.S. DuPont Pension and Retirement Plan (the "Plan"), a "defined benefit pension plan" within the meaning of 29 U.S.C. § 1002(35). Plaintiffs bring this action on their own behalf and on behalf of all similarly situated participants, their beneficiaries and estates, pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA") and seek, for themselves and on behalf of one or more classes of Plan participants and their

1

beneficiaries, declaratory, permanent injunctive and other appropriate equitable and remedial plan-wide relief as follows.

## II.    JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and under the specific jurisdictional statute for claims brought under ERISA, 29 U.S.C. § 1132(e), (f). The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. Additionally, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the case involves citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

3.    Pursuant to 29 U.S.C. § 1132(e)(2), venue is proper in this District, in that the Defendants may be found in this District and/or because one of the Plaintiffs and other participants in the Plan earned and accrued pension benefits while residents within this district, and pursuant to 28 U.S.C. § 1391(b).

## III.    PARTIES

### A.    Plaintiffs

4.    Plaintiff Robert F. Cockerill is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7). He resides in Kennett Square, Pennsylvania.

5.    Plaintiff Christopher William Newton is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7). He resides in Richmond, Virginia.

6.    Plaintiff Oliver F. Major is a participant in the Plan, within the meaning of 29 U.S.C. § 1002(7). He resides in Middletown, Delaware.

**B.     Defendants**

7.     Defendant Corteva, Inc., ("Corteva") is a Delaware corporation with its corporate headquarters located at 974 Centre Road, Building 735, Wilmington, DE 19805. As of June 1, 2019, Corteva is the parent company of the historical E.I. du Pont de Nemours and Company ("historical DuPont") and is the entity with responsibility for the administration of the Plan. Since that time, Corteva has been responsible to appoint the members of the Administrative Committee that is the named Plan Administrator. In these roles, Corteva is a fiduciary under ERISA with respect to the Plan.

8.     Defendant DuPont Specialty Products USA, LLC ("Specialty Products"), is a Delaware corporation and now a subsidiary of DuPont de Nemours, Inc. Prior to June 1, 2019, Specialty Products was a subsidiary of DowDuPont Inc. ("DowDuPont"). Prior to the merger of Dow and DuPont on August 31, 2017, Specialty Products was a subsidiary of historical DuPont. Specialty Products was, at all relevant times, the company for which Mr. Newton worked and for which Mr. Cockerill worked and continues to work. In this capacity, Specialty Products made numerous misrepresentations to both Mr. Newton, Mr. Cockerill, Mr. Major and members of the Class over many years leading up to the merger of Dow and DuPont and continuing after the merge of Dow and DuPont, about their eligibility for early retirement benefits if they fulfilled certain conditions.

9.     Defendant E.I. Du Pont de Nemours and Company is a Delaware company founded more the 200 years ago and, as such, was one of the oldest companies in the United States. For over 110 years, E.I. Du Pont de Nemours and Company sponsored the Plan, one of the oldest pension plans in this country. Historical DuPont also acted as a fiduciary under ERISA with respect to its appointment of the members of the Committee that is the named Plan Administrator.

Historical DuPont, through its former subsidiary Specialty Products, also employed Mr. Cockerill, Mr. Newton, Mr. Major and many other Class members and Plan participants and communicated with these employees about the Plan. As of June 1, 2019, Historical DuPont has ostensibly ceased to exist except as a paper subsidiary of Corteva, although most of its businesses continue to operate under the similarly named DuPont de Nemours, Inc. ("new DuPont").

10.     Defendant DuPont de Nemours, Inc. is a Delaware corporation with its corporate headquarters located at 974 Centre Road, Building 730, Wilmington, Delaware, 19805.

11.     The Pension and Retirement Plan, previously named the U.S. DuPont Pension and Retirement Plan ("Plan") is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). It is also a "defined benefit pension plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

12.     Defendant The Benefit Plans Administrative Committee ("Administrative Committee") is the "Plan Administrator" and "named fiduciary" of the Plan, pursuant to Title I, Section II of the Plan documents. Under the Plan, the Administrator has authority to adopt rules, regulations, and policies for the Plan's administration, to make eligibility and other benefits determinations under the Plan, and to interpret and/or effectuate the Plan. Thus, the Administrative Committee is the "Administrator" of the Plan, within the meaning of 29 U.S.C. § 1002(16)(A)(i); a plan fiduciary with discretionary authority to manage and administer the plan within the meaning of 29 U.S.C. § 1002(21)(A); and a named fiduciary of the Plan with the authority and control to manage the operation and administration of the Plan within the meaning of 29 U.S.C. § 1102(a)

## IV.    FACTS

### History of the Plan

13.    The Plan was originally adopted effective September 1, 1904, making it one of the oldest defined benefit pension plans in the United States.

14.    On December 11, 2015, the 217-year-old historical DuPont announced its intent to merge with Dow Chemical Company.

15.    In November 2016, participants were notified of DuPont's intent to freeze the Plan so that no new benefits would accrue to participants in the Plan and no new employees would become eligible to participate in the Plan. Frequently Asked Questions and Answers were distributed to the participants explaining the "freeze." Question 9 asked "What is changing with the Pension Plan?" The answer stated:

> The Pension Plan benefit is calculated using pay and years of service. The pay and service amounts used to calculate your pension benefit will stop growing on November 30, 2018. Your Pension Plan benefit formula will use your pay and years of service as of November 30, 2018 to calculate your benefit. **Your Pension Plan will continue to recognize growth in age and service with the company after November 30, 2018 to determine any applicable early retirement reduction factors.** Continuing service with the company, even after November 30, 2018, may ensure you receive 100% of your benefit. (Emphasis Added).

16.    Question 10 asked "How do I find out if early retirement reduction factors will be applied to my Pension Plan benefit?" The answer stated:

> Depending on the age at which you retire and your years of service, you may receive less than 100% of the value of your benefit (reduced pension). The amount by which your Pension Plan benefit is reduced to reflect early commencement is known as an early retirement reduction factor. Continuing service with the company, even after November 30, 2018, may ensure you receive 100% of your benefit.
>
> Generally, as an employee who participates in the DuPont (parent company) section of the Pension Plan, you can receive a reduced

5

pension at age 50 and 15 years of service and may be able to receive 100% of the value of your benefit as early as age 58 depending on your service when you terminate employment and your age when you begin payments. The table below illustrates how the early retirement reduction factors are applied to your Pension Plan benefit.

**DuPont (Parent Company) Early Retirement Reduction Factor Chart**

| AGE AT PAYMENT DATE | 15-20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 and over |
|---|---|---|---|---|---|---|---|---|
| 65 | 100% | | | | | | | |
| 64 | 95 | 100% | | | | | | |
| 63 | 90 | 95 | 100% | | | | | |
| 62 | 85 | 90 | 95 | 100% | | | | |
| 61 | 80 | 85 | 90 | 95 | 100% | | | |
| 60 | 75 | 80 | 85 | 90 | 95 | 100% | | |
| 59 | 70 | 75 | 80 | 85 | 90 | 95 | 100% | |
| 58 | 65 | 70 | 75 | 80 | 85 | 90 | 95 | 100% |
| 57 | 60 | 65 | 70 | 75 | 80 | 85 | 90 | 95 |
| 56 | 55 | 60 | 65 | 70 | 75 | 80 | 85 | 90 |
| 55 | 50 | 55 | 60 | 65 | 70 | 75 | 80 | 85 |
| 54 | 50 | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 53 | 50 | 50 | 50 | 55 | 60 | 65 | 70 | 75 |
| 52 | 50 | 50 | 50 | 50 | 55 | 60 | 65 | 70 |
| 51 | 50 | 50 | 50 | 50 | 50 | 55 | 60 | 65 |
| 50 | 50 | 50 | 50 | 50 | 50 | 50 | 55 | 60 |

YEARS OF SERVICE

17.    The merger of Dow and DuPont closed August 31, 2017, creating the combined entity DowDuPont.

18.    The merger was designed to combine the two entities and then spin-off into three separate entities: Corteva, Inc., focusing on agricultural chemicals, a new Dow, Inc., focusing on materials science, and a new DuPont de Nemours, Inc., focusing on specialty product industries, the industry in which the Plaintiffs worked.

19.    In a Question and Answer in 2018 about the effect of the spin-off on the Plan for active employees, the question was asked: "I am currently a participant in DuPont's U.S. Pension Plan and will be an employee of Specialty Products in the US. How does this affect my pension?" The answer:

> The spin of DuPont and Corteva Agriscience will impact Specialty Products employees as follows:
>
> Since Corteva Agriscience will be the ongoing sponsor of the Plan, Specialty Products employees who participate in the Plan will be eligible to commence their pension, at spin, if they meet the Plan commencement requirements in terms of age and service.
>
> At spin, future service for Specialty Products employees who participate in the Plan will no longer be recognized in determining eligibility for pension benefits and any applicable early retirement reduction factors. For those employees who qualify for retirement by meeting the Plan's age and service requirements, **growth in age will continue to be recognized allowing those participants to age into an improved reduction factor prior to commencing their pension**.

20.    In March 2019, a presentation was made available for participants in the Plan who were hired or rehired as Full-Service Employees prior to January 1, 2007, and who had, or would have, obtained at least age 50 with 15 years of service as of May 31, 2019. This presentation informed participants in this category who were not immediately eligible for an unreduced pension at the time of the spin-off that, "following your transition to New DuPont, . . . your reduction factor will be based on your service calculated based on your age as of May 31, 2019, **and your age on the date you elect to commence benefit payments**." This presentation further informed these participants:

> If you are entitled to an immediate early reduced pension, your monthly benefit payments will be reduced due to commencing benefits early. You may choose to defer the benefit to decrease or eliminate the reduction. In that case, you will get a larger monthly benefit when you commence your payments in the future.

21.    A similar presentation was made available for participants in similar circumstances who were transitioning to New DuPont who had not yet obtained age 50 as of May 31, 2019. This presentation used identical language to inform these participants that "deferring the

benefit to decrease or eliminate the benefit as you age," assuring them that if they do so, they "will get a larger monthly benefit when you commence your payments in the future."

22.     The presentation notified the age 50 group that they would be considered a "retiree" as of June 1, 2019. The presentation further notified employees who had the age and service for an *unreduced* pension benefit as of June 1, 2019, that they could commence their benefit immediately.

23.     The presentation also provided that participants who were age 50 but who would receive a reduced pension benefit as of June 1, 2019, could wait until they reached an age where the benefit was no longer reduced. Specifically, the presentation stated: "If you are entitled to an immediate early reduced pension, your monthly benefit payments will be reduced due to commencing benefits early. You may choose to defer the benefit to decrease or eliminate the reduction. In that case, you will get a larger monthly benefit when you commence your payments in the future."



Now we'll shift gears and take a closer look at reduced pension benefits.

If you are entitled to an immediate early reduced pension, your monthly benefit payments will be reduced due to commencing benefits early. You may choose to defer the benefit to decrease or eliminate the reduction. In that case, you will get a larger monthly benefit when you commence your payments in the future.

24.     As of June 1, 2019, the Plan (along with a company denominated "E.I. Du Pont de Nemours and Company" or "historical DuPont"), including all pension liabilities was moved to Corteva. Neither Specialty Products nor any of its business units were moved to Corteva. This move was specifically designed for the new DuPont to divest itself of any future funding obligations and liabilities of the Plan.

25.     Corteva is now responsible for funding and administration of the pension benefits for over 100,000 participants even though the majority of active participants have never worked in the businesses now operating as Corteva. In comparison, Corteva has only about 21,000 total employees.

26.     The spin-off created a new parent company that took on the historical DuPont name and logo and most of the historical DuPont businesses, including Specialty Products. The spin-off also created a nominal subsidiary of the newly formed Corteva that was dubbed the continuation of the 217 year-old historical DuPont although it retained none of that venerable DuPont's business operations, but nevertheless was deemed the Plan's sponsor with the obligations and duties delegated to the Plan sponsor under ERISA and the Plan. The employees of DuPont nearly all remained in the same location and engaged in the same activities.

**Robert F. Cockerill**

27.     Mr. Cockerill, like many members of his family over three generations, spent most of his working life in the employ of DuPont. Mr. Cockerill's maternal grandfather worked for DuPont as a Research Chemist for over 30 years from the 1940's to the 1970's in the areas of agricultural and polymer product development and processing (and also worked on the Manhattan Project as a DuPont Scientist on loan to the U.S. government during WWII).

28.     Mr. Cockerill's paternal grandmother worked for DuPont for several years in the 1940's as an administrative assistant in Delaware prior to starting a family with his paternal grandfather who also retired from DuPont after more than 30 years of service as a chemical engineer and plant manager across multiple locations from the 1940's to the 1970's.

29.     Mr. Cockerill's father worked for DuPont from approximately 1966 until 2004 in the Nylon and Polymers departments. He worked as a Chemical Engineer and Manufacturing and Project Manager during his career, relocating twice during that time in 1978 and 1981. In 2001, at the age of 58, he retired and began receiving an early full pension benefit under the Plan's "rule of 85," which has long been a feature of the Plan that allows an unreduced early retirement if an employee's age plus years of service equals 85.

30.     Mr. Cockerill himself has worked for DuPont since June of 1992, starting as a Chemical Engineer out of college and progressing through many roles in Process Engineering, Product R&D, Operations Management, Product Management, Sales, Marketing, Strategic Planning and Mergers/Acquisitions. During Mr. Cockerill's 29 years, his family has been relocated seven times to locations in Texas, North Carolina, Pennsylvania, Delaware and California. Mr. Cockerill has traveled for work extensively during his career, in some years spending as much as 35% of his time away from his family.

31.     In 1996, DuPont moved Mr. Cockerill and his family from Victoria, Texas (Plant Process Engineer-DuPont Nylon) to Raleigh, North Carolina (Process/Product Development Engineer – DuPont Electronics). Mr. Cockerill's spouse had to resign from her teaching position in Texas and spend an entire year unemployed while obtaining qualifications for a teaching license in North Carolina. Resigning from her Texas teacher position meant abandoning the years she had accumulated under the Texas teacher retirement system. But the family believed that this sacrifice

would help them achieve Mr. Cockerill's goal of obtaining unreduced early retirement benefits under the Plan.

32.    In 2000, DuPont again moved Mr. Cockerill's family, from Raleigh, North Carolina to Beaumont, Texas (Operations Manager – DuPont Nylon). This time Mr. Cockerill's spouse had to resign from her teaching position in North Carolina and abandon her years toward the North Carolina State Employees Retirement System.

33.    In 2002, Mr. Cockerill's family was forced to pull up roots once again and move from Beaumont, Texas to Towanda, Pennsylvania (Operations Manager – DuPont Electronics). At that time, their daughter had just entered kindergarten and Mr. Cockerill's spouse was planning to return to teaching but was forced to abandon these plans when they learned they would soon be moving again.

34.    In 2004, only two years after they arrived in Towanda, Pennsylvania, DuPont moved the family again to Raleigh, North Carolina (Product/Marketing Manager DuPont Electronics). Because they were only in Pennsylvania a short time, Mr. Cockerill's spouse was not able to complete requirements to obtain a Pennsylvania Teachers License and secure a teaching position during this stop. Instead, she was limited to tutoring and part time work while in Pennsylvania.

35.    In 2011, Mr. Cockerill's family was moved from Raleigh, North Carolina to Sunnyvale, California (Business/Integration Leader for acquired company Innovalight, Inc.). Mr. Cockerill's spouse had resumed teaching in North Carolina, where she had been previously licensed and had to resign her position again and abandon the North Carolina Teacher Retirement System. The Cockerill's daughter had to change high schools after completion of her freshmen

year and their son during middle school after completing seventh grade in North Carolina. This was an especially difficult move for their daughter during high school.

36.    In 2015, Mr. Cockerill's family was moved from Sunnyvale, California to Raleigh, North Carolina (Marketing Manager – DuPont Electronics). Mr. Cockerill's spouse was able to get licensed to teach in California but was never able to secure a teaching position due to the fiscal shortages in California schools and lack of position availability. She was able to work as a part time teacher's assistant while in California and was eligible for a retirement benefit but once again had to abandon any significant accumulation of a pension upon leaving the state. Their daughter was in college at the time of this move and unaffected, but their son had to change high schools between Junior and Senior year which was difficult for him.

37.    In 2016, the Cockerills were moved from Raleigh, North Carolina to Corporate Headquarters in Wilmington, Delaware (Product and Sales Manager -DuPont Tedlar Fluorinated Film). Though employed in Delaware, the family resides in Landenberg, Pennsylvania. Mr. Cockerill's spouse was not able to secure a teaching position during their short time in North Carolina of less than one year.

38.    The Cockerills currently reside in Landenberg, Pennsylvania where Mr. Cockerill's spouse has been unable to obtain a full-time teaching position with benefits/pension opportunity in Landenberg. Indeed, because she is over 50 years of age and has had a very inconsistent employment history due to their frequent relocations, she has had difficulty getting strong consideration in competition with younger candidates who would receive lower salary due to their age and experience. West Chester University is a local University with a recognized education program, graduating 250-300 new teachers each year making this an especially difficult area to find employment for experienced and higher salaried teachers. Mr. Cockerill's spouse is currently

employed by a private company that provides contracted paraprofessionals working with special needs children in a local high school. This position offers no retirement benefits.

39.    Because of the family's repeated moves, Mr. Cockerill's spouse's longest employment was over two periods in North Carolina, for a total of 5 years. Had the family stayed in North Carolina from 1996 to the present, her salary would be over $50,000 per year and she would have accrued 25 years participation in the North Carolina Teacher Retirement System, which continues to provide medical benefits to participants and families in retirement. At age 58, she would have qualified for approximately $23,000 per year in pension benefits, plus medical benefits for herself and her spouse in retirement. Due to the constant relocations, she has not qualified for any pension benefits, including medical benefits, with any of the school systems for which she worked. This has affected the whole family because DuPont eliminated health and dental benefits for retirees who did not meet a certain cutoff date, which includes Mr. Cockerill.

40.    Mr. Cockerill was always aware of and intended to take early retirement at the age of 58 once his years of service as his father had done under the rule of 85 feature of the Plan that has been available to all DuPont employees for more than 30 years. The relocations and sacrifices his family made were all toward the goal of achieving early retirement at age 58.

41.    At the time the spin-off was finalized on June 1, 2019, Mr. Cockerill had over 26 years of qualified service with historical DuPont and then DowDuPont within the meaning of the Plan and he had attained the age of 49.85278.

42.    Unbeknownst to Mr. Cockerill the spin-off was intended to divest him of his early retirement benefits because, according to Corteva's interpretation of the spin-off as it relates to the Plan, the spin-off terminated Mr. Cockerill's employment from the Plan Sponsor (historical DuPont/Corteva) even though he continued in the same job at the same location with DuPont

13

Specialties Products under the former DowDuPont and was certainly not "terminated" in the typical way that termination is understood by an employee. In fact, Mr. Cockerill continues his work for DuPont Specialty Products to this day. The only difference being that the early retirement benefit Mr. Cockerill and his family had carefully planned for and made personal and financial sacrifices towards the goal of achieving, has been taken away from him and his family due to an incomprehensible and illogical interpretation of what "termination of employment" means in the context of a series of corporate spin-offs that split off the Plan sponsor of his Plan from his actual employer.

43.    Mr. Cockerill has never worked in any of the Agricultural Products businesses which were spun off to create Corteva. Nor has he ever been employed by Corteva, which has now become the Plan sponsor of the DuPont Pension Plan. Over his dedicated career, Mr. Cockerill has directly created value of over $1 billion in new product developments and over $1 billion in sales and business success for business lines that no longer support the Plan but that continue to benefit Specialty Products. The business lines for which he worked and continues to work have nothing to do with Corteva or its agricultural businesses.

44.    Mr. Cockerill's entire career was designed around an early retirement. When the Plan was frozen in 2018, cutting out accruals for additional years of service, Mr. Cockerill's earliest opportunity to apply for unreduced early retirement under the Rule of 85 was age 58.5 (i.e., since years of service would no longer count toward the benefit

45.    he needed to be a half year older to meet the age plus years of service equal to 85). So long as he was not fired and did not leave his employment before he reached the age of 58.5, Mr. Cockerill had been promised and therefore believed that he would be eligible for an unreduced

14

Early Retirement Benefit, and he and his family built their retirement plans around this promised benefit.

46.     Mr. Cockerill had been advised by many colleagues early in his career that working in the environment of a chemical plant does not lead to long life in retirement and that he should work hard to get away from such an environment and plan to retire early since there are no guarantees in life and often DuPont retirees do not live long after they retire.

47.     Over the more than 20 years that he worked for DuPont, Mr. Cockerill and his spouse continuously discussed his plan to retire at age 58. Mr. Cockerill's pension benefit was to be the primary component to their retirement income and was a key factor in his accepting the numerous relocations, even at the expense of his spouse's opportunity to grow her own income and retirement benefits (both medical and financial).

48.     When the company began to curtail retirement benefits in 2006, Mr. Cockerill began to model his retirement pension value to understand what the pension he would receive if he retired immediately upon reaching 58 years of age, and also to understand what impact an even earlier retirement might have. The modeling was performed using his age, salary and service information and following the pension calculation formulas that had been provided by DuPont human resources. The results of the models estimated the benefits he would receive based on an early retirement at the age of 58 as well as estimates of retiring between the ages of 50 and 58.

49.     During Mr. Cockerill's employment there were some notable changes to the pension benefits, which he reviewed with a keen eye and continued to monitor as he navigated toward retirement. First, in 2006, the company significantly reduced the calculation methodology for pension benefits and closed the program to any unvested employees. At the time of the announcement, Mr. Cockerill had just past the threshold to be included in the group of employees

15

who would continue to accrue benefits under the Plan. He was relieved to hear this news while at the same time very disappointed and sympathetic to other hard-working employees who would not qualify for a pension.

50.     Ten years later, in 2016 the company announced that all pension formulas would be frozen with no further growth of benefits for vested employees. While again disappointed in this significant change in the pension plan which Mr. Cockerill worked so hard to obtain, including by relocating his family numerous times, and accepting reduced salary knowing he would be entitled to a pension, he marched on with his mission to retire at age 58. He did so despite being approached numerous times during his career with other employment opportunities which he declined to pursue due to the long family history and loyalty to DuPont and the time already invested towards his early retirement at age 58.

51.     After so many years of hard work and sacrifice for DuPont and careful planning for retirement, Mr. Cockerill was crestfallen when he learned in early 2020 that the spin-off had significantly reduced his pension benefit. DuPont has maintained an employee information/data portal called "DuPont Connection" for many years where employees can review their benefits information. However, in early 2020, he received a notification that employees were now directed to the "Corteva Connection" portal as the pension information would no longer be visible in DuPont Connection. Mr. Cockerill located the web portal and established his account. Navigating through the information he landed on the page for his pension benefit and was shocked to see that his earliest unreduced retirement date was changed to 2034 versus his planned date in 2027. Any retirement prior to the 2034 date per the current company position would result in a 5% reduction for each year so retiring as planned would result in a 35% lifetime reduction. He was never told that this would be the case before or after the spin-off and never suspected that this was possible.

52.     Mr. Cockerill contacted the Corteva Connection Customer service line to question what he assumed was an error with regard to when he could qualify for full retirement benefits but was informed it was not an error and that he should discuss the matter with DuPont human resources.

53.     Mr. Cockerill immediately scheduled a meeting with Lisa White (DuPont Corporate Human Resources for Pension Affairs), who confirmed that the date was correct based on the design and terms of the separation of Corteva, Dow and DuPont and due to the fact that the Plan was transferred to Corteva.

54.     Around November of 2018, when the announcement was made that Corteva would be taking over the Plan, Mr. Cockerill reviewed the 2018 Q&A document that was shared with all DowDuPont employees. As a manager of other employees, it was Mr. Cockerill's responsibility to understand the changes that would impact employees and be able to answer any questions and support any concerns employees might have. As described in Mr. Cockerill's appeal, the language in this Q&A did not make clear the underlying impact of the changes intended by DowDuPont management.

55.     Moreover, as a manager Mr. Cockerill was aware that employees were continuing to age into early retirement. He had no reason to believe that the spin-off would eliminate participants' ability to retire once they reached their desired retirement age so long as they had the requisite number of years of service.

56.     Mr. Cockerill has been in a leadership role for more than 20 years and is very experienced at both writing and interpreting such Q&A's, but DuPont and Corteva's plan to cut off early retirement benefits for worker such as himself was not in any way apparent from the Q&A document, which instead obscured this critical fact. Nor was the distribution of the Q&A

document about the effect of the spin-off on the Plan consistent with prior communications about changes to the Plan. For example, historically when there were changes to the Plan, human resources would hold meetings with participants and discuss the effects of the changes on the employees. There would be specific site meetings with human resources consultants who would provide PowerPoint presentations. They would take roll and document attendance to ensure that all participants were properly informed of Plan changes. None of this happened in November 2018. Instead, Mr. Cockerill and other affected employees were left to try to understand an unclear and misleading document on their own.

57.    Consequently, Mr. Cockerill believes that the majority of employees would not and still do not understand the intent of the companies to take away promised early retirement benefits through a corporate sleight of hand that ostensibly transformed current employees into terminated employees. An employee in the human resources department of Corteva disclosed to Mr. Cockerill that 7,000 of the 23,000 employees of DuPont Specialty Products would be negatively affected by this change, most of whom are likely still in the dark and do not understand what has been taken away from them. Despite this large number of affected employees, there was no presentation given to these employees, no communication provided other than the Q&A, which did not even provide managers with enough information to understand the impact on early retirement benefits.

58.    When Mr. Cockerill first learned that he was "terminated" as a result of the spin-off of Corteva he requested approval to qualify for benefits under the Optional Retirement at Involuntary Termination provision of the Plan. This request was denied. Mr. Cockerill asked why this option was not available to him and in response DuPont Human Resources stated that he was not terminated but, rather, "divested" and therefore the Optional Retirement provision did not apply.

59.    On February 4, 2020, Mr. Cockerill filed a Level I appeal for benefits, which was denied on May 11, 2020. The denial letter stated that Mr. Cockerill was age 49 years and 9 months with 27.9 years of service when he was terminated from the company. It further stated that he was involuntarily terminated, that he was not terminated due to dishonesty, insubordination or other misconduct. Finally, the letter stated that he was terminated due to the divestiture rather than due to lack of work and was, therefore, ineligible for Optional Retirement at Involuntary Termination. It also stated that "your eligibility service that determines reduction factors stopped on May 31, 2019, when your employment ended with DuPont (Corteva) with your age below 50 at the time of termination. Therefore, as per the rule 85 (age + service = 85), you will not qualify for an unreduced pension at the age of 58, and your request is dnied [sic]."

60.    On June 12, 2020, Mr. Cockerill filed a Level II appeal pursuant to the Plan requirements, which was denied on September 4, 2020. Corteva informed him that as of May 31, 2019, he was 49.85278 years of age and that his employment was terminated on that date. Because he was not yet eligible for early retirement, he was not eligible for the rule of 85 benefit.

61.    The June 12, 2020, letter also stated "Please note that in November 2018, the Benefit Plans Administrative Committee, the Plan Sponsor, reviewed the applicability of the Optional Retirement provision [Section IV.D. of the Plan], and determined that Optional Retirement is not applicable when employment is terminated in connection with a corporate spin-off, consistent with the intent of the Plan provisions and consistent with past practices. You are therefore not eligible for the Optional Retirement benefit as you did not terminate employment due to lack of work, but due to the corporate spin-off activity."

**Christopher William Newton**

62.    Mr. Newton became an employee of E.I. du Pont de Nemours and Company on September 7, 1999, in the business of Advanced Fibers Systems, which later became a subsidiary of DuPont Specialty Products on February 1, 2019.

63.    Mr. Newton was hired as an engineer in industrial manufacturing process to make aerospace structural honeycomb materials known as Nomex paper.

64.    Over his career at DuPont Mr. Newton had stellar performance, which opened new opportunities to work on some of the most challenging projects where DuPont needed to deliver success. For example, he worked on designing and manufacturing Kevlar when the U.S. Military needed protection from improvised explosive devices. Mr. Newton's research work produced the next generation Kevlar with breakthroughs exceeding the goals required to scale up the technology.

65.    Mr. Newton's innovation also pioneered next generation fire protection materials and protection from electrical arc events. His innovations and work at DuPont have likely saved many thousands of lives.

66.    DuPont continues to use Mr. Newton's work today to highlight their innovation in protecting police, military and firefighters.

67.    Mr. Newton received a Pioneering Innovation Award from the American Gas Association recognizing his work with natural gas fire hazard assessments.

68.    During his 19 years of employment, DuPont filed for more than 40 patents for Mr. Newton's inventions, almost all of which are still active as of today and continue to be used by DuPont as flagship technology in the company's multi-billion-dollar business. Mr. Newton's patents are publications of invention of the next generation Kevlar. The first generation of Kevlar

has been a pillar product for DuPont for 40 years and Mr. Newton's inventions will likely be a pillar product for the next 40 years to come.

69.    In 2007, when DuPont made significant changes to the benefit formula under the Pension and Retirement Plan, the company provided participants, including Mr. Newton, with an excel calculator called the DuPont Retirement Benefits Illustrator. The calculator stated that it was a tool that employees like Mr. Newton could use to see comparative ways the redesigned savings and pension plan would impact his retirement benefits. Using this calculator, Mr. Newton was able to project his retirement income based on his estimated years of service, age and salary. Using this retirement calculator, Mr. Newton determined that his ideal retirement age would be 58, the earliest age at which he could retire for an unreduced early retirement using the rule of 85.

70.    On May 23, 2019, just 8 days before the close of the spin-off, and just shy of one year from reaching age 50, Mr. Newton was informed that his position was declared "excess" and he was terminated for lack of work.

71.    On May 23, 2019, Mr. Newton was required to attend a meeting with human resources manager, Claude Stultz, and the DuPont Technology Director, Stephane Bazzana. During the meeting Mr. Newton was presented with a Career Transition Program ("CTP") package. The Director and Mr. Newton discussed the CTP and Mr. Bazzana told Mr. Newton that he was entitled to an enhanced pension under the Plan due to being involuntarily terminated for lack of work and receiving the CTP. The human resources manager handed Mr. Newton a matrix showing the percentages of retirement based on age at payment start date and years of service. He then circled 55% which correlated to 49 years of age and 19 years of service, was Newton's age and service as of July 31, 2019, the date of his termination. Mr. Newton was also told that his percentage benefits would increase the longer he waited after termination to commence benefits.

72.    Using the matrix for the CTP payout with age and years of service, Mr. Newton created his own spreadsheet to determine the amount of income he would receive from the Plan at different ages to compare benefit commencement scenarios. Mr. Newton determined that if he opted to begin receiving a benefit at age 50, he would get 60% of his projected normal retirement benefit of $1,652.29, or $991.37 per month. He noted on the spreadsheet that if he waited until age 60 his benefit would increase to $1,404.45 a month, but that he would lose $118,964.90 in retirement benefits over the ten-year period from age 50 to 60. Based on these calculations, Mr. Newton determined that his optimal date to begin receiving benefits under the CTP program was at age 50 to receive the maximum value.

73.    Mr. Newton's formal termination letter stated that effective May 23, 2019, Newton was released from his assignment and no longer required to report to work. In addition, all access to company facilities and property was terminated on May 23, 2019.

74.    Despite being told on May 23, 2019, that he was no longer employed, was released from his assignments and no longer had to report to work, Mr. Newton's official termination date was set for July 31, 2019, two months after the date of the spin-off.

75.    At the time of the spin-off on June 1, 2019, Newton had 19.72 years of service and was 48.919440 years old.

76.    On June 26, 2019, Mr. Newton emailed Mr. Bazzana, the Global Innovation Director who Mr. Newton reported to, and Mr. Stultz, from human resources, Mr. Newton reminded them that when he was hired in 1999, he was told by management that his base salary was only part of the compensation he would receive and that the pension was of significant value in his total compensation package. This is consistent with the messaging from DuPont to employees about compensation throughout the years.

22

77. On June 26, 2019, Mr. Newton sent an email to Stephane Bazzana, Global Director of and Claude Stultz requesting an adjustment to his service date. Mr. Bazzana responded by email stating that "The Career Transition Program is a consistent way for us to support employees transitioning out of DuPont who have experienced a job elimination due to a reduction in force." He further stated that HR would not change the CTP terms as presented on May 23, 2019.

78. Based on the representations of DuPont, Mr. Newton waited about a year until he was close to 50 to apply for his benefits to commence effective July 1, 2020. Much to his surprise, Corteva sent him a Pension Estimate Calculation Statement listing him as "Deferred Vested" and only entitled to 25% of his normal retirement benefit rather than the 60% he had expected to receive upon turning 50, based on the communications and 19 years of planning.

79. Mr. Newton submitted an appeal explaining that he had been terminated for lack of work under the CTP. Corteva responded that effective on the date of the spin-off, June 1, 2019, Corteva began sponsoring the heritage DuPont CTP and that Newton's CTP was under the new DuPont CTP.

80. Even though Mr. Newton emailed Mr. Bazzana and Mr. Stultz after the date of the spin-off, neither informed Mr. Newton about any new CTP from a new company, and neither notified Mr. Newton that he was now terminated as of June 1, 2019.

81. On March 19, 2021, Mr. Newton, through his attorneys, submitted a Level II appeal arguing he was involuntarily terminated for lack of work and is entitled to a 60% benefit based on his 19 years of service and being age 50 as of July 1, 2020.

82. On July 6, 2021, Mr. Newton's Level II appeal was denied. The Committee found that as a result of the spin-off Mr. Newton "voluntarily terminated" his employment because his employment continued under the new DuPont after the date of the spin-off, even though he never

worked after May 23, 2019. It further found that because the spin-off occurred before the official termination date, Mr. Newton was not terminated for "lack of work." All of this, combined with the Committee's finding that Mr. Newton was not 50 at the time of his termination, reduced his benefit to just 25% of his full retirement benefit. Mr. Newton's only option for a higher pension now is to wait another 15 years from age 50 until he reaches the normal retirement age of 65 before taking his pension at a reduced overall value, even though, having been terminated after a long and loyal career with DuPont, he needs his pension now.

83.    Plaintiffs are informed and believe, and thereon allege, that the Plan and the Committee's interpretation of the Plan prior to the spin-off and prior to administration by Corteva allowed participants to age into early retirement benefits. Participants who had the requisite years of service but who terminated service, voluntarily or involuntarily, prior to reaching the requisite age to qualify under the Rule of 85 could choose to commence their pension benefits as soon as they reached the requisite age.

84.    Plaintiffs are informed and believe, and thereon allege, that the Plan sent notices to participants who had terminated service prior to reaching their earliest retirement age informing them of the earliest date in the future at which they could commence a reduced or unreduced pension benefit.

### Oliver Major

85.    Mr. Major began his career with E.I. du Pont de Nemours and Company in 1997, as an operator in Newark, Delaware for DuPont Dow Elastomers. Mr. Major was a dedicated worker and quick learner, and his contributions to the company led to regular promotions. He quickly progressed to more and more demanding positions, first as a manufacturing supervisor and then in human resources. By 2017, he was promoted to a position as the company's North

24

American Talent Acquisition Leader for Professional Roles. After the spin-off, he remained at DuPont's corporate headquarters in Delaware and was promoted in 2020 to head the Global Talent Acquisition division of DuPont de Nemours, Inc. (also referred to as "DuPont Specialties"). He was terminated on September 30, 2021, as part of a restructuring at DuPont Specialties. Throughout his more than two decades of working at DuPont companies, Mr. Majors was thus recognized as a valued, talented and hard-working employee.

86.    Despite his management position, when the spin-off occurred on May 31, 2019, Mr. Major was not told and as a result had no understanding that Defendants considered his employment with the Plan sponsor to have ended for purposes of his benefits under the Plan and that his benefits would not increase as he aged. Indeed, because he continued to work in the same position and location as he had before May 31, 2019, he naturally believed that he would be entitled to greater Plan benefits as he aged, and that he would receive unreduced benefits by the time he was 59. He was greatly taken aback when he learned that this would not be the case.

87.    On September 30, 2021, Mr. Major's employment with DuPont Specialties was terminated due to "lack of work."

88.    In January 2022, Mr. Major requested a pension benefit calculation for a benefit commencement date of February 1, 2022. After he was informed that he would only be entitled to 70% of his unreduced pension benefit (or $1,584.95) on that commencement date, rather than the nearly 90% Optional Retirement benefit he was expecting, he called Corteva Connections to question this calculation.

89.    Mr. Major was told that he was not eligible for Optional Retirement benefits because he was terminated from the Plan sponsor on May 31, 2019, and this was due to a corporate spin-off and not lack of work.

90.     Mr. Major appealed this determination on January 22, 2022. The Benefit Determination Review Team at Corteva Connections denied this appeal, stating that Mr. Major's involuntary termination on September 30, 2021, had no impact on his pension eligibility, and that his termination from the Plan sponsor on May 31, 2019, was due to a corporate spin-off and not to lack of work. The denial letter pointed to p. 18 of the January 2022 version of the Corteva Agriscience Summary Plan Description ("SPD") for the Plan in reaching this determination.

91.     Mr. Major filed a second level appeal on May 15, 2022. He pointed out that the explanation of Optional Retirement provisions on p. 19 of the 2022 SPD did not state that "involuntary termination" provisions did not apply to current employees of DuPont Specialties, and the fact that he would have to wait an extra three years to receive his unreduced pension was not communicated to him at the time Corteva took on fiduciary responsibility for the Plan. Nor was the impact of the spin-off on pension benefits explained to him despite his management position.

92.     On August 22, 2022, the Corteva Benefits Appeals Committees denied Mr. Major's second level appeal. The denial letter first stated that Mr. Major was ineligible for the Optional Retirement Benefit because he was not terminated for lack of work but "because you were no longer an employee of E.I. du Pont de Nemours and Company or a wholly owned subsidiary due to the Spin-Off." With regard to the unreduced benefit date, the letter reasoned that Mr. Major would have only been eligible for an unreduced benefit at age 58.8 if he had continued employment with the Company after the spin (meaning E.I. du Pont de Nemours and Company), and he did not. Moreover, the letter indicated that Mr. Major had been informed of this change in the Statement he received a month after the Spin-off on July 30, 2019, which showed his earliest unreduced retirement benefit date as September 1, 2028 (when he will be age 63.2). The letter also

pointed to a FAQ sheet that stated that "future service for Specialty Products employees who participate in the Plan will no longer be recognized in determining . . . any applicable early retirement reduction factors," but that "growth in age will continue to be recognized allowing those participants to age into an improved reduction factor prior to commencing their pension."

**Plan Provisions**

93.    Without limitation, the following provisions of the Plan, as amended and restated effective December 16, 2015, along with prior Plan documents, Plan amendments, summary plan descriptions, as well as certain amendments thereafter, are applicable to the allegations of the complaint:

a. Section III provides that normal retirement age under the Plan is the later of age 65 or, for employees who commence participation in the Plan after age 60, the 5th anniversary of the time Plan participation commenced.

b. Section IV A (1) - Normal Retirement Eligibility: "An employee will be eligible for Normal Retirement after reaching age 65 with at least 15 years of service."

c. Section IV B (1) – Early Retirement Eligibility: "An employee will be eligible for Early Retirement after reaching age 50 and prior to reaching age 65 with at least 15 years of service."

d.  Section IV B – Percentage Factor for Early Retirement Pension are as follows:

**PERCENTAGE FACTORS FOR EARLY RETIREMENT PENSION**

| AGE AT COMMEN-CEMENT OF PAYMENT | 15 THROUGH 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 AND OVER |
|---|---|---|---|---|---|---|---|---|
| 65 | 100% | | | | UNREDUCED PENSION | | | |
| 64 | 95 | 100% | | | | | | |
| 63 | 90 | 95 | 100% | | | | | |
| 62 | 85 | 90 | 95 | 100% | | | | |
| 61 | 80 | 85 | 90 | 95 | 100% | | | |
| 60 | 75 | 80 | 85 | 90 | 95 | 100% | | |
| 59 | 70 | 75 | 80 | 85 | 90 | 95 | 100% | |
| 58 | 65 | 70 | 75 | 80 | 85 | 90 | 95 | 100% |
| 57 | 60 | 65 | 70 | 75 | 80 | 85 | 90 | 95 |
| 56 | 55 | 60 | 65 | 70 | 75 | 80 | 85 | 90 |
| 55 | 50 | 55 | 60 | 65 | 70 | 75 | 80 | 85 |
| 54 | 50 | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 53 | 50 | 50 | 50 | 55 | 60 | 65 | 70 | 75 |
| 52 | 50 | 50 | 50 | 50 | 55 | 60 | 65 | 70 |
| 51 | 50 | 50 | 50 | 50 | 50 | 55 | 60 | 65 |
| 50 | 50 | 50 | 50 | 50 | 50 | 50 | 55 | 60 |

**For intermediate age and service combinations, the percentage factor will be interpolated from the above.**

e.  Section IV D (1) – Optional Retirement Eligibility: (a) An employee will be eligible for Optional Retirement after reaching age 50 with at least 15 years of service if his employment would otherwise be involuntarily terminated for reasons other than discharge for dishonesty, insubordination or other misconduct. (b) An employee will be eligible for Optional Retirement after reaching age 45 and prior to reaching age 50 with at least 25 years of service if his employment would otherwise be involuntarily terminated due to lack of work. The length and service required for eligibility shall be reduced by two months, or a proportionate part thereof, for each month or portion thereof which has elapsed since the employee reached age 45.

94.    The Seventh Amendment to the Plan signed December 19, 2019, amended Section

IX K of Title I of the Plan effective January 1, 2021, as follows:

"K.    Right to Modify Plan

The Company reserves the right to change or discontinue this Plan in its discretion. Upon the complete or partial termination of this Plan, an employee who is affected by such termination and is not otherwise entitled to benefits under this Plan shall acquire a vested right to benefits accrued under this Plan to the date of such termination, to the extent then funded. **Prior to January 1, 2021,** any change which has the effect of reducing or terminating benefits under this Plan will not be effective until one year following announcement of such change by the Company, unless the Company deems that the change is necessary or appropriate to qualify or maintain the Plan as one meeting the requirements of the Code with respect to qualified pension plans. Pensions granted pursuant to this Plan, to former employees who were retired or otherwise terminated prior to any such change many not be reduced, cancelled or suspended except as provided under Section VII and paragraph F of this Section. "

95.    The Seventh Amendment to the Plan, signed December 19, 2019, amended Section

IX N of Title I of the Plan, and effective June 1, 2019, reads as follows:

3.    Section IX.N. of Title I of the Plan is amended to read as follows, effective June 1, 2019:

"N.    Transfer of Employment and Multiple Titles

Participation in this Title I shall continue for any employee who transfers on or after January 1, 2012 to an employer who participates in another Title of the ~~DuPont~~ Pension and Retirement Plan unless such transfer is to an employer participating under Title V in which case the effective date to this rule governing transfers (and continuance under Title I) will be on or after January 1, 2009. Such transfer shall not be considered a transfer to an affiliated group company. **Beginning June 1, 2019, participation in this Title I shall continue for an employee for so long as the employee is continuously employed by a U.S. or Puerto Rico legal entity which is wholly owned by Corteva, Inc.**"

96.    The Eighth Amendment to the Plan signed November 30, 2020, amended Section

IV D of Title I of the Plan, effective February 1, 2021, as follows:

1.    Section IV.D.(1)(a) of Title I of the Plan is hereby amended as follows, effective as of February 1, 2021:

"(a)    An employee will be eligible for Optional Retirement after reaching age 50 with at least 15 years of service if his employment would otherwise be involuntarily terminated <u>due to lack of work</u>~~for reasons other than discharge for dishonesty, insubordination or other misconduct~~."

97.    The January 2020 Summary Plan Description sets forth the amount of benefits payable under the Optional Retirement at Involuntary Termination as follows:

## Optional Retirement at Involuntary Termination

If your employment ends because of an involuntary termination (for reasons other than dishonesty, insubordination, or other misconduct), you may be eligible for Optional Retirement if you are an FSE and you are over age 50 with at least 15 years of Eligibility Service. If you're terminated involuntarily due to lack of work and have at least 25 years of Eligibility Service, you may be eligible for Optional Retirement as early as age 45. The 25-year service requirement is reduced by two years for each year past your 45th birthday, as follows:

| Age | Required Service |
| --- | --- |
| 45 | 25 |
| 46 | 23 |
| 47 | 21 |
| 48 | 19 |
| 49 | 17 |
| 50 or older | 15 |

98.    The Optional Retirement section continues to provide:

If you are eligible for a pension due to an involuntary termination as described above, the chart below shows the percentage of your benefit that you will receive, based on your age when benefits begin and your years of eligibility service. For example, if you are entitled to a benefit of $1,000 per month, payable at age 65, and you have 20 years of service, you would receive 90% of your benefit—or $900 a month—if you began taking payments at age 61 instead of waiting until age 65. If you wait until you are age 65, you would then be entitled to an unreduced benefit.

The chart below is used to determine the percentage of pension you can receive in the event of an involuntary termination described above.

| Age When Benefit Payments Begin | If You Have This Many Years of Eligibility Service … | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27+ |
| | This Is the Percentage of Your Benefit That You Will Receive … | | | | | | | | | | | | |
| 65 | 100% | 100% | 100% | 100% | 100% | 100% | | | | | | | |
| 64 | 95% | 95% | 95% | 95% | 95% | 97.5% | 100% | | | | | | |
| 63 | 90% | 90% | 90% | 90% | 92.5% | 95% | 97.5% | 100% | | | | | |
| 62 | 85% | 85% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | | | | |
| 61 | 80% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | | | |
| 60 | 75% | 77.5% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | | |
| 59 | 72.5% | 75% | 77.5% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | |
| 58 | 70% | 72.5% | 75% | 77.5% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% |
| 57 | 67.5% | 70% | 72.5% | 75% | 77.5% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 95% |
| 56 | 65% | 67.5% | 70% | 72.5% | 75% | 77.7% | 80% | 82.5% | 85% | 87.5% | 90% | 90% | 90% |
| 55 | 62.5% | 65% | 67.5% | 70% | 72.5% | 75% | 77.5% | 80% | 82.5% | 85% | 85% | 85% | 85% |
| 54 | 60% | 62.5% | 65% | 67.5% | 70% | 72.5% | 75% | 77.5% | 80% | 80% | 80% | 80% | 80% |
| 53 | 57.5% | 60% | 62.5% | 65% | 67.5% | 70% | 72.5% | 75% | 75% | 75% | 75% | 75% | 75% |
| 52 | 55% | 57.5% | 60% | 62.5% | 65% | 67.5% | 70% | 70% | 70% | 70% | 70% | 70% | 70% |
| 51 | 52.5% | 55% | 57.5% | 60% | 62.5% | 65% | 65% | 65% | 65% | 65% | 65% | 65% | 65% |

| Age When Benefit Payments Begin | If You Have This Many Years of Eligibility Service … | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27+ |
| | This Is the Percentage of Your Benefit That You Will Receive … | | | | | | | | | | | | |
| 50 | 50% | 52.5% | 55% | 57.5% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% |
| 49 | | | 52.5% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% |
| 48 | | | | | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| 47 | | | | | | | 45% | 45% | 45% | 45% | 45% | 45% | 45% |
| 46 | | | | | | | | | 40% | 40% | 40% | 40% | 40% |
| 45 | | | | | | | | | | | 35% | 35% | 35% |

## V.   CLASS ACTION ALLEGATIONS

99.   **Class Definition.** Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All participants in and beneficiaries of the Plan or, if deceased, their Estates, whose employment with DowDuPont or any of its subsidiaries ended as of May 31, 2019, as a result of the DowDuPont spin-off of its agricultural division, now known as Corteva, who did not continue to work for Corteva or any of its subsidiaries as of May 31, 2019, but who continued to be employed by DuPont after May 31, 2019, and had at least 15 years of service as of May 31, 2019, and who have been or will be denied an Early Retirement, Optional Retirement or a Rule of 85 unreduced early retirement benefit;

> **Sub-class A**:

> All participants in and beneficiaries of the Plan or, if deceased, their Estates, whose employment with E.I. DuPont de Nemours and Company  or any of its subsidiaries ended as of May 31, 2019, as a result of the DowDuPont spin-off of its agricultural division, now known as Corteva, who did not continue to work for Corteva or any of its subsidiaries as of May 31, 2019, but who continued to be employed by DuPont after May 31, 2019, and who were age 50 or older with at least 15 years of service as of May 31, 2019, and have been or will be denied an Optional Retirement benefit.

> **Sub-class B**:

> All participants in and beneficiaries of the Plan or, if deceased, their Estates, who were informed they were being terminated for "lack of work" prior to May 31, 2019, and who were at least age 45 with 25 years of Service, age 46 with 23 years of service, age 47 with 21 years of service, age 48 with 19 years of service, or age 49 with 17 years of service as of May 31, 2019, and who have been or will be denied an Optional Retirement benefit.

100. **Numerosity**. Upon information and belief, the Class and Sub-classes are so numerous that joinder of all persons in the class is impracticable. Pursuant to the Plan's most recently available Form 5500 (for plan year ending December 31, 2018), as of January 1, 2018, there were 6,631 participants who had at least 15 years of service and who were not yet age 65. There were 3,432 participants between the ages of 45-64 with at least 25 years of service. Plaintiffs are informed and believe that there are at least thousands of participants who will be denied an Early Retirement, Optional Retirement or the Rule of 85 unreduced early retirement benefit despite meeting the Plan requirements. As a result of the spin-off, the status of 6,700 participants was immediately changed from "active" to "deferred vested." Although the precise number of proposed members of the Class and Sub-classes has not yet been determined, Plaintiffs are informed and believe that a substantial number of Plan participants and beneficiaries who are similarly affected precludes joinder of all affected participants and beneficiaries. Numerosity of the Class and Sub-classes will be ascertained and confirmed by discovery. The number and identity of the Class and Sub-classes members are determinable from the Defendants' records.

101. **Commonality**. There are questions of law or fact common to all members of the Class that concern Defendants' actions, including without limitation:

 a. Whether Defendants acted arbitrarily and capriciously in determining that Plaintiffs and the Class and Sub-classes can no longer age into Early Retirement and Rule of 85 unreduced early retirement.

 b. Whether Defendants Major and Newton and members of the Sub-classes are entitled to Optional Retirement benefits.

c.  Whether Defendants acted arbitrarily and capriciously in determining that Plaintiff Newton was terminated as a result of the spin-off and not for lack of work.

d.  Whether Defendants acted as ERISA fiduciaries with respect to their communications about Plan benefits to Plaintiffs and the Class and Sub-classes.

e.  Whether Defendants actively misinformed or omitted facts that led Plaintiffs and the Class into believing as long as they had sufficient years of service as of the date of the spin-off on May 31, 2019, that they could retire under the Early Retirement provision of the Plan when they reached their desired retirement age.

f.  Whether Plaintiff Newton and Sub-class B members who were terminated for lack of work prior to June 1, 2019, were misled by Defendants into believing they would be entitled to an Early Retirement or Optional Retirement benefit after the date of the spin-off or after the date of their final termination date.

g.  Whether Defendants committed co-fiduciary breaches with respect to their communications to Plaintiffs and the members of the Class and Sub-classes.

h.  Whether Defendants discharged, expelled or discriminated against Plaintiffs and the members of the Class and Sub-classes for the purpose of interfering with their rights to early retirement benefits under the Plan.

i.  Whether, in applying the requirement that a termination be for "lack of work" as provided in the Plan effective February 1, 2021, rather than an involuntary termination "for reasons other than discharge for dishonesty, insubordination or other misconduct," as required in the governing Plan at the date of the spin-off, as amended and restated effective December 16, 2015, Defendants impermissibly

denied and/or cut-back the Optional Retirement Benefits of Mr. Major and other similarly situated participants who were over 50 at the time of the spin-off.

j.   Whether Defendants made promises to Plaintiffs and the Class with respect to early retirement benefits that they intended to induce Plaintiffs to maintain their employment with DuPont, and which did, in fact, induce them to do so.

k.   Whether justice requires that these promises be enforced.

Resolution of these questions will not require individual inquiry into the actions or circumstances of individual Plan participants. These common questions of law or fact center upon whether the Defendants violated ERISA based on their determination that certain participants who were terminated as of the date of the spin-off do not qualify for nor can they age into an Early Retirement, Optional Retirement or Rule of 85 unreduced early retirement under the Plan. Defendants' interpretation is inconsistent with the terms of the Plan and has the effect of denying hundreds or thousands of participants a right to a benefit as defined by the Plan.

102.   **Typicality**. Plaintiffs are members of the Class as defined above. They have all been similarly harmed by the Defendants' actions in violating ERISA and the Plan documents, and in failing to properly protect the Plan and its participants and beneficiaries. They assert the same claims and legal theories under the same provisions of ERISA, and Regulations promulgated thereunder, that all Class members might assert.

103.   **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the absent members of the Class. Because their claims are typical of those of absent members of the Class, Plaintiffs have every incentive to vigorously pursue those claims on behalf of absent Class members. Their interests coincide with, and are not antagonistic to, those of the Class. Moreover, Plaintiffs are represented by counsel experienced in ERISA and complex class action litigation.

104. **Rule 23(b)(1) Requirements**. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants, and a risk of adjudications which as a practical matter would be dispositive of the interests of other members of the Class who are not parties.

105. **Rule 23(b)(2) Requirements**. Defendants have acted and/or refused to act and are likely to act and/or refuse to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and other relief with respect to the Class as a whole.

106. **Rule 23(b)(3) Requirements.** If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate because questions of law and fact common to members of the Class predominate over any questions affecting only individual members.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### (Claim to Clarify Benefits under 29 U.S.C. 1132(a)(1)(B) by Plaintiffs and the Class)
### Defendant Administrative Committee

107. Plaintiffs and the Class repeat and re-allege the foregoing paragraphs as if fully set forth herein.

108. ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), empowers a plan participant to bring suit to recover benefits due him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

109. Plaintiffs have exhausted their administrative remedies required under ERISA and the Plan and have performed all duties and obligations on Plaintiffs' part to be performed under the Plan.

110. Plaintiffs and the Class seek clarification that Defendant Administrative Committee acted arbitrarily and capriciously in interpreting the Plan to extinguish their right to age into an

Early Retirement or Rule of 85 unreduced early retirement under the Plan. The Plan terms, and communications related to the Plan, provide that a participant's Early Retirement, Optional Retirement or Rule of 85 unreduced early retirement are based on the length of service with the employer and the age at which they commence their benefit. Nothing in the Plan, the Summary Plan Description or any communications provides for any other interpretation and, in fact, state the contrary.

**COUNT II**
**(Claim for Benefits and to Clarify Benefits under 29 U.S.C. § 1132(a)(1)(B)**
**by Major and Sub-class A)**
**Defendant Administrative Committee and the Plan**

111.     Plaintiffs and the members of Sub-class A repeat and re-allege the foregoing paragraphs as if fully set forth herein.

112.     Plaintiff Major has exhausted his administrative remedies required under ERISA and the Plan and has performed all duties and obligations on Plaintiff's part to be performed under the Plan.

113.     If Mr. Major is not allowed to age into unreduced early retirement benefits, he seeks Optional Retirement benefits and seeks clarification that he is entitled to these benefits.

114.     Under the terms of the governing Plan document and applicable law, Plaintiff Major and Sub-class A are entitled to Optional Retirement benefits.

115.     In denying Mr. Major's claim for Optional Retirement benefits, the Administrative Committee determined that Mr. Major's employment was terminated as of May 31, 2019, as a result of the spin-off. The Optional Retirement provision in effect as of May 31, 2019, provided that an employee who is at least age 50 with 15 years of service and who is terminated "for reasons other than discharge for dishonesty, insubordination or other misconduct" is entitled to Optional Retirement benefits.

116. By relying on a Plan amendment adopted and effective after the date of the spin-off that eliminated the Optional Retirement for participants who are at least age 50 with 15 years of service who are terminated "for reasons other than discharge for dishonesty, insubordination or other misconduct" and replaced with "for lack of work" the Administrative Committee wrongfully denied Mr. Major's claim for Optional Retirement benefits.

**COUNT III**
**(In the Alternative to Claim I, Claim for Benefits under 29 U.S.C. § 1132(a)(1)(B) by Newton and Sub-class B)**
**Defendant Administrative Committee and the Plan**

117. Plaintiffs and the members of Sub-class B repeat and re-allege the foregoing paragraphs as if fully set forth herein.

118. Plaintiff Newton has exhausted his administrative remedies required under ERISA and the Plan and has performed all duties and obligations on Plaintiff's part to be performed under the Plan.

119. If Mr. Newton is not allowed to age into unreduced early retirement benefits, he seeks Optional Retirement benefits and seeks clarification that he is entitled to these benefits.

120. Under the terms of the Plan and applicable law, Plaintiff Newton and Sub-class B are entitled to Optional Retirement benefits.

121. Defendant Administrative Committee wrongfully denied Newton's claim for Optional Retirement benefits on the basis that Newton was not terminated for lack of work prior to the spin-off.

**COUNT IV**
**(In the Alternative to Claims I, II and III, Claim for Breach of Fiduciary Duty,**
**29 U.S.C. § 1104, and Breach of Co-Fiduciary Duty, 29 U.S.C. § 1105)**
**All Defendants Except the Pension and Retirement Plan**

122. Plaintiffs and the Class and Sub-classes repeat and re-allege the foregoing paragraphs as if fully set forth herein.

123. ERISA Section 404(a), 29 U.S.C. § 1104(a), requires that a fiduciary discharge its duties with respect to a plan solely in the interests of plan participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan, and that a fiduciary act under a prudent person standard of care. These duties include the duty to provide complete and accurate information regarding participants' benefits.

124. ERISA Section 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability under any other provision of ERISA, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if the fiduciary knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.

125. ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a plan participant to file suit to obtain injunctive or other appropriate equitable relief to remedy violations of ERISA.

126. Defendants breached their fiduciary duties under ERISA Section 404 to Plaintiffs and the Class by actively and repeatedly misinforming and omitting material information about their ability to age into an Early Retirement or Rule of 85 unreduced early retirement benefit under the Plan in the years and months leading up to the spin-off.

127. Defendants also breached their fiduciary duties by actively and repeatedly misinforming Plaintiff Newton and Sub-class B and omitting material information about the

38

employees' ability to obtain Optional Retirement benefits at certain percentages tied to their age at the time of commencement of benefits if they were terminated for lack of work.

128. Defendants also breached their co-fiduciary duties under ERISA Section 405 to Plaintiffs and the Class by failing to remedy the breaches of the other fiduciaries, knowingly participating in their breaches and/or enabling their breaches.

129. Plaintiffs and the Class have been harmed by Defendants' breaches of their duties as fiduciaries and co-fiduciaries.

**COUNT V**
**(In the Alternative to Claims I, II, and III,**
**Claim for Interference With Protected Rights, 29 U.S.C. § 1140)**
**All Defendants Except the Pension and Retirement Plan**

130. Plaintiffs and the Class and Sub-classes repeat and re-allege the foregoing paragraphs as if fully set forth herein.

131. ERISA Section 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan" or Title I of ERISA. 29 U.S.C. § 1140.

132. Defendants, acting separately and in concert, have discharged, expelled and otherwise discriminated against Plaintiffs and the Class for purpose of interfering with their attainment of early retirement pension benefits under the Plan.

133. Plaintiffs and the Class have been economically harmed by Defendants' conduct in violation of ERISA Section 510.

## COUNT VI
### (Claim for Impermissible Cutback of Accrued Pension Benefits, 29 U.S.C. § 1054(g))
### Defendants Administrative Committee and the Pension and Retirement Plan

134.    Plaintiffs and the Class and Sub-classes repeat and re-allege the foregoing paragraphs as if fully set forth herein.

135.    Section 204(g)(1) of ERISA, 29 U.S.C. § 1054(g)(1), provides in relevant part that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan."

136.    Section 204(g)(2) of ERISA, 29 U.S.C. § 1054(g)(2), provides in relevant part that "[f]or purposes of paragraph (1), a plan amendment which has the effect of (A) eliminating or reducing an early retirement benefit or retirement-type subsidy . . . with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits."

137.    Defendants Administrative Committee and the Pension and Retirement Plan violated ERISA Section 204(g) by amending the Plan to eliminate Optional Retirement benefits for participants who were at least age 50 with 15 years of service and who were involuntarily terminated for reasons other than discharge for dishonesty, insubordination or other misconduct prior to the effective date of the amendment.

138.    Plaintiff Major and the Class have been harmed by Defendants' conduct in violation of ERISA Section 204(g).

## COUNT VII
### (In the Alternative to Counts I through VII, State Law Claim for Promissory Estoppel)
### All Defendants Except the Pension and Retirement Plan

139.    Plaintiffs and the Class repeat and re-allege paragraphs 1 through 106 as if fully set forth herein.

140.    In Pennsylvania, promissory estoppel allows a court, in the absence of an enforceable contract, to enforce a party's promise where (1) the promisor makes a promise that he

40

reasonably expects to induce action or forbearance on the part of the promisee, (2) the promise does induce action or forbearance on the part of the promisee, and (3) injustice can only be avoided by enforcing the promise.

141. For decades, DuPont employees were consistently told that their base compensation was only one component and that the pension was where the real value was in overall compensation.

142. Here, in order the attract and maintain a talented workforce, that Mr. Cockerill, Mr. Newton, and Mr. Major exemplify, Defendants repeatedly promised Plaintiffs and the Class that they could qualify for full unreduced early retirement benefits under the Plan's Rule of 85 provision so long as they continued to work for DuPont until they met the age and service requirements.

143. Defendants also repeatedly promised Plaintiffs and the Class that they could qualify for reduced early retirement benefits when they reached age 50 if they had at least 15 years of service regardless of whether they continued to work for DuPont.

144. Defendants also promised Optional Retirement benefits at certain percentages tied to an employee's age at the time of commencement of benefits if an employee was terminated for lack of work.

145. As Defendants expected, Plaintiffs and the Class planned their careers around DuPont's promises, remained at DuPont, made break-through innovations that led to numerous patents and billions of dollars in profits for DuPont, gave up other employment opportunities, moved their families and made other sacrifices based on these promises of a comfortable early retirement.

146.   Justice requires that these promises be enforced if this Court determines that Plaintiffs are not entitled to early retirement benefits under the terms of the Plan and that the Defendants were not acting in a fiduciary capacity in making and breaking these promises.

## VII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray this Court enter judgment as follows:

<u>As to Count I</u>

A.   Certify the Class under Federal Rule of Civil Procedure 23, appoint Plaintiffs Cockerill, Newton, and Major as Class Representatives and appoint their attorneys as Class Counsel to represent the members of the Class.

B.   Declare and clarify that Plaintiffs and members of the Class retain the right to age into early retirement benefits.

C.   Declare and clarify that, so long as they continue to work in the same employment as before the spin-off of Corteva, to obtain a Rule of 85 unreduced early retirement benefit.

D.   Award Plaintiffs attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g).

E.   Award such other and further relief as the Court deems equitable and just.

<u>As to Count II</u>

A.   Certify the Sub-class under Federal Rule of Civil Procedure 23, appoint Plaintiff Major as Sub-class A Representative and appoint his attorneys as Class Counsel to represent the members of the Class.

B.   Declare that Mr. Major and all other Sub-class A members are entitled to benefits under the Optional Retirement at Involuntary Termination Provisions of the governing Plan.

C.    Order the Administrataive Committee to cause the Plan to pay Mr. Major the Optional Retirement benefit for which he has applied and qualifies in the event he is not permitted to age into the Rule of 85 unreduced early retirement benefit.

D.    Award Plaintiffs attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g).

E.    Award such other and further relief as the Court deems equitable and just.

As to Count III

A.    Certify the Sub-class under Federal Rule of Civil Procedure 23, appoint Plaintiff Newton as Sub-class Representative and appoint his attorneys as Class Counsel.

B.    Declare that Mr. Newton and all other Sub-class B members are entitled to benefits under the Optional Retirement at Involuntary Termination Provisions of the Plan.

C.    Order the Committee to cause the Plan to pay Mr. Newton the 60% retirement benefit for which he has applied and qualifies in the event he is not permitted to age into the Rule of 85 unreduced early retirement benefit.

D.    Award Plaintiffs attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g).

E.    Award such other and further relief as the Court deems equitable and just.

As to Count IV

A.    Certify the Class under Federal Rule of Civil Procedure 23, appoint Plaintiffs Cockerill, Newton and Major as Class Representatives and appoint their attorneys as Class Counsel to represent the members of the Class.

B.      Certify Sub-class A under Federal Rule of Civil Procedure 23, appoint Plaintiff
        Major as Class Representative and appoint his attorneys as Class Counsel.

C.      Declare that Defendants have breached their fiduciary duties to Plaintiffs and the
        Class members.

D.      Declare that Defendants engaged in co-fiduciary breaches in violation of ERISA
        Section 405, 29 U.S.C. § 1105.

E.      Surcharge Defendants in the amount necessary to place Plaintiffs and the Class
        in the position they would have been in but for the Defendants' fiduciary
        breaches.

F.      Equitably estop Defendants from denying that Plaintiffs and the Class are entitled
        to age into their early retirement benefits.

G.      Equitably estop Defendants from denying Plaintiff Newton and Class A members
        whose jobs were eliminated for lack of work prior to the spin-off and entitled to
        an Optional Retirement benefit under the Plan.

H.      Award Plaintiffs attorneys' fees and costs pursuant to ERISA Section 502(g), 29
        U.S.C. § 1132(g).

I.      Award such other and further relief as the Court deems equitable and just.

As to Count V

A.      Certify the Class under Federal Rule of Civil Procedure 23, appoint Plaintiffs
        Cockerill, Newton and Major as Class Representatives and appoint their attorneys
        as Class Counsel to represent the members of the Class.

B.      Certify the Sub-class under Federal Rule of Civil Procedure 23, appoint Plaintiff
        Newton as Class Representative and appoint his attorneys as Class Counsel.

44

C.     Equitably estop Defendants from denying that Plaintiffs and the Class are entitled to age into their full early retirement benefits.

D.     Equitably estop Defendants from denying Plaintiff Newton and Class A members whose jobs were eliminated because of the spin-off of Corteva were terminated for lack of work and entitled to an Optional Retirement benefit under the Plan.

E.     Award Plaintiffs attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g).

F.     Award such other and further relief as the Court deems equitable and just.

<u>As to Count VI</u>

A.     Declare that, in attempting to apply the requirement of a later enacted Plan amendment in order to deny Optional Retirement benefits to Mr. Major and Sub-class A members, the Committee is violating ERISA's anti-cutback provision, 29 U.S.C. § 1054(g).

B.     Declare that Mr. Major and the Class are entitled to Optional Retirement benefits.

C.     Equitable estop Defendants from violating ERISA Section 204(g) by denying Optional Retirement benefits to Mr. Major and the Class.

D.     Award Mr. Major and the Class Optional Retirement benefits wrongfully denied.

E.     Award Mr. Major and the Class pre-judgment and post-judgment interest on the wrongfully denied Optional Retirement benefits.

F.     Award Mr. Major and the Class attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g).

G.     Award such other and further relief as the Court deems equitable and just.

As to Count VII

A.     Equitably estop Defendants from denying that Plaintiffs and the Class are entitled to age into their full early retirement benefits.

B.     Equitably estop Defendants from denying Plaintiff Newton and Class A members whose jobs were eliminated for lack of work before the spin-off an Optional Retirement benefit under the Plan.


Dated:  April 13, 2023                              KANTOR & KANTOR, LLP

                                                    By:     */s/ Elizabeth Hopkins*
                                                            Elizbeth Hopkins, CA Bar No. 324431
                                                            *(Appearing Pro Hac Vice)*
                                                            Susan L. Meter, CA Bar No. 236133
                                                            *(Appearing Pro Hac Vice)*
                                                            Jaclyn Conover, PA ID # 312449
                                                            19839 Nordhoff Street
                                                            Northridge, CA 91324
                                                            Telephone: 877-783-8686
                                                            Facsimile: 253-285-1849
                                                            ehopkins@kantorlaw.net
                                                            smeter@kantorlaw.net
                                                            jconover@kantorlaw.net

                                                            Edward S. Stone (*pro hac vice*)
                                                            EDWARD STONE LAW, P.C.
                                                            175 West Putnam Ave., 2nd Floor
                                                            Greenwich, CT 06830
                                                            (203) 504-8425
                                                            eddie@edwardstonelaw.com

                                                            Daniel M. Feinberg (*pro hac vice*)
                                                            Nina Wasow (*pro hac vice*)
                                                            FEINBERG, JACKSON, WORTHMAN &
                                                            WASOW LLP
                                                            2030 Addison Street, Suite 500
                                                            Berkeley, CA 94704

                                                            *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of April, 2023, a true and correct copy of the foregoing

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA AND**

**STATE LAW; JURY TRIAL DEMANDED AS TO STATE LAW CLAIMS** was filed using

the court's ECF system, and thereby served copies of same on counsel for all parties of record

registered with the ECF system:

Cory A. Thomas, Esq.
Nipun J. Patel, Esq.
Holland & Knight LLP
Cira Centre
2929 Arch Street, Suite 800
Philadelphia, PA 19104
Cory.thomas@hklaw.com
Nipun.patel@hklaw.com

Todd D. Wozniak, Esq.*
Holland & Knight LLP
1180 West Peachtree Street N.W., Suite 1800
Atlanta, GA 30309
Todd.wozniak@hklaw.com

*admitted Pro Hac Vice

*Counsel for Defendants*

/s/ Susan Peterson
Susan Peterson