**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT F. COCKERILL et al.,**<br>*Plaintiffs,*<br><br>   **v.**<br><br>**CORTEVA, INC. et al.,**<br>*Defendants.* | **CIVIL ACTION**<br><br>**NO. 21-3966** |

**MEMORANDUM RE: CLASS CERTIFICATION**

**Baylson, J.**                                                            **November 17, 2023**

I.    Introduction .................................................................................................. 1

II.   Description of the Corporate Restructure ..................................................... 2

   A.   Corporate Structures ................................................................................ 2

   B.   History of the Plan and Spin-Off ............................................................ 3

      1.   November 2016-September 2018: The Benefit Freeze .................... 4

      2.   November 1, 2018: CEO Ed Breen Email to Employees ................ 7

      3.   November 8, 2018: Administrative Committee Private Meeting ..... 7

      4.   November 2018: Question and Answer to Employees .................... 9

      5.   March 20, 2019: Email with PowerPoint Links for Employees ..... 9

      6.   June 1, 2019: The Spin-Off ........................................................... 11

      7.   June 2019: Post Spin-Off Summary Plan Description ................... 11

III.  Summary of Plaintiffs' Allegations ........................................................... 13

   A.   Description of the Counts and Classes................................................... 14

   B.   Applicable Plan Provisions.................................................................... 15

   C.   The Early Retirement Plaintiffs ............................................................ 20

      1.   Robert F. Cockerill.......................................................................... 20

      2.   Christopher W. Newton..................................................................... 21

D.   The Optional Retirement Plaintiffs ............................................................. 22

   1.   Oliver Major .................................................................................... 22

   2.   Darrell Benson .................................................................................. 24

IV.   Procedural History ..................................................................................... 24

V.   The Class Definitions Certified by this Court .............................................. 24

VI.   Discussion and Analysis of Rule 23(a) and Rule 23(b) ................................. 27

A.   Rule 23(a) ................................................................................................ 27

   1.   Numerosity for All Counts ............................................................... 27

   2.   Commonality .................................................................................... 28

   3.   Typicality ......................................................................................... 35

   4.   Adequacy .......................................................................................... 38

B.   Rule 23(b) ................................................................................................ 41

   1.   23(b)(1) Certification ....................................................................... 42

   2.   23(b)(2) Certification ....................................................................... 44

VII.   Discussion of Employers' Opposition to Certification ................................. 45

A.   Exhaustion of Remedies ........................................................................... 46

   1.   Counts IV and V Do Not Require Exhaustion Under Zipf ................. 48

   2.   Counts I, II and VI Do Not Require Exhaustion for Unnamed Plaintiffs ..................... 48

B.   Statute of Limitations ............................................................................... 52

   1.   Statute of Limitations Issues Do Not Defeat Commonality ................ 52

   2.   Statute of Limitations Defenses Do Not Defeat Plaintiffs' Adequacy .......................... 55

C.   Signed Releases Do Not Render Named Plaintiffs' Atypical .......................... 56

D.   Choices of Law Do Not Defeat Certification ............................................. 58

VIII.   Conclusion ............................................................................................... 60

## I.    Introduction

This ERISA case involves claims made by individuals who allege they were adversely impacted by a corporate restructuring of the centuries' old corporation previously known as the E.I. DuPont de Nemours Company ("Historical DuPont"), which took place in a series of transactions planned in 2015 and executed in 2019. Named Plaintiffs seek to represent two putative classes ("Employees"), asserting the Defendant corporations ("Employers") violated multiple sections of ERISA by both misinterpreting the Pension and Retirement Plan Document and making misrepresentations and omissions that resulted in significant diminutions or eliminations of retirement rights that they had enjoyed.

Although the complex corporate transactions alleged in this case resemble a novel by Dostoevsky or an opera by Wagner, the Employers resolutely deny they violated ERISA. The Employers have not seriously contested the accuracy of how the corporate restructuring unfolded, but have concentrated their defenses on alleged defects of the Named Plaintiffs as class representatives, and on the failure of the Employees to satisfy the Rule 23 requirements for class certification.

After significant discovery, briefing, and two oral arguments, this Court previously determined that the requisites of class certification had been met, and that one or more classes would be certified, but left open the exact class definitions. Tr. Second Class Certification Arg. 10:12–11:09, ECF 124.

It is important to note that the primary remedy that Employees seek is one of "clarification," relief specifically available to district courts under the ERISA statute. 29 U.S.C. § 1132(a)(1)(B); Kemmerer v. ICI Americas Inc., 70 F.3d 281, 289 (3d Cir. 1995). However,

Employees alternatively seek, if Employers breached their fiduciary obligations, equitable relief to restore the benefits due to them before the corporate transactions. 29 U.S.C. § 1132(a)(3); Varity Corp. v. Howe, 516 U.S. 489, 507–15 (1996)

## II.   Description of the Corporate Restructure

Based on the pleadings and class certification discovery, the relevant facts are as follows. The authenticity of all referenced written materials has been verified by Employers in discovery.[1]

### A.  Corporate Structures

On December 11, 2015, Historical DuPont, which was founded over 200 years ago, announced its intent to merge with Dow Chemical Company ("Dow Chemical"). Second Am. Compl. ¶¶ 10, 15 ("SAC"). On August 31, 2017, the Historical DuPont-Dow Chemical merger closed, to create a combined entity, DowDuPont. Id. at ¶ 18.

On June 1, 2019, DowDuPont spun-off into three separate entities: Corteva, Inc. (focusing on agricultural chemicals); Dow, Inc. (focusing on materials science); and DuPont de Nemours, Inc. ("New DuPont") (focusing on specialty product industries). Id. at ¶¶ 19, 27. Corteva, which has approximately 21,000 employees, is the parent company of what remains of Historical DuPont. Id. at ¶¶ 4, 10, 26 (noting that Historical DuPont is a "paper subsidiary" of Corteva). Most of what had been Historical DuPont's businesses now operates under New DuPont. Id. at ¶ 10.

Specialty Products USA, LLC ("Specialty Products") had been a subsidiary of Historical DuPont prior to the Historical DuPont-Dow Chemical merger, at which point it became a

---

[1] See Durkovic Decl., Ex. 1 to Defs. Mot. in Opp'n to Class Certification, ECF 82–2; Lantagne Decl., Ex. 2 to Defs. Mot. in Opp'n to Class Certification, ECF 82–3; Hopkins Aff., Ex. A to Pls. Reply to Defs. Opp'n to Class Certification, ECF 83–1.

subsidiary of DowDuPont. Id. at ¶ 9. Following the spin-offs in 2019, it became a subsidiary of New DuPont. Id.

### B. History of the Plan and Spin-Off

The Pension and Retirement Plan ("Plan"), sponsored Historical DuPont, was originally effective September 1, 1904. SAC ¶ 14.

Title I of the Plan provided significant defined benefits to retired and terminated employees via monthly pension payouts. Three of the Plan's defined benefits are at issue.

First, Plan participant employees who reached age 50 with 15 years of eligible years of service were entitled to a reduced or unreduced Early Retirement Benefit. Historical DuPont Pension and Retirement Plan Title I, IV.B, Ex. 12 to Defs. Mot. in Opp'n to Class Certification, ECF 82–10 ("Plan Document"). Employees received an unreduced monthly pension at age 65. Id. at IV.A. If they elected to retire earlier, the monthly payout was reduced, if reduced at all, based on the (1) age of the employees at time of election and (2) their years of service under the Plan. Id. at IV.B. The longer the employees' tenure and the closer their age to 65, the smaller the reduction. Id. Employees who reached age 58 could receive a fully unreduced Early Retirement pension when their years of service and age totaled 85. Id.

Second, Plan participants with 15 years of eligible years of service but who were "terminated" prior to reaching age 50 could acquire a "nonforfeitable right to a deferred pension" once they reached age 50 ("Deferred Pension"). Id. at V.A(1). Like the Early Retirement Benefit, the amount of Deferred Pension payout varied by age and years of service at time of the employees'

election. Id. The Deferred Pension reduction factors were categorically less favorable to employees than the Early Retirement Benefit. Id.[2]

Third, Plan participants who were "involuntarily terminated for reasons other than discharge for dishonesty, insubordination, or other misconduct" were entitled to Optional Retirement if they were over 50 years old with 15 years of eligible service. Plan Document Title I, IV.D(1). Plan participants at least age 45 years old with 15–25 years of experience, terminated for "lack of work" were also eligible for this benefit. Id. For those who qualified for Optional Retirement and Early Retirement, the Optional Retirement Benefit was either equal to or greater than the Early Retirement Benefit at every combination of age and service year. The Plan carved out exceptions for Optional Retirement eligibility if the employees continued to work for a new entity that bought the Plan sponsor, was a joint venture with the Plan sponsor, or was a subsidiary of the Plan sponsor. Id. at IV.D(1)(c).

### 1. November 2016-September 2018: The Benefit Freeze

In November 2016, following the announcement of the Historical DuPont-Dow Chemical merger, but prior to the closing, Historical DuPont announced its intent to freeze the Plan "so that no new benefits would accrue to participants in the Plan and no new employees would become eligible to participate in the Plan." SAC at ¶ 16.

In 2016, updated in 2018, Plan participants received "Frequently Asked Questions" concerning the freeze, which included the following two questions and answers:

"What is changing with the Pension Plan?" (Question 9)

---

[2] For instance, an employee with 27 years of service could receive an unreduced pension at age 58 under the Early Retirement Benefit. However, the same employee would not be entitled to an unreduced pension until age 65 under the Deferred Pension. Plan Document Title I, IV B(2); V A(1).

The Pension Plan benefit is calculated using pay and years of service. The pay and service amounts used to calculate your pension benefit will stop growing on November 30, 2018. Your Pension Plan benefit formula will use your pay and years of service as of November 30, 2018 to calculate your benefit. Your Pension Plan will continue to recognize growth in age and service with the company after November 30, 2018 to determine any applicable early retirement reduction factors. Continuing service with the company, even after November 30, 2018, may ensure you receive 100% of your benefit.

"How do I find out if early retirement reduction factors will be applied to my Pension Plan benefit?" (Question 10)

Depending on the age at which you retire and your years of service, you may receive less than 100% of the value of your benefit (reduced pension). The amount by which your Pension Plan benefit is reduced to reflect early commencement is known as an early retirement reduction factor. Continuing service with the company, even after November 30, 2018, may ensure you receive 100% of your benefit. Generally, as an employee who participates in the DuPont (parent company) section of the Pension Plan, you can receive a reduced pension at age 50 and 15 years of service and may be able to receive 100% of the value of your benefit as early as age 58 depending on your service when you terminate employment and your age when you begin payments. The table below illustrates how the early retirement reduction factors are applied to your Pension Plan benefit.

**DuPont (Parent Company) Early Retirement Reduction Factor Chart**

| AGE AT PAYMENT DATE | 15-20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 and over |
|---|---|---|---|---|---|---|---|---|
| 65 | 100% | | | | | | | |
| 64 | 95 | 100% | | | | | | |
| 63 | 90 | 95 | 100% | | | | | |
| 62 | 85 | 90 | 95 | 100% | | | | |
| 61 | 80 | 85 | 90 | 95 | 100% | | | |
| 60 | 75 | 80 | 85 | 90 | 95 | 100% | | |
| 59 | 70 | 75 | 80 | 85 | 90 | 95 | 100% | |
| 58 | 65 | 70 | 75 | 80 | 85 | 90 | 95 | 100% |
| 57 | 60 | 65 | 70 | 75 | 80 | 85 | 90 | 95 |
| 56 | 55 | 60 | 65 | 70 | 75 | 80 | 85 | 90 |
| 55 | 50 | 55 | 60 | 65 | 70 | 75 | 80 | 85 |
| 54 | 50 | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 53 | 50 | 50 | 50 | 55 | 60 | 65 | 70 | 75 |
| 52 | 50 | 50 | 50 | 50 | 55 | 60 | 65 | 70 |
| 51 | 50 | 50 | 50 | 50 | 50 | 55 | 60 | 65 |
| 50 | 50 | 50 | 50 | 50 | 50 | 50 | 55 | 60 |

**YEARS OF SERVICE**

SAC at ¶¶ 16–17. A User Guide distributed at the time explained that the Plan would "continue to recognize age and continued service with the company for purposes of determining" eligibility and reduction factors for Early Retirement. User Guide: Understanding Your 2018 DuPont Retirement Changes 10, Ex. 1.B to Defs. Mot. in Opp'n to Class Certification, ECF 82–2 ("2018 User Guide"). The freeze also eliminated certain post-retirement benefits for anyone under age 50 at the time of the freeze. Id. at 11. DowDuPont sent a formal letter and amendment consecrating the freeze and elimination of post-retirement benefits on September 12, 2018. DuPont Letter to Plan Participants, Ex. 1.D. to Defs. Mot. in Opp'n to Class Certification, ECF 82–2. The 2018 Summary Plan Description ("2018 SPD") also emphasized that certain benefits ceased accruing on the "Freeze Date" and provided examples how the freeze altered benefits calculations 2018 SPD 9, 16, Ex. 14 to Defs. Mot. in Opp'n to Class Certification, ECF 82–10. The spin-off date was May 31, 2019.

The 2018 SPD did not reference then-impending spin-off or its potential impact on retirement benefits. In describing who was eligible for the Deferred Pension Benefit, the 2018 SPD stated employees who were under age 50 with 15 years of experience when "[they] terminate[d]

employment," qualified. 2018 SPD 12. This is the same language found in the User Guide. 2018 User Guide 5 ("If you terminate employment before reaching age 50 with 15 years of service," then Deferred Pension Benefits apply).

### 2. November 1, 2018: CEO Ed Breen Email to Employees

On November 1, 2018, Ed Breen, Chief Executive Officer of DowDuPont emailed all Plan participants about how the spin-off and freeze would affect benefits under the Plan. Breen Email, Ex. 9 to Defs. Mot. in Opp'n to Class Certification, ECF 82–10. He reiterated that "continuing to fulfill our obligations to plan participants is a top priority." Id. He also explained that Corteva would assume all Historical DuPont pension and retiree benefit obligations after the spin-off. Id. Breen articulated that for Plan participants who "have not yet started receiving your pension, your accrued benefit can't and won't, be reduced." Id. Several times, the communication iterated that fulfilling obligations to Plan participants was a "top priority" and assured participants that Historical DuPont's pension "commitment has not and will not change with Corteva [ ] as the future steward of the Plan." Id. Finally, Breen promised to "provide [Plan participants] with additional details, including information related to other benefit programs that are not mentioned in this letter." Id.

### 3. November 8, 2018: Administrative Committee Private Meeting

On November 8, 2018, the Plan Administrative Committee held a private meeting to "make an interpretation of the pension plan language with respect to the applicability of the optional retirement provision in the spinoff." Durkovic Dep. 135:8–11, Ex. F to Pls. Reply to Defs. Opp'n

to Class Certification, ECF 83–1.[3] As a reminder, the Plan conferred Optional Retirement Benefits to certain employee who were either (1) terminated for reasons "other than discharge for dishonesty, insubordination, or other misconduct," (for those over age 50), or (2) terminated due to "lack of work" (for those between 45 and 50). Plan Document Title I, IV.D(1)(a)–(b). But the Plan also exempted Optional Retirement Benefits when employment with Historical DuPont ceased as a result of sale of Historical DuPont, a joint venture undertaken by Historical DuPont and another entity, or transfer to a partially or wholly owned subsidiary of Historical DuPont ("Business Exceptions"). Id. at IV.D(1)(c). In those Business Exceptions, employees were eligible for lesser Deferred Pension Benefits, not the more generous Optional Retirement Benefit. Id.

In other words, if emloyees "technically" stopped working for Historical DuPont as a result of several identified types of business transactions, but continued their employment with the new entity, then the Optional Retirement provision would not apply. Id. The Administrative Committee had to determine whether the impending spin-off constituted one of the Business Exceptions to Optional Retirement Benefit. Durkovic Dep. 133:18–134:16.

The meeting lasted 15 minutes. Durkovic Dep. 134:3–12. The Committee decided the spin-fell under a Business Exception to the Optional Retirement Benefit (i.e. joint venture, sale, or transfer to a subsidiary). Id. at 134:3–12. So, the spin-off would "terminate" employees for the purposes of Plan participation but would not entitle employees to Optional Retirement Benefits. Id. at 144:18–151:21. The Committee did not directly communicate its decision to Plan beneficiaries. Id. at 156:11–19.

---

[3] Mark Durkovic is the Benefits Director for Corteva and Defendant Benefit Plans Administrative Committee's designee under Federal Rule of Civil Procedure 30(b)(6). Hopkins Aff. ¶ 3, Ex. A to Pls. Reply to Defs. Opp'n to Class Certification, ECF 83–1; Dukovic Decl. ¶ 1, Ex. 1 to Defs. Mot. in Opp'n to Class Certification, ECF 82–2.

### 4.   November 2018: Question and Answer to Employees

Around the same time, a "question and answer" sent to Employees concerning the spin-

off's effect on Plan participants, stated:

> "I am currently a participant in DuPont's U.S. Pension Plan and will be an employee of
> Specialty Products in the US. How does this affect my pension?"

>> The spin of DuPont and Corteva Agriscience will impact Specialty
>> Products employees as follows:

>> Since Corteva Agriscience will be the ongoing sponsor of the Plan,
>> Specialty Products employees who participate in the Plan will be
>> eligible to commence their pension, at spin, if they meet the Plan
>> commencement requirements in terms of age and service.

>> At spin, future service for Specialty Products employees who
>> participate in the Plan will no longer be recognized in determining
>> eligibility for pension benefits and any applicable early retirement
>> reduction factors. For those employees who qualify for retirement
>> by meeting the Plan's age and service requirements, growth in age
>> will continue to be recognized allowing those participants to age into
>> an improved reduction factor prior to commencing their pension.

SAC at ¶ 20.

### 5.   March 20, 2019: Email with PowerPoint Links for Employees

Three months before the spin-off, Plan participants received an email from Employers,

which began: "As a pension eligible employee moving to 'New' DuPont, you may be eligible to

begin collecting your pension as of 6/1/2019." March 20, 2019 Email, Ex. 1.E to Defs. Mot. in

Opp'n to Class Certification, ECF 82–2. The email included a hyperlink to a website with several

PowerPoint presentations explaining employees' Plan retirement benefits post spin-off. Id. One

presentation was for employees "hired or rehired" as "Full-Service Employees prior to January 1,

2007, and who had, or would have, obtained at least age 50 with 15 years of service as of May 31,

2019."  Over 50 PowerPoint, Ex. F to Defs. Mot. in Opp'n to Class Certification, ECF 82–2.

Pursuant to the digital presentation, those qualifying individuals would be considered "retiree[s]" as of June 1, 2019. <u>Id.</u> at 5. Employees with the age and service for an unreduced pension benefit as of June 1, 2019 could commence their benefit immediately. <u>Id.</u> at 8–12. Employees age 50 or older who would receive a reduced pension benefit as of June 1, 2019, could wait until they reached an age where the benefit was no longer reduced. <u>Id.</u> at 13–16 (including "If you are entitled to an immediate early reduced pension, your monthly benefit payments will be reduced due to commencing benefits early. You may choose to defer the benefit to decrease or eliminate the reduction. In that case, you will get a larger monthly benefit when you commence your payments in the future."). The presentation explained how the spin-off affected the two variables determining the Early Retirement reduction factor: eligible company service and age at time of retirement. Over 50 PowerPoint 7–8. Service stopped on May 31, 2019, the time of the spin-off. <u>Id.</u> at 7. However, an employee could still age into a higher pension payout if they deferred Early Retirement until they reached an older age. <u>Id.</u> at 13–16.

The same hyperlinked site also included a digital presentation for Plan participants who were "term vested eligible pension plan participants under the DuPont Pension Plan." Under 50 PowerPoint 3, Ex. G to Defs. Mot. in Opp'n to Class Certification, ECF 82–2. Neither the Plan nor the 2018 SPD included or defined the phrase "term vested eligible." Plan Document Title I; 2018 SPD. The PowerPoint defined "term vested" participants as those who have 15 years of eligible service under the Plan but will not reach age 50 by May 31, 2019, and who "have the option to commence or defer their reduced or unreduced pension benefits." Under 50 PowerPoint 3. Under the Plan, the only potential benefit immediately available to under 50 employees was Optional Retirement. Plan Document Title I, IV.D. Nonetheless, the under age 50 PowerPoint continuously referenced employees' choice to either defer or begin monthly pension benefits

immediately. Under 50 PowerPoint 6. The PowerPoint also discussed what under age 50 employees needed to do to receive their unreduced pension on May 31, 2019. <u>Id.</u> at 8–10.

Like the over age 50 PowerPoint, the under age 50 presentation specified that service with New DuPont post spin-off would not factor into any benefits calculation. <u>Id.</u> at 6. Other slides highlighted that while service years froze at the spin-off, employees could increase their benefit by aging into a lesser reduced or unreduced pension. <u>Id.</u> at 11–12. Employees who were "unsure" of their eligibility for either reduced or unreduced pensions were to refer to the presentations or the 2018 SPD. March 20, 2019 Email.

### 6.   June 1, 2019: The Spin-Off

On June 1, 2019, the Plan, including pension liabilities, transferred to Corteva. SAC ¶ 8. Historical DuPont, the Plan's sponsor, became a subsidiary of Corteva. <u>Id.</u> The former employees of Historical DuPont under Specialty Products became employees of New DuPont. Durkovic Dep. 144:18–145:14. Historical DuPont ceased some of its business activities at the spin-off and later became a "paper subsidiary" of Corteva. SAC ¶ 10. As of 2021, Historical DuPont did not employ any workers. Durkovic Dep. 143:5–18. Historical DuPont, as a subsidiary of Corteva, remains the Plan sponsor. SAC ¶ 24.

### 7.   June 2019: Post Spin-Off Summary Plan Description

Employees received a new Summary Plan Description ("2019 SPD") from Corteva closely following the spin-off. The 2019 SPD does not reference the spin-off or its impact on retirement benefits. 2019 SPD, Ex. 15 to Defs. Mot. in Opp'n to Class Certification, ECF 82–11. Further, the 2019 SPD is almost identical to the pre-spin-off 2018 SPD, including the same examples describing benefit payouts. <u>Compare</u> 2018 SPD 15–18 <u>with</u> 2019 SPD 15–18. For instance, the

table of contents, including the section titles and pagination, are mirror images. 2018 SPD 3; 2019 SPD 3.

Corteva did make at least one grammatical edit. In the "Common Defined Terms" subsection, the SPDs define two terms used throughout: "DuPont" and "the Company." The 2018 SPD reads:

## Common Defined Terms
These terms are capitalized throughout this summary. In this section, you will find the definitions for these terms to help clarify their meaning and to provide information to better help you understand the provisions of the Plan.

**BENEFIT FREEZE DATE**
The Benefit Freeze Date is November 30, 2018. No benefits will accrue under the Plan after that date. Note however, benefits under Title III stopped accruing after June 30, 2015.

**"DUPONT" AND THE "COMPANY"**
- Where we use "DuPont" in this summary, we mean E. I. du Pont de Nemours and Company.
- Where we refer to the "Company" in this summary, we mean the DuPont affiliated organization that has adopted or participates in the Plan and employs you.

**SPOUSE**
Your Spouse is the person to whom you are legally married.

2018 SPD 9. The 2019 SPD reads:

## Common Defined Terms
These terms are capitalized throughout this summary. In this section, you will find the definitions for these terms to help clarify their meaning and to provide information to better help you understand the provisions of the Plan.

**BENEFIT FREEZE DATE**
The Benefit Freeze Date is November 30, 2018. No benefits will accrue under the Plan after that date. Note however, benefits under Title III stopped accruing after June 30, 2015.

**"DUPONT" AND THE "COMPANY"**
- Where we use "DuPont" in this summary, we mean E. I. du Pont de Nemours and Company, a subsidiary of Corteva, Inc.
- Where we refer to the "Company" in this summary, we mean an entity that adopted or participated in the Plan while affiliated with DuPont and that employs or employed you.

**SPOUSE**
Your Spouse is the person to whom you are legally married.

2019 SPD 9. Post spin-off, the "Company" definition altered the tense of "adopt" and "participate" from present to past. Id. Under the 2019 SPD, the "Company" was an entity that had previously

12

"adopted" or "participated in the Plan while affiliated with DuPont." Id. The rest of the 2019 SPD remained in the present tense, including the sections describing Early Retirement,[4] Deferred Pension,[5] and Optional Retirement Benefits.[6] The 2018 and 2019 SPDs offer pages of hypotheticals detailing how several freeze dates, from December 2007 through the November 2018 Freeze, factor into pension benefits. 2018 SPD 15–18; 2019 SPD 15–18. Neither SPD makes mention of the spin-off date or its effect on benefits. Moreover, the Plan itself remained unamended, with no mention of the spin-off, in June 2019. Plan Document Title I.

Employers interpret the spin-off to have (1) qualified as a Business Exception under the Plan, foreclosing Plan participants from receiving Optional Retirement Benefits and (2) eliminated the Plan participant employees at New DuPont who were under age 50 at the time of spin-off from aging into Early Retirement Benefits.

## III.    Summary of Plaintiffs' Allegations

Two groups of formerly Historical DuPont Employees brought the current lawsuit. The core of the dispute revolves around how the spin-off reduced or eliminated Early Retirement and Optional Retirement Benefits for certain employees who transferred from Historical DuPont to New DuPont at spin-off.

---

[4] 2019 SPD 18 ("You are eligible for a reduced Early Retirement if you are an [Full Service Employee] . . .") (emphasis added).

[5] 2019 SPD 20 ("If you leave the Company after you become vested, but before you are eligible to retire, you are entitled to a [ ] Deferred pension benefit.") (emphasis added).

[6] 2019 SPD 19 ("If your employment ends because of an involuntary termination . . . you may be eligible for Optional Retirement.") (emphasis added).

### A. Description of the Counts and Classes

Employees seek to certify two classes under Federal Rule of Civil Procedure 23(b)(1) and (b)(2). Plaintiffs Cockerill and Newton are the proposed Class A ("Early Retirement Class") representatives. Plaintiffs Major and Benson are the proposed Class B ("Optional Retirement Class") representatives. Employees wish to certify the below counts and classes:

- **Count I and Count II:** Employees seek clarification and enforcement of the Plan's Early Retirement and Optional Retirement Benefits under 29 U.S.C. § 1132(a)(1)(B) ("ERISA Benefit Clarification Claims").

  - **Count I (Early Retirement Class)** asserts, that under the language of the Plan, the Early Retirement Benefit is available to those who were under age 50 with at least 15 years of service with Historical DuPont and transferred to New DuPont at the time of spin-off.

  - **Count II (Optional Retirement Class)** asserts, that under the language of the Plan, that the spin-off, by terminating employment with Historical DuPont, entitled eligible employees for Optional Retirement Benefits at spin-off.

- **Counts IV, V and VI:** In the alternative to the ERISA Benefit Clarification Claims (Counts I and II), Employees argue that the Employers violated several provisions of ERISA.

  - **Count IV (both classes)** asserts Employers breached ERISA fiduciary duties by misinforming and omitting information that would explain the effect of the spin-off on Early Retirement and Optional Retirement Benefits to Employees. 29 U.S.C. §§ 1104–05.

  - **Count V (both classes)** asserts that the purpose of the spin-off—splitting Employees from Historical DuPont while the firm continued to sponsor their

Plans—was to prevent Employees from attaining Optional Retirement and Early Retirement Benefits, in violation of 29 U.S.C. § 1140.

   o  **Count VI (Optional Retirement Class)** asserts that Employers retroactively applied an amendment to the Optional Retirement Benefit, which violated ERISA's anti-cutback clause. 29 U.S.C. § 1054(g).[7]

The equitable remedies sought reduce to simple propositions for the respective classes.

- **Early Retirement Class (Count I, IV and V):** restore the Early Retirement Benefits for Title I Plan participant employees who were under age 50 with at least 15 years of experience at the spin-off and continued to work for New DuPont until they reached age 50.

- **Optional Retirement Class (Counts II, IV, V, and VI):** restore Optional Retirement Benefit to Title I Plan participant employees who were over 50 with at least 15 years of experience when they were transferred to New DuPont at spin-off.

### B.  Applicable Plan Provisions

The applicable Plan provisions, as amended and restated effective December 16, 2015 through the spin-off, and including relevant amendments are as follows:

- Title I, III "provides that normal retirement age under the Plan is the later of age 65 or, for employees who commence participation in the Plan after age 60, the 5th anniversary of the time Plan participation commenced."

---

[7] Employees do not seek class certification for Count III (Newton's individual claim for benefits) or Count VII (an alternative theory of promissory estoppel under state law).

- Title I, IV.A(1) ("Normal Retirement Eligibility") states that "[a]n employee will be eligible for Normal Retirement after reaching age 65 with at least 15 years of service."

- Title I, IV.B(1) ("Early Retirement Eligibility") states that "[a]n employee will be eligible for Early Retirement after reaching age 50 and prior to reaching age 65 with at least 15 years of service."

- Title I, IV.B ("Percentage Factor for Early Retirement") sets forth the percentage factor for early retirement as it pertains to service years and age at commencement of payment.

### PERCENTAGE FACTORS FOR EARLY RETIREMENT PENSION

| AGE AT COMMEN-CEMENT OF PAYMENT | 15 THROUGH 20 | SERVICE YEARS | | | | | | 27 AND OVER |
|---|---|---|---|---|---|---|---|---|
| | | 21 | 22 | 23 | 24 | 25 | 26 | |
| 65 | 100% | UNREDUCED PENSION | | | | | | |
| 64 | 95 | 100% | | | | | | |
| 63 | 90 | 95 | 100% | | | | | |
| 62 | 85 | 90 | 95 | 100% | | | | |
| 61 | 80 | 85 | 90 | 95 | 100% | | | |
| 60 | 75 | 80 | 85 | 90 | 95 | 100% | | |
| 59 | 70 | 75 | 80 | 85 | 90 | 95 | 100% | |
| 58 | 65 | 70 | 75 | 80 | 85 | 90 | 95 | 100% |
| 57 | 60 | 65 | 70 | 75 | 80 | 85 | 90 | 95 |
| 56 | 55 | 60 | 65 | 70 | 75 | 80 | 85 | 90 |
| 55 | 50 | 55 | 60 | 65 | 70 | 75 | 80 | 85 |
| 54 | 50 | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 53 | 50 | 50 | 50 | 55 | 60 | 65 | 70 | 75 |
| 52 | 50 | 50 | 50 | 50 | 55 | 60 | 65 | 70 |
| 51 | 50 | 50 | 50 | 50 | 50 | 55 | 60 | 65 |
| 50 | 50 | 50 | 50 | 50 | 50 | 50 | 55 | 60 |

**For intermediate age and service combinations, the percentage factor will be interpolated from the above.**

- Title I, IV.D(1) ("Optional Retirement Eligibility") provides that:

> (a) An employee will be eligible for Optional Retirement after reaching age 50 with at least 15 years of service if his employment would otherwise be involuntarily terminated for reasons other than discharge for dishonesty, insubordination or other misconduct.

(b) An employee will be eligible for Optional Retirement after reaching age 45 and prior to reaching age 50 with at least 25 years of service if his employment would otherwise be involuntarily terminated due to lack of work. The length and service required for eligibility shall be reduced by two months, or a proportionate part thereof, for each month or portion thereof which has elapsed since the employee reached age 45.

- Title I, IV.D(1)(c)–(d) states:

(c)   Effective October 15, 1994, an employee will not be eligible for Optional Retirement under the following circumstances but will be eligible for the right described in Section V.A.(2):

  (i)    the employee is offered and accepts employment with the buyer or joint venture at the site in conjunction with a sales agreement between the Company and a buyer of company assets or in conjunction with the formation of a joint venture; or

  (ii)   the employee is offered and refuses employment with the buyer or joint venture at the site in conjunction with a sales agreement between the Company and a buyer of Company assets or in conjunction with the formation of a joint venture unless the offer is less than 80% of the employee's Company wage or salary level or the rejection results in a job for another employee who would otherwise have been terminated for lack of work.

  (iii)  the employee is transferred to or employed by a wholly-owned subsidiary of the Company, or is transferred to or employed by a subsidiary of the Company or a joint venture in which the Company participates that recognized Company service.

- 2018 SPD 19–20 and 2019 SPD 19–20 clarified the amount of Optional Retirement Benefits available based on age and years of service at time of involuntary termination:

17

## Optional Retirement at Involuntary Termination

If your employment ends because of an involuntary termination (for reasons other than dishonesty, insubordination, or other misconduct), you may be eligible for Optional Retirement if you are an FSE and you are over age 50 with at least 15 years of Eligibility Service. If you're terminated involuntarily due to lack of work and have at least 25 years of Eligibility Service, you may be eligible for Optional Retirement as early as age 45. The 25-year service requirement is reduced by two years for each year past your 45th birthday, as follows:

| Age | Required Service |
|---|---|
| 45 | 25 |
| 46 | 23 |
| 47 | 21 |
| 48 | 19 |
| 49 | 17 |
| 50 or older | 15 |

If you are eligible for a pension due to an involuntary termination as described above, the chart below shows the percentage of your benefit that you will receive, based on your age when benefits begin and your years of eligibility service. For example, if you are entitled to a benefit of $1,000 per month, payable at age 65, and you have 20 years of service, you would receive 90% of your benefit—or $900 a month—if you began taking payments at age 61 instead of waiting until age 65. If you wait until you are age 65, you would then be entitled to an unreduced benefit.

The chart below is used to determine the percentage of pension you can receive in the event of an involuntary termination described above.

| Age When Benefit Payments Begin | If You Have This Many Years of Eligibility Service ... | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27+ |
| | This Is the Percentage of Your Benefit That You Will Receive ... | | | | | | | | | | | | |
| 65 | 100% | 100% | 100% | 100% | 100% | 100% | | | | | | | |
| 64 | 95% | 95% | 95% | 95% | 95% | 97.5% | 100% | | | | | | |
| 63 | 90% | 90% | 90% | 90% | 92.5% | 95% | 97.5% | 100% | | | | | |
| 62 | 85% | 85% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | | | | |
| 61 | 80% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | | | |
| 60 | 75% | 77.5% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | | |
| 59 | 72.5% | 75% | 77.5% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | |
| 58 | 70% | 72.5% | 75% | 77.5% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% |
| 57 | 67.5% | 70% | 72.5% | 75% | 77.5% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 95% |
| 56 | 65% | 67.5% | 70% | 72.5% | 75% | 77.7% | 80% | 82.5% | 85% | 87.5% | 90% | 90% | 90% |
| 55 | 62.5% | 65% | 67.5% | 70% | 72.5% | 75% | 77.5% | 80% | 82.5% | 85% | 85% | 85% | 85% |
| 54 | 60% | 62.5% | 65% | 67.5% | 70% | 72.5% | 75% | 77.5% | 80% | 80% | 80% | 80% | 80% |
| 53 | 57.5% | 60% | 62.5% | 65% | 67.5% | 70% | 72.5% | 75% | 75% | 75% | 75% | 75% | 75% |
| 52 | 55% | 57.5% | 60% | 62.5% | 65% | 67.5% | 70% | 70% | 70% | 70% | 70% | 70% | 70% |
| 51 | 52.5% | 55% | 57.5% | 60% | 62.5% | 65% | 65% | 65% | 65% | 65% | 65% | 65% | 65% |

18

| Age When Benefit Payments Begin | If You Have This Many Years of Eligibility Service ... | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27+ |
| | This Is the Percentage of Your Benefit That You Will Receive ... | | | | | | | | | | | | |
| 50 | 50% | 52.5% | 55% | 57.5% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% |
| 49 | | | 52.5% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% |
| 48 | | | | | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| 47 | | | | | | | 45% | 45% | 45% | 45% | 45% | 45% | 45% |
| 46 | | | | | | | | | 40% | 40% | 40% | 40% | 40% |
| 45 | | | | | | | | | | | 35% | 35% | 35% |

- Title I, IX.N, effective June 1, 2019, ("Transfer of Employment and Multiple Titles") states:

> "N.  Transfer of Employment and Multiple Titles
>
> Participation in this Title I shall continue for any employee who transfers on or after January 1, 2012 to an employer who participates in another Title of the ~~DuPont~~ Pension and Retirement Plan unless such transfer is to an employer participating under Title V in which case the effective date to this rule governing transfers (and continuance under Title I) will be on or after January 1, 2009.  Such transfer shall not be considered a transfer to an affiliated group company.  **Beginning June 1, 2019, participation in this Title I shall continue for an employee for so long as the employee is continuously employed by a U.S. or Puerto Rico legal entity which is wholly owned by Corteva, Inc."**

(Seventh Amendment to the Plan, signed December 19, 2019).

- Title I, IV.D(1)(a), pursuant to the Eighth Amendment to the Plan, signed November 30, 2020:

> "(a)      An employee will be eligible for Optional Retirement after reaching age 50 with at least 15 years of service if his employment would otherwise be involuntarily terminated due to lack of work~~for reasons other than discharge for dishonesty, insubordination or other misconduct~~."

### C.  The Early Retirement Plaintiffs

### 1.  Robert F. Cockerill

Robert F. Cockerill started with DuPont in 1992, out of college, as a chemical engineer. SAC ¶ 29. Cockerill claims to have designed his career around the Early Retirement Benefit. See, e.g., id. at ¶¶ 28–41. At the time of the Plan freeze in 2018, Cockerill's earliest opportunity to apply for unreduced early retirement was at the age of 58.5 years. Id. at ¶ 45. Cockerill believed that, so long as he was not fired or left his employment, he would qualify for an unreduced Early Retirement Benefit at that age. Id. at ¶ 46

At the time of the spin-off on June 1, 2019, Cockerill was 49.85278 years old and had over 26 years of qualified service with Historical DuPont and DowDuPont. Id. at ¶ 42. He continued in the same job at the same location with Specialty Products after spin-off. Id. at ¶ 43.

In early 2020, he learned that his earliest unreduced retirement date had been changed from 2027 to 2034, with any retirement prior to 2034 resulting in a 5% reduction for each year. Id. at ¶ 52. He was told that the spin-off had "terminated" his employment under the Plan, preventing him from aging into the Early Retirement Benefit. Id. at ¶¶ 45–58. Cockerill also tried applying for Optional Retirement Benefits. Employers told him that provision of the Plan did not apply because he was "divested," not "terminated". Id. at ¶ 59. His Level I appeal for benefits was denied on May 11, 2020. Id. at ¶ 56. The denial letter from the Administrator stated, in relevant part that,

> your eligibility service that determines reduction factors stopped on May 31, 2019, when your employment ended with DuPont (Corteva) with your age below 50 at the time of termination. Therefore as per the rule 85 (age + service = 85), you will not qualify for an unreduced pension at the age of 58, and your request is dnied [sic].

Id. His Level II appeal was denied on September 4, 2020. Id. at ¶ 61.

### 2. Christopher W. Newton

Christopher W. Newton started at Historical DuPont on September 7, 1999, in the Advanced Fibers Systems business, which became a subsidiary of Specialty Products following the spin-off. Id. at ¶ 63. On May 23, 2019, eight days prior to the spin-off, Newton was declared "excess" and was terminated for lack of work. Id. at ¶ 71. He was 49 years old. Id. Although he stopped working at that time, his "official termination date" was set at July 31, 2019. Id. at ¶¶ 74–75. During a meeting with human resources and management on May 23, 2019, he was presented with a Career Transition Package ("CTP") and informed of his entitlement to Optional Retirement Benefits due to involuntary termination because of lack of work. Id. at ¶ 72–73. Using the matrix shown above, he determined that the day he turned 50 was the optimal date to begin receiving benefits. Id.

Newton waited approximately one year to apply for benefits, to commence with an effective date of July 1, 2020. Id. at ¶ 79. However, when he tried to begin his Optional Retirement Benefit, Corteva provided him with a Pension Estimate Calculation Statement listing him as "Deferred Vested" and "only entitled to 25% of his normal retirement benefit rather than the 60% he had expected to receive upon turning 50." Id. Newton's appeal was denied on the ground that New DuPont, not Historical DuPont sponsored his CTP. Newton Level I Denial, Ex. 30 to Defs. Mot. in Opp'n to Class Certification, ECF 82–13. He filed a Level II appeal on March 19, 2021, which was likewise denied on the ground that he had been "voluntarily terminated" as a result of the spin-off, and had not been terminated for a "lack of work" because his official termination was subsequent to the spin-off. Newton Level II Denial 2, Ex. H to Pls. Reply to Defs. Opp'n to Class

Certification, ECF 83–1. Corteva maintained that the Optional Retirement Benefits did not apply since (1) the spin-off did not trigger Optional Retirement Benefits and (2) Newton's termination was post spin-off. Newton Level II Denial 1–2. Newton now over age 50, seeks Early Retirement and Optional Retirement Benefits.

### D.  The Optional Retirement Plaintiffs

### 1.  Oliver Major

Oliver Major began working for Historical DuPont in 1997. SAC ¶ 86. By 2017, he was in a senior position for talent recruitment in North America. Id. After the spin-off, he continued working for Specialty Products, in the New DuPont headquarters. Id. He received a promotion in 2020. Id. Then, he was terminated on September 30, 2021, due to corporate restructuring. Id. At the time of the spin-off, Major was 54 years old with over 21 years of service under the Plan. Id. ¶¶ 86, 93.

Major signed a general release agreement as part of his termination. Major Release ¶ 4.a, b, Ex. 6 to Defs. Mot. in Opp'n to Class Certification, ECF 82–7. The agreement included a Delaware choice of law provision and forum selection clause. Major Release ¶ 12. It released New Dupont, Specialty Products, "its parent corporation, affiliate, subsidiaries, divisions, predecessors, insurers, successors and assigns, and their current and former attorneys, officers, directors, and agents . . . and their employee benefit plans and programs and their administrators and fiduciaries" from ERISA claims "as of the date of the execution of the agreement." Major Release ¶ 4.a. However, Major did not release New Dupont or Specialty Products from ERISA claims for "vested or accrued employee benefits under Employer's health, welfare, or retirement plans as of Separation Date." Major Release ¶ 4.b.

Major believed he was entitled to Optional Retirement Benefits after his termination. SAC ¶ 89. Moreover, Major apparently thought, because he continued working in the same position at the same location, the Optional Retirement Benefit had continued post spin-off. Id. at ¶ 87. Major appears to have also thought his service with Specialty Products post spin-off would count toward the service year calculation in both Optional Retirement and Early Retirement calculations. Major Dep. 33:16–37:14 Ex. 8 to Defs. Mot. in Opp'n to Class Certification, ECF 82–9. With this understanding, Major believed he was entitled to an unreduced pension at roughly 59 years old, when his 26 service years (pre and post spin-off combined) and age equaled 85 years old. Id.

When Major elected to begin his benefits in January 2022, he learned that (1) the Optional Retirement Benefit was eliminated at spin-off and (2) his service years post spin-off did not count toward his benefit calculation. SAC ¶¶ 87–93. Major appealed the decision to the Benefit Appeals Committee. They responded that Major was not entitled to the Optional Retirement Benefit because Specialty Products had not participated in the Plan since the spin-off. Major Level II Denial 2–3. Ex. I to Pls. Reply to Defs. Opp'n to Class Certification, ECF 83–1. Moreover, he was not eligible for Optional Retirement at spin-off because employment terminated with Historical DuPont for reasons other than "lack of work."[8] Id. at 3 The Committee pointed out that the question and answer circulated near the spin-off explained that future years of service would not count toward pension benefits. Id. at 3. Major seeks the Optional Retirement Benefit.

---

[8] The Optional Retirement Benefit was amended on November 20, 2020, after spin-off. At the time of spin-off, an employee with at least 50 years of age and 15 years of service was entitled to Optional Retirement so long as his discharge was not due to misconduct or subject to a Business Exception, as explained above. Plan Document Title I, IV.D. In 2020, Employers amended the Optional Retirement Benefit to only kick in for over age 50 employees, like the under age 50 employees, if they were terminated for "lack of work."

### 2.  Darrell Benson

Darrell Benson started working for Historical DuPont in May 1996. SAC ¶ 94. He worked for Specialty Products before spin-off and continues to work for the firm today. Id. At the time of spin-off, Benson was 56.72 years old with over 23 years of service under the Plan. Id. at ¶ 95. Benson claims he planned to retire at age 59 with an unreduced pension, when his years of service (including post spin-off years) and age equaled 85. Id.

Benson claims, like Major, that he was not aware that his years of service under the Plan stopped accruing post spin-off. Id. at ¶ 98. He also did not know that the Optional Retirement benefit ceased at spin-off. Id. at ¶ 99. Benson claims he was eligible for the Optional Retirement Benefit at spin-off, which offered a greater benefit than his reduced Early Retirement Benefit at spin-off. Id. at ¶¶ 99–100.

### IV.    Procedural History

On September 3, 2021, Plaintiffs Cockerill and Newton filed a putative class action against Employers. Benson and Major subsequently joined.

Employees moved for class certification on April 21, 2023. The Employers opposed. Employees and Employers have fully briefed the issue and provided relevant discovery. On June 29, 2023 and on September 27, 2023, this Court heard oral argument on class certification.

### V.    The Class Definitions Certified by this Court

This Court will certify two classes based on the discovery provided and that accord with Employees' theories of liability.

> Early Retirement Class (Cockerill as representative): All Plan participants who were less than age 50, with at least 15 years of service under Title I of the Plan as of May 31, 2019, and were employed by Historical DuPont or any other

24

participating employer of Title I of the Plan, and who continued to be employed, post spin-off, by New DuPont or one of its subsidiaries that did not participate in Title I of the Plan until they reached age 50, and beneficiaries or estates of such participants.[9]

Optional Retirement Class (Major and Benson as representatives): All Plan participants who were over age 50, with at least 15 years of service under Title I of the Plan as of May 31, 2019, and who were employed by Historical DuPont or any other participating employer of Title I of the Plan, and who continued to be employed, post spin-off, by New DuPont or one of its subsidiaries that did not participate in Title I of the Plan, and the beneficiaries or estates of such participants. The class does not include anyone who received or was eligible for unreduced Early Retirement Benefits at the time of the spin-off. The class does not include anyone whose Early Retirement Benefits, at spin-off or through present, would be equal to, or greater than their Optional Retirement Benefit.[10]

---

[9] In their most recent briefing to this Court, Employees opposed limiting the Early Retirement Class to those who continued working for New DuPont or one of its non-participating subsidiaries until they reached age 50. Counsel for Employees wrote, "Nothing about continued employment with any entity (other than historical DuPont) post spin-off has any bearing on the allegations and claims that participants who were under age 50 at the time of the spin-off, and in [the Early Retirement Class], are entitled to age into early retirement." Pls. Reply to Defs. Memo 3, ECF 129.

This statement confounds this Court. Employees have repeatedly addressed this precise issue, both in response to Employer briefing and directly to this Court. This Court has always understood Employees' Early Retirement theory to encompass under age 50 individuals who did not realize that their employment "terminated" at spin-off under the Plan. Because of this misapprehension, Employees claim, their continued employment with New DuPont allowed them to age into Early Retirement. Indeed, counsel for Employees confirmed "this is what the claim is." Tr. First Class Certification Arg. 33:10–34:11, 4:3–5:13. Moreover, in the face of repeated charges that Employees have attempted to expand their theory, counsel has remained steadfast that they have not changed their substantive claims. Pls. Opp'n to Defs. Mot. for Reconsideration 8–9, ECF 111; Pls. Opp'n to D. Second Mot. to Dismiss 15, ECF 112.

This Court relied on counsel's representations. In denying Employers' Second Motion to Dismiss, this Court took "at face value Plaintiffs' assertion that any such expansion in the scope [of liability] is not intended in the revised definitions. If the Court concludes that either class should be certified, it is likely that the Court will modify its definition to include the limitations to former [Historical Dupont] employees continuing with [New DuPont] explicitly." Cockerill v. Corteva, Inc., 2023 WL 5672833 at *5 n.2 (E.D. Pa. Sept. 1, 2023) (denying Second Motion to Dismiss). Further, "[i]f Plaintiffs change their tune and later attempt to argue that such limitations are unwarranted, contrary to their express representations in their response, such contentions will be scrutinized and the Court will consider anew the arguments raised by Defendants in these briefings as to whether such modifications in scope would effectively restart the litigation and result in considerable prejudice to Defendants." Id.

[10] Employers contend the classes should only include Specialty Products employees because the named Plaintiffs were Specialty Products employees. However, that only the corporate subsidiary "Specialty Products" employed named Plaintiffs does not limit certification. The relevant communications, Plan Document, SPDs, and benefits interpretation applied to all participants under Title I of the Plan who migrated to New DuPont, not only Specialty Products staff. Supra, at 3–13. Should further discovery reveal Specialty Products employees were subject to materially different circumstances compared to other Title I Plan participants, this Court may always modify its definition.

Employers and Employees dispute whether Employees have also sought certification for a class of individuals under age 50 seeking Optional Retirement Benefits. Under the Plan, "after reaching age 45 and prior to reaching age 50," employees with "at least 25 years of service" who are involuntarily terminated due to "lack of work" are eligible for Optional Retirement Benefits.[11] Plan Document Title I, IV.D(1)(b). Employers contend that Employees never argued the spin-off terminated employees for "lack of work." Defs. Surreply to Class Statement 3, ECF 132. Employees counter that the Complaint demands Optional Retirement Benefits for Employees who were under age 50 at spin-off, necessarily invoking the "lack of work" provision. SAC ¶¶ 83, 112.b., 122, 140, 146.

While far from a model of clarity, the Complaint adequately alleges Optional Retirement Benefits for under age 50 employees. However, this Court will not certify any class or counts for these individuals at this time. Employees have failed to provide this Court with the information necessary to certify this class. Counsel's discovery focused on individuals under age 50 <u>with at least</u> 15 years of eligible service. Durkovic Dep. 201:24–202:8. But for under age 50 Optional Retirement, relevant members needed <u>over</u> 15 years of eligible service, often closer to 20 or 25 years, depending on their age. <u>Supra</u>, at 16–17. Based on the evidence, two Plaintiffs are in this class, Cockerill and Newton, with a potential ceiling of several hundred putative members. However, "[m]ere speculation" that others exist is not enough for certification. <u>Mielo v. Steak 'n Shake Operations, Inc.</u>, 897 F.3d 467, 486 (3d Cir. 2018). Thus, this Court will not certify a subclass at this time. <u>See Hayes v. Wal-Mart Stores, Inc.</u>, 725 F.3d 349, 358 (3d Cir. 2013) (rejecting certification because evidence

---

[11] Moreover, "[t]he length of service required for eligibility shall be reduced by two months, or a proportionate part thereof, for each month or portion thereof which has elapsed since the employee reached age 45." Plan Document Title I, IV.D(1)(b)

only showed "class members would be equal-to-or-less than 3,500 and equal-to-or-greater than zero.").

## VI.   Discussion and Analysis of Rule 23(a) and Rule 23(b)

### A.  Rule 23(a)

"Class certification is proper only if the trial court is satisfied, after a rigorous analysis that the prerequisites of Rule 23 are met." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008) (internal quotations and citations omitted). This means a court may have to "delve beyond the pleadings to determine whether the requirements for class certification are satisfied," which can include deciding class issues that "overlap" with the merits. In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 596 (3d Cir. 2009) (internal quotations and citations omitted).

The party proposing class certification bears the burden of demonstrating all four prerequisites set out in Rule 23(a) and at least one prerequisite contained in Rule 23(b) are met. Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 55 (3d Cir. 1994). Rule 23(a) requires:

> (1) numerosity of class members such that joinder of all members is impracticable (numerosity);
>
> (2) questions of law or fact common to the class (commonality);
>
> (3) the lead representative's claims must be typical of the claims of the entire class (typicality); and
>
> (4) the lead representative must fairly and adequately protect the interests of the class (adequacy).

Fed. R. Civ. P. 23(a)(1)–(4).

### 1.  Numerosity for All Counts

Generally, if a class contains over 40 members, numerosity is met. Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001). According to Employers, 584 Historical DuPont employees who were under age 50 with at least 15 years of qualified service continued to work for New

DuPont until they reached age 50 after spin-off. Sher Decl. ¶¶ 37–38, Ex. 5 to Defs. Mot. in Opp'n to Class Certification, ECF 82–6. They comprise the Early Retirement Class. While the Optional Retirement Class is not as precisely known, Employers approximate thousands of Specialty Products employees were over age 50 with at least 15 years of qualified service at spin-off. Durkovic Dep. 202:09–203:11. Both classes fulfill the numerosity requirement.

### 2. Commonality

The threshold for establishing "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Schering Plough, 589 F.3d at 596–97 (internal quotations and citations omitted). The proposed class must do more than plead their legal claim as a common question—to satisfy commonality the class must be able to "generate common answers apt to drive the resolution of the litigation." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) (internal quotations and citations omitted) (emphasis in original). So, if the "determination of [a contention's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," then the class meets the commonality requirement. Id.

Both classes share multiple common questions, that, when answered, will advance the litigation for all class members. Before detailing each matter below, the throughline among the common class questions is their focus on the Employers' conduct. Because the claims center on how the Employers acted toward the classes as a whole, their disposition is common to all class members. See Baby Neal, 43 F.3d at 57 (emphasizing "engaging in a common course of conduct" toward proposed class militates commonality finding).

### a. Common Questions for Counts I and II

Count I and Count II seek clarification and allege Employers violated ERISA § 502(a)(1)(B) when they denied Early Retirement Benefits and Optional Retirement Benefits to the respective classes. Where, as here, "the plan grants the administrator discretionary authority to determine eligibility for benefits," a court reviews benefit denials and terminations under "an arbitrary and capricious" standard. Miller v. American Airlines, Inc. 632 F.3d 837, 844–45 (3d Cir. 2011). A decision is arbitrary and capricious "if it is without reason, unsupported by substantive evidence or erroneous as a matter of law." Id. at 845 (internal quotations and citations omitted).

Thus, for both Count I and Count II, the common question is whether the Employers' interpretation of the Plan was arbitrary and capricious. With respect to Count I, this Court has already discussed how the latent ambiguity of the term "employee" in the Plan could render it susceptible to multiple definitions in the Early Retirement section. Cockerill v. Corteva, Inc., 2022 WL 3099771 at *6–8 (E.D. Pa. Aug. 4, 2022). Whether the Plan Administrator acted reasonably or arbitrarily and capriciously in its interpretation of the Early Retirement Benefit—that Plan participants employees under age 50 with 15 years of experience who continued work for New DuPont could no longer age into Early Retirement after spin-off—is the "glue" binding members for Count I. Dukes, 564 U.S. at 352.

Regarding Count II, the critical common question is whether the spin-off fell under one of the Business Exceptions to the Optional Retirement Benefit. Employers admitted the spin-off did not satisfy the plain language for any of the Business Exceptions (i.e. comparable employment continuing with a joint venture, buyer of Historical DuPont, or subsidiary of Historical DuPont). Durkovic Dep. 146:6–151:21. The November meeting to decide the applicability of the Optional

Retirement Benefit at spin-off suggests Employers recognized ambiguity in the Plan. So, whether the Employers acted reasonably, or arbitrarily and capriciously when they decided the Optional Retirement Benefit would not trigger at spin-off is the common question.

### b. Common Questions for Counts V and VI

Employees bring the remaining Counts in the alternative. That is, only if they fail on Count I and II (i.e. the Employers properly interpreted the Plan provisions) do they seek reformation of the Plan and equitable relief on Counts IV, V, and VI.

Count V alleges the spin-off, by splitting the Plan off to Corteva and transferring Employees to New DuPont, was an unlawful attempt to prevent Employees from attaining their Early Retirement and Optional Retirement Benefits, in violation of ERISA § 510. To prevail, a plaintiff must show "that the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or additional benefits." Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 522 (3d Cir. 1997). Termination is not enough; the plaintiff must offer "some additional evidence suggesting that interference with ERISA benefits was a motivating factor in the employer's decision." Balmat v. CertainTeed Corp., 338 F. App'x 256, 259 (3d Cir. 2009) (citing Turner v. Schering-Plough Corp., 901 F.2d 335, 348 (3d Cir. 1990)). Turning to the case at hand, because the crux of the § 510 claim is the Employers' intent behind the spin-off and Plan interpretation, the question is common to all class members. Whether reducing pension obligations was a motivating factor in the spin-off will advance litigation for both classes.

Under Count VI, Employees argue that applying the 2020 Optional Retirement Amendment to the June 2019 spin-off violates ERISA § 204(g). Section 204(g), "known as the anti-cutback rule, prohibits an employer from decreasing or eliminating a participant's accrued benefit by plan amendment." Shaver v. Siemens Corp., 670 F.3d 462, 472 (3d Cir. 2012) (internal

quotations and citations omitted). An individual entitled to a vested retirement-type benefit cannot be stripped of it through a Plan amendment. Id. Turning to the Optional Retirement Class claim, whether applying the 2020 Optional Retirement Amendment to Employees at the time of spin-off would eliminate or reduce their vested Optional Retirement Benefit due at spin-off is a common question to the class.

### c. Common Questions for Count IV

Under Count IV, the classes must prove Employers breached their fiduciary duties under ERISA § 404(a)(1). Section 404 fiduciary duty claims have at least three elements: (1) that the defendant was acting as a fiduciary; (2) that the defendant made misrepresentations or omissions about the Plan; and (3) that the misrepresentations or omissions were material. Burstein v. Ret. Acct. Plan For Emps. of Allegheny Health Educ. & Rsch. Found., 334 F.3d 365, 387 (3d Cir. 2003), as amended (Aug. 1, 2003). For element one, "a person is a fiduciary with respect to a plan only to the extent that he has any discretionary authority or discretionary responsibility in the administration of the plan." Varity, 516 U.S. at 527 (Thomas, J, dissenting on other grounds). An individual "acts as a fiduciary when explaining plan benefits and business decisions about plan benefits to its employees." Adams v. Freedom Forge Corp., 204 F.3d 475, 492 (3d Cir. 2000). The second and third element are best analyzed together. In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 579 F.3d 220, 228 (3d Cir. 2009). A misleading statement or omission is material if "there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision or a harmful decision regarding benefits." Id. (internal quotations and citations omitted).

Employees argue that Employers' class-wide communications misrepresented and omitted information concerning how the spin-off affected Early Retirement and Optional Retirement

31

Benefits. Applying the elements in turn, whether any or all the Employers were acting as "fiduciaries" when they communicated with the Employees about the spin-off is a common question. The second and third elements also raise common questions because the communications at the heart of the claim were class-wide. A non-exhaustive list of the class-wide communications that may have included material misrepresentations or omissions are: (1) Ed Breen's email to all Employees emphasizing that Historical DuPont's pension "commitment has not and will not change with Corteva [ ] as the future steward of the Plan[;]"[12] (2) the 2018 SPD that phrased Deferred Benefits as applicable only when "you terminate" employment and did not reference the spin-off (emphasis added);[13] (3) the March 2019 email that made no reference to Employees losing Early Retirement or Optional Retirement Benefits;[14] (4) the under age 50 PowerPoint that did not mention the elimination of Early Retirement Benefits;[15] and (5) the 2019 SPD that almost entirely tracked the 2018 SPD without reference to the spin-off or its effects on Early or Optional Retirement Benefits.[16] To be clear, this Court makes no comment on the final merits. Suffice to say, the class-wide communications present the same question for all class claims—did Employers materially misrepresent or omit information to Specialty Products employees?

Employers' principal contentions are that (1) unique misrepresentations made to specific class members and (2) the necessary element of detrimental reliance destroy commonality.[17]

---

[12] Breen Email.

[13] 2018 SPD 12 (emphasis added).

[14] March 20, 2019 Email.

[15] Under 50 PowerPoint.

[16] 2019 SPD.

[17] Employers thread these two points throughout their multi-pronged opposition to class certification. This Court addresses the claim through commonality, where Employers most directly advanced their arguments. Defs. Mot. in Opp'n to Class Certification 22–25. Moreover, while Employers do not specify which of Employees' five Counts these arguments challenge, misrepresentations and omissions are only relevant for Employees' breach of fiduciary duty (Count IV) claim. So, this Court understands these arguments to confront certification of Count IV.

Regarding the first point, Employers emphasize that named Plaintiffs did not read the class-wide communications and instead based their understanding of the Plan on individualized communications. Defs. Mot. in Opp'n to Class Certification 23–24. This Court finds these arguments unavailing for two reasons. First, Employees do not base their § 404(a)(1) claim on individualized communications, but rather on Employees' class-wide communications made in the lead-up to, and after the spin-off. Cf. Sprague v. General Motors Corp., 133 F.3d 388, 397–98, (6th Cir. 1998) (finding no commonality when estoppel and bilateral contract theories required evidence of individual misrepresentations made at varying times, place, and to different plaintiffs). The mass emails, FAQs, SPDs, Plan Document, and PowerPoint presentations are the basis of Employees' arguments, not individualized misrepresentations. Furthermore, even if Employees received individualized misrepresentations, those would not negate common questions. For "[i]t is well established that only one question of law or fact in common is necessary to satisfy the commonality requirement[.]" Schering Plough Corp., 589 F.3d at 597 n.10. The aforementioned three elements of § 404 fiduciary duty claims focus on the defendant's conduct, which is common through Employers' class communications, not Employees' digestion of information.

The meatier question is whether proof of Employees' detrimental reliance, which is inherently individualized, defeats class certification. Employers correctly note that Third Circuit precedent has identified four elements in § 404(a)(1) claims. Defs. Mot. in Opp'n to Class Certification 24–25. In addition to the three listed above, a plaintiff must have "detrimentally relied on the misrepresentation or inadequate disclosure." Shook v. Avaya Inc., 625 F.3d 69, 73 (3d Cir. 2010) (internal quotations and citations omitted). This Court finds the detrimental reliance argument does not defeat commonality for two reasons. First, as many in-Circuit district courts recognize, this individualized element does not erase the other common ones. See, e.g., In re Ikon

Office Solutions, Inc., 191 F.R.D. 457, 463–64, 466 (E.D. Pa. 2000) (certifying class for ERISA breach of fiduciary duty claim, notwithstanding potential individualized reliance questions, because "common course of conduct" by defendants raised common questions). To this point, the Third Circuit recently explained that the "important issues of individual reliance and damages [ ] are more properly considered and relevant under the predominance and superiority" requirements of Rule 23(b)(3), not commonality. Boley v. Universal Health Services Inc., 36 F.4th 124, 136 (3d Cir. 2022) (internal quotations and citations omitted).

Second, this Court is unpersuaded that detrimental reliance remains an element of § 404(a)(1) claims in light of CIGNA Corp. v. Amara, 563 U.S. 421 (2011). In CIGNA, plan beneficiaries alleged that the defendants made misrepresentations in the SPD, violating ERISA §§ 102 and 104, and sought equitable relief of reformation and surcharge under ERISA § 502(a)(3). Section 502(a)(3) allows a court to award an "appropriate" remedy when a defendant has violated ERISA. Id. at 443. Assuming defendants made misrepresentations in the SPD, the Court needed to decide the appropriate standard for determining whether an ERISA plaintiff suffered injury and what remedy was appropriate. Id. at 424. In looking to the "law of equity," the Court found there was "no general principle that 'detrimental reliance' must be proved before a remedy is decreed." Id. at 443. Most on point, the Court reasoned that remedies like reformation and surcharge generally do not require a showing of detrimental reliance. Id. at 443–44.

The Third Circuit has not addressed CIGNA's impact on § 404(a)(1)'s detrimental reliance element. However, other circuits have. The Second Circuit has interpreted CIGNA to do away with § 404(a)(1)'s detrimental reliance prong. In Osberg v. Foot Locker Inc., the Court held that CIGNA "mandates the conclusion that detrimental reliance need not be shown where" a "plaintiff alleging a violation of § 404(a) seeks plan reformation." 862 F.3d 198, 213 (2d Cir. 2017).

34

"Because the statutory text of § 404(a) does not articulate a standard for determining harm," the Court took <u>CIGNA</u>'s direction that plan reformation, as equitable relief, "does not require a showing of detrimental reliance." <u>Id.</u> at 212; <u>see also</u> <u>Silva v. Metropolitan Life Ins. Co.</u>, 762 F.3d 711, 720–23 (8th Cir. 2014) (emphasizing that <u>CIGNA</u> "changed the legal landscape by clearly spelling out the possibility of an equitable remedy under ERISA for breaches of fiduciary obligations" and that detrimental reliance is not required for surcharge or reformation remedies). Moreover, the two in-Circuit district courts to address the issue have agreed that <u>CIGNA</u> eliminated the detrimental reliance element of § 404(a) claims seeking reformation and surcharge. <u>See</u> <u>Cunningham v. Wawa</u>, 387 F. Supp. 3d 529, 540–42 (E.D. Pa. 2019) (finding the Second and Eighth Circuit persuasive and concluding that detrimental reliance is no longer an element of § 404(a)); <u>Goldenberg v. Indel, Inc.</u>, 2012 WL 12906332 at *6 (D.N.J. Feb. 28, 2012) (per <u>CIGNA</u>, only "harm and causation," not detrimental reliance, needed to prevail on a § 404(a) claim).

This case is on all fours with <u>Osberg</u> and <u>Cunningham</u>. In Count IV, Employees seek reformation and surcharge for Employers' alleged § 404(a) breach of fiduciary duty. At this preliminary stage, this Court declines to render a final decision on the detrimental reliance question. However, the unsettled issue of whether detrimental reliance is still an element of § 404(a) diminishes Employers' contention that its proof destroys class certification.

### 3. Typicality

Typicality overlaps with commonality, but distinctly analyzes the propriety of the specific plaintiffs representing the class, rather than commonality's evaluation of the legal claims across all class members. <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 182 (3d Cir. 2001), <u>as amended</u> (Oct. 16, 2001). While, like commonality, a "low threshold," <u>Id.</u> at 183, typicality still requires that:

(1) the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory;

(2) the class representative must not be a subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and

(3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

Schering Plough, 589 F.3d at 599. Legal claim similarity means the legal theory of the named party is "typical, in common-sense terms, of the class." Beck v. Maximus, 457 F.3d 291, 295–96 (3d Cir. 2006) (internal quotations and citations omitted). Further, factual similarity is met so long as "the claim [of the named member] arises from the same event or practice or course of conduct that gives rise to the claims of the class members." Schering Plough, 589 F.3d at 598 (internal quotations and citations omitted).

The "unique defenses" consideration also ensures that the named representatives' incentives align with the class members. When named representatives faces a unique defense that becomes a major focus of litigation, they might dedicate time and effort to an issue that is irrelevant to the class members. Schering Plough, 589 F.3d at 598. In this way, the named representatives are no longer "typical" of the unnamed members and "will become distracted by the presence of a possible defense applicable only to [them] so that the representation of the rest of the class will suffer." Id. at 598–99 (internal citations omitted). Moreover, it is the non-movant who bears the burden on this prong. Beck, 457 F.3d at 300. He must prove the requisite "degree of likelihood [that] a unique defense" will subsume litigation. Id. at 300; see also Roofer's Pension Fund v. Papa, 333 F.R.D. 66, 75 (D.N.J. 2019) (restating that non-movant bears the burden on the "unique defenses" prong and that "[s]peculative defenses will not suffice."); Dukich v. IKEA US Retail LLC, 343 F.R.D. 296, 307 (E.D. Pa. 2022) (finding typicality because defendant "ha[d] not shown

36

that [the named plaintiff] is subject to a unique defense that is likely to become a major focus of the lawsuit").

The first two prongs of analysis inform the final catchall, and "common thread," of typicality—the interests and incentives of the representatives must be aligned with those of the class. Schering Plough, 589 F.3d at 599.

### a.   The Early Retirement Plaintiffs (Counts I, IV, and V)

Factual and legal similarity does not have to be perfect. Baby Neal, 43 F.3d at 56. The requirement simply undergirds the animating principle that "maintaining the class action is reasonably economical and the interests of the other class members will be fairly and adequately protected." Schering Plough, 589 F.3d at 598. Alignment of interests between the named and unnamed members is the core interest. See Boley, 36 F.4th 133.

Cockerill's claims are factually and legally typical of the unnamed members. For Count I, IV, and V, the legal claims are identical. Moreover, the "basic factual circumstances supporting those claims—namely, the defendant's conduct," satisfies typicality. Schering Plough, 589 F.3d at 599. The dispositive point is that Employers' alleged misconduct "is comparably central to the claims of the named plaintiffs as to the claims of the absentees." Boley, 36 F.4th at 135 (citing Baby Neal, 43 F.3d at 57). The relevant questions for Cockerill are the same as for the rest of the class—did Employers arbitrarily and capriciously interpret the Plan (Count I), are there class-wide communications that misrepresented or omitted material information (Count II), do the facts evince an improper motivation for the spin-off (Count V).

Newton's circumstances, however, are atypical and he cannot serve as a class representative. Simply put, he does not fit within the definition of the class. Newton did not

continue to work for New DuPont, post spin-off, until he reached age 50. He was fired at age 49. Because Newton is atypical and will not serve as an Early Retirement representative, this Court has no need to address Employers' other Newton-specific objections.[18] So long as Cockerill is a proper representative, the Early Retirement Class may proceed.

### b.  The Optional Retirement Plaintiffs (Counts II, IV, V, and VI)

The same reasoning for Cockerill supports typicality for Major and Oliver—their legal theories are identical with the class, and the relevant facts are similar for all members. The gravamen of Counts II, IV, V, and VI is the defendant's conduct—deciding Optional Retirement did not apply at spin-off—which applies equally to all members. This Court notes "[t]ypicality does not require the class representatives' claims be coterminous" with unnamed members, but places emphasis on whether defendant's "uniform course of conduct" supports all members' claims. Boley, 36 F.4th 134–35 (citing Newton, 259 F.3d at 185).

And as discussed in more depth below, none of the named Plaintiffs will face unique defenses likely to become a major focus of litigation.

### 4.  Adequacy

The adequacy requirement "tends to merge" with typicality because both evaluate the alignment of interests between named and unnamed plaintiffs. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 626 n.20 (1997); see also Schering Plough, 689 F.3d at 602 (stating that adequacy inquiry into "possible conflicts of interest" between named and unnamed plaintiffs overlaps with

---

[18] Perhaps Newton's sub-50 age at termination explains why he originally sought Optional Retirement, not Early Retirement Benefits. Newton Level II Denial 1–2. Indeed, Newton testified, in deposition, to believing he would receive his Optional Retirement, not Early Retirement Benefit in 2020. Newton Dep. 59:10–62:22; 66:2–67:19 (believing he would receive a 60% monthly pension payout at age 50). Only Optional Retirement Benefits would pay Newton out at 60% of his salary. 2018 SPD 19-20. Early Retirement would only pay 50%. Plan Document Title I, IV.B.

typicality's alignment of interests and absence of unique defenses). However, adequacy distinctly "tests the qualifications of the counsel to represent the class." In re Warfarin Sodium Antitrust Litigation, 391 F.3d 516, 532 (3d Cir. 2004) (internal quotations and citations omitted).

### a. The Early Retirement Plaintiff (Counts I, IV, and V)

As discussed regarding typicality, Cockerill's interests are aligned with unnamed class members. Moreover, no conflicts of interest have emerged between him and the class. To the contrary, the Early Retirement Benefit Cockerill seeks will uniformly benefit the class.

Employers point out several characteristics specific to Cockerill, but fail to articulate how they "uncover" conflicts of interests, which are "rare" in "class actions seeking only declaratory and injunctive relief." New Directions Treatment Servs. v. City of Reading, 490 F.3d 293, 313 (3d Cir. 2007). More generally, Employers appear to argue that Cockerill does not have the requisite knowledge to serve as a representative because he did not read every communication, nor does he fully grasp the claims. Both arguments miss the mark. Named Plaintiffs need only "a minimal degree of knowledge" about the litigation to be adequate. Id. Cockerill understands his claim for relief and theory of liability. Cockerill Dep. 137:3–20, Ex. 3 to Defs. Mot. in Opp'n to Class Certification, ECF 82–4. Indeed, as the Supreme Court explained half a century ago, Rule 23 set out to rectify "the old procedural booby traps" which prevented "unsophisticated litigants from ever having their day in court." Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 373 (1966).

Moreover, as discussed above, whether Cockerill read—and therefore relied upon—specific classwide communications is irrelevant for Count I and V. Regarding Count IV, reading these communications potentially affects only one of four elements, detrimental reliance. Perhaps these arguments will weigh in the disposition of the case, but they simply do not expose any "fundamental conflict [ ] where some class members claim to have been harmed by the same

conduct that benefitted other members of the class." <u>Dewey v. Volkswagen Aktiengesellschaft</u>, 681 F.3d 170, 184 (3d Cir. 2012) (internal quotations and citations omitted). The theory of the case is that Employers' actions uniformly harmed the Early Retirement class members.

### b.   The Optional Retirement Plaintiffs (Counts II, IV, V, and VI)

Benson and Major are aligned with the unnamed members and are adequate representatives. No "fundamental conflicts" exist between them and the unnamed members—their sought relief universally benefits the class. <u>Dewey</u>, 681 F.3d at 184. They also have the "minimal degree of knowledge necessary[.]" <u>New Directions</u>, 490 F.3d at 313. Major testified to not being eligible for Optional Retirement in his deposition and both representatives have sought administrative relief on their claims. Major Dep. 128:4–136:23, Ex. 8 to Defs. Mot. in Opp'n to Class Certification, ECF 82–9; Major Level II Denial 2–3; Benson Claim, Ex. A to Pls. Resp. to Defs. Second Mot. to Dismiss, ECF 112. Thus, they are adequate.[19]

### c.   Class Counsel

Class counsel are adequate when they (1) possess adequate experience; (2) vigorously prosecute the action; and (3) act at arm's length from the defendant. <u>In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.</u>, 55 F.3d 768, 801 (3d Cir. 1995). Employers argue that defects in the counsel's motion for class certification precludes adequacy.

As detailed above, Employees' counsel have, at times, puzzled this Court. Nonetheless, they are adequate to represent the classes. Employers' staunch opposition to Employees' motion is not grounds for inadequacy. Attorneys for Employees are experienced ERISA litigators. Hopkins Decl. 1–4, Ex. A to Pls. Mot. for Class Certification, ECF 77–2; Wasow Decl. 1–7, Ex.

---

[19] This Court addresses Employers' unique defenses arguments below. For ease of comprehension, these assertions, which overlap with typicality and commonality, are discussed together.

B to Pls. Mot. for Class Certification, ECF 77–3; Stone Decl. 1–4, Ex. C to Pls. Mot. for Class

Certification, ECF 77–4. Moreover, they have vigorously prosecuted the action, amply responding

to Employers' motions and filing their own. And there is no evidence of back-dealing with

Employers—to the contrary pitted conflict defines the relationship.[20]

## B. Rule 23(b)

This Court may certify three types of classes under Rule 23(b). The first two are at issue.

Under Rule 23(b)(1), a class is appropriate if:

> prosecuting separate actions by or against individual class members would create a
> risk of:
>
> (A) inconsistent or varying adjudications with respect to individual class members
> that would establish incompatible standards of conduct for the party opposing the
> class; or
>
> (B) adjudication with respect to individual class members that, as a practical matter,
> would be dispositive of the interests of the other members not parties to the
> individual adjudications or would substantially impair or impede their ability to
> protect their interests.

Fed. R. Civ. P. 23(b)(1)(A)–(B). Said differently, Rule 23(b)(1)(A) "addresses possible

prejudice to the party opposing the class and is intended to eliminate the possibility of separate

actions imposing inconsistent courses of conduct on the defendant," while Rule 23(b)(1)(B)

focuses on "possible prejudice to the members of the proposed class" whose interests or legal

---

[20] Employers also argue that the Early Retirement and Optional Retirement classes are in tension with each other. They claim the Early Retirement claim is based on the idea that employment did not end under the Plan, while the Optional Retirement claims require finding employment did end. This Court agrees that, if the claims were mutually exclusive, the same counsel would be hard pressed to represent both classes loyally. At this stage, however, such a finding is speculative and premature. For instance, this Court could find that Employees were terminated for the purposes of Optional Retirement, but not for Early Retirement. Or, this Court could award one of the Benefits due under the Plan interpretation claims (Count I or II), while granting equitable relief for a fiduciary violation of the other one (Count IV, V or VI). If, as discovery progresses, relief for both claims reaches an impasse, this Court stresses its ability to modify certification as required under Rule 23(c).

claims may be foreclosed by the class litigation. <u>Beck,</u> 457 F.3d at 301 (internal quotations and citations omitted) (emphasis added).

Rule 23(b)(2) applies when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). The Third Circuit places an additional "cohesiveness" requirement of class claims for (b)(2) certifications. <u>Barnes v. Am. Tobacco Co.</u>, 161 F.3d 127, 142 (3d Cir. 1998). Because broad injunctive relief is the remedy, courts "must ensure that significant individual issues [of class members] do not pervade the entire action" in order to establish defendants' liability. <u>Id.</u> at 143 (internal quotations and citations omitted).

### 1. 23(b)(1) Certification

Rule 23(b)(1) certification is most appropriate when a defendant is "obligated to treat all members of the class alike as a matter of law or other necessity." <u>Cottillion v. United Ref. Co.</u>, 2013 WL 5936368 at *6 (W.D. Pa. Nov. 5, 2013), <u>aff'd,</u> 781 F.3d 47 (3d Cir. 2015) (citing <u>Amchem Prods. v. Windsor</u>, 521 U.S. 591, 614 (1997). Consequently, 23(b)(1) is "especially helpful in ERISA cases where a defendant provides unitary treatment to all members of a putative class and where litigation of some class members' rights could be implicated in suits brought by other class members." <u>Mezyk v. U.S. Bank Pension Plan</u>, 2011 WL 601653 at *9 (S.D. Ill. Feb. 11, 2011) (citing <u>Thomas v. SmithKline Beecham Corp.</u>, 201 F.R.D. 386, 396–97 (E.D. Pa. 2001)); <u>see also</u> <u>Ikon</u>, 191 F.R.D. at 466 (distilling the principle that certifications under 23(b)(1) are common in labor cases that allege "unitary treatment" of putative class members).

The Third Circuit has described claims brought under ERISA § 502(a)(2)—a closely related cause of action brought on behalf of a plan—as the "paradigmatic examples" of 23(b)(1) classes. Schering Plough, 589 F.3d at 604. While § 502(a)(1)(B) claims are not inherently in the interest of all plan participants, they can become so when asserted on behalf of participants in a class action. When liability for a § 502(a)(1)(B) class claim hinges on class-wide decisions, it is similarly paradigmatic. See, e.g, In re Citigroup Pension Plan ERISA Litig., 241 F.R.D. 172, 179–80 (S.D.N.Y. 2006) ("Because the claims here are premised on statutory violations caused by the terms of the Plan, and because plaintiffs seek injunctive relief—including the retroactive reformation of the Plan and recalculation of benefits—inconsistent dispositions of these claims by different courts" suffice for 23(b)(1) certification); Sloan v. BorgWarner, Inc., 263 F.R.D. 470, 475–77 (E.D. Mich. 2009) (certifying § 502(a)(1)(B) class seeking lifetime health benefits for the class); Stone v. Signode Indus. Grp., LLC, 594 F. Supp. 3d 993, 998 (N.D. Ill. 2022) (certifying 23(b)(1) and (b)(2) class for § 502(a)(1)(B) claim for health care benefits); Harju v. Olson, 709 F. Supp. 2d 699, 735–36 (D. Minn. 2010) (same).

In contrast, when material idiosyncrasies are sure to permeate members' claims, 23(b)(1) certification will fail because no one adjudication is likely to prejudice other plaintiffs, nor will incompatible standards emerge. Such is the case when different Plan documents apply to different class members. See Lutz Surgical Partners PLLC v. Aetna, Inc., 2023 WL 2153806 at *12 (D.N.J. Feb. 21, 2023) (denying certification because different plans applied to different members); Ass'n of New Jersey Chiropractors v. Aetna, Inc., 2023 WL 2154584 at *15 (D.N.J. Feb. 21, 2023) (denying certification because key documents in ERISA claims were tailored and customized for each class member).

This Court finds 23(b)(1) certification appropriate here for both classes. Employees want two benefits: the Early Retirement Class wants either clarification that they are entitled to the benefit, or, in the alternative, reformation of the Plan to allow them to age into it. The Optional Retirement Class seeks the same relief for the Optional Retirement Benefit. Moreover, for each count, both classes prevail based not on individual members' circumstances, but whether Employers' interpretation of the same Plan Document was arbitrary and capricious (Counts I and II), Employers misrepresented or failed to inform members how the spin-off affected benefits through uniform communications (Count IV), Employers harbored improper motivation for the spin-off (Count V), and Employers unlawfully cut-back the Optional Retirement Benefit through retroactive amendment (Count VI). When a factfinder decides any of these charges for one member, they would effectively decide it for everyone because Employers' statutory obligations and the relevant facts are the same for all members.

### 2. 23(b)(2) Certification

For largely the same reasons, this Court also certifies under Rule 23(b)(2). Employers made uniform decisions that denied Early Retirement and Optional Retirement Benefits to the members, respectively. By the same token, injunctive or declaratory relief that reinstates such benefits as of the time of the spin-off and onward, applies to all members. Cottillion, 2013 WL 5936368 at *6; Pfeifer v. Wawa, Inc., 2018 WL 4203880 at *5 (E.D. Pa. Aug. 31, 2018). Moreover, as discussed, material facts for the class members are not individualized, but largely uniform, satisfying the cohesive requirement. Shelton v. Bledsoe, 775 F.3d 554, 561 (3d Cir. 2015). Barnes instructs that cohesiveness means the class actions seek redress for "group, as opposed to individual injures," bound together by "significant common trait[s]" of the plaintiffs. Barnes, 161 F.3d at 143 n.18 (internal quotations and citations omitted). Here, two discrete

groups of Employees, concretely identified by common traits of age and years of service with Employers, seek the identical benefit for the respective group. They are cohesive.

And while it is true that a declaration or injunction will be "merely a prelude to a request damages," that does not pose an obstacle to a 23(b)(2) class when "the computation of the damages due each follow[s] mechanically." Berger v. Xerox Corp. Ret. Income Guarantee Plan, 338 F.3d 755, 764 (7th Cir. 2003) (Posner, J.). Calculating the proper benefit for each member—found in the matrixes of age and years of service—is easily computed by objective standards. Amara v. CIGNA Corp., 775 F.3d 510, 519–24 (2d Cir. 2014).[21] Because monetary damages naturally flow from the equitable relief, not subject to complex individualized determinations, they are "incidental," and permissible under Rule 23(b)(2). Amara, 775 F.3d at 519–24; Johnson v. Meriter Health Servs. Emp. Plan, 702 F.3d 364, 369–71 (7th Cir. 2012).[22]

## VII.    Discussion of Employers' Opposition to Certification

Employers raise several arguments that attack multiple prongs of the 23(a) analysis. These arguments include:

> (1) None of the unnamed Plaintiffs have exhausted administrative remedies, destroying numerosity;[23]

---

[21] This Court notes that the Third Circuit has not revisited what "incidental" monetary damages are permissible under 23(b)(2) since the Supreme Court's last decision on the matter, CIGNA. Richardson v. Bledsoe, 829 F.3d 273, 277 n.1 (3d Cir. 2016). This Court find persuasive the Circuits and in-Circuit district courts that have. See, e.g., In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig., 2023 WL 1818922 at *28 (D.N.J. Feb. 8, 2023) (incidental damages "flow directly from liability to the class as a whole" and may not be rely upon "the intangible, subjective differences of each class member's circumstances.") (citing pre-CIGNA Third Circuit cases) (emphasis in original).

[22] If, as this case matures, individualized retroactive money damages become a focus of litigation, this Court may well modify certification as appropriate. At this time, this Court understands Employees to largely desire injunctive and declaratory relief for the two Benefits at issue.

[23] Defs. Mot. in Opp'n to Class Certification 22.

(2) The statute of limitations has run for either all plaintiffs, or some of the named Plaintiffs, which makes certification inappropriate;[24]

(3) Variations in the choice of law for class members is lethal to certification;[25] and

(4) Several of the named Plaintiffs and unnamed class members have signed releases of liability for these claims, rendering them atypical[26]

This Court addresses them in turn.

## A. Exhaustion of Remedies

The Third Circuit "requires the exhaustion of Plan remedies in some, but not all, ERISA cases." D'Amico v. CBS Corp., 297 F.3d 287 (3d Cir. 2002). Exhaustion of internal administrative remedies is necessary when plaintiffs seek to enforce the terms of a benefit plan. Zipf v. AT&T, 799 F.2d 889, 891 (3d Cir. 1986). However, plaintiffs need not exhaust when they assert rights established by the ERISA statute. Id. In developing this distinction, the Third Circuit has admonished plaintiffs for attempting to "circumvent the exhaustion requirement by artfully pleading benefit claims as breach of fiduciary claims." Harrow v. Prudential Ins. Co. of America, 279 F.3d 244 (3d Cir. 2002). The dispositive question is whether "resolution of the claims rests upon an interpretation and application of an ERISA-regulated plan rather than on an interpretation and application of ERISA itself." Id. at 253–54 (internal quotations and citations omitted).

Even when plaintiffs file suit for ERISA benefits, they need not exhaust if it would be futile to do so. Several factors guide this analysis, including:

(1) whether plaintiff diligently pursued administrative relief;

(2) whether plaintiff acted reasonably in seeking immediate judicial review under the circumstances;

---

[24] Id. at 32.

[25] Id. at 26–27.

[26] Id. at 29–30.

(3) existence of a fixed policy denying benefits;

(4) failure of the defendant to comply with its own internal administrative procedures; and

(5) testimony of plan administrators that any administrative appeal was futile

Cottillion v. United Refin. Co., 781 F.3d 47, 54 (3d Cir. 2015) (citing Harrow, 279 F.3d at 250). Not all factors need to weigh evenly. Id. The moving party must provide "clear and positive" evidence of futility. D'Amico, 297 F.3d at 293. In practice, evidence of some failed appeals and a clear fixed policy to deny benefits is sufficient for a futility finding. Cottillion, 781 F.3d at 54–55.

Employers argue Employees' failure to exhaust affects class certification in two significant ways. First and foremost, Employers contend all class members who have not exhausted Corteva's administrative process are excluded from the class definition. Because no class members have exhausted except for the named Plaintiffs, Employers, in effect, argue that the failure to exhaust defeats class certification entirely—each class would consist of one or two people, which fails numerosity. Second, Employers argue that named Plaintiff Benson's failure to exhaust renders him atypical and inadequate to serve as a class representative.

Employees rebut with several arguments. First, under Zipf, they argue only Count I and Count II fall under ERISA's exhaustion requirement. Count IV, V and VI are statutory obligations. Regardless, because the Plan makes no reference to an exhaustion requirement (only the SPD articulates an exhaustion requirement) no Plaintiff needed to exhaust before filing suit. Third, exhaustion would be futile because Employers maintain a fixed policy, as demonstrated through named Plaintiffs' appeals, to deny the Optional Retirement and Early Retirement Benefits Plaintiffs seek.

### 1. Counts IV and V Do Not Require Exhaustion Under <u>Zipf</u>

Count IV (fiduciary breach) and Count V (preventing attainment of benefits) do not require exhaustion under <u>Zipf</u>. For both claims, Employees are not merely recasting their claim for benefits, but asserting distinct substantive violations under ERISA. <u>Harrow</u>, 279 F.3d at 253–54; <u>see also</u> <u>Smith v. Sydnor</u>, 184 F.3d 356, 361–63 (4th Cir. 1999) (independent fiduciary duty claim when plaintiffs alleged fiduciary sold preferred stock at undervalued price). Employees' § 404(a)(1) fiduciary breach claim stems from Employers' alleged omissions and misrepresentations separate from the Plan language itself. Those communications include the various emails, FAQs, and PowerPoint presentations Employers transmitted in the year leading up to the spin-off. In other words, the elements and evidence for Count IV are not "artful" framings of disputed Plan interpretation—they derive from the doctrines of fraud. Count V, moreover, focuses on the Employers' intent when deciding to spin-off the plan. Such intent has little, if any, relevance to interpretations of Plan language. Rather, the proscribed intent—preventing Employees from achieving benefits—is statutory. <u>See</u> <u>Gavalik v. Continental Can Co.</u>, 812 F.2d 834, 851–52 (3d Cir. 1987) ("Proof of specific intent to interfere with the attainment of pension eligibility . . . will ordinarily constitute a violation of § 510 of ERISA").

### 2. Counts I, II and VI Do Not Require Exhaustion for Unnamed Plaintiffs

Regardless, the Plan does not mandate any employees exhaust remedies prior to filing suit. Statements in a summary plan description "provide communication with beneficiaries <u>about</u> the plan, but . . . [they] do not themselves constitute the <u>terms</u> of the plan." <u>CIGNA</u>, 563 U.S. at 438 (2011) (emphasis in original). Courts interpret <u>CIGNA</u> to mean that Summary Plan Descriptions are binding plan documents only when the parties jointly treat SPDs as plan documents or the plan expressly incorporates the SPD. <u>See</u> <u>McLaughlin</u>, 686 F. App'x. 118, 123 n.3 (3d. Cir. 2017)

(including SPD as plan document when both parties treated it as such); Tetreault v. Reliance Standard Life Ins. Co., 769 F.3d 49, 56 (1st Cir. 2014) (SPD part of plan when, in contrast to CIGNA, plan document was not silent, but "expressly" incorporated SPD). Without such stipulations or authorizations, however, SPDs "cannot create terms that are not also authorized by, or reflected in, governing plan documents." Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey, 663 F.3d 1124, 1131 (10th Cir. 2011).

The Third Circuit has not directly addressed the question of when SPDs constitute terms of the plan post-CIGNA. But many other appellate courts have, adopting the Tenth Circuit's language in Eugene S. See Prichard v. Metropolitan Life Ins. Co., 783 F.3d 1166, 1170 (9th Cir. 2015) (following Eugene S.'s rule that the SPD cannot add terms to Plan unless expressly authorized); Tetrault, 769 F.3d at 56 (express incorporation in plan document required); Board of Trustees v. Moore, 800 F.3d 214, 220 (6th Cir. 2015) (SPD part of the plan when expressly incorporated). So too, have in-Circuit district courts. Ho v. Goldman Sachs & Co. Grp. Long Term Disability Plan, 2016 WL 8673067 at *9 (D.N.J. Oct. 28, 2016) (collecting in-Circuit district court cases following Eugene S). This Court joins them.

Here, neither the Plan document nor the SPD expressly incorporated the SPD as part of the Plan. In fact, the Plan does not mention the SPD at all. Instead, the 2018, 2019, and 2021 SPDs all include the same disclaimer that they are "description[s] of the Pension and Retirement Plan" and "do[ ] not describe every feature in the Plan" nor are they "intended to be [ ] full statement[s] of the official plan document." 2018 SPD 2; 2019 SPD 2; 2021 SPD 2, Ex. 39 to Defs. Mot. in Opp'n to Class Certification, ECF 82–14 (emphasis added). In the event of discrepancies, "the official plan document will govern." Id. The final, isolated line is particularly illustrative: "This summary does not constitute a contract of employment or guarantee any particular benefit." Id. Thus,

Employers diligently distinguished and excluded the SPDs from "guarantee[ing] any benefit," independent of the "official plan document," and CIGNA's direction squarely applies. See e.g. Calabree v. Eaton Med. Plan for Retirees & Other Eligible Individuals, 2015 WL 3903499 at *6 (E.D. Pa. June 25, 2015) (collecting in-Circuit district court cases where SPDs were not enforceable absent express incorporation). The SPDs' exhaustion language is not "part" of the Plan and does not bind Employees. See also Kaufmann v. Prudential Ins. Co. Am., 840 F. Supp. 2d 495, 499 (D.N.H. 2012) (concluding that SPD did not establish appeal procedure when no corresponding language was within plan document); Merigan v. Liberty Life Assurance Co. of Boston, 826 F. Supp. 2d 388, 396–98 (D. Mass. 2011) (finding appeal deadline only found within SPD was unenforceable).

Notwithstanding both these findings, exhaustion would also be futile for all class members. Named Plaintiffs Cockerill, Newton,[27] and Major fully exhausted the internal claims procedures. Supra, at 20–23. Those appeals reflect Employers' fixed policies. For the Optional Retirement Benefit, Employers made clear that "Optional Retirement is not applicable when employment is terminated in connection with a corporate spin-off," (Cockerill Denial) that "the corporate spin-off was considered a 'voluntary termination'" not triggering Optional Retirement (Newton Denial), and that "employment with [Historical DuPont] was not terminated due to lack of work" at spin-off rendering employees "not eligible for Optional Retirement benefits" (Major Denial). Id. For the Early Retirement Benefit, the denial of Cockerill's appeal also plainly held that "[b]ecause [his] employment with the Plan's sponsor terminated before [he] attained age 50, [he

---

[27] Although Newton will not serve as a class representative, his appeal is relevant evidence of Employers' fixed policy.

is] not eligible for Early Retirement." Cockerill Level II Denial 1, Ex. G to Pls. Reply to Defs. Opp'n to Class Certification, ECF 83–1.

The denials are consistent with Employers' Plan interpretation in the November 2018 meeting, and their defense of the present action. As in <u>Cottillion</u>, the "blanket administrative policy" denying the requested benefits and testimony from the Plan administrator explaining its interpretation of the Benefits provisions are dispositive. <u>Cottillion</u>, 783 F.3d at 54–55; <u>Handle v. Postmaster Gen., United States Postal Serv.</u>, 806 F. App'x 95, 99 (3d Cir. 2020). Any additional claims for the benefits at issue "would not merely be futile for the applicant, but would also be a commitment of administrative resources unsupported by an administrative or judicial interest." <u>Liberty Alliance of the Blind v. Califano</u>, 568 F.2d 333, 345 (3d Cir. 1977) (quoting <u>Weinberger v. Salfi</u>, 422 U.S. 749, 765–66 (1975)).[28]

---

[28] A final point on the matter—while named plaintiffs in a class action must ordinarily exhaust, the Third Circuit has not addressed whether unnamed class members must as well. <u>Feeko v. Pfizer</u>, 636 F. App'x 98, 108 n.1 (3d Cir. 2016) ("The overwhelming consensus among other courts to consider the question in the ERISA context is that exhaustion by unnamed class members is not necessary where the named plaintiffs have exhausted their administrative remedies.") (Ambro, J., dissenting on other grounds); <u>In re Household Int'l Tax Reduction Plan</u>, 441 F.3d 500, 501 (7th Cir. 2006) (deciding the "novel though not difficult" issue that unnamed class members in an ERISA class action suit do not need to exhaust plan remedies in order to join class) (Posner, J.).

Moreover, a clear majority of district courts to address this issue have found exhaustion is not necessary for unnamed class members in ERISA claims. See <u>Thomas</u>, 201 F.R.D. at 395 (stating that "in the context of an ERISA class action, only the <u>named plaintiffs</u> must exhaust their administrative remedies.") (emphasis in original) (internal citation omitted); <u>Matz v. Household Int'l Tax Reduction Inv. Plan</u>, 232 F.R.D. 593, 597 (N.D. Ill. 2005) ("requiring exhaustion by only the named plaintiffs is the better approach") (collecting cases including <u>Thomas</u>) <u>aff'd sub nom. In re Household Tax Reduction Plan</u>, 441 F.3d 500 (7th Cir. 2006); <u>Clarke v. Ford Motor Co.</u>, 220 F.R.D. 568, 576 (E.D. Wis. 2004) ("To require all class members to exhaust administrative remedies would place an unnecessary procedural hurdle in the path of ERISA plaintiffs and, thus, contravene ERISA's goal of protecting the interests of participants in benefit plans by providing convenient access to the federal courts."), <u>vacated on other grounds</u>, 228 F.R.D. 631 (E.D. Wis. 2005); <u>Adams v. Anheuser–Busch Cos., Inc.</u>, 2012 WL 1058961 at *6 (S.D. Ohio Mar. 28, 2012) ("In light of the nature of this [ERISA] case, the court will not require exhaustion of administrative remedies as a prerequisite for class membership"); <u>Knowlton v. Anheuser-Busch Companies, LLC</u>, 2014 WL 2009076 at *4–5 (E.D. Mo. May 16, 2014) (finding that exhaustion not required for unnamed plaintiffs in ERISA case and also that exhaustion would be futile); <u>Laurenzano v. Blue Cross and Blue Shield</u>, 134 F. Supp. 2d 189, 211 (D. Mass. 2001) (stating that only the lead plaintiff must exhaust her administrative remedies in an ERISA class action) (citing <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 414 n.8 (1975) (stating that unnamed class members need not exhaust administrative remedies for an award of back pay under Title VII)).

Even the minority of district courts that have required unnamed plaintiffs exhaust have afforded procedural flexibility to allow additional time for class members to do so. <u>Coffin v. Bowater Inc.</u>, 228 F.R.D. 397, 404 (D. Me. 2006). In

## B. Statute of Limitations

Employers contend statute of limitations arguments (1) defeat commonality and (2) render the named Plaintiffs of the Optional Retirement Class, Major and Benson, inadequate. Regarding commonality, Employers argue various statute of limitations apply to Counts I, II, V, and VI, depending on which state law governs. Separately, Employers allege that Major and Benson's claims are time-barred under all Counts, which makes them inadequate representatives.

### 1. Statute of Limitations Issues Do Not Defeat Commonality

Many courts "have refused to consider statute-of-limitations issues at the class certification stage" because that inquiry "veers impermissibly into whether the named plaintiffs and class can prevail" on the merits. In re Community Bank of Northern Virginia, 622 F.3d 275, 293 (3d Cir. 2010). Nonetheless, situations can arise where the defense "overlap[s] with certain of the Rule 23 requirements," such as deciding whether named plaintiffs are typical or adequate or whether individual questions will predominate under 23(b)(3). Id. at 293–94. So, while the Third Circuit allows a district court to consider statute of limitation defenses for certification hearings, it has

---

Coffin, the District Court did not reject certification based on exhaustion. Rather, the Court, after reminding defendant that it was "neither naive nor strategically blind," perceived the "obvious fact that [defendant] is insisting on" exhaustion to qualify for class membership, all the while "acting without any other purpose than delay and obstruction" to deny the claims. Id. at 403 n.8. Instead of denying certification, the Court baked into the class definition, all person who exhausted "prior to the date on which the Court acts on any dispositive motions, or . . . prior to the date of trial." Id. at 410. Thus, the Court sought a creative remedy to close the class on a future date to allow for exhaustion.

A closer analog comes from the Eastern District of New York. In Babcock v. Computer Assocs. Int'l, Inc., the Court had to decide multiple ERISA claims for certification. 212 F.R.D. 126, 132–33 (E.D.N.Y. 2003). As in this case, some were subject to exhaustion requirements, some were not (under Zipf, as discussed, Counts IV and V do not require exhaustion). The District Court noted the exhaustion requirement for unnamed plaintiffs was unsettled. Without deciding on the significance of exhaustion for unnamed plaintiffs, Judge Spatt decided that because some of the claims did not require exhaustion, the Court chose to certify all counts while noting that "the instant decision is a conditional certification," which could be amended under Rule 23(c)(1)(C) before final judgment. Id. at 133.

Altogether, this Court is persuaded by the majority approach and would not require unnamed Plaintiffs exhaust. Even if we were not, however, because Count IV and V do not require exhaustion, this Court finds certification at this stage appropriate for all Counts in the interest of economy, per Babcock.

also explained that "[c]hallenges based on statute of limitations . . . have usually been rejected . . . because those issues go to the right of a class member to recover, in contrast to the underlying common issues of the defendant's liability." In re Linerboard Antitrust Litigation, 305 F.3d 145, 163 (3d Cir. 2002) (citing NEWBERG & CONTI, NEWBERG ON CLASS ACTIONS § 4.26 (3d ed.)). Altogether then, this Court will review the statute of limitations arguments, but in the paler light that an opponent's "speculation and surmise" that individual defenses apply should not "tip the decisional scales in a class certification ruling." Huffman v. Prudential Ins. Co. of Am., 2018 WL 583046 at *6 (E.D. Pa. Jan. 29, 2018) (quoting Bridging Communities Inc. v. Top Flite Fin. Inc., 843 F.3d 1119, 1125 (6th Cir. 2016)).

As a preliminary matter, Employers have failed to cite any authority where a statute of limitations defense destroyed commonality, as opposed to its more stringent cousin, predominance.[29] Rather, when describing how statute of limitations defenses affect class certification, the Third Circuit conspicuously omitted commonality. In re Community Bank, 622 F.3d at 293–94. This makes sense, of course, because the presence of a defense does not erase common questions of liability. For this reason alone, Employers arguments are unavailing.

Even so, Employers have not identified, with specificity, how statute of limitations issues would unwind the bundle of common issues. For the Early Retirement Class, Employers do not actually assert the statute of limitation defense for any class members, named or unnamed, regardless of their state of residence. And a "speculative defense" is too contingent to weigh against certification. Beck, 457 F.3d at 301.

---

[29] The only in-Circuit district court opinion Employers cited for the statute of limitations proposition explicitly noted that the statute of limitations defense "by itself may not warrant decertification." In re Unisys Corp. Retiree Med. Benefits Litig., 2003 WL 252106 at *6 (E.D. Pa. Feb. 4, 2003) (emphasis added).

On the other hand, Employers do raise statute of limitations defenses for the Optional Retirement Classes. In their briefing, they have two alternative arguments. First, Delaware's one-year statute of limitations applies to Count II, V, and VI and time bars all class members. Alternatively, if another state's limitations law applies to some class members, Delaware class members are time-barred. Defs. Second Mot. to Dismiss 11–12, ECF 110.[30] Thus, Employers have pointed to two relevant statute of limitations laws, those of Delaware (potentially time-barred) and everywhere else (not time-barred)

Contrary to their purpose, Employers' bolster the common questions across the class. For one, does Delaware statute of limitations law apply to the entire Optional Retirement Class? Even if it does not, the legal questions do not greatly proliferate, they simply double from one to two. For those class members governed under Delaware law, the finder of fact will engage in an equitable tolling analysis.[31] For those class members under other state law, the statute of limitations issue is irrelevant. This Court either decides one, or two statute of limitations questions. Neither would defeat commonality.[32]

---

[30] No evidence in the record demonstrates where the unnamed Optional Retirement Class members reside. This Court will still consider Employers' arguments because it is reasonable to assume that the thousands of members are residents of various states.

[31] In our previous Memorandum denying Employers' Second Motion to Dismiss, this Court recognized Employees sufficiently pled that Employers' fraudulent concealment tolled any statute of limitation. Cockerill, 2023 WL 5672833 at *4. Furthermore, even the question of equitable tolling can be common because it "is the fact of [defendant's] concealment that is the polestar" in a tolling analysis. Linerboard, 305 F.3d at 163 (emphasis in original); see also, Slamon v. Carrizo (Marcellus) LLC, 2020 WL 2525961 at *21 (M.D. Pa. May 18 2020) (finding equitable tolling for each putative class member would not predominate over the common issues); In re Plastics Additives Antitrust Litigation, 2006 WL 6172035 at *12 (E.D. Pa. Aug. 31, 2006) ("common issues of [equitable tolling] predominate because the inquiry focuses on the alleged obscurantism of the defendants, rather than on the plaintiffs' conduct.").

[32] Employers acknowledge that ERISA provides the statute of limitations for Count IV, three years from date of discovery. However, they argue the accrual date differs among the class based on when misrepresentations were made to whom. As previously discussed, the communications at issue are class-wide (i.e. common), not individual. Supra, at 30–35. More importantly, the Supreme Court has directly held that limitations begin to run only when the plaintiff has "actual knowledge" of the breach. Intel Corp. Inv. Pol'y Comm. v. Sulyma, 140 S. Ct. 768, 775–77

### 2. Statute of Limitations Defenses Do Not Defeat Plaintiffs' Adequacy

Statute of limitations defenses can affect the adequacy of the named class representatives in two ways. In re Community Bank, 622 F.3d at 294. First a class member with an obviously time-barred claim can be inadequate because "a loser from the start knows that he has nothing to gain from the victory of the class, and so has little incentive to assist or cooperate in the litigation." Robinson v. Sheriff of Cook County, 167 F.3d 1155, 1157 (7th Cir. 1999) (Posner, J.). On the flip side, when the unnamed class members face defenses that the named representatives do not, adequacy may also fail. Doe v. Chao, 306 F.3d 170, 184 (4th Cir. 2002). The question is whether idiosyncratic timeliness issues give the named Plaintiffs divergent incentives from unnamed class members. In re Community Bank, 622 F.3d at 294.

Employers argue that Major and Benson are inadequate representatives because their claims are time-barred. However, as discussed above, Employers' statute of limitations arguments are largely applicable to all members of the Optional Retirement Class, not only Major and Benson. Employers argue Count II, V, and VI are entirely time-barred under Delaware's one-year statute of limitations. All class members have the same incentive to defeat this contention.

Alternatively, Employers argue that only Delaware class members, like Benson, are time barred. Here too, the mixed-class representatives properly include one representative aligned with Delaware members, and one aligned with other states. See Schering Plough, 589 F.3d at 601 (approvingly citing certification of "mixed" class representatives where some had signed releases of liability, and some had not when class consisted of some members who had signed releases and some had not).

---

(2020). Employers have not offered proof that any class members had actual knowledge of their alleged breach to toll the statute.

### C. Signed Releases Do Not Render Named Plaintiffs' Atypical

Employers argue that class member Major, who signed a release of liability is atypical. They claim that because Major's separation agreement released Employers from any ERISA liability claims, he will face unique defenses likely to subsume the focus of litigation.

In Schering Plough, the Third Circuit discussed how general releases and covenants not to sue affect typicality. When such agreements subject named plaintiffs to "unique defenses" apart from the class, their "interests and incentives may not be sufficiently aligned" with unnamed members. Schering Plough, 589 F.3d at 599–600. There, the named plaintiff had signed a total release of claims with the defendant. Id. at 591–92. The Third Circuit remanded certification, noting "specifically," that they "kn[e]w nothing about how many [other class members] have signed releases or covenants not to sue." Id. at 600. If the named plaintiff were the rare employee who signed a release, she was likely atypical. Id. If many other class members also signed releases, she could still be typical. Id. The upshot is that releases are relevant for certification analyses only to the extent that they affect the similarity of named and unnamed plaintiffs. Any "inquiry" into the merits of the defense "that is not necessary to determine a Rule 23 requirement," is premature. Hydrogen Peroxide, 552 F.3d at 317.

In its remand, the Court highlighted appropriately certified "mixed" classes. Schering Plough, 589 F.3d at 601. In these cases, "some but not all" representative signed releases, and the class contained "some who had signed releases, [and] some who had not." Id. at 601 n.17 (citing In re Aquila ERISA Litig., 237 F.R.D. 202 (W.D. Mo. 2006)). Altogether, the class representatives shared the same incentives as the mix of class members.[33]

---

[33] Even in the cases where Courts consider releases, they do not often find their presence precludes certification. See, e.g., Moore v. Comcast, 268 F.R.D. 530, 536–37 (E.D. Pa. 2010) (certifying class with one named plaintiff who

This Court finds the mixed representatives typical of the mixed class they will represent. For the Optional Retirement Class, Major has signed a release, and Oliver has not. Employers represent that between 110 and 389 class members have signed releases, which would account for approximately 5–19% of the class members.[34] Tr. First Class Certification Arg. 17:3–18:12, ECF 99. Notably, the only two releases in certification evidence contain identical language with respect to claims relinquished and governing law.[35] Defendants, who bear the burden to show the likelihood of unique defenses, have not produced any releases that differ from Newton or Major's. So, even if the releases absorb a significant focus of litigation, Major is not atypical, but incentivized in the same way as many unnamed members. Cf. In re Aquila, 237 F.R.D. at 211 (allowing for possibility of later decertification if releases later become overwhelming).

Nonetheless, this Court does not anticipate the releases will become a "major focus" of litigation. First, by the plain language of the release, it does not apply to Count II, which is a claim for vested Optional Retirement Benefits. Second, it also may not release Defendants Corteva, Historical DuPont, the Pension and Retirement Plan, or the Administrative Committee.[36] Finally, the releases may not affect Counts IV, V, or VI either, considering the carve-out provisions safeguarded claims for "vested" or "accrued" benefits. See Brieger v. Tellabs, Inc., 473 F. Supp.

---

had signed release that only 1.5% of class signed); In re Williams Cos. ERISA Litig., 231 F.R.D. 416, 423 (N.D. Okla. 2005) (certifying class even where no named plaintiffs signed releases while 10% of class had); Chesemore v. Alliance Holdings, Inc., 276 F.R.D. 506, 513 (E.D. Wis. 2011) (finding that presence of 10% of class who had released claims would not overwhelm litigation). Indeed, the limited holdings in Schering Plough and its cited authority merely remanded for consideration of releases; they did not mandate decertification. See Schering Plough, 589 F.3d at 601 n.16; Langbecker v. Electronic Data Systems Corp., 476 F.3d 299, 313 (5th Cir. 2007) (stating only that the District Court "must consider the releases more thoroughly on remand.") (emphasis added).

[34] The breakdown of how many members signed releases in each class, respectively, is unclear at this time.

[35] Newton also signed a general release at termination. Newton Release, Ex. 1 to Defs. Mot. to Dismiss First Compl. ECF 21–2.

[36] Central to Employers' defense theory is that the spin-off severed New DuPont and Specialty Products completely from Historical DuPont and the Plan, such that they may not qualify as a "parent corporation, affiliates, subsidiaries, divisions, predecessors, insurers successors and assigns." Major Release ¶ 4.a.

2d 878, 886 (N.D. Ill 2007) (finding that agreement carving out claims for vested benefits did not bar ERISA fiduciary breach claim because no evidence that "any signatory would have understood a release that expressly excepted claims for vested benefits to bar a claim that the signatory received a lower level of a vested benefits as a result of defendant's fiduciary breaches") accord Romero v. Allstate Ins. Co., 1 F. Supp. 3d 319, 369 n.10 (E.D. Pa. 2014). At the certification stage, this Court makes no ruling on these matters. Rather, the presence of multiple non-frivolous defenses to the release diminishes its likelihood of becoming a "major focus" of litigation.

### D.  Choices of Law Do Not Defeat Certification

When class plaintiffs span "all fifty states," Powers v. Lycoming Engines, 328 F. App'x. 121, 124 (3d Cir. 2009), class certification is appropriate only if differences in substantive state laws, applicable to the class, do "not present insuperable obstacles" which render class action litigation unmanageable. In re Sch. Asbestos Litig., 789 F.2d 996, 1010 (3d Cir. 1986).

Employers argue choice of law considerations are lethal to class certification. They acknowledge that the substantive liability rests on federal law, not subject to variations in state law. Rather, the conflict arises, they claim, from (1) various statute of limitations associated with each count and (2) applicable contract formation law for members who signed releases.[37]

---

[37] Generally, the choice of law consideration falls under Rule 23(b)(3)'s requirement that individual issues will not predominate over common ones, but the Third Circuit has suggested analysis of differing substantive law can also affect commonality, typicality and adequacy. Compare In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions, 148 F.3d 283, 315 (3d Cir. 1998) (analyzing choice of law under 23(b)(3)); Warfarin, 391 F.3d at 529 (same); and Georgine v. Amchem Products, Inc., 83 F.3d 610, 627 (3d Cir. 1996) (specifically declining to hold conflicting substantive state laws destroy commonality while holding same conflicts torpedo predominance requirement); with Powers, 328 F. App'x. at 124 ("Irreconcilable conflicts can be an impediment to certification because they can offset the analysis of the legal commonality, typicality, and adequacy requirements of Rule 23(a)) (non-precedential); and Huber v. Taylor, 469 F.3d 67, 82–83 (3d Cir. 2006) (noting that differences in substantive state laws could affect typicality and adequacy analyses for certification). While perhaps superfluous given Employees are not moving for a 23(b)(3) class, this Court will evaluate Employers' choice of law arguments.

First turning to the statute of limitations question. As previously addressed, the choice of state statute of limitations creates one potential split—whether Delaware's one-year time bar applies to Count I, II, V, and VI or a state law where the limitation period did not run.[38] This cannot weigh heavily on this Court's analysis for two reasons. First, a choice of law of two states is manageable, unlike the scenarios where the law of "forty-eight" or fifty "different jurisdictions" may become insuperable obstacles. Grandalski v. Quest Diagnostics Inc., 767 F.3d 175, 180 (3d Cir. 2014). Second, choice of law over an affirmative defense is less important than conflicts over laws of substantive liability. Compare Asbestos, 78 F.2d at 1010 (choice of law changed underlying theory of product liability); Prudential Ins., 148 F.3d at 315 (3d Cir. 1998) (discussing minor changes in common law claims in different states); and Warfarin, 391 F.3d at 529 (choice of law issue can arise "when claims arise under the substantive laws of the fifty states"); with Linerboard, 305 F.3d at 163 (characterizing statute of limitations defenses as going to the right of class members to recover, in contrast with "underlying" issues of "defendant's liability.")

Second, the Delaware choice of law provisions in the release does not harm commonality. For one, Delaware law would only apply to tertiary issues like the applicable statute of limitations and rules of contract formation for the release. As discussed above, the substantive theories of liability are federally decided. Second, the release may not amount to "anything more than a side issue" in this litigation. Supra, at 54–56; Chesemore, 276 F.R.D. at 513. Finally, even if the release requires Delaware law for some issues, it uniformly applies Delaware law. The choice of law would not splinter but reduce to one forum for any member who executed an agreement, Delaware.

---

[38] The second shortest statute of limitations on these Counts, as cited by Employers, is four years. Defs. Second Mot. to Dismiss 9–10. Employees filed suit less than three years after the spin-off.

## VIII.    Conclusion

For the foregoing reasons, this Court **CERTIFIES** Cockerill, Major, and Benson as representatives for their respective Classes. This Court **CERTIFIES** the Early Retirement Class for Counts I, IV, and V under Rule 23(b)(1) and 23(b)(2). This Court **CERTIFIES** the Optional Retirement Class for Counts II, IV, V, and VI under rule 23(b)(1) and 23(b)(2). An order will be forthcoming.

O:\CIVIL 21\21-3966 Cockerill et al v. Corteva, Inc\21cv3966 Memo for Class Certification FINAL.docx