**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT F. COCKERILL, CHRISTOPHER WILLIAM NEWTON, OLIVER MAJOR, and DARRELL D. BENSON, SR., individually and as representatives on behalf of a class of similarly situated persons,<br><br>Plaintiffs,<br><br>vs.<br><br>CORTEVA, INC.; DUPONT SPECIALTY PRODUCTS USA, LLC; DUPONT DE NEMOURS, INC.; E.I. DU PONT DE NEMOURS AND COMPANY; THE PENSION AND RETIREMENT PLAN; THE BENEFIT PLANS ADMINISTRATIVE COMMITTEE<br><br>Defendants. | Case No.: Case No. 2:21-cv-03966-MMB<br><br>**[PROPOSED] ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

After considering Defendants' Motion for Summary Judgment (ECF No. 196), and

Plaintiffs' Opposition thereto, it is hereby **ORDERED AND DECREED** that said Motion is

**DENIED**.

**SO ORDERED**, this ___ day of _____, 2024.

_____
MICHAEL M. BAYLSON, U.S.D.J.

i

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ROBERT F. COCKERILL, CHRISTOPHER WILLIAM NEWTON, OLIVER MAJOR, and DARRELL D. BENSON, SR., individually and as representatives on behalf of a class of similarly situated persons,<br><br>        Plaintiffs,<br><br>  vs.<br><br>CORTEVA, INC.; DUPONT SPECIALTY PRODUCTS USA, LLC; DUPONT DE NEMOURS, INC.; E.I. DU PONT DE NEMOURS AND COMPANY; THE PENSION AND RETIREMENT PLAN; THE BENEFIT PLANS ADMINISTRATIVE COMMITTEE<br><br>        Defendants. | Case No.: Case No. 2:21-cv-03966-MMB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................... 1

II.     LEGAL STANDARDS ....................................................................................................... 3

III.    THE PLAN ADMINISTRATOR'S INTERPRETATION OF THE EARLY
        RETIREMENT PROVISION OF THE PLAN IS ARBITRARY AND CAPRICIOUS. .. 5

IV.     THE PLAN ADMINISTRATOR'S INTERPRETATION OF THE OPTIONAL
        RETIREMENT PROVISION IS NOT REASONABLY CONSISTENT WITH THE
        PLAN'S TEXT. ................................................................................................................... 7

V.      COUNTS I, II, AND V ARE TIMELY. ........................................................................... 10

VI.     SUMMARY JUDGMENT IS INAPPROPRIATE WITH RESPECT TO COUNT IV ... 13

        A.      Defendants' Inadequate and Misleading Disclosures Failed to Inform Early
                Retirement Class Members That They Were Losing Their Ability to Age Into Early
                Retirement Benefits and Failed to Inform Optional Retirement Class Members That
                They Were Losing Their Right to Optional Retirement Benefits Altogether. .......... 13

        B.      Equitable Remedies Are Available to Remedy These Fiduciary Misrepresentations.
                ....................................................................................................................................... 17

VII.    SUMMARY JUDGMENT IS INAPPROPRIATE WITH RESPECT TO COUNT V
        BECAUSE PLAINTIFFS WILL SHOW THAT THE DECISION TO PLACE THE
        PLAN AND ITS SPONSOR WITH CORTEVA WAS DONE WITH THE
        KNOWLEDGE THAT THIS WOULD NEGATIVELY IMPACT THE RETIREMENT
        BENEFITS OF THOUSANDS OF LAN PARTICIPANTS. ............................................ 20

VIII.   BECAUSE A PLAN AMENDMENT CHANGED THE CRITERIA FOR OPTIONAL
        RETIREMENT BENEFITS, SUMMARY JUDGEMENT IS INAPPROPRIATE WITH
        RESPECT TO COUNT VI. ............................................................................................... 22

IX.     PLAINTIFFS WILL NOT ASSERT THEIR CLAIM FOR PROMISSORY ESTOPPEL
        UNDER STATE LAW. ...................................................................................................... 24

X.      MR. MAJOR'S CLAIMS ARE NOT RELEASED. ........................................................ 24

XI.     THERE IS NO BASIS TO GRANT SUMMARY JUDGMENT BASED ON
        EXHAUSTION. ................................................................................................................. 25

XII.    THERE IS NO BASIS FOR DECERTIFICATION OF THE OPTIONAL
        RETIREMENT CLASS. .................................................................................................... 27

XIII.   CONCLUSION ................................................................................................................. 28

Plaintiffs Robert F. Cockerill, Oliver Major, and Darrell D. Benson, Sr., individually and on behalf of all others similarly situated ("Plaintiffs") hereby oppose Defendants' Motion for Summary Judgment (ECF No. 196-1, hereinafter "MSJ").

## I.    INTRODUCTION

Defendants' MSJ either misstates, misunderstands or elides the applicable law and the factual basis for Plaintiffs' claims. A trial is necessary to sort out the material factual disputes that abound in this case.

This case is about DuPont's maneuvers to take away optional and early retirement benefits for a group of long-time employees. As part of a corporate spin-off, DuPont placed its Pension and Retirement Plan ("the Plan") with a newly formed company called Corteva, terminated thousands of employees from historical DuPont and re-employed them with "New DuPont," and designated New DuPont as a "non-participating" employer in the Plan. DuPont stripped these employees of eligibility for optional and early retirement benefits knowing that they would do the same work, at the same desk, for the same salary that they always had received, but that their retirement security had been fundamentally impaired.

On the first page of their MSJ, Defendants claim that "the Plan and the SPD make clear that a participant is only eligible for Early Retirement benefits if they are at least age 50 with at least 15 years of service *while still working for a participating employer in the Plan."* MSJ at 1. But the Plan contains no such language or anything approaching it, and DuPont obfuscated who was "still working for a participating employer in the Plan." In the same vein, Defendants claim that "the Plan makes clear" that Optional Retirement Benefits "are unavailable" due to "corporate reorganization." But again, the Plan says no such thing.

DuPont could have clearly communicated to the employees it was spinning off to New DuPont that they were losing rights to Optional and Early retirements with four simple statements: 1) your employment will be terminated on May 31, 2019; 2) as of June 1, 2019 you will work for New DuPont, which does not participate in the Plan; 3) if you are under 50 on May 31, 2019, you will never be eligible for an early retirement benefit; 4) you are not eligible for an optional retirement benefit because you still have a job. Instead, DuPont chose to make vague but reassuring statements that everyone's pension would be fine. The employees were not fine and this lawsuit followed.

Not only did DuPont provide scant and misleading communications, but DuPont got it wrong when it determined that Early and Optional Retirement benefits are not available to Plaintiffs and Classes under the Plan. In the case of optional benefits, the members of the Optional Retirement Class were entitled to those benefits under the clear Plan terms in Section IV.D because they were involuntarily terminated from historical DuPont. Defendants attempt to evade the clear language of the Plan by pointing to an exception to eligibility for optional retirement benefits in a sale or joint venture, but its own witnesses concede that the spin-off was neither. The facts around Plaintiffs' eligibility for optional retirement should be decided after testimony at trial.

Likewise, according to Defendants, employees with over 15 years of service could not choose to commence early retirement starting at age 50 unless they were already 50 **and** employed by DuPont on May 31, 2019. But that is not what the Plan says. The Plan says that a participant with 15 years of service can **commence** an early retirement starting at age 50. It does not say that participants have to be employed with the company to commence retirement, only that that they must reach 50 to start collecting the reduced retirement that they earned with 15

years of service. DuPont's witnesses contort themselves to suggest otherwise. Indeed, DuPont now claims that the loyal employees who are members of the Classes **were not** terminated for the purpose of optional retirement benefits, while they **were** terminated for the purpose of eligibility for early retirement. A trial is necessary so that the Court can hear all the testimony from both sides before making its decision.

Finally, Defendants' MSJ adopts a scattershot approach to other claims that this case should not be tried, but those arguments rely on misapprehension or misstatement of the governing law and the underlying factual disputes.

As the Court will hear at trial, for Class members the result of the spin-off was an enormous loss of retirement benefits and a loss of control over when and how they could retire. They were shocked to find out, sometimes as recently as when they received Class notice in this case, that their retirement would never happen as they planned. Plaintiffs ask that after trial they be placed in the position they were in prior to DuPont's illegal actions and be given the choice of whether and when to commence the benefits they earned through a long career at DuPont.

## II.    LEGAL STANDARDS

"When deciding a motion for summary judgment, '[a]ll reasonable inferences from the record must be drawn in favor of the nonmoving party' and the court 'may not weigh the evidence or assess credibility.'" *United States v. Care Alternatives*, 81 F.4th 361, 369 (3d Cir. 2023) (quoting *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 209 (3d Cir. 2005)). "[S]ummary judgment may not be granted where there is disagreement over inferences that can be reasonably drawn from [undisputed] facts." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 433 (3d Cir. 1996). This is true even where the Court is the trier of fact. *Id.* n.10. "To raise a genuine issue of material fact the opponent need not match, item for item, each piece of evidence

proffered by the movant." *Id.* (citing *Big Apple, BMW, Inc. v. BMW of N. Am. Inc.,* 974 F.2d 1358, 1362–63 (3d Cir.1992)).

Defendants argue that the ordinary summary judgment standards do not apply to ERISA benefit claims (Counts I and II). MSJ at 3. The Third Circuit has never adopted this rule, and other circuits apply varying procedures for determination of claims under ERISA § 502(a)(1)(B). *See, e.g.*, *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 958-61 (4th Cir. 2022) (surveying case law and holding that, if there are disputed issues of material fact, a Rule 52 bench trial is the appropriate mechanism); *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009) ("ignoring the protections that summary judgment usually affords the non-moving party" is erroneous).[1]

Counts I and II are subject to a specific legal framework, however. Because the Plan confers discretion on the Plan Administrator, its interpretations of "unambiguous" terms must be upheld "as long as those interpretations are 'reasonably consistent' with the plan's text." *Dowling v. Pension Plan For Salaried Emps. of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 245–46 (3d Cir. 2017) (citing *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012)). The Plan Administrator's interpretations of "ambiguous" plan language will be sustained unless they are "arbitrary and capricious." *Id.* (citing *McElroy v. SmithKline Beecham Health & Welfare Benefits Tr. Plan*, 340 F.3d 139, 143 (3d Cir. 2003)). "Whether plan language is ambiguous or unambiguous is itself a question of law subject to [] *de novo* review, with the definition of ambiguity being language that is 'subject to reasonable alternative interpretations.'" *Id.* (quoting

---

[1] Defendants mis-cite *Nolan*, which actually rejected the notion that a "motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine issue of material fact exists, do not apply." *Id.* (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

*Taylor v. Cont'l Grp. Change in Control Severance Pay Plan*, 933 F.2d 1227, 1233 (3d Cir.

1991)). Any biases and conflicts of interest on the part of the Plan Administrator are relevant to

whether its interpretations of the Plan are "reasonable" or "arbitrary and capricious." *Id*. at 250-

51. And, contrary to Defendants' assertion, the Court may certainly consider evidence of such

biases outside the administrative record. *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 (3d

Cir. 2010) (internal quotation omitted).

### III.   THE PLAN ADMINISTRATOR'S INTERPRETATION OF THE EARLY RETIREMENT PROVISION OF THE PLAN IS ARBITRARY AND CAPRICIOUS.

Section IV.B(1) of the Plan states that "[a]n employee will be eligible for Early

Retirement after reaching age 50 and prior to reaching age 65 with at least 15 years of service."

ECF No. 196-5 at PROD0000916-17. It does not state that a person must be employed by an

employer participating in the Plan as of the date they turn 50 in order to elect an early retirement

benefit. The Plan defines "employee" as "all employees of the Company hired on or before

December 31, 2006." *Id*. at PROD0000933. There is no end date, and this definition certainly

does not state that former employees are excluded. The term "employee" in Section IV.B(1) is

ambiguous because it does not specify whether it includes former employees of Historical

DuPont. *Cockerill v. Corteva, Inc.*, 2022 WL 3099771, at *6–8 (E.D. Pa. Aug. 4, 2022).

Defendants argue that their interpretation is not arbitrary and capricious because the Plan

contains multiple references to "former employees." MSJ at 6. But this is not dispositive, and

provisions of the Plan that relate to eligibility do not use the term "former employee." For

instance, the optional retirement provision also uses the term "employee" without "current" or

"former," and this provision clearly applies to participants whose employment has been

terminated. ECF No. 196-5 at PROD0000918. Moreover, the early retirement provision contains

5

a matrix for determining the percentage reduction based on "age at commencement of payment." *Id*. at PROD0000917. This would lead a reasonable participant reviewing the Plan to understand that so long as they commence payment at or over age 50, they are eligible to a benefit reduced in accordance with the matrix. Because Defendants' interpretation is inconsistent with express terms of the Plan and participant expectations, it is arbitrary and capricious. *See, e.g.*, *Dewitt v. Penn-Del Directory Corp*., 106 F.3d 514, 521-22 (3d Cir. 1997).

Moreover, Defendants clearly have a financial interest in interpreting the Plan to preclude those who were spun off to New DuPont before turning 50 from ever electing an early retirement benefit: the benefits these participants would have received under the early retirement provision are substantially higher than the benefits they were instead deemed eligible to receive under the Plan's "deferred vested" provision. Pl. Ex. 1 (Yang 67:5-15). This conflict is manifest in Defendants' shifting rationales: in their Motion, Defendants defend their interpretation by pointing to uses of the term "former employee" in the Plan, but The Committee's 30(b)(6) witness gave a different explanation:

> Q. So can you point me exactly to where in that front language of Section IV where it says that a person must be at least 50 at their determination [sic] date in order to receive an early retirement?
> A. Yeah. It's implicit in the word, "retire." You can commence your benefit at various different times, but you can only – retirement is measured at your termination date.
> Q. So retirement is not synonymous with commencement of benefit in your mind?
> A. No, it's not.
> Q. Retirement is synonymous with termination of employment in your mind?
> A. For purposes of the plan, it is.
> …
> Q. What I think you're saying is that because a person has to consent to commence their payments under this plan, that means that the word, "retire" is synonymous with termination of employment?
> A. In [Section IV], it is.

Pl. Ex. 2 (Durkovic Dep. 115:8-118:24). Changing rationales for denial of benefits supports a finding that the Plan Administrator has acted arbitrarily and capriciously. *See, e.g*., *McKay v. Bd. of Trs. of Bakery Drivers and Salesmen Local 194 Pension Fund*, 291 F. Supp. 3d 597, 605 (D.N.J. 2017) (plan administrator's "shifting rationales for its decision" and "clear conflict of interest" were evidence of abuse of discretion); *Jonathan Z. v. Oxford Health Plans*, 2022 WL 2528362, at *10 (D. Utah July 7, 2022) ("shifting rationales indicate the type of self-interested decision-making that . . . is the essence of an abuse of [a plan administrator's] discretion") (internal quotation marks omitted).

The words of the Plan are undisputed, but there are genuine disputes as to whether Defendants' interpretation is arbitrary and capricious. Summary judgment should be denied as to Count I.

## IV.   THE PLAN ADMINISTRATOR'S INTERPRETATION OF THE OPTIONAL RETIREMENT PROVISION IS NOT REASONABLY CONSISTENT WITH THE PLAN'S TEXT.

At the time of the spin-off, a participant was eligible for optional retirement after reaching age 50 with at least 15 years of service "if his employment would otherwise be involuntarily terminated for reasons other than discharge for dishonesty, insubordination or other misconduct." ECF No. 196-5 at PROD0000918. However, there were three enumerated exceptions to optional retirement eligibility, one of which Defendants rely on here to justify their denial of optional benefits to spun-off participants: where "the employee is offered and accepts employment with the buyer or joint venture at the site in conjunction with a sales agreement between the Company and a buyer of company assets or in conjunction with the formation of a joint venture." *Id*.

This Plan provision is not ambiguous: it means that optional retirement is not available to participants who accept employment in a sale of company assets or a joint venture. The spin-off was undisputedly *not* a sale of company assets or a joint venture. Pl. Ex. 2 (Durkovic 150:21-151:2); Pl. Ex. 3 (Dineen 229:15-230:21).

Recognizing that the Plan language itself did not support denial of optional retirement benefits in a spin-off, the Committee convened a 15-minute meeting to follow instructions from Company counsel to "make a formal interpretation" of the Plan "to include corporate spin-offs as one of the exceptions to the applicability of Optional Retirement." ECF No. 196-17 at PROD0003581; Pl. Ex. 4 (noting that the exception language "does not specifically reference a spin-off"); Pl. Ex. 3 (Dineen 238:3-17). This interpretation was not reasonably consistent with the Plan's express terms, and the Court should not defer to it.

Defendants attempt to justify their interpretation by reference to the "Plan sponsor's intention" to offer optional retirement as a sort of severance benefit to cushion the financial blow of lost employment, but the asserted purpose of the Plan provision cannot trump the plain terms of the Plan, which do not preclude optional retirement in a spin-off. *See Saltzman v. Independence Blue Cross*, 634 F. Supp. 2d 538, 561 (E.D. Pa. 2009) ("breach of contract principles, applied as a matter of federal law, govern claims for benefits due under an ERISA plan . . . and straightforward language in an ERISA plan document 'should be given its natural meaning.'") (citing *Bill Gray Enterprises, Inc. Employee Health and Welfare Plan v. Gourley*, 248 F.3d 206, 220 n.13 (3d Cir. 2001)). Moreover, participants who were spun to New DuPont undisputedly did not have comparable benefits to those who continued at Historical DuPont or its parent, Corteva. Pl. Ex. 3 (Dineen 263:13-264:1). Likewise, a participant who was involuntarily terminated but had other employment at "an unrelated company" was eligible for optional

benefits – even though he or she would not experience income loss. *Id*. at 224:4-21.[2] Thus, the rationale that optional retirement is intended only to help employees who lost compensation or benefits strains credulity.

Defendants further assert that their interpretation of the optional retirement provision is "consistent with past practice." But the evidence offered in support of this assertion is a list of "corporate transactions . . . related to Historical DuPont and/or the Plan" which was prepared for Defendants' expert in this litigation. ECF No. 196-6 at ¶¶ 5-6, App'x 1. Fourteen of the sixteen transactions on the list are sales, not spin-offs, and there is no information about any of the transactions that would enable the Court to determine whether they are remotely similar to the spin-off at issue here. *Id*. There is no contemporaneous evidence that it was actually DuPont's past practice to treat participants who were spun off to non-participating employers as ineligible for optional retirement. Even assuming it was, past practices that are not reasonably consistent with the Plan's express terms are still an abuse of discretion.

Finally, the Administrative Committee did not refer to the exception language in denying Mr. Major's benefit claim, instead pointing to later-enacted Plan language.[3] ECF No. 196-17 at PROD0003574-74. This alone makes this basis for denial ineligible for deferential review or means that Defendants have waived it. *Compare Matuszak v. The Torrington Co*., 927 F.2d 320, 322-23 (7th Cir. 1991) (no deference to newly asserted basis for denial), *with Lauder v. First Unum Life Ins. Co*., 284 F.3d 375, 381 (2d Cir. 2002) (finding defendant had waived new basis

---

[2] This testimony is ironic, given Defendants' expert's insistence that New DuPont and Historical DuPont are unrelated. ECF No. 179 at 4-5.

[3] Highlighting that the Plan's unambiguous terms in 2019 allowed optional retirement to spun-off participants, the Plan was amended effective February 1, 2021 to eliminate optional retirement for involuntary termination for "reasons other than discharge for dishonesty, insubordination or other misconduct." ECF No. 196-13 at PROD0000881.

by not asserting it prior to the lawsuit); *see also Gritzer v. CBS, Inc.*, 275 F.3d 291, 296 (3d Cir. 2002) (where plan administrator provided no reason for denial, reasons provided for the first time in litigation reviewed de novo).

Summary judgment is not warranted as to Count II.

## V.   COUNTS I, II, AND V ARE TIMELY.

Defendants mistakenly argue that Counts I, II and V are untimely because, they say, Plaintiffs filed their complaint more than a year after their claims accrued. In fact, however, these counts, like the remaining claims in the case, were timely filed.

ERISA Section 413 provides a statute of limitations for fiduciary breach and other claims brought under part 4 of ERISA, of the earlier of: "(1) six years after (A) the last action which constituted a part of the breach or violation or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had *actual knowledge* of the breach or violation." 29 U.S.C. § 1113(1)(2) (emphasis added). The "actual knowledge" provision is construed literally, and thus requires actual, not constructive or hypothetical, knowledge of the breach or violation.  *See Intel Corp. Investment Policy Committee v. Sulyma*, __ U.S. ___ , 140 S. Ct. 768, 776-77 (2020). "[I]n the case of  fraud or concealment," ERISA Section 413 tolls the accrual of the six-year statute of repose and provides that an action under part 4 of ERISA "may be commenced not later than six years after the discovery of such breach or violation." 29 U.S.C. § 1113.

ERISA's statutory limitations periods do not apply, however, to claims brought under other parts of ERISA, including, as relevant here, claims for benefits under 29 U.S.C. § 1132(a)(1)(B) (Counts I and II), and for interference with protected rights under 29 U.S.C. § 1110 (Count V), both of which arise under part 5 of ERISA. Because ERISA does not provide a

statute of limitations for these kinds of claims, courts "borrow" limitations periods from analogous state law statutes of limitations, *see Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 (3d Cir. 1992), or apply the limitations set forth in the plan itself. *See Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013) ("principle that contractual limitations period should ordinarily be applied as written . . . when enforcing an ERISA plan"). Even when a borrowed state law provision applies, accrual of the claims is governed by federal law, which requires discovery of the violation and tolls the limitation period if there is fraudulent concealment. *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1127 (3d Cir. 1988). With respect to a claim for plan benefits such as asserted in Counts I and II, "[a] participant's cause of action under ERISA accordingly does not accrue until the plan issues a final denial." *See Heimeshoff*, 571 U.S. at 105.

In arguing that Counts I, II and V are untimely, Defendants make a multi-step argument. First, they contend that Pennsylvania's choice of law rule applies and, under this rule, Delaware law with respect to the statute of limitations applies. Second, they contend that a one-year Delaware limitations period applies to all three counts. Third, they argue that the claims accrued when members of the classes received a benefit statement in July of 2019 that Defendants say clearly informed the class members of the benefits to which they were and were not entitled, thus triggering accrual of the limitations period. Because the suit was filed more than a year after this "notice" was sent, Defendants insist the suit is untimely with respect to the claims for benefits and the claim for interference with a protected right under ERISA Section 510. But Defendants have taken a wrong turn at each step.

First, Defendants are mistaken that "Pennsylvania's choice of law rules determine which state's law controls the limitations period." MSJ at 10. For this erroneous proposition, Defendants cite *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994), a case about

choice of law where a federal court is exercising diversity jurisdiction. Here of course, the court is exercising federal question jurisdiction under ERISA. In such a case, the Third Circuit has rejected an "interest analysis" of the kind conducted in *Kruzits* and instead has instructed that courts must "follow the general rule and borrow a limitations period applicable to the forum state claim most analogous to the ERISA claim at hand." *Gluck*, 960 F.2d at 1180. As in *Gluck*, this means that the Court should "proceed to a determination of the most analogous Pennsylvania claim for each of the claims asserted here." *Id.*

For this reason, Defendants are incorrect that Delaware's one-year statute of limitations for wages, salary, overtime and benefits, 10 Del. C. § 8111, applies. Indeed, even if Delaware were the forum state the law of which this Court should borrow, the state law provision that Defendants point to is not the appropriate analogy with respect to either the benefits claim or the claim for interference with benefits. *See DeWitt v. Penn-Del Directory Corp.*, 872 F. Supp. 126, 133–34 (D. Del. 1994) (applying Delaware's three-year limitations period for "actions[s] based on a statute" or "actions[s] based on a promise," 10 Del. C. § 8106, to an ERISA § 510 claim). But the more salient point is that *Gluck* makes clear that Pennsylvania's four-year statute of limitation for breach of contract is the appropriate limitations period for Counts I and II, and Pennsylvania's general six-year statute of limitations is the appropriate limitations period for the Section 510 claim. 960 F.2d at 1181.

Finally, Defendants are also mistaken about when the claims accrued for purposes of measuring the limitations period. Defendants insist that the claims accrued in July of 2019 when they say that class members all received notice that they say should have alerted Class members to the fact that they no longer had the same ability to the obtain early and optional retirement benefits that they had prior to the spin-off. Plaintiffs, however, dispute that these notices alerted

class members to anything, much less that they did so clearly. *See Gluck*, 960 F.2d at 1181 ("statute of limitations measured from the time a claimant first knows that the benefit has been infringed or denied"). In any event, this argument about accrual is irrelevant for two reasons. First, "[a] participant's cause of action under ERISA accordingly does not accrue until the plan issues a final denial." *Heimeshoff*, 571 U.S. at 105.[4] Second, under the applicable four- and six-year Pennsylvania statutes of limitations (and indeed under the three-year Delaware statute that would apply were this case in federal court in Delaware), the claims are timely even assuming the notices started the clock ticking.

## VI.   SUMMARY JUDGMENT IS INAPPROPRIATE WITH RESPECT TO COUNT IV

### A.   Defendants' Inadequate and Misleading Disclosures Failed to Inform Early Retirement Class Members That They Were Losing Their Ability to Age Into Early Retirement Benefits and Failed to Inform Optional Retirement Class Members That They Were Losing Their Right to Optional Retirement Benefits Altogether.

Plaintiffs' fiduciary breach claims turn on whether, in the months and years leading up to the spin-off, the plan-wide communications about the impact of the decision to place the venerable DuPont Plan with a newly formed corporation called Corteva rather than with the company called DuPont, were misleading and incomplete, especially given that all of the Class members remained at their same desks doing their same jobs for a company called DuPont, both before and after the spin-off. Contrary to Defendants' contention, this issue, as with most questions of fiduciary breach, can only be determined by this Court after consideration of the testimony presented at trial from the Plaintiffs as well as company officials. *See In re Unisys Sav.*

---

[4] Mr. Cockerill's claim was finally denied on September 4, 2020. ECF No. 196-5 at PROD0001608-09. Mr. Major received a final denial of his claim by letter dated August 22, 2022. ECF No. 196-17 at PROD17628-31. And Mr. Benson's final appeal of his benefit claim was denied on February 23, 2024. ECF No. 196-10 at PROD0021562-69. This case was filed on September 3, 2021. ECF No. 1.

*Plan Litig.*, 74 F.3d 420, 443 (3d Cir. 1996) ("Whether the communications constituted misrepresentations and whether they were material under the principles we have articulated are questions of fact that are properly left for trial.").

The existence of certain communications is undisputed, but the distribution, meaning and materiality of these communications remains hotly contested. As Plaintiffs intend to prove at trial, the communications that Defendants tout did not plainly or understandably inform Plaintiffs and Class members of the information they needed to know and did not even reach the named Plaintiffs and many other Class members. Indeed, many of the communications that will be discussed at trial appear designed to reassure employees and create the impression that everything would remain the same with respect to the benefits under the Plan. Pl. Ex. 5 (Message from CEO Ed Breen stating "As always, continuing to fulfill our obligations to plan participants is a top priority and we have given careful and diligent thought to the structure of the U.S. DuPont Pension and Retirement Plan ("the "Plan") with the best interests of our pensioners in mind, including assignment of the retirement obligations."); Pl. Ex. 6 (September 1, 2017 letter from Ed Breen stating "[C]ontinuing to fulfill our obligations to plan participants remains a top priority); Pl. Ex. 7 (Annual Funding Notice Questions and Answers stating "All participants will be accounted for in the transition to the new companies."); Pl. Ex. 8 (Letter to participants from Meghan Cassidy, VP, Human Resources Agriculture Division of DowDuPont and Kim Wallenhorst, VP, Human Resources, Specialty Products Division of DowDuPont, stating "[R]egardless of which company administers your pension in the future, the amounts of existing pensioner's benefits will not change. All participants will be accounted for in the transition to the new companies."). *See Osberg v. Foot Locker, Inc., (Osberg II)*, 862 F.3d 198, 213 (2d Cir. 2017) (affirming district court findings "that class-wide communications uniformly failed to

14

describe wear-away and, in fact, concealed the phenomenon by giving participants the false impression that their benefits would be fully reflected in growing account balances").

Most importantly, none of the Plan fiduciaries informed Class members of the facts they needed to know: (1) that they were being terminated from employment effective June 1, 2019 for purposes of Pan benefits; (2) that their new employer is not participating in the plan; (3) that if they were not yet age 50 on May 31, 2019, they could not get early retirement benefits and would never be able to; and (4) that despite being terminated, and even if they were over 50 at the time of the spin-off, they could get optional benefits under the Plan terms that provide for such benefits when an employee is terminated for any reason other than cause, because the Plan administrator decided that a spin-off is an exception to eligibility. Indeed, that Defendants were aware of how to plainly communicate this information is demonstrated by its inclusion in the letter denying Mr. Cockerill's appeal of his benefit denial, *see* ECF No. 196-5 at PROD0001608, which unfortunately came after the spin-off, too late for him and other employees to object or to make alternative plans.

This failure to inform the Class members of what they needed to know is a fiduciary breach. *See In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* 579 F.3d 220, 228 (3d Cir. 2009) (citing *Bixler v. Cent. Penn. Teamsters Health and Welfare Fund,* 12 F.3d 1292, 1300 (3d Cir. 1993), for the proposition that an ERISA fiduciary's duty of candor encompasses "not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful").

The documents and deposition testimony cited by Defendants by no means conclusively establish that the communications were clear or sufficient to meet the Defendants' fiduciary duty to inform Plaintiff about the impact of the spin-off on their pension benefits. And while

15

Defendants blame Plaintiffs for failing to click a link in an email that would have led to a website with some materials that might have alerted them to some of the changes that were about to take place (although not in plain and easy to understand terms), the fact that none of the Plaintiffs found this information could hardly be more relevant to Plaintiffs' contention that Defendants' communications were inadequate. Indeed, as evidenced by a discussion among Human Resources officials, there was some concern about this method of communication given the lack of traffic on the website by employees. Pl. Ex. 9. Mary Dineen, who was in charge of pension plan communications at the time of the spin-off, acknowledged that employees were not required to click on the links containing the materials nor were there any mandatory meetings to inform participants about changes to their pension eligibility. Pl. Ex. 3 (Dineen 21:4-13, 337:20-23; 338:6-8. When asked why DuPont had not clearly communicated that spun-off participants were being terminated for early retirement purposes (but not for optional retirement purposes), Ms. Dineen testified "I think we felt that all new DuPont employees understood that," and "I feel that that was not a question we were getting" and it wasn't necessary to explain. *Id*. at 341:3-16, 343:19-344:11. But the Chief Financial Officer of DowDupont testified that he personally never went to the website and even at the time of the deposition did not understand that employees of Specialty Products had been terminated for purposes of obtaining early retirement benefits. Pl. Ex. 10 (Fanandakis 82:7-14-19, 158:14-16). Plaintiffs certainly did not understand it. *See* Pl. Ex. 11 (recorded phone call from Plaintiff Cockerill to Corteva Connection). Although Defendants dismiss Plaintiffs' testimony that none of them understood the changes that would take place at the spin-off or what benefits they remained eligible for after the spin-off as their own "subjective" and "unreasonable misunderstanding," MSJ at 14-16, such common lack of understanding is also extremely relevant to whether the Plan fiduciaries failed to meet their duty

16

of candor in communicating with the participants about their benefits. Whatever the case may be, these are factual issues that must be resolved at trial.

### B. Equitable Remedies Are Available to Remedy These Fiduciary Misrepresentations.

Defendants also insist that they are entitled to summary judgment on the Count IV fiduciary breach claim because, they say, no equitable remedy is possible on the undisputed facts. This argument misunderstands both the factual issues that remain in the case and more fundamentally, the law of remedies.

Plaintiffs seek one of three kinds of equitable relief with respect to the fiduciary breaches: (1) plan reformation; (2) surcharge; or (3) equitable estoppel. All three types of remedies were recognized by the Supreme Court as available under ERISA to remedy fiduciary breaches, specifically with regard to misleading communications. *Cigna Corp. v. Amara*, 563 U.S. 421, 443 (2011).

First, with respect to reformation, Defendants are correct that this remedy requires either mutual mistake or mistake on the part of the plaintiff and fraud or inequitable conduct by the fiduciary defendants. They also correctly quote the Second Circuit on remand from the Supreme Court in *Amara*, that the kind of inequitable conduct by a fiduciary that can support reformation incudes "obtaining an undue advantage by means of some act or omission that is unconscientious or a violation of good faith." *Amara v. CIGNA Corp.*, 772 F.3d 510, 525 (2d Cir. 2014). This is exactly what Plaintiffs will prove at trial through evidence that Defendants violated their duties by failing to plainly inform plan participants of the impact of the spin-off on their early and optional benefits given the placement of the Plan in the newly-formed Corteva Corporation, deciding to treat the Class members as terminated for purposes of the Plan's age requirements for early retirement but as not terminated in a relevant way for purposes of optional retirement

17

benefits and fostering a false impression that employees had nothing to worry about with respect to these benefits. *See Osberg II*, 862 F.3d at 213, 215 (2d Cir. 2017) (affirming district court findings that class-wide communications were misleading and concluding that reformation allows the court to reform the plan to reflect the representations that the defendants made to the plaintiffs). Defendants do not and cannot point to uncontested facts which would preclude such a showing at trial.

Defendants also insist that, for reformation, Plaintiffs must show that their mistaken understanding of the Plan was objectively reasonable. But Defendants have not shown what in the record precludes Plaintiffs from establishing that they reasonably expected that if they stayed at the same desk at the same job both before and after the spin-off, they would remain eligible for early retirement benefits, particularly when they were not informed otherwise, and that if they qualified for optional retirement benefits because the company considered them "terminated" they would receive the optional retirement benefits available to employees who are terminated for reason other than cause. Defendants' assertion that Plaintiffs failed to exercise "reasonable prudence" by figuring out that they would be considered terminated for one purpose but not for another is nothing more than an attempt to hold the plan participants to a higher standard than the fiduciaries charged with acting in their interests.

Defendants' arguments with respect to surcharge being unavailable are likewise unavailing. First, Defendants misconstrue the basis for Plaintiffs' fiduciary breach claim, erroneously asserting that it is based on an allegation that they were harmed by the denial of the early and optional retirement benefits. Based on this misconstruction, and ignoring that Plaintiffs assert the fiduciary breach claim in the alternative to the benefit claims asserted in Counts I and II, Defendants cite *Varity v. Howe*, 516 U.S. 489, 512 (1996), to argue that Plaintiffs have

alleged harms that are duplicative of what they seek in Counts I and II and that are therefore precluded as repackaged benefit claims. But Plaintiffs in fact contend that they were harmed by Defendants' failure to tell them that they were about to lose their ability to get these benefits at a time when they could have done something about it. Moreover, neither *Varity* nor the other cases cited by Defendants in any way support that a plan participant is precluded from simultaneously asserting that they are entitled to plan benefits but, if not, they are entitled to relief to the extent that they have been damaged by fiduciary breaches in misrepresenting available benefits. To the contrary, many decisions, including the Supreme Court's decision in *Amara* itself, support that a participant may assert such a claim in the alternative and seek such relief. *See Amara*, 563 U.S. at 436-38 (holding that plan participants were not entitled to benefits under the plan as written but remanding for the district court to consider whether appropriate equitable relief in the form of surcharge or reformation was available to remedy misrepresentations); *Dean v. Nat'l Production Workers Severance Trust Plan*, 46 F.4th 535, 544 (7th Cir. 2022) (holding that while "a participant generally cannot pursue both a § 502(a)(1)(B) claim and a § 502(a)(3) claim if the two claims seek the same relief or are based on the same allegations. . . . Participants may still plead the two claims in the alternative.").

Finally, because both reformation and surcharge may be available remedies if Plaintiffs prove, as they intend to do, that Defendants breached their fiduciary duty of candor with respect to the effect of the spin-off on Plan benefits, they need not also prove entitlement to an estoppel remedy to forestall summary judgment in favor of Defendants. But Plaintiffs have presented evidence of reliance and harm, some of which Defendants cite. *See* MSJ at 23-24. *See also Amara*, 775 F.3d at 527 (recognizing that by making "incomplete, inconsistent [and] contradictory disclosures" Defendants "prevented *all* of its employees becoming disaffected,

spreading knowledge of the plan to others . . . and from planning for their retirement"). Just because Defendants disagree with Plaintiffs' assertions and testimony does not mean they are entitled to a summary judgment ruling in their favor on these issues.

**VII.** **SUMMARY JUDGMENT IS INAPPROPRIATE WITH RESPECT TO COUNT V BECAUSE PLAINTIFFS WILL SHOW THAT THE DECISION TO PLACE THE PLAN AND ITS SPONSOR WITH CORTEVA WAS DONE WITH THE KNOWLEDGE THAT THIS WOULD NEGATIVELY IMPACT THE RETIREMENT BENEFITS OF THOUSANDS OF PLAN PARTICIPANTS.**

In relevant part, ERISA Section 510 provides "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. This provision "makes it unlawful to interfere with the attainment of rights or benefits associated with an employee benefit plan." *DiFederico v. Rolm Co., 201* F.3d 200, 204 (3d Cir. 2000). To succeed on a claim under Section 510, a "plaintiff must demonstrate that the defendant had the 'specific intent' to violate" the provision, which "requires the plaintiff to show that 'the employer made a conscious decision to interfere with the employee's attainment of pension eligibility or additional benefits.'" *DiFederico v. Rolm Co.,* 201 F.3d 200, 205 (3d Cir. 2000) (quoting *DeWitt v. Penn–Del Directory Corp.*, 106 F.3d 514, 522 (3d Cir.1997) (additional citations omitted)).

Importantly, a plaintiff may make this showing through either direct proof or circumstantial evidence of intent but when, as is usually the case, the plaintiff is unable to offer direct proof, the court applies the burden shifting analysis developed in in *McDonnell Douglas Corp. v. Green*, 411 U.S. 791, 802 (1973), for Title VII discrimination cases. *DiFederico*, 201 F.3d at 205. Under this framework, the plaintiff must make a prima facie showing of a violation, at which point the burden shifts to the defendant to who must articulate a legitimate,

nondiscriminatory reason for the violation; only if the defendant is able to do so must the

plaintiff prove by a preponderance of the evidence that the employer's reason is pretextual. *Id.*

(citations omitted).

Plaintiffs will show at trial that the decision to place the Plan with Corteva was not done

for a legitimate business purpose but was done with the express knowledge and therefore intent

that it would prevent many active Plan participants from attaining early and optional retirement

benefits after the spin-off. Although corporate officials described the decision to place the Plan

with Corteva as intended to balance the credit ratings of the three companies, this contention is

pretextual given that DowDuPont had to make a massive contribution to prefund the Plan in

order to accomplish this. Pl. Ex. 1 (Yang 88:22-89:8); Pl. Ex. 12 (noting that pension

contributions of $2.9 billion and $1.1 billion were made in 2017 and 2018, and "[a] significant

portion of the $4 billion in contributions was considered discretionary, meaning they were above

the minimum level required by law."). *See also* Pl. Ex. 13 at PROD0005180 (showing that

~6,700 active plan participants would become deferred vested or retirement eligible post-spin

and a correlating decrease in underfunding status from $2.9 billion in 2018 to $2 billion

forecasted 2020). The Administrative Committee's tortured formal interpretation of the Plan

language to foreclose optional retirement benefits for employees who had been terminated from

the Plan sponsor as a result of this decision was even more plainly made for the purpose of

cutting off these benefits. ECF No. 196-17 at PROD0003581.

Defendants argue that summary judgment in their favor is warranted because they say

"the only record evidence shows that Defendants' business decision to merge and then

restructure the business via the Spin-Off was a corporate strategy spanning more than four years"

that was "'intended to create[e] to create three strong, independent growth companies tended to

be industry leaders focused on driving innovation and delivering long-term value for shareholders." MSJ at 26 (quoting statement from Corteva 30(b)(6) witness). Such boosterism does not a fact establish. But, in any event, this contention simply misses the mark. Plaintiffs in no way contend that the merger and spin-off itself was done with the intent to cut off benefits for a large group of employees, but rather that the placement of the Plan, which was, according to the Defendants, not decided until shortly before the spin-off, was done for this purpose. Furthermore, the fact that some other employees benefitted from the spin-off in no way "establishes that Defendants did not undergo the Spin-Off with the purpose of interfering with employees' attainment of benefits." MSJ at 27.

## VIII.   BECAUSE A PLAN AMENDMENT CHANGED THE CRITERIA FOR OPTIONAL RETIREMENT BENEFITS, SUMMARY JUDGEMENT IS INAPPROPRIATE WITH RESPECT TO COUNT VI.

Section 204(g) of ERISA provides, as relevant here, that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." 29 U.S.C. § 1054(g)(1). This provision was amended in 1984 to ensure that an amendment "reducing or eliminating an early retirement benefit" be "treated as reducing accrued benefits," *id.* § 1052(g)(2), and thus subject to the prohibition on benefit cut-backs.[5]

At the time of the spin-off, the Plan provided that participants who were "involuntarily terminated for reasons other than discharge for dishonesty, insubordination, or other misconduct" are entitled to "optional retirement" if they, like all members of the Optional Retirement Class, were over 50 years old with 15 years of eligible service at termination. ECF No. 196-5 at PROD0000918. The Plan provided exceptions for optional retirement eligibility if the employee

---

[5] "Because early retirement benefits "by definition commence prior to normal retirement," *Shaver v. Siemens Corp.*, 670 F.3d 462, 472 (3d Cir. 2012), both the early and optional retirement benefit are covered by the 1984 amendment to Section 204(g).

continued to work for a new entity that bought the Plan sponsor or was a joint venture with the Plan sponsor. *Id.* Plaintiffs maintain (Count II) that the members of the Optional Retirement Class all became entitled to Optional Retirement benefits when they were terminated from employment with the Plan sponsor at the time of the spin-off on June 1, 2019 (and increasing benefits thereafter as they aged) based on the plain and unambiguous Plan terms.

However, Defendants attempted to change the criteria and cut-back these benefits in two ways. First, they cut back these benefits through a "formal interpretation" voted on by the Administrative Committee at a 15-minute meeting in which the Committee was tasked with interpreting the Plan to make participants such as the Optional Retirement class members ineligible. *Supra* p. 8. Second, apparently recognizing that the interpretation did not fit the existing Plan language, the Board of Corteva later amended the Plan to remove the language applicable to the over-50 participants that qualified them for benefits so long as they were terminated "for reasons other than discharge for dishonesty, insubordination, or other misconduct," and applied this amended provision in denying Plaintiff Major's claim. ECF No. 196-13 at PROD0000881; ECF No. 196-17 at PROD0003574-74.

In *Hein v. F.D.I.C.*, 88 F.3d 210, 216 (3d Cir. 2010), the Third Circuit held that even in the absence of an actual amendment of plan text, "[a]n erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an "amendment" for the purposes of ERISA § 204(g)." Therefore, the court held that if the fiduciary "improperly denied Hein unreduced early retirement benefits, McNeil's action could be construed as a Plan amendment, and ERISA § 204(g) would apply." *Id.* (citation omitted).

The same is true here and both the original interpretation and the later Plan amendment are subject to 204(g) and in violation of that provision if they were used to improperly deny the Optional Class members' benefits.

## IX.     PLAINTIFFS WILL NOT ASSERT THEIR CLAIM FOR PROMISSORY ESTOPPEL UNDER STATE LAW.

From the beginning, Plaintiffs asserted state-law claims for promissory estoppel in the alternative to the ERISA claims in the event that Defendants asserted, and this Court found, that any of the Defendants were not acting in a fiduciary capacity with respect to their communications with Plaintiffs and the Classes concerning early and optional benefits. Because it appears that Defendants are not asserting that any of the Defendants lack such capacity, Plaintiffs do not intend to assert this state-law claim.

## X.     MR. MAJOR'S CLAIMS ARE NOT RELEASED.

Plaintiffs do not dispute that Mr. Major entered into a valid release on July 31, 2021. ECF No. 196-18. However, the release is not applicable to the claims in this case.

First, on its face, the release only covers DuPont Specialty Products and New DuPont, Mr. Major's employer and its parent company at the time he signed. ECF No. 196-18 at App'x 1. Therefore, the release at most precludes Mr. Major's claims against those two Defendants. The release cannot be read to apply to Corteva, historical DuPont, the Committee or the Plan, who were not "parents, affiliates, [or] subsidiaries" of Specialty Products. *Id.; see Cockerill v. Corteva, Inc.*, 345 F.R.D. 81, 121 n.36 (E.D. Pa. 2023). Mr. Major may thus pursue Counts II, IV, V, and VI against these entities.[6]

---

[6] Mr. Major is not the representative of or a member of the Early Retirement class, which asserts Count I. He also does not assert Count III, and Plaintiffs are not pursuing Count VII. *Supra* x.

24

Further, the release contains a carve-out for claims for "vested or accrued employee benefits under Employer's . . . retirement plans." *Id*. Thus, "by the plain language of the release, it does not apply to Count II, which is a claim for vested Optional Retirement Benefits." *Id.* at 121. Defendants argue that Mr. Major is not seeking any "vested or accrued" benefit because optional retirement was "neither accrued nor vested at the time he executed the release," relying on *Romero v. Allstate Ins. Co*., 1 F. Supp. 3d 319, 371 (E.D. Pa. 2014). MSJ at 31-32. This argument fails. In *Romero*, the court stated that vested benefits are the accrued benefits that an employee is "entitled to keep" under the terms of the plan at the time the participant signed the release. 1 F. Supp. 3d at 371. Mr. Major was undisputedly vested in the Plan, and the crux of Count II is that he accrued the right to an optional retirement when he was involuntarily terminated on May 31, 2019 as a result of the spin-off. ECF No. 102 at ¶¶ 125-127. Accepting Defendants' argument about the release would require the Court to also accept their argument as to the merits of Count II, i.e., to hold that the spin-off extinguished Mr. Major's eligibility for optional retirement benefits. If the Court agrees that the express terms of the Plan entitle Mr. Major to an optional retirement, then he has a vested and accrued right to such benefit and his claim in Count II was carved out of the release.

The Court need not even reach the issue of whether Count II seeks vested or accrued benefits, though, as Count II is not asserted against New DuPont or Specialty Products, the only parties Mr. Major released. The Court should reject Defendants' arguments as to the release.

## XI.   THERE IS NO BASIS TO GRANT SUMMARY JUDGMENT BASED ON EXHAUSTION.

ERISA's "exhaustion requirement is a nonjurisdictional affirmative defense." *Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 282-83 (3d Cir. 2007). Defendants contend that the exhaustion

requirement set forth in the September 2018 SPD is enforceable against Plaintiffs Major and Benson, and that they failed to properly exhaust. MSJ at 33-34.

This issue was thoroughly addressed in the Court's order granting class certification, and Defendants have offered no reason for the Court to depart from its holdings that (1) there is no exhaustion requirement in the Plan and the SPD's exhaustion language does not bind participants; (2) Mr. Major fully exhausted the SPD's claims procedure, and (3) exhaustion would be futile for all Class members. *Cockerill*, 345 F.R.D. at 116-17. Defendants insist that the SPD's claims process is "part of the Plan document as all parties treated it as such," citing *McLaughlin v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 686 Fed. Appx. 118, 123 n.3 (3d Cir. 2017). MSJ at 33. But the plaintiffs in *McLaughlin* had argued for the first time in their reply brief that the SPD was not a plan document and could not control, so the court held that the argument was forfeited – it did *not* hold that merely participating in a claims and appeals process set forth in an SPD means the parties have agreed the process is part of the plan. *Id. See also Cockerill*, 345 F.R.D. at 116 (citing *McLaughlin* and noting that without "stipulations or authorizations," SPDs "cannot create terms that are not also authorized by, or reflected in, governing plan documents.") (citation omitted).

Whether or not the SPD's procedure here is incorporated into the Plan is immaterial, in any event, because Mr. Major complied with it[7] *and* compliance is excused because it would be futile. Where a benefit denial is based on a fixed policy or interpretation, exhaustion is excused as it would be futile. *Harrow v. Prudential Ins. Co. of Am.*, 279 F.2d 244, *250 (3d Cir. 2002); *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 916-17 (3d Cir. 1990); *Cotillion v. United Ref. Co.*,

---

[7] Defendants argue that Major only exhausted his individual claim and not the Optional Class's claim. MSJ at 34. This argument fails, because the individual and class claims are the same. *See Cockerill*, 345 F.R.D. at 112.

No. CIV. A. 09-140E, 2013 WL 1419705, at *14-15 (W.D. Pa. Apr. 8, 2013). This Court has already held that the appeals for Plaintiffs Cockerill, Major, and Newton "reflect Employers' fixed policies" that "Optional Retirement is not applicable when employment is terminated in connection with a corporate spin-off" and that early retirement is not available to participants who terminate employment with the Plan sponsor before attaining age 50. *Cockerill*, 345 F.R.D. at 117. Thus, exhaustion would be futile for Mr. Benson and other Class members. *Id.*

## XII.   THERE IS NO BASIS FOR DECERTIFICATION OF THE OPTIONAL RETIREMENT CLASS.

Defendants' basis for seeking decertification of the Optional Retirement Class is that Plaintiff Benson assertedly "has no interest in receiving an Optional Retirement benefit." MSJ at 35. But Mr. Benson agreed to serve as a representative of the Optional Retirement Class and meets the Class definition – which does not require members to elect an optional retirement benefit, but instead simply to be over 50 with at least 15 years of service as of May 31, 2019 and to continue to be employed post spin-off by New DuPont or another non-participating employer (and to have an optional benefit greater than their early retirement at spin-off). ECF No. 137. To the extent Mr. Benson was uncertain about the precise contours of the optional retirement claim in his deposition, that is immaterial to his typicality or adequacy as a named Plaintiff. *Cockerill*, 345 F.R.D. at 111 ("Named Plaintiffs need only 'a minimal degree of knowledge' about the litigation to be adequate.") (citing *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)). The confusion fostered by the Defendants' misleading and inadequate disclosures is at the heart of this case. In any event. Mr. Bensen will testify at trial that he seeks an optional retirement benefit.

Further, even if the Court were to find Mr. Benson somehow inadequate or atypical, that would not warrant decertification of the Optional Retirement Class: the Class already has an

adequate and typical representative in Plaintiff Major. *Id.* at 112. Mr. Benson was added as a

proposed representative to address concern about Mr. Major's release, but as discussed herein

and in Plaintiffs' class certification papers, he has not actually released any of the claims in this

lawsuit and the release does not render him inadequate or atypical. *Supra* p. 24-25; ECF No. 83

at p. 11-12. Thus, there is no basis for decertification.

## XIII.   CONCLUSION

      For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

                        Respectfully submitted,

DATED:  June 7, 2024       By:   */s/ Nina Wasow*
                        Nina Wasow (*pro hac vice*)
                        Todd Jackson (pro hac vice)
                        FEINBERG, JACKSON, WORTHMAN
                        & WASOW LLP
                        2030 Addison Street, Suite 500
                        Berkeley, CA 94704
                        Telephone: (510) 269-7998
                        Facsimile: (510) 269-7994
                        nina@feinbergjackson.com
                        todd@feinbergjackson.com

                        Elizbeth Hopkins (*pro hac vice*)
                        Susan L. Meter (*pro hac vice*)
                        Jaclyn Conover (ID No. 312449)
                        KANTOR & KANTOR, LLP
                        9301 Corbin Avenue, Suite 1400
                        Northridge, CA 91324
                        Telephone: (877) 783-8686
                        Facsimile:  (253) 285-1849
                        ehopkins@kantorlaw.net
                        smeter@kantorlaw.net
                        jconover@kantorlaw.net

                        Edward S. Stone (*pro hac vice*)
                        EDWARD STONE LAW P.C.
                        175 West Putnam Ave., 2nd Floor
                        Greenwich, CT 06830
                        Telephone: (203) 504-8425
                        eddie@edwardstonelaw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 7, 2024, a true and correct copy of **PLAINTIFFS'**

**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was filed

using the Court's CM/ECF system, and thereby served copies of same on counsel for all parties of

record registered with the ECF system.

Cory A. Thomas, Esq.
Nipun J. Patel, Esq.
Holland & Knight LLP
One Liberty Place
1650 Market Street, Suite 3300
Philadelphia, PA 19103
Cory.thomas@hklaw.com
Nipun.patel@hklaw.com

Todd D. Wozniak, Esq. (*pro hac vice*)
Holland & Knight LLP
1180 West Peachtree Street N.W., Suite 1800
Atlanta, GA 30309
Todd.wozniak@hklaw.com

Kayla L. Pragid (*pro hac vice*)
777 S. Flagler Dr., Suite 1900W
West Palm Beach, FL 33401
Kayla.Pragid@hklaw.com

*Counsel for Defendants*

*/s/ Nina Wasow*
Nina Wasow