## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ROBERT F. COCKERILL et al.,** <br> *Plaintiffs,* <br><br>      **v.** <br><br> **CORTEVA, INC. et al.,** <br> *Defendants* | **CIVIL ACTION** <br><br> **NO. 21-3966** |

Baylson, J.                                                      June 17, 2024

### MEMORANDUM

## I.  PROCEDURAL HISTORY AND FACTUAL SUMMARY

In its previous Class Certification Memorandum, this Court recited the lengthy and complex factual and procedural history of this action. Cockerill v. Corteva, Inc., 345 F.R.D. 81 (E.D. Pa. 2023). In brief, this lawsuit sprouts from two corporate actions Defendants executed on August 31, 2017, and June 1, 2019.

On August 31, 2017, E.I. Du Pont De Nemours and Company ("Historical DuPont") and Dow, Inc. merged, creating a new combined entity, DowDuPont. Id. at 92–94. Then, on June 1, 2019, the corporation DowDuPont spun-off into three independent companies: Corteva Inc. (a new entity), Dow Inc., and DuPont De Nemours ("New DuPont"). Id. Critically, at spin-off, Historical DuPont, and the Pension and Retirement Plan ("the Plan") it had sponsored for over 100 years became a subsidiary of Corteva, not New DuPont. Id. at 97–98.

The rub, according to Plaintiffs, is that while thousands of Historical DuPont employees kept the same job, at the same location, with the same pay, Defendants (New DuPont, Historical DuPont, and Corteva) surreptitiously "terminated" these employees on paper. That is, as of the spin-off, these employees were no longer Historical DuPont's (a Corteva subsidiary) employees—

1

they became employees of the brand-new corporate form, New DuPont, which did not participate in the Historical DuPont retirement Plan. As a result of this alleged paper-only termination, Plaintiffs claim they lost valuable retirement benefits, in violation of the Employment Retirement Income Security Act ("ERISA").

Two specific defined benefits are at issue here—Early Retirement and Optional Retirement Benefits. Defined benefits are set monthly payouts employees may receive under a retirement plan, akin to Social Security, but sponsored by a private company. The Early Retirement Benefit entitled employees who were reached age 50 with at least 15 years of employment with Historical DuPont to receive a monthly payment, at retirement, given their age and years of service. Cockerill, 345 F.R.D. at 93. The Optional Retirement Benefit functioned similarly (eligible for over age 50 employees with 15 years of experience) but was slightly more generous in its payout structure. Id. The Optional Retirement Benefit was available when an employee lost his job with Historical DuPont, due to no fault of his own. Id.

### A.  **Description of Plaintiff's Claims**

Plaintiffs initiated this suit on September 3, 2021. On November 17, 2023, this Court certified two Plaintiffs classes, one for employees seeking the Optional Retirement Benefit, and one for employees seeking the Early Retirement Benefit. ECF 137. Below are the Plaintiffs' remaining claims, and the defined classes.

- **Count I and Count II:** Plaintiffs seek clarification and enforcement of the Plan's Early Retirement and Optional Retirement Benefits under 29 U.S.C. § 1132(a)(1)(B) ("ERISA Benefit Denial Claims").

  - **Count I (Early Retirement Class)** asserts, that under the language of the Plan, the Early Retirement Benefit is available to those who were under age 50 with at least

15 years of service with Historical DuPont and transferred to New DuPont at the time of spin-off.

- o **Count II (Optional Retirement Class)** asserts, that under the language of the Plan, that the spin-off, by terminating employment with Historical DuPont, entitled eligible employees to Optional Retirement Benefits at spin-off.

- **Counts IV, V and VI:** In the alternative to the ERISA Benefit Denial Claims (Counts I and II), Plaintiffs argue that the Defendants violated several provisions of ERISA.

  - o **Count IV (both classes)** asserts Defendants breached ERISA fiduciary duties by misinforming and omitting information that would have explained the effect of the spin-off on Early Retirement and Optional Retirement Benefits to Plaintiffs. 29 U.S.C. §§ 1104–05.

  - o **Count V (both classes)** asserts that Defendants' purpose in assigning Historical DuPont class employees to New DuPont at spin-off, even though Historical DuPont continued to sponsor their Plan, was to prevent Plaintiffs from attaining Optional and Early Retirement Benefits, in violation of 29 U.S.C. § 1140.

  - o **Count VI (Optional Retirement Class)** asserts that Defendants impermissibly amended the Optional Retirement Benefit to cut back Plaintiffs' accrued Benefit. 29 U.S.C. § 1054(g).

The classes are:

- **Early Retirement Class (Count I, IV and V):** Historical DuPont Plan employees who were under age 50 with at least 15 years of experience at the spin-off and continued to work for New DuPont until they reached age 50. Plaintiff Robert Cockerill is the class representative.

- **Optional Retirement Class (Counts II, IV, V, and VI):** Historical DuPont Plan employees who were over 50 with at least 15 years of experience when they were assigned to New DuPont at spin-off. Plaintiffs Oliver Major and Darrell Benson are class representatives.

On May 31, 2024, Defendants moved for summary judgment on all remaining claims with a submitted Statement of Material Facts. Defs. Summ. J., ECF 196. Plaintiffs responded on June 7, 2024, and Defendants replied on June 14, 2024. Pls. Resp. to Summ. J., ECF 206; Defs. Reply, ECF 219. This Court, before issuing this Memorandum, has reviewed over 4,000 pages of record evidence.

### B.  Undisputed Facts

The parties agree on much of what transpired before and after the spin-off. Moreover, the facts presented at summary judgment are nearly identical to the record this Court exhaustively reviewed and recounted in its Class Certification Memorandum. Cockerill, 345 F.R.D. at 92–98, 99–102. In summary, the relevant undisputed facts, are that before the spin-off, DowDuPont decided that thousands of Historical DuPont employees would continue employment under New DuPont post-spin-off. Id. Because those employees were no longer employed by Historical DuPont, a Corteva subsidiary, Defendants interpreted the Plan to mean those employees were no longer participating in the Plan and could not accrue any additional benefits. Id.

Plaintiff Cockerill, prior to the spin-off, was 49 years old and had worked for Historical DuPont for over 26 years. Id. at 102 After spin-off, he became a New DuPont employee. Because he was not 50 years old when he lost employment with Historical DuPont, Defendants determined he could never become eligible for the Early Retirement Benefit. Id. Cockerill learned this fact when he applied for an Early Retirement Benefit, and Defendants denied it to him. Id.

Before the spin-off, Plaintiffs Major and Benson were both over age 50 and had worked for Historical DuPont for over 20 years. Id. at 103–04. After the spin-off, they too became New DuPont employees. Id. They seek the Optional Retirement Benefit. Id. Their logic is that if employment with Historical DuPont did terminate, then they are entitled to Optional Retirement under the Plan. In Major's administrative appeal, Defendants denied that the spin-off triggered the Optional Retirement Benefit. Id. Instead, Defendants interpreted the spin-off as an exempted corporate action. Id. Under the Plan, when, due to a joint venture agreement, company sale, or subsidiary transfer, an employee was no longer employed by Historical DuPont, but continued the same functional job with the new entity, Optional Retirement did not apply ("Business Exceptions"). Id. at 95.

Beyond the relevant Plan documents, it is undisputed that Defendants generated and distributed several class wide communications in the months and years leading up to the spin-off. While the meaning of those communications is hotly disputed, their existence is not. Id. at 93–97. Some of those pre-spin-off communications that discuss how the spin-off would affect Plan benefits include emails from DowDuPont CEO Ed Breen, emails from Defendants' Human Resources Department, a website created by Defendants, PowerPoint presentations circulated to employees, and Question and Answer documents. Id.

Both parties have also unearthed a few new exhibits at summary judgment. Plaintiffs supplement the record with some more class communications, in which Defendants' generally, albeit vaguely, reassure class members that the spin-off will not harm their benefits. Pls. Ex. 3 ("Breen September 1, 2017 Email"), ECF 206-4; Pls. Ex. 7, 206-8 ("Pension Question and Answer"); Pls. Ex. 8, 206-9 ("Human Resources February 9, 2018 Email"). Plaintiffs also produced a pre-spin-off email exchange among the Human Resources Department, showing that

several employees were unsure how the spin-off was going to affect their Early Retirement accruals. Pls. Ex. 9 at 3–4, 206-10.

The final new material exhibit sheds light on the financial effects of Defendants' Plan interpretation. According to Defendants' internal calculations, before the spin-off, and subsequent elimination of benefits to both classes, the Plan's liabilities had exceeded its assets, by billions of dollars every year, for a decade. Pls. Ex. 13 at 34, ECF 206-14. After the spin-off—and elimination of potential benefits for thousands of class members—Defendants projected its absolute Plan obligations to drop by some four billion dollars and the Plan deficit to narrow by nine hundred million dollars over the following three years. Id.



Id.

C.  **Disputed Facts**

Most disputed facts center around the interpretation of the class communications. Were the various corporate bromides reassuring class members that they would not lose their accrued benefits misleading? Was the language in Defendants' PowerPoints misleading? Plaintiffs, of course, argue they were, while Defendants contend the communications clearly explained the effects of the spin-off on benefits. Defs. Statement of Fact, ¶¶ 31, 33, 35, 37, ECF 196-3; Pls. Resp. Statement of Fact, ¶¶ 31, 33, 35, 37, ECF 207. In that vein, both parties trade deposition excerpts to support their position. Defs. Statement of Fact, ¶¶ 53, 111; Pls. Resp. Statement of Fact, ¶¶ 53, 111.

Parties also dispute that the Plan distinguishes between former and current employees when describing the Early and Optional Retirement Benefits. Defs. Statement of Fact, ¶ 17; Pls. Resp. Statement of Fact, ¶ 17.

Another dispute arises from the Plan Administrator Meeting on November 1, 2018. The parties disagree whether classifying the spin-off as one of the Business Exceptions outlined in the Plan, such that it would not trigger the Optional Retirement Benefit, is consistent with past practice. Defs. Statement of Fact, ¶ 29; Pls. Resp. Statement of Fact, ¶ 29.

The last major dispute revolves around the financial implications of Defendants' Plan interpretation. For thousands of over age 50 Historical DuPont employees, the spin-off, by "terminating" them from Historical DuPont and assigning them to New DuPont, allowed them to begin their Early Retirement benefits immediately, while still working for New DuPont and earning a salary. Defs. Statement of Fact, ¶¶ 39–44; Pls. Resp. Statement of Fact, ¶¶ 39–44. Defendants point this out to show that the spin-off multiplied its immediate payouts—thousands of employees began receiving their benefits earlier than they would have because they could both

continue working and receive pension simultaneously. Defs. Statement of Fact, ¶¶ 43–44; Pls. Resp. Statement of Fact, ¶¶ 43–44. Plaintiffs dispute that the number and demographics of post-spin-off Early Retirement electees is known, and thus argues that the financial implications are murky. Id.

## II.  **PARTY CONTENTIONS**

### A.  **Defendants' Contentions**

#### 1.  Statute of Limitations

Defendants argue that the statute of limitations has run on Counts I, II, and V. First, Defendants insist that Delaware provides the statute of limitations for these counts. Defs. Summ. J. at 9–11. Using Pennsylvania's choice of law analysis, Defendants assert that Delaware trumps other jurisdictions because the Plan was "drafted, offered, and administered in Delaware," and Delaware was the corporate headquarters for Historical DuPont and Corteva through 2021. Id. at 10. Then, under Delaware's one-year statute of limitations, Defendants continue, both classes received a statement with their post-spin-off benefits by July 2019, triggering the limitations period. Id. at 10–11. Because Plaintiffs did not file suit until September 3, 2021, over two years later, their actions are time-barred. Id.

#### 2.  Counts I and II—Benefit Denial Claims

Defendants explain that under ERISA § 502(a)(1)(B), in Benefit Denial claims where the Plan codifies discretion to the Plan Administrator, this Court must review the Defendants' decision to deny Early Retirement (Count I) and Optional Retirement (Count II) Benefits with an "arbitrary and capricious" standard of review. Defs. Summ. J. at 3–4. Through that lens, Defendants argue, only denials that rise to an "abuse of discretion," are actionable. Id. Moreover, Defendants contend that the ordinary rules of summary judgment give way to a tighter frame in § 502(a)(1)(B) claims,

where this Court may only look to whether the Defendants' interpretation of the Plan was reasonable given the administrative record, and only the administrative record. Id. at 4–5.

For the Early Retirement determination, Defendants conclude that their interpretation of "employee" of Historical DuPont as "current employee" followed the unambiguous language of the Plan, and alternatively, was reasonable if interpreting an ambiguous term. Because the Plan provides the Early Retirement Benefit to "an employee" of Historical DuPont who has reached age 50 with over 15 years of experience, Defendants argue, employees under age 50 are not eligible. Id. 5–6. "Employee," moreover, unambiguously only includes current, not former employees. Id. Defendants support this assertion based on the word's "plain, natural meaning," and because other sections of the Plan explicitly distinguish between employees and former employees, indicating "employee" must exclude past employees. Id. at 6. Finally, Defendants claim no evidence shows their interpretation of employee as inconsistent with past practice. Id.

Second for the Optional Retirement decision, Defendants appear to concede ambiguity in the Plan, but argue their interpretation of the spin-off as a qualifying Business Exception was reasonable. Id. at 7. Defendants contend that interpreting the spin-off as an exception is consistent with the Plan's purpose and past practice. Id. While the spin-off does not expressly fit into any of the Business Exceptions listed in the Plan (i.e. sale, transfer, or joint venture), Defendants argue that the purpose of the Optional Retirement Benefit was to insure employees who lost work as a result of corporate restructuring, not to protect employees who continued to work in the same position, at the same site after a corporate transaction. Id. 7–9. Defendants further state that they treated a prior corporate spin-off in the same way as this one—denying Optional Retirement to employees at the spun-off company, so long as they did not lose their position. Id. at 8. As such,

Defendants argue that interpreting the Plan to deny Optional Retirement Benefits to the class was reasonable. Id.

### 3.   Count IV—Breach of Fiduciary Duty Claim

Defendants move for judgment on Count IV under two theories—liability and damages. As to liability, Defendants argue they communicated the spin-off's effect on both the Early and Optional Retirement Benefits clearly and without omission. Id. at 13–17. Defendants specifically highlight CEO Ed Breen's email on November 1, 2018, the two PowerPoints circulated in March 2019 discussing Early Retirement Benefits at spin-off, a question-and-answer document explaining Early Retirement eligibility after spin-off, and the Summary Plan Description's ("SPD") explanation of benefits as clear communications. Id. Defendants characterize Plaintiffs' countervailing interpretations as subjective and unreasonable. Id. 15–17. Finally, Defendants support their position by pointing out that thousands of employees who were over 50 at spin-off have begun their benefits, suggesting they understood the spin-off effects. Id.

Moreover, even if some representations were inaccurate, Defendants argue, those infirmities were mitigated by the clear language of the Plan describing that under 50 employees at spin-off would be ineligible for Early Retirement Benefits. Id. at 18

Onto remedies, Defendants argue that the evidence cannot show Plaintiffs are entitled to (1) plan reformation, (2) surcharge, or (3) equitable estoppel. Id. at 19. For reformation, Defendants essentially repeat the same reasoning underpinning their liability arguments—the communications and Plan language are sufficiently clear that no reasonable employee would believe either class could receive the Benefit sought. Id. at 19–21. For surcharge, Defendants argue that Plaintiffs need to show actual harm, that but for the misrepresentations or omissions, class members would have elected to receive their benefit. Id. at 21–23. Plaintiffs cannot do so, Defendants argue. Id.

Additionally, Defendants contend surcharge is unavailable as a remedy for ERISA fiduciary breaches when the harm is simply a redux of Plaintiffs' Benefits Denial claims (Counts I and II). Id. Finally, Plaintiffs cannot obtain equitable estoppel relief because that requires proving detrimental reliance, which is not possible on a class wide basis. Id. at 23–24.

### 4.  Count V—Prevention of Benefit Attainment Claim

Defendants argue they prevail on Count V because no evidence shows that any of Defendants' business decisions were made specifically to stop the classes from Early or Optional Retirement Benefits. Id. at 24–27. Rather, Defendants made the decision to spin-off the three companies for sound business reasons. Id. That the classes were no longer eligible for Optional and Early Retirement Benefits were incidental effects, not motivating reasons, requiring judgment for Defendants. Id.

### 5.  Count VI—Anti-Cutback Claim

Defendants move for summary judgment on Count VI because there was no Plan amendment, in connection with the spin-off, that affected the Optional Retirement Benefit. Id. at 27-28.

### 6.  Count VII—State Promissory Estoppel Claim

Defendants advance two reasons to grant them judgment on Count VII. First, Defendants contend that ERISA § 514(a) "supersede[s] any and all State laws insofar as they . . . relate to any employee benefit plan." 29 U.S.C. § 1144(A); Defs. Summ. J. at 28. This far-reaching provision preempts Plaintiffs' state law promissory estoppel claims, which require analyses largely redundant of, and therefore "relate[d] to" the ERISA causes of action. Defs. Summ. J. at 28.

### 7.   Releases of Liability

Some class members, including named Plaintiff Major, signed general releases of liability when they ended employment with New DuPont. Id. at 30–31. Defendants contend these releases bar Counts IV and VII for all members who signed the release. Id. at 31. Specific to Plaintiff Major, Defendants argue that his claim for Optional Retirement does not fall under the only relevant carve-outs in his signed release, thus precluding all his claims. Id. at 31–32.

### 8.   Exhaustion of Internal Plan Remedies

Defendants further argue that Plaintiffs Major and Benson have not exhausted Defendants' internal claims and appeals procedure for benefits and, therefore, must fail on Counts II and VI. Id. at 32–34. Defendants first argue that the exhaustion procedure outlined in the SPD are binding on all class members. Id. at 32–33. Therefore, Benson and Major, Defendants assert, who did not exhaust their claim for the Optional Retirement Benefit internally, cannot now bring claims for benefits into federal court. Id. at 33–34.

### B.   **Plaintiffs' Contentions**

### 1.   Statute of Limitations

Plaintiffs counter Defendants' statute of limitations argument two ways. First, they submit that Pennsylvania provides the proper statute of limitation for Counts I, II, and V. Pls. Resp. to Summ. J. at 11–12. Federal choice of law, not state jurisprudence, governs federal statutes. Id. Because the limitations period from the forum state statute applies to federal laws, like ERISA, Pennsylvania limitations, not Delaware, apply. Id. Second, even if Delaware limitations were applicable, Plaintiffs assert several reasons why the limitations period has not run. Id. at 12–13.

### 2. <u>Counts I and II—Denial of Benefits Claims</u>

Regarding Count I, Plaintiffs submit that the term "employee," as used in the Early Retirement provision of the Plan, is ambiguous, citing to this Court's previous discussion of the term's ambiguity when denying Defendants' Motion to Dismiss. <u>Id.</u> at 5–7; <u>Cockerill v. Corteva, Inc.</u>, 2022 WL 3099771 at *6–8 (E.D. Pa. Aug. 4, 2022).

Firmly in the realm of ambiguity, Plaintiffs then argue that interpreting "employee" to refer only to "current employees" was arbitrary and capricious because the Plan, in other sections and descriptions of benefits—including the cousin-Optional Retirement provision—implicitly encompasses "former employees" within the umbrella of "employee." Pls. Resp. to Summ. J. at 5–6. Plaintiffs buttress their arbitrary and capricious argument by highlighting Defendants' financial incentive to deny Early Retirement and exposing inconsistent rationales for denying Early Retirement to class members. <u>Id.</u> at 6–7.

On Count II, Plaintiffs argue that the plain language of the Plan specifies three—and only three—Business Exceptions for the Optional Retirement Benefit. <u>Id.</u> at 7. Further, Plaintiffs assert that the exception Defendants rely on, when an employee continues employment at the same site in conjunction with a joint venture enterprise or sales agreement, unambiguously <u>does not</u> apply to the spin-off. <u>Id.</u> at 7–8

Assuming, <u>arguendo</u>, that the language was ambiguous, Plaintiffs attack the reasonableness of Defendants' interpretation on several grounds. First, their interpretation conflicts with the express language of the Plan. <u>Id.</u> at 8. Second, Defendants' purported rationale, that Optional Retirement was for employees who lose employment, is unpersuasive. <u>Id.</u> The Benefit remained available for employees who re-gained employment, even higher income employment, with another firm, which undercuts the employment-insurance motive. <u>Id.</u> At any rate, Plaintiffs

emphasize, the class members did not retain comparable employment at spin-off because they lost significant benefits. Id. Third, Plaintiffs cast doubt that Defendants' interpretation was consistent with past practice. Id. at 9. Defendants only evidence to support this claim comes from a one-line description of a prior "spin-off," ripped from a document prepared for this litigation, which is simply too flimsy, without elaboration, to support Defendants' argument. Id. Finally, Plaintiffs respond that the Defendants changed their reason for denying Optional Retirement from their initial proffered basis to the arguments advanced in this suit. Id. at 9–10.

### 3. Count IV—Breach of Fiduciary Duty Claim

Count IV boils down to whether Defendants misled class members with respect to the two Benefits at bar. In response, Plaintiffs refer to several class wide communications describing how the spin-off would (or would not) affect Early and Optional Retirement Benefits to underscore their key contention—whether these communications would mislead a reasonable employee is a fundamental question of disputed fact. Id. at 13–17. Plaintiffs quote CEO Ed Breen's reassuring emails to class members pre-spin-off, as well as communications from Defendants' Human Resources Department underscoring that "regardless of which company administers your pension in the future, the amount of the pensioner's existing benefits will not change." Id. at 14. Rather than plainly stating how the class members would lose their eligibility for Early and Optional Retirement Benefits, Defendants cloaked their decision in euphemism. Id. at 14–15.

To rebut Defendants' remedies arguments, Plaintiffs return to crux of their substantive fiduciary claim. The remedies of surcharge and reformation, Plaintiffs assert, flow naturally from liability for fiduciary breaches because the required showings of harm, mutual mistake, and/or inequitable conduct by Defendant mirror the elements for the underlying cause of action. Id. at

17–20. In other words, since disputed material facts preclude summary judgment on liability, they necessarily prevent summary judgment for remedy as well. Id.

### 4. Count V—Prevention of Benefit Attainment Claim

Plaintiffs argue the illegal decision was not the spin-off in and of itself, but Defendants choosing to decouple the Plan sponsor (Corteva), from the class members' employer (New DuPont). Id. at 21. Applying the burden shifting framework, Plaintiffs argue that the spin-off benefits decision allowed Defendants to alleviate some multi-billions of dollars of liability under the Plan, offering sufficient circumstantial evidence that their motivation was to prevent class members from gaining benefits eligibility. Id. at 21–22. Given their prima facie case, Plaintiffs submit, summary judgment is inappropriate.

### 5. Count VI—Anti-Cutback Claim

Plaintiffs argue the impermissible cut-back of the Optional Retirement Benefit, the core of Count VI, was when Defendants erroneously interpreted the spin-off to fall under a Business Exception in the Plan. Id. at 23–24. Thus, Plaintiffs' Count VI claim largely tracks Count II.

### 6. Count VII—State Promissory Estoppel Claim

Plaintiffs essentially concede that they will not present a state promissory estoppel cause of action at trial and do not substantively respond to Defendants' arguments. Id. at 24.

### 7. Releases of Liability

Plaintiffs contend that Major's signed Release does not bar his claims for two reasons. First, by its own language, the General Release only applies to Major's employer and its parent company—New DuPont and DuPont Specialty Products—but not any other named Defendant. Id. at 24. Second, even if the Release applied, it could not bar Major's claim for vested Optional

Retirement Benefits under Count II, which is non-forfeitable under ERISA and carved out from the Release. Id. at 25.

### 8.   Exhaustion of Internal Plan Remedies

Plaintiffs point this Court toward its prior discussion and ruling that exhausting the internal appeals process is unnecessary before bringing their federal claims. Id. at 24–26; Cockerill, 345 F.R.D. at 115–17.

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed."  Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Under Rule 56,

the Court must view the evidence presented on the motion in the light most favorable to the opposing party. <u>Anderson</u>, 477 U.S. at 255.

## IV.   <u>DISCUSSION</u>

### A.   <u>Where ERISA is Silent, Pennsylvania Statute of Limitations Apply</u>

Defendants apply an erroneous (and needlessly convoluted) framework for their statute of limitations argument. Selecting the "appropriate statute of limitations" for a federal statute "is a question of federal law." <u>Syed v. Hercules Inc.</u>, 214 F.3d 155, 160 (3d Cir. 2000). Generally, courts "presume that Congress intended courts to apply the most closely analogous state statute of limitations," essentially "borrowing" the limitations period from the forum state. <u>Id.</u> That presumption gives way only when "a party can make a compelling showing that the application of that [the forum state's] time bar would seriously frustrate federal labor policy or work severe hardship to the litigants." <u>Consol. Exp., Inc. v. New York Shipping Ass'n, Inc.</u>, 602 F.2d 494, 508 (3d Cir. 1979), <u>vacated on other grounds</u>.

Defendants have not argued, let alone shown that applying Pennsylvania's statute of limitations would do either. Rather, to the extent the Third Circuit has suggested inapplicable state limitations for ERISA claims, their potential qualm was with <u>Delaware's</u> shorter limitations period, not longer time bars. <u>Syed</u>, 214 F.3d at 161 ("we recognize that the one-year statute of limitations of [Delaware's analogous state law] is short, but we cannot say that it is inconsistent with ERISA policy.").

### B.   <u>Counts I and II Must Proceed to Trial</u>

Under 29 U.S.C. § 1132(a)(1)(B), a plan participant may sue for reinstatement of a specific benefit that the Plan entitled him to, but employers improperly denied. When, as here, the plan documents "give[ ] the administrator or fiduciary discretionary authority to determine eligibility

for benefits or to construe the terms of the plan, then the Court reviews the administrator's decision on a more deferential basis." Dowling v. Pension Plan For Salaried Emps. of Union Pac. Corp. & Affiliates, 871 F.3d 239, 245 (3d Cir. 2017) (internal quotations and citations omitted).

A court's review of plan interpretation flows along two paths. First, the court must decide, as a matter of law, whether the relevant plan language is unambiguous. Id. If so, then the administrator's interpretation of "unambiguous plan language" controls "as long as those interpretations are reasonably consistent with the plan's text." Id. (internal quotations and citations omitted). Or, more plainly put, "when plan terms are clear, they have only one meaning" and a court considers only "whether the administrator acted within the scope of the plan's unambiguous terms while engaging in straightforward Plan execution." Bergamatto v. Bd. of Trustees of the NYSA- ILA Pension Fund, 933 F.3d 257, 264 n.12 (3d Cir. 2019) (internal quotations and citations omitted).

If the plan language is ambiguous, however, then courts defer to the administrator's interpretation so long as it is not "arbitrary and capricious." Id. Some factors that guide the "arbitrary and capricious" or "abuse of discretion" analysis include:

> (1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the relevant entities have interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

Howley v. Mellon Fin. Corp., 625 F.3d 788, 795 (3d Cir. 2010).

"When the same entity administers a plan and pays the benefits due under the plan, it has a structural conflict of interest." Noga v. Fulton Fin. Corp. Emp. Benefit Plan, 19 F.4th 264, 276 (3d Cir. 2021). Moreover, while courts are generally bound to the administrative record in ERISA Benefit Denial claims, that rule yields when "the record may lack information about a fiduciary's

potential biases and conflicts of interest." Id. at 273 (internal quotations and citations omitted). The Third Circuit recognizes that "[d]espite its potential relevance, information regarding a structural conflict may be omitted from the administrative record due to the combination of information asymmetry and financial incentives: the participant may not know of the conflict, and the fiduciary has no financial incentive to disclose it." Id. So, when financial conflicts of interest are present, a reviewing court may consider evidence of the structural conflict beyond the administrative record. Id. at 273–74.

But the structural conflict scenarios do more than alter evidentiary review—they affect the substantive analysis. Importantly, a "conflict alone does not render a fiduciary's adverse benefit determination an abuse of discretion." Id. at 276. But, it "must be weighed as [one] factor" and its presence inflects procedural irregularities that align with an administrator's financial incentives with greater significance." Id. (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).

As a matter of law, the Optional and Early Retirement provisions do not unambiguously comport with Defendants' interpretations. First, the term "employee" remains subject to multiple reasonable interpretations—former and/or current employees. The Plan defines an employee as "all employees of [Historical DuPont] hired on or before December 31, 2006." Defs. Statement of Fact, ¶ 16. That language is a plug-and-play version of ERISA's statutory definition of "employee," which the Supreme Court unsparingly wrote "is completely circular and explains nothing." Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992). And specifically, the Supreme Court and subsequent district court decisions have found that the term "employee" is ambiguous with respect to current or former employees. Robinson v. Shell Oil Co., 519 U.S. 337, 341–44 (1997); see Colburn v. Hickory Springs Mfg. Co., 448 F. Supp. 3d 512, 525–27 (E.D.N.C. 2020)

(grafting <u>Robinson</u>'s holding in the ERISA context). Importantly, simply because the term may have a "plain meaning in the context of a particular section" of a text, does not demonstrate "that the term has the same meaning in all other sections and all other contexts." <u>Robinson</u>, 332 F.3d at 343. Rather, once "it is established that the term 'employees' includes former employees in some sections, but not in others, the term standing alone is necessarily ambiguous." <u>Id.</u>

Defendants thus plead themselves into ambiguity. Their main argument that "employees" only refer to current employees is that <u>some</u> sections of the Plan distinguish between employees and former employees. However, those sections are not the ones at issue—and reinforce, rather than resolve the ambiguity. As Plaintiffs point out, Section IV of Historical DuPont's Plan specifically refers to some "employees" who have retired, linguistically rendering some "former" employees within the definition. Defs. Ex. 1, Title I §§ IV.D, E, ECF 196-5.

Confronted with ambiguous language, summary judgment is not appropriate for Count I.[1] And because Defendants had a financial interest in denying Early and Optional Retirement, a structural conflict exists, and the evidentiary record properly expands to potential biases and financial incentives. Moreover, genuine disputes of fact bear on both the procedural irregularities throughout administering Cockerill's claim and the structural conflict of interest affecting the administrator, namely the billions of dollars in projected savings. Pls. Ex. 13 at 34.

Onto Count II, Defendants' interpretation is far from unambiguous. The Plan excepts certain corporate events from triggering Optional Retirement, meticulously listing several past

---

[1] In their Reply Brief, Defendants advance a forceful argument. Defs. Reply at 4–7. Namely, if "employees," for Early Retirement, extended to former employees then judgment for Plaintiffs would grant benefits to not only the class members, but also any former Historical DuPont employee with fifteen years of experience once reach 50. <u>Id.</u> Their reasoning is persuasive and appropriate for trial, where this Court will balance the five <u>Howley</u> factors and extant conflict-of-interest. Interpreting ambiguous contracts—in this case weighing extrinsic evidence of bias and prejudice and engaging in a balancing test—is a quintessential question of fact, not law. <u>Einhorn v. Fleming Foods of Pennsylvania, Inc.</u>, 258 F.3d 192, 195 (3d Cir. 2001).

actions that are exempt. Defs. Ex. 1 Title I § XIII. Nowhere, however, does the Plan refer to corporate spin-off events as qualifying events. Id. at § IV.D. This Court cannot say Defendants did not abuse their discretion, as a matter of law, considering the factual disputes over the structural conflict of interest present and potential procedural irregularities in claims administration.

### C.  Count IV Must Proceed to Trial

In drafting and enacting ERISA, Congress "relied upon the common law of trusts to define the general scope of [the fiduciaries'] authority and responsibility." In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 579 F.3d 220, 227 (3d Cir. 2009) (internal quotations and citations omitted). Several of those fiduciary responsibilities, codified in ERISA § 404,[2] prohibit a fiduciary, "in the performance of its duties," from "materially mislead[ing] those to whom the duties of loyalty and prudence are owed." Id. at 228 (quoting Adams v. Freedom Forge Corp., 204 F.3d 475, 492 (3d Cir. 2000)). Its responsibility is "not only a negative duty not to misinform, but also an affirmative duty to inform when the [fiduciary] knows that silence might be harmful." Id. (quoting Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993)). In summation, the Third Circuit holds, "when a fiduciary speaks, it must speak truthfully, and when it communicates with plan participants and beneficiaries it must convey complete and accurate information that is material to their circumstance." Id. (internal quotations and citations omitted).

---

[2] The text states that: "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims"

29 U.S.C. § 1104(a)(1).

Stripped to the relevant elements in this cause of action, Plaintiffs must prove that Defendants (1) acted in their fiduciary capacity; (2) that they made "affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries;" and (3) that the misrepresentations or omissions were material. Id. The second and third elements are objective evaluations—the question is whether "there is a substantial likelihood that [the misrepresentations or omissions] would mislead a reasonable employee in making an adequately informed retirement decision," or detrimental decision about his benefits. Harte v. Bethlehem Steel Corp., 214 F.3d 446, 452 (3d Cir. 2000).[3]

In this Court's Class Certification Memorandum, we identified a non-exhaustive list of class-wide communications that may have been misleading or omissions. Cockerill, 345 F.R.D. at 108. Now at summary judgment, this Court re-acquaints itself with essentially the same evidence—the same pre-spin-off emails, FAQs, websites, PowerPoint presentations, SPDs, and post-spin-off documents comprise the evidentiary corpus of Plaintiffs' fiduciary claims. Id.

And these communications present genuine disputes that precludes summary judgment. Would a reasonable fiduciary know their communications were not clear? Would the reasonable class member recognize that these communications altered their accrual of Optional and Early Retirement Benefits? Those questions are unanswerable without weighing evidence and assessing witness credibility, which must commence at trial, not summary judgment.[4]

---

[3] Prior to the Supreme Court's decision in CIGNA Corp. v. Amara, the Third Circuit required plaintiffs to prove detrimental reliance in addition to the first three elements. 563 U.S. 421 (2011); see In re Unisys, 579 F.3d at 228. As discussed in the Class Certification Memorandum, this Court finds that, post-Amara, detrimental reliance is no longer an element of an ERISA § 404(a)(1) cause of action. Cockerill, 345 F.R.D. at 109–110.

[4] This decision interacts with our interpretation of the Plan in Counts I and II—if the Plan language unambiguously prevented employees from obtaining either Benefit at spin-off, then supplementary representations are less important, although still not dispositive. Compare Bicknell v. Lockheed Martin Grp. Benefits Plan, 410 F. App'x 570, 574 (3d Cir. 2011) (stating "it is unreasonable for a plan participant to rely upon an employer's representation as to the contents of the Plan where the participant is in

Defendants are incorrect that Plaintiffs' fiduciary claims are mere recasts of their Benefit Denial actions. Defendants are correct that a plan participant cannot "repackage" the same facts to bring a denial of benefits and fiduciary breach claim. <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 513 (1996). But Plaintiffs do no such thing—Plaintiffs fiduciary breach claims rest on fundamentally different evidence, elements, and actions than their Benefits Denial claims. <u>Cf. Dean v. Nat'l Prod. Workers Union Severance Tr. Plan</u>, 46 F.4th 535, 544 (7th Cir. 2022) (plaintiffs pled "same facts" in ERISA denial of benefits and fiduciary duty claims). Their argument is that <u>even if</u> Defendants properly interpreted the Plan in denying Optional and Early Retirement (losing on Counts I and II), Defendants breached their fiduciary obligations by not informing and/or actively misleading Plaintiffs in how the spin-off would affect them.[5] Indeed, by pleading Count IV in the alternative, Plaintiffs "may proceed under subsection 1132(a)(3)" for equitable remedies because they are "seek[ing] a remedy for injuries not available under" the Benefits Denial cause of action. <u>Doe v. Indep. Blue Cross</u>, --- F. Supp. 3d ---, 2023 WL 8050471, at *8 (E.D. Pa. 2023) (Savage, J.).

**D.  <u>Count V Must Proceed to Trial</u>**

Section 510 of ERISA prohibits an employer from discharging or discriminating against "a participant or beneficiary" of a pension plan "for the purpose of interfering with the attainment of any right to which such participant" may accrue in the future. 29 U.S.C. § 1140.

---

possession of a plan document containing express terms regarding the subject of representation") (non-precedential) <u>with</u> <u>In re Unisys Corp. Retiree Med. Ben. ERISA Litig.</u>, 57 F.3d 1255, 1264 (3d Cir. 1995) (holding that fiduciary breach claims still lie when defendants "affirmatively and systematically" misrepresent the plan terms, even when the plan terms "clearly permitted" the complained of action). Regardless, as discussed, <u>supra</u>, both the term "employee," as used in the Plan to describe the Early Retirement Benefit (Count I) and the scope of the Optional Retirement Business Exception (Count II) are ambiguous.

[5] The communications about the spin-off's effects, not the decision to spin-off, are the gravamen of Plaintiffs' fiduciary claim. And "when explaining plan benefits and business decisions about plan benefits to its employees," employers act in their "fiduciary," not business, capacity. <u>Adams</u>, 204 F.3d at 492.

The Third Circuit has been clear that pension liability avoidance programs—corporate plans to fire certain employees specifically to prevent them from vesting pension benefits—are illegal under ERISA § 510. Gavalik v. Cont'l Can Co., 812 F.2d 834, 852–57 (3d Cir. 1987) ("we agree, that the maintenance of the [liability avoidance program] with the specific intent to interfere with class members' pension eligibility was in itself a classwide violation of ERISA"). An employee need not "prove that the only reason that he or she was terminated was an intent to interfere with pension benefits," just that the employer made a "conscious decision to interfere" with them. Jakimas v. Hoffmann-La Roche, Inc., 485 F.3d 770, 785 (3d Cir. 2007) (internal quotations and citations omitted) (emphasis added). Importantly, neither proof that an employee "lost benefits because of termination" or that "termination prevented the employee from accruing benefits" alone is probative of intent. Id. (citing Turner v. Schering-Plough Corp., 901 F.2d 335, 348 (3d Cir. 1990)). However, when terminations result in "savings to the employer . . . of sufficient size," they "may be realistically viewed as a motivating factor." Turner, 901 F.2d at 348. Circumstantial evidence of this vintage is especially important in ERISA § 510 causes of actions, where "smoking gun" proof of intent evidence is often rare. Gavalik, 812 F.2d at 852.

Plaintiffs have presented sufficient evidence of a prima facie ERISA § 510 violation, and this Court cannot rule, without a fact-finding endeavor, whether Defendants' spin-off rationale was pretextual. See DiFederico v. Rolm Co., 201 F.3d 200, 204–05 (3d Cir. 2000) (applying Title VII burden shifting framework to ERISA § 510 claims). Critically, the record evidence is far closer to Gavalik than Turner. Plaintiffs have shown much more than that mere termination from Historical DuPont prevented the classes from receiving benefits; they have submitted the billions of dollars—sufficiently sized, in this Court's view—in savings that Defendants reaped by splitting the atom of class members' employment between New DuPont, for paycheck purposes, and

Corteva (Historical DuPont's parent company at spin-off), for retirement benefits. Pls. Ex. 13. In the decade before spin-off, the Plan was a significant liability to Historical DuPont. Id. at 34. The Plan's assets were consistently billions of dollars short of their obligations to employees, requiring Historical DuPont, and then DowDuPont post-merger, to divert four billion dollars from its business to fund Plan benefits in 2017 and 2018. Id. Then post-spin-off, the Plan's projected deficit shrank by hundreds of millions of dollars. Id.

Defendants' main counterargument, while appealing at first blush, betrays reason. Defendants explain that plan participant employees who were already eligible for Early Retirement at spin-off (at least age 50 with 15 years of service) could begin the Benefit immediately while still working for New DuPont. Pre-spin-off, on the other hand, employees would have had to retire to start this Benefit. But the spin-off allowed these employees to significantly increase their monthly earnings—they received their normal salary plus Early Retirement. Therefore, Defendants suggest, the firms' motives must have been pure, ask the happy employees.

But Defendants' argument is smokescreen. As the Plan balance sheet makes clear, Defendants were legally and financially responsible for the total value of the Early Retirement Benefit the moment Historical DuPont employees reached age 50, regardless of when they decided to commence the Benefit. Pls. Ex. 13 at 34. In other words, it was irrelevant, from a financial perspective, when already vested early retirees started their payout, be it the day of spin-off, a year later, or ten. Id. So, while it is true that some New DuPont employees likely enjoyed receiving an augmented income post-spin-off, their wellbeing has no bearing on Defendants' intent. Their windfall appears, at best, an incidental effect of Defendants' cost-saving measures.

Instead, Defendants have a rather striking question to answer at trial—why would a corporation, Corteva in this case, take on billions of dollars of underfunded liabilities to

unaffiliated, unrelated employees, the New DuPont class members, for any legitimate profit-reaping business reason?

### E.  Count VI is Co-Extensive with Count II

Summary judgment is not appropriate for Count VI. ERISA § 204(g) states that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." 29 U.S.C. § 1054(g)(1). Accordingly, even without formal amendment, "[a]n erroneous interpretation of a plan provision that results in the improper denial of benefits to a plan participant may be construed as an 'amendment'" under § 204(g). Cottillion v. United Ref. Co., 781 F.3d 47, 58 (3d Cir. 2015) (internal quotations and citations omitted). Plaintiffs argue that because Defendants erroneously interpreted the spin-off to fall under the Business Exceptions, their denial of Optional Retirement was an impermissible "amendment" under ERISA § 204(g).

Thus, as a practical matter, Plaintiffs' "erroneous interpretation" claim is co-extensive with Count II, the Benefit Denial for Optional Retirement. If Defendants erroneously interpreted the Business Exceptions to cover the spin-off, thus forfeiting the Optional Retirement Benefit for class members, then Plaintiffs win on Count II as well as Count VI. However, if Defendants' interpretation was reasonable, then Defendants never "amended" the Plan; they simply interpreted it.[6]

### F.  Whether General Releases Bar Claims Requires Factual Development

Valid releases can bar an individual from bringing certain ERISA causes of action. See Romero v. Allstate Ins. Co., 1 F. Supp. 3d 319, 367 (E.D. Pa. 2014) (Buckwalter, J.). But for three reasons, they do not bar Major from this lawsuit.

---

[6] Plaintiffs' second ERISA § 204(g) theory of liability is a non-starter. The post spin-off Plan amendment is irrelevant because the critical event that either did or did not accrue the Optional Retirement Benefit for class members, the spin-off, occurred beforehand.

First, it is factual dispute whether Major's agreement released any of the Defendants, notwithstanding New DuPont and DuPont Specialty Products. By its language, the contract released Major's "Employer, its parent corporation, affiliates, subsidiaries, divisions, predecessors, insurers, successors, and assigns, and their current and former employees, attorneys, officers, directors and agents, whether now in existence or hereafter created, both individually and in their business capacities, and their employee benefit plans and programs and their administrators and fiduciaries" from "any and all claims, known or unknown," including ERISA claims "(except for any vested benefits under any tax qualified plan)[.]" Defs. Ex. 14 at 1–2, ECF 196-18. Major signed this release on July 31, 2021, after the spin-off. Id. at 9. Defendants have offered no evidence that Defendants Corteva, Historical DuPont, the Pension and Retirement Plan, or the Benefits Plans Administrative Committee qualify as New DuPont's parent, affiliate, subsidiary, division, insurer, successor, or assign. Perhaps, some qualify as New DuPont's "predecessor," but proving that term of art requires evidence not before this Court.[7]

Second, the Release cannot apply to Counts II or IV. By its plain terms, the Release does not—and legally could not—bar Major's claim for vested Optional Retirement in Count II. Moreover, releases like this one, also cannot bar Count IV, ERISA's § 502(a)(2) breach of fiduciary duty cause of action. Those claims, "are, by their nature, plan [not individual] claims." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 594 (3d Cir. 2009). Construed this way, "as a matter of law, an individual cannot release the plan's claims, and so for that reason an individual release cannot bar an individual from bringing a claim on behalf of an ERISA plan under ERISA § 502(a)(2)." Id.

---

[7] For instance, both New DuPont and Corteva are creatures of the spin-off. Even the name, Corteva, was a newfangled innovation of DowDuPont, without etymological roots in either Historical Dupont or Dow Inc. Can either entity properly be understood as "predecessors" or "successor" of the other?

And even were the release to apply to all Defendants, it is a disputed fact whether Major's Count V and VI claims are carved-out "vested benefits" under the terms of the Release. See Stanley v. George Washington Univ., 394 F. Supp. 3d 97, 109 (D.D.C. 2019), aff'd, 801 F. App'x 792 (D.C. Cir. 2020) (surveying how contract "carve-out[s]" apply to ERISA causes of action).

### G. Exhaustion of Remedies Does Not Preclude Any of Plaintiffs' Claims

Briefly, this Court rejects Defendants' argument that Plaintiffs Benson, Major, and any unnamed class members, need to and have not properly exhausted their administrative remedies for Optional and Early Retirement Benefits. As discussed at length in this Court's Class Certification Memorandum, Counts IV and V never require exhaustion, the Plan does not require exhaustion for any claims, and, alternatively, exhaustion would be futile for all class members because Defendants have adopted a fixed policy to deny the benefits at issue to all class members. Cockerill, 345 F.R.D. at 115–17.

### H. ERISA Preempts Count VII

Defendants are correct that Plaintiffs' promissory estoppel claims are preempted by ERISA because they "relate to" plan benefits. New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656 (1995). In fact, they are seeking them. Plaintiffs do not dispute this point and summary judgment is appropriate.

## V. CONCLUSION

For the foregoing reasons, this Court **GRANTS in part** (Count VII) and **DENIES in part** (all other Counts) Defendant's Motion for Summary Judgment.[8]

---

[8] Defendants' Motion to Decertify will also be **DENIED**. As concluded above, Defendants will need to prove, at trial, facts that render the release binding on Plaintiff Major. Supra, at 26–27. Because they have thus far failed to do so, the class has at least one appropriate representative for trial. Additionally, this Court is quite familiar with the contours of this action, including Major's Release, and does not anticipate it will become a "major focus" of litigation.