**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT F. COCKERILL et al.,**<br>*Plaintiffs,*<br><br>**v.**<br><br>**CORTEVA, INC. et al.,**<br>*Defendants.* | **CIVIL ACTION**<br><br>**NO. 21-3966** |

<u>**MEMORANDUM OF FINDINGS OF FACT**</u>
<u>**AND CONCLUSIONS OF LAW REGARDING LIABILITY**</u>

**Baylson, J.**                                        **December 18, 2024**

<u>**Table of Contents**</u>

**I.     FINDINGS OF FACT RE: LIABILITY** ........................................................................ **1**

a.   CHRONOLOGY ................................................................................................... 1

b.   BACKGROUND ................................................................................................... 4

   i.     Administrative Committee and Appeals Committee ..................................... 5

   ii.    Exhaustion ..................................................................................................... 6

   iii.   Description of Plan Benefits .......................................................................... 6

   iv.    2015 Chemours Spin-Off ............................................................................... 11

   v.     The DowDuPont Merger ................................................................................ 12

   vi.    The Decision for Corteva to "Sponsor" the Plan .......................................... 14

   vii.   November 8, 2018, Administrative Committee Meeting ................................ 16

   viii.  June 1, 2019: The Spin-Off .......................................................................... 18

   ix.    Defendants' External Communications About Plan Benefits ........................ 20

   x.     Defendants' Internal Communications About Plan Benefits ......................... 31

   xi.    Release .......................................................................................................... 33

c.   WITNESSES ........................................................................................................ 34

   i.     Plaintiffs' Case-in-Chief ............................................................................... 36

   ii.    Defendants' Case-in-Chief ............................................................................ 74

d.   ADDITIONAL FINDINGS OF FACT ................................................................. 90

**II.    CONCLUSIONS OF LAW RE: LIABILITY** ............................................................. **94**

a.   Counts I And II—Denial of Benefits ................................................................... 94

i.   Overview of Counts I and II ........................................................................ 94

ii.  Legal Standard ............................................................................................ 95

iii. Count I—Early Retirement Benefits.......................................................... 97

iv. Count II—Optional Retirement Benefits ................................................. 104

b.  Count IV—Breach of Fiduciary Duty.......................................................... 110

i.   Overview of Count IV .............................................................................. 110

ii.  Legal Standard .......................................................................................... 112

iii. Relevant Facts Related to Early Retirement Communications................... 115

iv. Analysis..................................................................................................... 117

c.  Count V—Interference With Benefit Attainment ......................................... 131

i.   Overview of Count V ............................................................................... 131

ii.  Legal Standard .......................................................................................... 131

iii. Analysis..................................................................................................... 133

d.  Count VI—Anti-Cutback ............................................................................. 135

i.   Overview of Count VI .............................................................................. 135

ii.  Legal Standard .......................................................................................... 135

iii. Analysis..................................................................................................... 136

e.  Implications of the Release on Counts II, VI, V, and VI............................... 137

i.   Liability and Damages Under Counts II and IV Cannot Be Barred By The Release.. 138

ii.  Count VI Is Not Barred By The Release ................................................... 138

III.   **CONCLUSION** ............................................................................................ **140**

<u>**MEMORANDUM OF FINDINGS OF FACT**</u>
<u>**AND CONLUSIONS OF LAW REGARDING LIABILITY**</u>

**I.**    <u>**FINDINGS OF FACT RE: LIABILITY**</u>

    **a.** <u>**CHRONOLOGY**</u>

1.    On September 1, 1904, E. I. du Pont de Nemours and Company ("Historical DuPont") adopted the Pension and Retirement Plan ("the Plan").  Historical DuPont Pension and Retirement Plan, Ex. P-1.

2.    In June 1992, Plaintiff Robert Cockerill began working for Historical DuPont. 6/25/24 Day 1 AM Tr. Trans. 58:8–10, ECF 240.  On May 28, 1996, Plaintiff Darrell Benson began working for Historical DuPont.  6/27/24 Day 3 PM Tr. Trans. 32:3–4, ECF 247.  On September 1, 1997, Plaintiff Oliver Major began working for Historical DuPont.  6/28/24 Day 4 AM Tr. Trans. 37:16–17, ECF 243.

3.    On January 1, 2007, a "Soft Freeze" of the Plan was enacted that prohibited anyone hired or rehired after January 1, 2007, from participating in the Plan.  2018 SPD, Ex. J-10 at 11, 13; 9/24/24 Day 5 Tr. Trans. 78:5–8, ECF 280.

4.    On July 1, 2015, the Performance Chemicals business ("Chemours") spun off from Historical DuPont.  6/26/24 Day 2 AM Tr. Trans. 36:17–25, ECF 241.

5.    On December 11, 2015, Historical DuPont announced its intent to merge with Dow Chemical Company.  Ex. D-66 at 1–2.

6.    On December 16, 2015, the relevant Pension and Retirement Plan ("Plan") document became effective.  Historical DuPont Pension and Retirement Plan, Ex. P-1.  Title I of the Plan applies to Historical DuPont employees.  Id. at I-1.

7.    On November 17, 2016, Benito Cachinero-Sanchez, Historical DuPont's Senior Vice President of Human Resources, sent a letter to Plan participants explaining that a "Hard

Freeze" in benefits would occur by November 30, 2018.  Ex. D-59 at 1; 6/27/24 Day 3 AM Tr. Trans. 32:8–11, ECF 242.  Historical DuPont intended that the Hard Freeze cease any increase in Title I Plan participants' accrued benefits.  6/26/24 Day 2 PM Tr. Trans. 27:7–14, ECF 246.

8.     On September 1, 2017, Dow and Historical DuPont consummated a merger and announced their intention to create "three strong, new, market-focused companies in Agriculture [Corteva], Material Science [Dow] and Specialty Products [New DuPont]" (the "spin-off").  Ex. D-32.

9.     On May 31, 2018, Meghan Cassidy and Kim Wallenhorst, Vice Presidents of Human Resources, emailed Plan participants explaining that New Dow (Materials Science) would spin-off by the end of the first quarter of 2019, while Corteva (Agriculture) and New DuPont (Specialty Products) would spin-off by June 1, 2019.  Ex. D-34.

10.     In September 2018, an updated Summary Plan Description ("2018 SPD") was published and made available to Plan participants.  2018 SPD, Ex. J-10; 6/25/24 Day 1 AM Tr. Trans. 69:9–70:1, 70:12–14, ECF 240.  The 2018 SPD was the operative SPD prior to the spin-off.  2018 SPD, Ex. J-10.

11.     On November 1, 2018, DowDuPont CEO Ed Breen announced via email that the Plan would be assumed by Corteva after the spin-off.  Ex. J-17(c).  Breen's email contained a hyperlink to a frequently asked questions ("FAQ") document about the spin-off's effects on Plan benefits.  Id.; Ex. D-33.

12.     On November 8, 2018, the Benefit Plans Administrative Committee ("Administrative Committee") met for fifteen minutes and determined that the Optional Retirement Benefit would not be available for employees moving to New DuPont as part of the spin-off.  Ex. J-46(a).  Prior to the meeting, Administrative Committee members received a

memorandum to review which discussed the Chemours spin-off and requested that the Administrative Committee make an interpretation of the Plan that the spin-off was a Business Exception to Optional Retirement Benefit. Ex. J-52; 9/24/24 Day 5 Tr. Trans. 107:20–25, ECF 280.

13. From January to February 2019, Defendants formally transferred certain employees from Historical DuPont to New DuPont (or its subsidiaries) in anticipation of the spin-off. 9/24/24 Day 5 Tr. Trans. 166:2–23, ECF 280.

14. On March 20, 2019, DowDuPont's Human Resources department emailed employees moving from Historical DuPont to New DuPont and informed them that they "may be eligible" to receive benefits at the time of the spin-off. Ex. D-89(a). This email provided employees with links to portals that hosted, among other things, PowerPoint Presentations discussing the impact of the spin-off on benefits. See Exs. D-89(a), D-84(a), D-85(b).

15. On May 23, 2019, Defendants published a "Benefits News" bulletin discussing the impact of the spin-off on employment and benefits. Ex. D-110.

16. Historical DuPont sent retirement kits to Plan participants who were eligible to start their "unreduced benefits" as of the spin-off date. 9/24/24 Day 5 Tr. Trans. 73:9–74:10, ECF 280. Those who were eligible for reduced Early Retirement as of the spin-off could—and in many instances did—request retirement kits. Id.

17. On June 1, 2019, DowDuPont completed the spin-off into three separate companies: Corteva Inc., "New Dow" (Dow Inc.), and "New DuPont" (DuPont De Nemours, Inc.). Stipulated Facts, Ex. P-83 ¶ 2, ECF 238. All New DuPont employees were deemed "terminated" under the Plan for the purposes of calculating benefits. Ex. D-120 at 5, 8, 10–11.[1]

---

[1] See infra n.5–6.

18.     After the spin-off, Historical DuPont became a subsidiary of Corteva.  6/27/24 Day 3 PM Tr. Trans. 13:10–12, ECF 247.

19.     On January 21, 2020, Plaintiff Cockerill learned he would never be eligible for an Early Retirement Benefit and initiated his claim and appeal process.  6/26/24 Day 2 AM Tr. Trans. 71:7–16, ECF 241.  On February 4, 2020, Cockerill filed a Level I appeal for Early Retirement or Optional Retirement Benefits.  Robert Cockerill Level I and Level II Appeals and Denials, Ex. J-2.  On May 11, 2020, Cockerill's Level I appeal was denied.  Id. at 10–11.  On June 12, 2020, Cockerill filed a Level II appeal.  Id. at 12.  On September 4, 2020, Cockerill's final internal appeal was denied.  Id. at 720.

20.     On September 30, 2021, Plaintiff Major's position with New DuPont was eliminated.  6/28/24 Day 4 AM Tr. Trans. 39:5, ECF 243.  On January 28, 2022, Major filed a Level I appeal for the Optional Retirement Benefit.  Oliver Major Level I and Level II Appeals and Denials, Ex. J-4 at 104.  On April 4, 2022, Major's Level I appeal was denied.  Id. at 100.  On May 15, 2022, Major filed a Level II appeal.  Id. at 97.  On August 22, 2022, Major's final internal appeal was denied.  Id. at 1–3.  In early 2023, Major elected to commence Early Retirement Benefits.  6/28/24 Day 4 AM Tr. Trans. 62:7–10, ECF 243.

21.     On July 31, 2023, Plaintiff Benson filed his Level I appeal for the Optional Retirement Benefit.  Darrell Benson Level I and Level II Appeals and Denials, Ex. J-3 at 1.  On October 26, 2023, Benson's Level I appeal was denied.  Id.  On October 26, 2023, Benson's final internal appeal was denied.  Id. at 22–29.

**b.  BACKGROUND**

22.     On September 1, 1904, Historical DuPont adopted the Plan.  See Historical DuPont Pension and Retirement Plan, Ex. P-1.  On December 16, 2015, the Plan was amended and restated. Id.

23.     Historical DuPont did not provide employees with a copy of the Plan document unless specifically requested.  6/26/24 Day 2 PM Tr. Trans. 102:21–24, ECF 246.  Instead, employees received annual descriptions of the Plan in the form of Summary Plan Descriptions ("SPDs").  6/26/24 Day 2 PM Tr. Trans. 102:16–18, ECF 246.  The operative SPD at the time of the spin-off was the 2018 SPD and was provided to all Plan participants.  2018 SPD, Ex. J-10; 6/25/24 Day 1 AM Tr. Trans. 69:9–70:1, 70:12–14, ECF 240.

24.     Plaintiffs and Class Members who testified all stated they did not read the Plan document prior to this litigation.  See, e.g., 6/26/24 Day 2 AM Tr. Trans. 72:23–25, ECF 241; 6/28/24 Day 4 AM Tr. Trans. 49:14–18, ECF 243.  Cockerill testified that he "did not know [the Plan document] existed until it was provided in my level 2 appeal denial."  6/26/24 Day 2 AM Tr. Trans. 72:24–25, ECF 241.

### i.     Administrative Committee and Appeals Committee

25.     The Benefit Plan Administrative Committee ("Administrative Committee") is a Plan Administrator and a named fiduciary of the Plan.  Stipulated Facts, Ex. P-83 ¶ 7, ECF 238. For the purpose of appeals, the Benefit Plan Appeals Committee ("Appeals Committee") is a named fiduciary of the Plan.  Id. ¶ 8.

26.     The Plan provides the Administrative Committee with certain "duties and powers," including "to enact uniform and nondiscriminatory rules and regulations to carry out the provisions of the Plan" and "construe and interpret and supply omission with respect to the provisions of the Plan."  Historical DuPont Pension and Retirement Plan, Ex. P-1 at 7.

27.     Committee members were not compensated extra for their Committee roles and attended ERISA fiduciary training. 6/27/24 Day 3 AM Tr. Trans. 74:25–75:2, ECF 242; 6/26/24 Day 2 PM Tr. Trans. 100:16–101:1, ECF 246.

### ii.    Exhaustion

28.    The Plan Document does not include any exhaustion requirements.  Historical DuPont Pension and Retirement Plan, Ex. P-1.  A Plan participant who wishes to challenge denial of a benefit or bring a legal claim based on their rights under federal law need not exhaust internal administrative processes before filing a lawsuit.  Id.

29.    The operative SPD leading up to the spin-off, however, mandated that employees first exhaust their remedies internally.  2018 SPD, Ex. J-10 at 82–84.

### iii.    Description of Plan Benefits

30.    For employees hired before 2007, once they had worked for Historical DuPont for five years, they were entitled to an unreduced monthly pension payment to be paid beginning at age 65.  Historical DuPont Pension and Retirement Plan, Ex. P-1 at Title I § IV.A.

31.    The Plan also provided additional benefit opportunities to certain employees: Early Retirement, Optional Retirement, and Vested Deferred Pension Benefits.  Id. at Title I §§ IV.B, IV.D, V.

### a.  Early Retirement Benefit

32.    Under the Early Retirement Benefit, Historical DuPont employees who reached age 50 and had accrued 15 years of eligible service could collect pension payments before the age of 65.  Id. at Title I § IV.B.  The payment could be (a) unreduced or (b) reduced according to a calculation based on a combination of their (1) age at time of election and (2) years of service under the Plan.  Id.  The longer the employees' tenure and the closer their age to 65, the smaller the reduction.  Id.

33.    An employee who was age 58 or older could receive unreduced Early Retirement pension payments when their years of service and age totaled 85.  Id.  This was colloquially referred to as the "Rule of 85."  E.g., Ex. D-91 at 3.

6

34.     The 2018 SPD included a table describing how an employee's age and year of service affected their Early Retirement Benefit.  2018 SPD, Ex. J-10 at 18.

**Early Retirement**

You are eligible for a reduced Early Retirement benefit if you are an FSE and you are at least age 50 and have at least 15 years of Eligibility Service. In addition, you are eligible for an unreduced Early Retirement benefit if you begin payments between age 58 and 65 and your age and service add up to 85 or more; otherwise, you can retire with a reduced pension.

The chart below shows the percentage of your benefit that you will receive, based on your age when benefits begin and your years of eligibility service as of your termination date. For example, if you terminate employment at age 60 with 23 years of eligibility service and are entitled to a benefit of $1,000 per month, payable at age 65, you would receive 90% of your benefit—or $900 a month—if you began taking payments at age 60. However, if you wait until age 62 to start your pension, you would be entitled to an unreduced benefit, or the full $1,000 per month.

| Age When Benefit Payments Begin | If You Have This Many Years of Eligibility Service ... | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 15 – 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 and over |
| | This Is the Percentage of Your Benefit That You Will Receive ... | | | | | | | |
| 65 | 100% | | | | | | | |
| 64 | 95% | 100% | | | | | | |
| 63 | 90% | 95% | 100% | | | | | |
| 62 | 85% | 90% | 95% | 100% | | | | |
| 61 | 80% | 85% | 90% | 95% | 100% | | | |
| 60 | 75% | 80% | 85% | 90% | 95% | 100% | | |
| 59 | 70% | 75% | 80% | 85% | 90% | 95% | 100% | |
| 58 | 65% | 70% | 75% | 80% | 85% | 90% | 95% | 100% |
| 57 | 60% | 65% | 70% | 75% | 80% | 85% | 90% | 95% |
| 56 | 55% | 60% | 65% | 70% | 75% | 80% | 85% | 90% |
| 55 | 50% | 55% | 60% | 65% | 70% | 75% | 80% | 85% |
| 54 | 50% | 50% | 55% | 60% | 65% | 70% | 75% | 80% |
| 53 | 50% | 50% | 50% | 55% | 60% | 65% | 70% | 75% |
| 52 | 50% | 50% | 50% | 50% | 55% | 60% | 65% | 70% |
| 51 | 50% | 50% | 50% | 50% | 50% | 55% | 60% | 65% |
| 50 | 50% | 50% | 50% | 50% | 50% | 50% | 55% | 60% |

Id.  As described by the 2018 SPD, a Plan participant's benefit is calculated based on (1) pay, (2) years of service, (3) age at termination, and (4) age at commencement of benefit.  Id. at 5. Specifically, the 2018 SPD states "if you are a[ full service employee] and have 15 years of or more of service and you are at least age 50 when you terminate employment, you are eligible for an Early Retirement benefit."  Id. at 12.

### b.  Optional Retirement Benefits

35.     Employees who reached age 50 and had accrued 15 years of service (the same criteria as for Early Retirement), but who were "involuntarily terminated for reasons other than discharge for dishonesty, insubordination, or other misconduct" could receive Optional Retirement Benefits.   Historical DuPont Pension and Retirement Plan, Ex. P-1 at Title I § IV.D(1)(a). Employees who reached age 45 and had at least 25 years of service, but who were "involuntarily terminated due to lack of work" were also eligible for Optional Retirement Benefits.  Id. at Title I § IV.D(1)(b).

36.    Optional Retirement Benefits were either equal to or greater than Early Retirement Benefits at every combination of age and years of service at time of commencement.  2018 SPD, Ex. J-10 at 18–19.

37.    The 2018 SPD included a table describing how an employee's age and years of service affected their Optional Retirement Benefit.  2018 SPD, Ex. J-10 at 19–20.

**Optional Retirement at Involuntary Termination**

If your employment ends because of an involuntary termination (for reasons other than dishonesty, insubordination, or other misconduct), you may be eligible for Optional Retirement if you are an FSE and you are over age 50 with at least 15 years of Eligibility Service. If you're terminated involuntarily due to lack of work and have at least 25 years of Eligibility Service, you may be eligible for Optional Retirement as early as age 45. The 25-year service requirement is reduced by two years for each year past your 45th birthday, as follows:

| Age | Required Service |
|---|---|
| 45 | 25 |
| 46 | 23 |
| 47 | 21 |
| 48 | 19 |
| 49 | 17 |
| 50 or older | 15 |

If you are eligible for a pension due to an involuntary termination as described above, the chart below shows the percentage of your benefit that you will receive, based on your age when benefits begin and your years of eligibility service. For example, if you are entitled to a benefit of $1,000 per month, payable at age 65, and you have 20 years of service, you would receive 90% of your benefit—or $900 a month—if you began taking payments at age 61 instead of waiting until age 65. If you wait until you are age 65, you would then be entitled to an unreduced benefit.

The chart below is used to determine the percentage of pension you can receive in the event of an involuntary termination described above.

| Age When Benefit Payments Begin | If You Have This Many Years of Eligibility Service ... | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27+ |
| | This Is the Percentage of Your Benefit That You Will Receive ... | | | | | | | | | | | | |
| 65 | 100% | 100% | 100% | 100% | 100% | 100% | | | | | | | |
| 64 | 95% | 95% | 95% | 95% | 95% | 97.5% | 100% | | | | | | |
| 63 | 90% | 90% | 90% | 90% | 92.5% | 95% | 97.5% | 100% | | | | | |
| 62 | 85% | 85% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | | | | |
| 61 | 80% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | | | |
| 60 | 75% | 77.5% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | | |
| 59 | 72.5% | 75% | 77.5% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% | |
| 58 | 70% | 72.5% | 75% | 77.5% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% | 100% |
| 57 | 67.5% | 70% | 72.5% | 75% | 77.7% | 80% | 82.5% | 85% | 87.5% | 90% | 92.5% | 95% | 95% |
| 56 | 65% | 67.5% | 70% | 72.5% | 75% | 77.7% | 80% | 82.5% | 85% | 87.5% | 90% | 90% | 90% |
| 55 | 62.5% | 65% | 67.5% | 70% | 72.5% | 75% | 77.5% | 80% | 82.5% | 85% | 85% | 85% | 85% |
| 54 | 60% | 62.5% | 65% | 67.5% | 70% | 72.5% | 75% | 77.5% | 80% | 80% | 80% | 80% | 80% |
| 53 | 57.5% | 60% | 62.5% | 65% | 67.5% | 70% | 72.5% | 75% | 75% | 75% | 75% | 75% | 75% |
| 52 | 55% | 57.5% | 60% | 62.5% | 65% | 67.5% | 70% | 70% | 70% | 70% | 70% | 70% | 70% |
| 51 | 52.5% | 55% | 57.5% | 60% | 62.5% | 65% | 65% | 65% | 65% | 65% | 65% | 65% | 65% |

| Age When Benefit Payments Begin | If You Have This Many Years of Eligibility Service ... | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27+ |
| | This Is the Percentage of Your Benefit That You Will Receive ... | | | | | | | | | | | | |
| 50 | 50% | 52.5% | 55% | 57.5% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% |
| 49 | | | 52.5% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% |
| 48 | | | | | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% |
| 47 | | | | | | | 45% | 45% | 45% | 45% | 45% | 45% | 45% |
| 46 | | | | | | | | | 40% | 40% | 40% | 40% | 40% |
| 45 | | | | | | | | | | | 35% | 35% | 35% |

Id.

38.    The description of the Optional Retirement Benefit program in the Plan included certain enumerated Business Exceptions.  The Optional Retirement Benefit was not available where: (1) "the employee is offered and accepts employment with the buyer or joint venture at the

site in conjunction with a sales agreement between the Company and a buyer of company assets or in conjunction with the formation of a joint venture"; (2) "the employee is offered and refuses employment with the buyer or joint venture at the site in conjunction with a sales agreement between the Company and a buyer of Company assets or in conjunction with the formation of a joint venture unless the offer is less than 80% of the employee's Company wage or salary level or the rejection results in a job for another employee who would otherwise have been terminated for lack of work"; or (3) "the employee is transferred to or employed by a wholly-owned subsidiary of the Company, or is transferred to or employed by a subsidiary of the Company or a joint venture in which the Company participates that recognized Company service."  Historical DuPont Pension and Retirement Plan, Ex. P-1 at Title I § IV.D(1)(c).  Title I § XIII of the Plan exempts seven business transactions from the exceptions to Optional Retirement, meaning that the specified transactions still permit Optional Retirement.[2]

---

[2] These transactions which are exempt from the Business Exceptions to Optional Retirement are:

A. Employees who are hired by Tech Services International, Inc., on April I, 1997 in connection with the Asset Purchase and Sale Agreement between E. I. du Pont de Nemours and Company and Tech Services International, Inc., for the Printing and Publishing Technical Marketing and Services Business dated January 2, 1997.

B. Employees who are hired by Xymid LLC on October l, 1998 in connection with the Purchase and Sales Agreement for the sale of Assets related to the Sorptive Products; Wound Shells; Lanx Nuclear, Biological and Chemical Protective Fabrics; Multi-Threat Protective Apparel and Xymid® Nonwoven Fabrics Business between E. I. du Pont de Nemours and Company and Xymld LLC.

C. Employees who are hired by American President Line on October 1, 1998 in connection with the agreement for scheduling services for E. I. du Pont de Nemours and Company's Fluoroproducts business.

D. Employees who are hired on December 31, 1998 by U.S. Salt Corporation in connection with the Purchase and Sales Agreement for the sale of Assets related to the Sodium Nitrite Business by E. I. du Pont de Nemours and Company to Repauno Products LLC.

E. Employees who are hired on May 1, 1999 by Mypodiamond, Inc. in connection with the Purchase and Sales Agreement for the sale of Assets related to the Industrial Diamond business by E. I. du Pont de Nemours and Company to Mypodiamond, Inc.

39.     Neither the Plan document nor the 2018 or 2019 SPDs discuss whether continued employment at another entity because of a corporate "spin-off" is a Business Exception to Optional Retirement Benefits.  The only way a Plan participant would know the Business Exceptions existed would be from review of Plan document, which employees did not receive unless requested, since the SPDs were silent on these Business Exceptions.  6/27/24 Day 3 AM Tr. Trans. 14:11–17, ECF 242.

### c.  Vested Deferred Pension Benefits

40.     For employees with at least 15 years of eligible service but who were "terminated" prior to reaching age 50, a Vested Deferred Pension Benefit was available that could be taken on a reduced or unreduced basis if they met certain criteria.  Id. at Title I § V.A(1).

41.     For Vested Deferred Pension Benefits, the 2018 SPD states "[i]f you have 15 years or more of service but you are not yet age 50 when you terminate employment, you are eligible for a [Deferred Pension] benefit."  2018 SPD, Ex. J-10 at 12.

42.     The amount of Vested Deferred Benefits varied by age and years of eligible service at the time of the employee's election.  Id.  The Vested Deferred Benefit reduction factors were less favorable than Early Retirement Benefits—the reduction was a product of 5/12th of 1% multiplied by the number of months before the employee was entitled to an unreduced benefit.  Id. at 21.  To illustrate the difference between Vested Deferred Benefits and Early Retirement Benefits, a 58-year-old employee with 27 years of service could receive a full, unreduced pension

---

F.  Employees who are hired by VWR on September 1, 2001 in connection with the agreement for materials management services between E. I. du Pont de Nemours and Company and VWR International, Inc.

G.  Employees hired by AVEVA, Inc. or Cadcentre on July 1, 2002 in connection with the Master Outsourcing Services Agreement between E. I. du Pont de Nemours and Company and AVEVA, Inc., for Engineering IT services, dated June 24, 2002."

Historical DuPont Pension and Retirement Plan, Ex. P-1 at Title I § XIII.  None of these apply to the spin-off.

with Early Retirement Benefits, but only 65% of his full benefit with Vested Deferred Benefits.[3] Id. at 20–21.

    **iv.    2015 Chemours Spin-Off**

43.    On July 1, 2015, Chemours spun-off from Historical DuPont.  6/26/24 Day 2 AM Tr. Trans. 36:17–25, ECF 241.

44.    In 2016, a Chemours employee, Michael Bilbo, who was 49 years old with 26 years of service as of the Chemours spin-off, applied for Early and Optional Retirement Benefits after the spin-off.  Ex. D-118.  The Appeals Committee denied Bilbo's claims.  Id. at 2.  With respect to the Optional Retirement Benefits denial, the Appeals Committee did not rely on the Business Exceptions.  Rather, the Appeals Committee upheld the denial because Bilbo was not terminated "due to a lack of work," as required by the Plan to obtain Optional Retirement Benefits.  Id.

45.    Megan Fitzpatrick, a member of the Administrative Committee during the Chemours spin-off, testified that employees who went to Chemours as part of that spin-off were not eligible for Optional Retirement Benefits.  Ex. J-46(a); 9/24/24 Day 5 Tr. Trans. 63:16– 20; 78:5–13, ECF 280.  Notably, Plaintiffs did not have a burden to prove that employees who went to Chemours as part of the Chemours spin-off were not eligible for Optional Retirement Benefits based on an interpretation of the Plan, and Defendants failed to present any evidence about how the Administrative Committee actually interpreted the Plan after the Chemours spin-off.

46.    While Fitzpatrick testified that she did not recall details of discussions regarding the Chemours spin-off, she testified that the Chemours spin-off ended many individuals' employment with Historical DuPont and that the Administrative Committee determined that the Optional Retirement Benefit would not be available to Chemours employees who had been spun-

---

[3] (5/12 of 1%) * (84 months, time before eligibility for full pension at 65) = 35% reduction factor.  2018 SPD, Ex. J-10 at 21.

off.  9/24/24 Day 5 Tr. Trans. 79:9–12, 107:15–19, ECF 280; see Ex. J-46(a); infra ¶¶ 66, 268, 292, 316.

### v.    The DowDuPont Merger

47.    On December 11, 2015, Historical DuPont announced its intent to merge with Dow Chemical Company.  See Ex. D-66 at 2.

48.    In February 2016, Benito Cachinero-Sanchez, the Senior Vice President of Human Resources at Historical DuPont, sent a letter to Plan participants informing them of the merger and the intent to spin-off the post-merger entity into three independent companies.  Ex. D-57.

49.    The intent was that this spin-off would result in the creation of a New Dow, a New DuPont focused on Specialty Products, and a new entity focused on Industrial Agriculture. Fanandakis Dep. 42:9–18, ECF 255-2.  Those organizations would become Dow ("New Dow"), DuPont De Nemours, Inc. ("New DuPont"), and Corteva, Inc., respectively.  Stipulated Facts, Ex. P-83 ¶ 2, ECF 238.

50.    On November 17, 2016, Sanchez emailed all Historical DuPont employees to inform them that additional changes to Plan benefits would be implemented in 2018.  Ex. D-59. Sanchez's email explained that for all active participating employees in the U.S. and Puerto Rico, the unreduced pension benefit would stop growing on November 30, 2018 (the "Hard Freeze"). Id. at 1.  The email explained that any employee who was not age 50 on the date of the Hard Freeze would no longer be eligible for post-retirement medical, dental, or life-insurance benefits.  Id.

51.    At the time of the November 17, 2016, email from Sanchez, Historical DuPont executives and managers did not know whether New DuPont or Corteva would assume responsibility for the Plan.  Fanandakis Dep. 60:3–16, ECF 255-2.

52.     Historical DuPont's former Chief Financial Officer, Nicholas Fanandakis, testified that throughout the merger and eventual spin-off, Dow would keep its assets and liabilities, and Historical DuPont would keep its assets and liabilities. Id. 190:15–21.

53.     After the November 17, 2016, email, Historical DuPont provided Plan participants with a User Guide and One-Pager reiterating that the "pay and service amounts used to calculate" a participant's unreduced benefit would freeze on November 30, 2018. Exs. J-21, J-23 at 11, J-24 at 11. The User Guide and One-Pager also stated that "[e]mployees who are under age 50 as of November 30, 2018 will not be eligible to receive company-sponsored Retiree Medical/Dental/Life Insurance Benefits." Ex. J-23 at 11.

54.     On September 1, 2017, the Chairmen of Dow and Historical DuPont announced that the Dow-Historical DuPont merger was complete and that Dow and Historical DuPont had each became subsidiaries of a new company, DowDuPont. Ex. D-32. The announcement also stated DowDuPont's intent to spin-off and create "three strong, new, market-focused companies in Agriculture [Corteva], Material Science [Dow] and Specialty Products [New DuPont]." Id.; see infra ¶ 70.

55.     In February 2018, Historical DuPont underscored in an email to all Plan participants that, notwithstanding the Freeze changes,

> [c]ontinuing to fulfill our obligations to pension plan participants remains a top priority. DuPont has a 100+ year history of providing pension payments to pensioners; this has not changed. While we work through the complexities of this process, we want to reiterate a key point – regardless of which company administers your pension in the future, the amounts of existing pensioners' benefits will not change. If you have not started receiving your pension, your accrued benefit cannot, and will not, be reduced. All participants will be accounted for in the transition to the new companies, and we will continue to fund the Plan in accordance with all legal requirements, as we always have.

Ex. J-20 (emphasis in original). For the reasons stated below, the underlined portion of the statement was misleading, if not incorrect.

13

56.     In another communication to Plan participants, on May 21, 2018, Meghan Cassidy and Kim Wallenhorst, Vice Presidents of Human Resources, informed Plan participants that Historical DuPont anticipated announcing which corporation(s) would assume the Plan's liabilities "at least 3-6 months prior to the first intended spin." Ex. D-34 at 1. Cassidy and Wallenhorst reiterated that Historical DuPont remained "committed to fulfilling our obligations to pension plan participants. Regardless of which company administers your pension in the future, and regardless of how the company makes pension contributions going forward, the amounts of existing pensioner's benefits will not change. Additionally, if you have not started receiving your pension, your accrued benefit will not be reduced." Id. at 2 (emphasis added).

### vi.     The Decision for Corteva to "Sponsor" the Plan

57.     As of May 21, 2018, Historical DuPont had not announced how the Plan's assets and liabilities would be allocated among the spin-off entities.

58.     At some point in 2018, DowDuPont decided that at the time of the spin-off, Corteva would assume responsibility for the Plan. Fanandakis Dep. 186:5–186:19, ECF 255-2; 6/25/24 Day 1 PM Tr. Trans. 7:16, ECF 245. That decision was not communicated to relevant Administrative Committee members and Plan participants until November 1, 2018. Dineen Dep. 276:13–19, ECF 255-1.

59.     DowDuPont assigned the Plan to Corteva post spin-off because it believed Corteva would be in the best financial position to remain a stable steward of the Plan. 6/25/24 Day 1 PM Tr. Trans. 37:4–38:2, 62:1–62:13, ECF 245; Fanandakis Dep. 58:1–59:3, ECF 255-2. Specifically, the relatively consolidated agricultural industry would allow Corteva to face less competition and instability. Fanandakis Dep. 58:5–16, ECF 255-2. In contrast, New DuPont was a conglomeration of "unrelated" businesses and was susceptible to future divestitures, sales, and spin-offs. Id. 59:4–10; 6/25/24 Day 1 PM Tr. Trans. 37:14-38:2, 62:1–62:13, ECF 245. If those future events were

to occur, the Plan might become too cumbersome for a smaller, reduced New DuPont entity to sponsor. Fanandakis Dep. 59:4–59:18, ECF 255-2.

60.    The 2018 SPD was published in September 2018, before the decision to assign the Plan to Corteva post spin-off was made public. 2018 SPD, Ex. J-10. The 2018 SPD does not refer to Corteva assuming the Plan at the time of spin-off nor explain how the spin-off would impact Plan participants or pension benefits. Id.

61.    The 2018 SPD notes:

> Your Eligibility Service determines the type of benefit you are eligible to receive and also when you are earliest eligible to receive it. For example, if you are an FSE [full service employee] and have 15 years or more of service and you are at least age 50 when you terminate employment, you are eligible for an Early Retirement benefit. If you have 15 years or more of service but you are not yet age 50 when you terminate employment, you are eligible for a Vested Deferred benefit. LSEs [limited service employees] are only eligible for Vested Deferred benefits and are not eligible for retirement benefits, no matter how many years of service they have earned.

Id. at 12. In describing who was eligible for the Deferred Pension Benefit, the 2018 SPD stated employees who were under age 50 with 15 years of experience when "[they] terminate[d] employment" qualified for Deferred Pension Benefits. Id. at 12.

62.    At trial, the Court asked a series of questions confirming the plain language regarding full service employees, confirming that this means "you have to currently be a full-time employee" or be "currently employed" at the time you meet the eligibility requirements. 6/27/24 Day 3 AM Tr. Trans. 15:9–17, ECF 242.

63.    The Plan remained with Historical DuPont, which eventually became a subsidiary of Corteva, and Corteva assumed responsibility for the Plan.

### vii.    November 8, 2018, Administrative Committee Meeting

64.    After DowDuPont decided to move the Plan to Corteva, the Administrative Committee was asked[4] in a memorandum "to make an interpretation of the pension plan language with respect to the applicability of the Optional Retirement provision in a spin-off." Ex. J-52; 9/24/24 Day 5 Tr. Trans. 107:20–25, ECF 280. Specifically, the memorandum advised that the "Committee is asked to make a formal interpretation of the plan language [included in the memorandum] to include corporate spin-offs as one of the exceptions to the applicability of Optional Retirement, consistent with past practice and the intent of the plan provisions." Ex. J-52 at 2. The memorandum further noted that "[a]lthough Section IV.D.(1)(c) does not specifically reference a spin-off, past practice has been to treat spin-offs the same as a divestiture, sale, or joint venture, etc. We did interpret the Plan to include the spin-off of Chemours as falling under this corporate transaction exception to the Optional Retirement provision . . . ." Id. at 1.

65.    On November 8, 2018, the Administrative Committee met for fifteen minutes and interpreted the language in Title I of the Plan—the part of the Plan directed towards  retirement benefits for individuals employed by Historical DuPont—to exclude corporate spin-offs from applicability of Optional Retirement Benefits. Ex. J-46(a). The Administrative Committee determined that, consistent with past practice and the intent of the Plan, "corporate spin-offs" were similar to the other corporate events listed in the Business Exceptions to Optional Retirement, id., and thus, Optional Retirement was unavailable to participants who moved to New DuPont as a result of the spin-off. 6/27/24 Day 3 AM Tr. Trans. 47:1–11, ECF 242.

66.    At the November 8, 2018, meeting, the Administrative Committee discussed the Chemours spin-off, after which the Plan did not provide Optional Retirement. Ex. J-46(a); 6/27/24

---

[4] As discussed further infra ¶¶ 290, 319, 366–367, there was no clear testimony on who asked the Administrative Committee to make such an interpretation.

Day 3 AM Tr. Trans. 86:5–10, ECF 242.  Participants in the November 8 Administrative Committee meeting who testified at trial could not recall specifics of the meeting other than that the Administrative Committee likened the spin-off to the prior Chemours spin-off, after which Optional Retirement was not available.  E.g., 6/27/24 Day 3 AM Tr. Trans. 86:1–18, ECF 242; 9/24/24 Day 5 Tr. Trans. 106:11–25, ECF 280.

67.    The Administrative Committee opined that as of the spin-off, "plan participants who will be part of new DuPont <u>are not being terminated under the [Plan] but rather are separating from the controlled group sponsoring the [Plan]</u>." Ex. J-46(a) (emphasis added).[5]  This meant that for the purposes of Optional Retirement, employees were not "terminated" from their employer (Specialty Products, then a subsidiary of Historical DuPont) by the spin-off, but rather, "transferred" to an employer (Specialty Products, now a subsidiary of New DuPont) that ceased participating in the Plan as of May 31, 2019, and thus were not entitled to Optional Retirement Benefits.[6]  <u>See</u> 9/24/24 Day 5 Tr. Trans. 62:8–10, 166:5–7, ECF 280.

---

[5] While the Administrative Committee noted that employees moving to New DuPont were not being "terminated" from their employer, Ex. J-46(a), <u>see</u> 9/24/24 Day 5 Tr. Trans. 166:5–7, ECF 280, employees were elsewhere referred to as "terminated," Ex. D-120 at 5, 8, 10–11.  This highlights the confusion of "termination" versus "transfer," as discussed <u>infra</u> n.6.

[6] Defendants contend that employees were not "terminated," but "transferred" (which did not "trigger" Optional Retirement Benefits), and that therefore their employer stopped "participating" in the Plan.  <u>See</u> 9/24/24 Day 5 Tr. Trans. 62:8–10, 166:5–7, ECF 280.  But Defendants <u>did</u> consider employees "terminated" for the purposes of Early Retirement (whereby employees no longer accrued years of service after the spin-off because they had been "terminated"), <u>unless</u> they were eligible for Early Retirement at the time of the spin-off, which rendered them "retired" rather than "terminated," and therefore permitted "double-dipping" (discussed further <u>infra</u> ¶ 185).

Defendants' inconsistent use of "termination" in documents and communications explaining the impact of the spin-off was confusing.  Defendants <u>did not</u> "terminate" employees for the purposes of Optional Retirement benefits, <u>did</u> "terminate" employees for the purposes of Early Retirement if they were ineligible upon spin-off, and <u>did not</u> "terminate" employees for the purposes of Early Retirement if they were eligible upon spin-off.  Nonetheless, the word "terminated" was present in some documents, absent in others, and used inconsistently.  <u>See</u>, <u>e.g.</u>, Exs. J-23, D-120.  "Termination" can be voluntary or involuntary.  <u>See</u> <u>*Termination,*</u>

### viii.    June 1, 2019: The Spin-Off

68.    On June 1, 2019, Historical DuPont emerged from the spin-off as a subsidiary of Corteva.  6/25/24 Day 1 PM Tr. Trans. 7:4–19, ECF 245.  Specialty Products, some of Plaintiffs' employer as of February 1, 2019, and previously a subsidiary of Historical DuPont, emerged from the spin-off as a subsidiary of New DuPont.  Id.

69.    Defendants had a right to—and did—transfer Plaintiffs and Class Members to different jobs and subsidiaries as part of the spin-off.

70.    Defendants' pre-merger, post-merger, and post spin-off corporate structure is detailed below.



Counsel for all parties agreed on the accuracy of this Chart at post-trial oral argument.  11/25/24 Oral Arg. Trans. 10:18–11:17, ECF 308

---

DICTIONARY.COM, https://www.dictionary.com/browse/termination (last visited Nov. 5, 2024). But the meaning of the word "termination" was unclear based on the inconsistent and confusing nature by which Defendants used the words.  Moreover, Defendants used the word "termination" in places where perhaps the more appropriate term would have been "transfer."

71.    On June 1, 2019, Corteva assumed responsibility for Plan liabilities after the spin-off, 6/27/24 Day 3 AM Trial Tr. 13:13–18, ECF 242, and Historical DuPont, the Plan's "sponsor," became a subsidiary of New DuPont.  6/25/24 Day 1 PM Tr. Trans. 7:4–19, ECF 245; 6/27/24 Day 3 PM Tr. Trans. 13:10–12, ECF 247.

72.    Of the active Plan participants (constituting 10% of the Plan's total participants, all of whom were employed by Historical DuPont), approximately 50% of active participants became employees of New DuPont after the spin-off.  6/25/24 Day 1 PM Tr. Trans. 61:6–17, ECF 245; 6/27/24 Day 3 AM Tr. Trans. 75:11–25, ECF 242.  Approximately 40% of active participants became Corteva employees after the spin-off.  6/25/24 Day 1 PM Tr. Trans. 61:6–10, ECF 245; 6/27/24 Day 3 AM Tr. Trans. 75:11–20, ECF 242.  The remainder worked for New Dow after the spin-off.  6/27/24 Day 3 AM Tr. Trans. 75:21–23, ECF 242.

### a.  Characterization of the Spin-Off During Litigation

73.    Throughout the past three years of litigation and at trial, Defendants have proffered a neat framework to conceptualize Plan benefits.  Summarizing their position, Durkovic testified that the Plan measures an employee's eligibility for Early, Optional, or Deferred Benefits "at the time the person terminates or separates from service."  6/26/24 Day 2 PM Tr. Trans. 82:17–18, ECF 246 (emphasis added).

74.    A "separation of service,"—Defendants' characterization of the New DuPont employees' status at spin-off—includes an employee (1) voluntarily leaving his job, (2) an involuntary termination, or (3) a "participating employer stopping" their participation in the Plan.  Id. 82:22–83:22.  Because the spin-off, after which New DuPont ceased participating in the Plan, fell into the third bucket of "separation of service," Defendants argue their interpretation of measuring eligibility for benefits as of May 31, 2019, was obvious.  See infra ¶ 333.

75.     But the problem with Defendants' conceptualization is that it was born of this litigation—not the Plan document or SPD.  The term "separation of service" is absent in the Early, Optional, or Deferred Retirement Benefits sections of the Plan and SPDs, as is any explanation of the phrase "participating employer ceasing to participate" in the Plan, let alone its consequence on benefits.  Instead, the word repeated throughout the Plan and SPD to describe when to measure an employee's benefits eligibility is "terminate," and focuses on when someone "terminates" employment, voluntarily or not.  See supra n.5–6.

### ix.     Defendants' External Communications About Plan Benefits

76.     While Plaintiffs and Defendants presented considerable testimony about the SPDs, portals, PowerPoints, hyperlinks, FAQ documents, and other sources of information about the impact of the spin-off on benefits, Defendants did not identify a single authoritative source of information about benefits after the spin-off.

77.     Defendants' multitude of informational sources was confusing to Plan participants (and the Court) and counterproductive.  While numerous informational sources may, in theory, be beneficial to help ensure that advice and facts are communicated to persons, testimony by Plaintiffs' witnesses pointed to innumerable sources which included unclear information about the impact of the spin-off on benefits.  Defendants' witnesses did not dispute this.  And these countless sources presented explanations about the impact of the spin-off which were confusing and/or contradictory.

78.     Defendants could have—and should have—adopted a "plain English" description for each change of employment that took place at the time of the spin-off, followed by a "plain English" discussion as to what would happen after the spin-off to each group of employees.[7]

---

[7] Defendants' documents used the term "participant" to refer to a current or former employee with a right to any benefit under the Plan as defined by ERISA.  See 29 U.S.C. §1002(7)

79.     Notably, Plaintiffs largely did not read the materials distributed to them regarding how their pension benefits were impacted by the spin-off.  See, e.g., 6/25/24 Day 1 AM Tr. Trans. 74:6–11, ECF 240; 6/26/24 Day 2 AM Tr. Trans. 70:25–71:6, 75:4–6, ECF 241; 6/27/24 Day 3 PM Tr. Trans. 61:19–62:3, 65:11–66:1, 70:14–17, ECF 247.

### a.   November 1, 2018, Email from Ed Breen

80.     On November 1, 2018, DowDuPont CEO Ed Breen announced via email to all Plan participants that Corteva would assume responsibility for the Plan at the spin-off. [8]  See Ex. J-17(a).  The e-mail explained that Corteva would maintain the Plan because it would be a long-lasting, stable company "[w]ith a strong balance sheet and an expected credit rating equal to that of [Historical] DuPont."  Id.  Until that point, no Plan participants received any communications how the spin-off would impact their benefits.

81.     Consistent with Historical DuPont's earlier communications, Breen reinforced that "[a]s always, continuing to fulfill our obligations to plan participants is a top priority" and that the

---

("'[P]articipant' means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit."). However, Defendants' use of and context around "participant" and related words was confusing. For example, certain communications by Defendants referred to "plan participants" even once "New DuPont [was] no longer a participating employer." Ex. D-85 at 1, 3. Defendants continued use of the term "participants" was confusing given that New DuPont was no longer a participating employer. This rendered the documents that Defendants attempted to use to explain the impact of the spin-off confusing where the documents referred to "plan participants" who were employees of employers that no longer participated in the Plan. See also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117 (1989) (noting that "participant" is naturally read to mean either current employees or certain former employees with benefits claims).

[8] Highlighting another instance of Defendants' confusing and inconsistent use of certain words, Defendants' communications state that Corteva "will be the ongoing sponsor of the Plan," Ex. D-33 at 3, see, e.g., infra ¶¶ 83–84, but the facts are undisputed that Historical DuPont remained the Plan sponsor, while Corteva, became responsible for the Plan's liabilities, see 6/25/24 Day 1 PM Tr. Trans. 7:12–19, ECF 245; 6/27/24 Day 3 AM Tr. Trans. 71:25–72:5, ECF 242; 6/27/24 Day 3 PM Tr. Trans. 13:6–12, ECF 247.

decision to move the Plan to Corteva was made "with the best interests of our pensioners in mind, including assignment of retirement programs and obligations.  Id.  Breen again stressed that "if you are currently receiving a pension benefit, the amount of your benefit will not change.  If you have not started receiving your pension, your accrued benefit can't, and won't, be reduced."  Id. (emphasis added).  Breen promised to "provide [Plan participants] with additional details, including information related to other benefit programs that are not mentioned in this letter."  Id. For reasons stated below, this language is misleading if not incorrect as to many Class Members.

### b.  The FAQ Document

82.     Breen's letter provided a link to a set of FAQs providing more information about how the spin-off would affect Plan participants.  Id.  This is one of the communications Defendants pointed to that they contend explained that New DuPont employees under age 50 at the spin-off could never receive Early Retirement Benefits.

83.     The FAQ document included the following question and answer:

> [Question] 4.  I am currently a participant in DuPont's U.S. Pension Plan and will be an employee of Specialty Products in the US.  How does this affect my pension?
>
> [Answer] The spin of DuPont and Corteva Agriscience will impact Specialty Products employes as follows:
>
> Since Corteva Agriscience will be the ongoing sponsor of the Plan, Specialty Products employees who participate in the Plan will be eligible to commence their pension, at spin, if they meet the Plan commencement requirements in terms of age and service.
>
> At spin, future service for Specialty Products employees who participate in the Plan will no longer be recognized in determining eligibility for pension benefits and any applicable early retirement reduction factors.  For those employees who qualify for retirement by meeting the Plan's age and service requirements, growth in age will continue to be recognized allowing those participants to age into an improved reduction factor prior to commencing their pension.

Ex. D-33 at 3.  According to Defendants, the underlined language above makes clear that "future service" with Specialty Products after the spin-off is irrelevant for not only determining an

employee's years of service under the Plan but also their ability to reach the Early Retirement threshold of 50 years old. For the reasons discussed further below, a reasonable Plan participant would not understand the significance or implications of this communication.

84.     Similarly, the FAQ document also included the following question and answer:

> [Question] 5. I am currently a participant in DuPont's U.S. Pension Plan and will be an employee of Materials Science in the US. How does this affect my pension?

> [Answer] The spin from DowDuPont will impact Materials Science employees going to the new Dow as follows:

> Once separated at spin from DowDuPont, Materials Science employee [who is working for New Dow after the spin-off] who participate in the Plan will be eligible to commence their pension if they meet the Plan commencement requirements in terms of age and service.

> At spin, future services for Materials Science employees who participate in the Plan will no longer be recognized in determining eligibility for pension benefits and any applicable early retirement reduction factors. For those employees who qualify for retirement by meeting the Plan's age and service requirements, growth in age will continue to be recognized allowing these participants to age into an improved reduction factor prior to commencing their pension.

Id.

85.     Mary Dineen was responsible for communications about Plan benefits in relation to the spin-off. Dineen Dep. 21:4–13, 68:3–12, ECF 255-1. Dineen, who drafted the FAQs, admitted that the document did not clearly explain the effect of the spin-off on Early Retirement Benefits. Id. 287:13–288:12. In justifying why the FAQ was imprecise, Dineen explained that when drafting the FAQ, she "really didn't know what the announcement at the beginning of November was going to be until that time. So we didn't get a lot of time to prepare and that was what the intent of the documents that we prepared in March of 2019 was to go into more detail to help people understand the impact." Id. 308:11–22. More bluntly, Dineen believed that the Early Retirement Class Members "had no choice" regardless of the communication—"[t]hey weren't making decisions based on that material." Id. 308:23–309:2.

### c.  2018 User Guide

86.    The 2018 User Guide, updated in November 2018 after Breen's announcement, on a page listed "Your Retirement Picture With DuPont Today," continued to tell employees that they were eligible for Early Retirement Benefits once they reached "age 50 with 15 years of experience" with "the Parent Company section of the Plan."  Ex. J-23 at 4.  Only those who "terminate[d] employment before reaching age 50 with 15 years of service" would not become eligible for Early Retirement.  Id. at 5.

87.    Based on the trial testimony and documents discussed herein, Defendants' communications about Plan benefits frequently referenced "termination," but then used the word in different context.  As noted below, Defendants could have and should have explained the meaning to employees.  See supra n.5, 6.

### d.  March 20, 2019, Email to Plan Participants and the Links

88.    On March 20, 2019, the Historical DuPont Human Resources team sent another email to Plan participants.  Ex. J-25.  The email, which included links to websites hosting PowerPoint Presentations, began with an advertisement, not a warning: "As a pension eligible employee moving to 'New' DuPont, you may be eligible to begin collecting your pension as of 6/1/2019 from the Pension and Retirement Plan sponsored by Corteva Agriscience."  Id.  The email hyperlinked to a website hosting "[p]resentations detailing pension benefits."[9]  Id.  The email

---

[9] While Defendants' documents and communications about the impact of the spin-off frequently used the term "pension benefits," these same documents also often used the language "pension payments"—sometimes interchangeably with "pension benefits" and sometimes in a distinct way.  See, e.g., Ex. D-85 at 6–7, 10 (using the language "pension benefits" and "pension payments" interchangeably).  Defendants' documents did not define either term nor clarify if additional benefits beyond payment are included as "pension benefits," absent occasional references to post-retirement medical, dental, and life insurance benefits.  See Ex. J-23 at 7. Defendants could have—and should have—stated in "plain English" the meaning of "pension benefits" when frequently using this term to explain the impact of the spin-off to employees.

"encourage[d employees] to read the material and carefully consider the best time for [employees] to commence [their] pension benefits." Id. Finally, the email stated that if an employee was "unsure of the eligibility requirements for a reduced or unreduced pension, please refer to the presentations noted above or" the 2018 SPD. Id.

89.    Employees who followed the links included in the March 20, 2019, email had to choose between two PowerPoint Presentations. 9/24/24 Day 5 Tr. Trans. 146:10–13, ECF 280. On at least one of the websites linked in the email, the two presentations were among many resources available to DuPont employees. Exs. D-91, J-48(a). On the same landing page, employees could access materials related to "2019 BeneFlex Checklists," a "2019 BeneFlex Enrollment Guide," and their "2019 Benefits Summary." Exs. D-91, J-48(a).

90.    To access the PowerPoint Presentations, employees had to first select the correct section "Pension and Retirement Plan Presentation" from a list of at least six other headings. Exs. D-91, J-48(a); 9/24/24 Day 5 Tr. Trans. 140:19–141:17, ECF 280. Then, within the selected section, employees needed to navigate to the specific presentation that applied to them—but the section did not include guiding labels distinguishing between the PowerPoint Presentations. Exs. D-91, J-48(a); 9/24/24 Day 5 Tr. Trans. 146:10–147:13, ECF 280.

91.    One PowerPoint Presentation, titled "Pension and Retirement Plan Presentation for U.S. DuPont Retirement-Eligible Employees Transitioning to 'New' DuPont on June 1, 2019," explained on its third slide that the presentation was intended for Plan participants who "obtained at least age 50 with 15 years of service as of May 31, 2019." Ex. D-84(a) at 1, 3. This presentation was for employees "hired or rehired" as "Full-Service Employees prior to January 1, 2007" and who "obtained at least age 50 with 15 years of service as of May 31, 2019." Id. at 3. Pursuant to this presentation, those qualifying individuals would be considered "retiree[s]" as of June 1, 2019.

Id. at 5.  Employees with the age and service for an unreduced pension benefit as of June 1, 2019, could commence their benefit immediately.  Id. at 8–12.  Employees ages 50 or older who would receive a reduced pension benefit as of June 1, 2019, could wait until they reached an age where the benefit was no longer reduced.  Id. at 13–16.

92.    This PowerPoint Presentation also explained how the spin-off affected the two variables determining the Early Retirement reduction factor: years of eligible service and age.  Id. at 7–8.  Years of service stopped accruing on May 31, 2019, the time of the spin-off.  Id. at 7. However, an employee could still obtain a higher pension payout if they deferred Early Retirement until they reached an older age.  Id. at 13–16.

93.    The other PowerPoint Presentation, titled "Pension and Retirement Plan Presentation for U.S. DuPont Term Vested Eligible Participant Transitioning to 'New' DuPont on June 1, 2019," explained on its third slide that an employee is "a term vested eligible pension plan participant if you have NOT reached age 50 with at least 15 years of eligible serve as of May 31, 2019, when New DuPont is no longer a participating employer in the Plan."  Ex. D-85 at 1, 3. Neither the Plan nor the 2018 SPD included or defined the phrase "term vested eligible."  Historical DuPont Pension and Retirement Plan, Ex. P-1; 2018 SPD, Ex. J-10.

94.    The Term-Vested Eligible Presentation stated that since New DuPont would no longer participate in the Plan, "future service with New DuPont will not be recognized in determining eligibility for pension benefits as of June 1, 2019."  Ex. D-85 at 2.  The PowerPoint defined "term vested" participants as those who have 15 years of eligible service under the Plan but will not reach age 50 by May 31, 2019, and who "have the option to commence or defer their reduced or unreduced pension benefits."  Id. at 3.

95.     At the same time, other slides in the Term-Vested Eligible Presentation contained information for employees who may be eligible to commence their pension benefits immediately. Id. at 6, 8, 10–12, 13–14.  Many of these slides were near, or identical copies, to those in the Retirement-Eligible Presentation.  See id., Ex. D-84A at 2, 7, 10–14, 16.  But under the Plan, the only potential benefit immediately available to employees under the age of 50—to whom this Vested Eligible Presentation was aimed—was Optional Retirement.  See Historical DuPont Pension and Retirement Plan, Ex. P-1 at Title I § IV.D.  Nonetheless, the Term-Vested Eligible Presentation referenced employees' choice to either defer or begin monthly pension benefits immediately or in the near future, which not all of them would be able to do.  Ex. D-85 at 6, 8, 10–12, 13–14.  The PowerPoint also discussed which employees would be eligible for unreduced benefits at spin-off.  Id. at 8–10.

96.     There were two notable inconsistencies between the PowerPoint Presentations.

97.     First, the PowerPoint Presentations used different language when describing employees' roles at New DuPont post spin-off.  While the Vested Eligible Presentation stated that "future service with New DuPont will not be recognized in determining eligibility for pension benefits" as of spin-off, Ex. D-85 at 2, the Retirement Eligible Presentation more clearly included a slide explaining that participants would be considered a "retiree of [Historical] DuPont" and "[a]t the same time . . . also an active employee of New DuPont," Ex. D-84(a) at 5.  The Vested Eligible Presentation at no point describes future New DuPont employees as "terminated" or losing their employment with Historical DuPont.[10]  Id.

---

[10] Fitzpatrick testified that employees who had been working for Historical Dupont were "transferred" to New DuPont on February 1, 2019.  9/24/24 Day 5 Tr. Trans. 166:5–7, ECF 280; see also id. 62:8–10 ("Well, all employees in Historical DuPont were being transferred out of that legal entity into the Corteva Agriscience's legal entity.").

98.    Second, the PowerPoint Presentations included different slides to describe the reduction factors for benefits.  The Vested Eligible Presentation incorporated charts from the 2018 SPD describing deferred benefits, Ex. D-85 at 7, 13, while the Retirement-Eligible Presentation included figures from the 2018 SPD characterizing the Early Retirement Benefit, Ex. D-84(a) at 15.

99.    The PowerPoint Presentations were only digitally available, and Defendants presented no evidence of in-person meetings to discuss the impact of the spin-off on benefits.

100.    Dineen testified that the PowerPoint Presentations did, in her opinion, communicate that under age 50 employees could never receive Early Retirement Benefits after the spin-off. Dineen Dep. 282:22–283:9, ECF 255-1.

101.    Cockerill admitted that once he saw the PowerPoint Presentations during this litigation, the presentation "would have set off alarm bells" had he read it prior to the spin-off.  Ex. J-28; 6/26/24 Day 2 PM Tr. Trans. 16:1–5, ECF 246.  Certain Plaintiffs never read the material distributed to them regarding their pension benefits as affected by the spin-off.

### e.  June 2019 SPD

102.    Employees received the 2019 Summary Plan Description ("2019 SPD") from Corteva following the spin-off.

103.    The 2019 SPD does not reference the spin-off or its impact on Plan benefits.  Robert Cockerill Level I and Level II Appeals and Denials (including 2019 SPD), Ex. J-2 at 414–501. Further, the 2019 SPD is almost identical to the 2018 SPD, including the same examples describing benefit payouts.  Compare 2018 SPD, Ex. J-10 at 15–18 with Robert Cockerill Level I and Level II Appeals and Denials (including 2019 SPD), Ex. J-2 at 428–31.

104.    Corteva made at least one grammatical edit to the 2019 SPD.  In the "Common Defined Terms" subsection, the SPDs define two terms used throughout: "DuPont" and "the Company."

105.    The 2018 SPD reads:

**Common Defined Terms**

These terms are capitalized throughout this summary. In this section, you will find the definitions for these terms to help clarify their meaning and to provide information to better help you understand the provisions of the Plan.

BENEFIT FREEZE DATE

The Benefit Freeze Date is November 30, 2018. No benefits will accrue under the Plan after that date. Note however, benefits under Title III stopped accruing after June 30, 2015.

"DUPONT" AND THE "COMPANY"

- Where we use "DuPont" in this summary, we mean E. I. du Pont de Nemours and Company.
- Where we refer to the "Company" in this summary, we mean the DuPont affiliated organization that has adopted or participates in the Plan and employs you.

SPOUSE

Your Spouse is the person to whom you are legally married.

2018 SPD, Ex. J-10 at 9.

106.    The 2019 SPD reads:

**Common Defined Terms**

These terms are capitalized throughout this summary. In this section, you will find the definitions for these terms to help clarify their meaning and to provide information to better help you understand the provisions of the Plan.

BENEFIT FREEZE DATE

The Benefit Freeze Date is November 30, 2018. No benefits will accrue under the Plan after that date. Note however, benefits under Title III stopped accruing after June 30, 2015.

"DUPONT" AND THE "COMPANY"

- Where we use "DuPont" in this summary, we mean E. I. du Pont de Nemours and Company, a subsidiary of Corteva, Inc.
- Where we refer to the "Company" in this summary, we mean an entity that adopted or participated in the Plan while affiliated with DuPont and that employs or employed you.

SPOUSE

Your Spouse is the person to whom you are legally married.

Robert Cockerill Level I and Level II Appeals and Denials (including 2019 SPD), Ex. J-2 at 422.

107.    Additional changes include that in the 2019 SPD, the definition of "Company" was altered; the tense of "adopt" and "participate" was changed from present to past.  Id.  In the 2019 SPD, the "Company" was an entity that had previously "adopted" or "participated in the Plan while affiliated with DuPont."  Id.  Previously, under the 2018 SPD, the Company was an entity that "has adopted" or "participates in" the Plan.  2018 SPD, Ex. J-10 at 9.  The rest of the 2019 SPD

29

remained in the present tense, including the sections describing Early Retirement Benefits,[11] Deferred Pension Benefits,[12] and Optional Retirement Benefits.[13]  Robert Cockerill Level I and Level II Appeals and Denials (including 2019 SPD), Ex. J-2 at 431–33.

108.    Moreover, while the 2018 and 2019 SPDs included numerous hypotheticals detailing how several freeze dates from December 2007 through November 2018 factored into calculating Plan benefits, neither SPD mentioned the date of the spin-off (or the spin-off at all) nor its effect on Plan benefits.  See 2018 SPD, Ex. J-10 at 15–18; Robert Cockerill Level I and Level II Appeals and Denials (including 2019 SPD), Ex. J-2 at 428–31.

### f.    "Benefits News" Document

109.    In another document titled "Benefit News," Historical DuPont wrote: "As an employee going to the new DuPont, you'll experience very few changes to your benefits because of the spin.  We've been working hard behind the scenes to make this a smooth transition for you." Ex. D-110 at 1.  Under a subsection titled "Pension and Retiree Medical, Dental and Life Insurance Benefits," the document stated that Corteva would assume the retiree benefits obligations after spin-off.  Id. at 2.  The document "encourage[d]" participants "to review the presentation[s]" to understand "how to access your benefits after the spin," and to "pay close attention" to the "pension benefits" section because employees "may be able to start receiving [their] pension while [they] continue to work at DuPont."  Id.

---

[11] Robert Cockerill Level I and Level II Appeals and Denials (including 2019 SPD) Ex. J-2 at 431 ("You are eligible for a reduced Early Retirement if you are [a Full Service Employee] . . .") (emphasis added).

[12] Id. at 433 ("If you leave the Company after you become vested, but before you are eligible to retire, you are entitled to a [ ] Deferred pension benefit.") (emphasis added).

[13] Id. at 432 ("If your employment ends because of an involuntary termination . . . you may be eligible for Optional Retirement.") (emphasis added).

### x.    Defendants' Internal Communications About Plan Benefits

#### a.    Pre-Spin-Off Internal Communications About Plan Benefits

110.    The Human Resources Department of DowDuPont received countless questions about how the spin-off would affect benefits beginning in November of 2018 after Breen's email hyperlinking the FAQ.

111.    In one email chain, a Human Resources employee emailed Lisa White and asked whether employees who were less than 50 years old at spin-off would be eligible for Vested Deferred Benefits after spin-off.  Ex. D-81 at 1–2.

112.    In another email chain, Human Resources employee Pamela Murray fielded questions to "help [employees] interpret" how future service post spin-off would affect the Rule of 85.  Ex. J-33 at 1–4.  Murray provided an "<u>unofficial</u> explanation" that a participant "who ha[d] met the age 50 + 15 [years of service minimum] retirement criteria can defer their pension and continue to 'age into' an improved reduction factor."  <u>Id.</u> at 1 (emphasis in original).

113.    On November 8, 2018, another employee, Mike Dutton, emailed Dineen and asked, "[a]re there plans to send additional communications, FAQ's, and/or illustrative examples to help [Historical] DuPont employees hired before 2007 better understand the impact to each of them from the recent Pension Announcement?"  Ex. J-37 at 1.  Dutton noted that "there is still a lot of confusion about the details" of how the spin-off would affect benefits among employees and that employees "have come to expect outstanding benefits communications that are self-contained and easy to understand. This one wasn't that way, coming as part of a Corporate financial liability announcement in a letter from Ed… ☹." <u>Id.</u>

114.    Before sending out the PowerPoint Presentations to employees on March 20, 2019, in February 2019, the Plan's call center generated an internal script for representatives who

received phone calls about post spin-off benefits questions.  See Ex. D-120.  Throughout this internal script, employees who would be spun-off to New DuPont were characterized as "terminated" from Historical DuPont.  Id. at 5, 8, 10–11.[14]

115.    Several members of the Human Resources Department traded drafts of the email that was eventually sent on March 20, 2019.  Ex. P-27.  Fitzpatrick, Durkovic, Dineen, and White were among those on the chain.  Id. at 1.  Fitzpatrick noted in the chain that, based on a draft of the March 20, 2019, email, "employees will not know if they are [eligible for] unreduced or reduced [benefits] so how can they tell that?"  Id. at 2.

116.    On the day Human Resources sent out the PowerPoint Presentations, White received more questions from employees.  Ex. D-91.  One employee asked, and White answered:

> [Question] If you are eligible for a reduced pension but elect to defer, is future eligibility to collect full pension based on "85 rule" or age? What is the age?
>
> [Answer] Still rule of 85 but only age will grow after June 1, ie based on service at June 1 and age when you wish to commence.

Id. at 3.  Nidhi Chaudhary, a Human Resources employee, notified White that "[i]t might be worth circulating [the PowerPoint Presentations] as employees don't tend to go into the portal as much." Ex. P-66 at 1.

### b.  Post Spin-Off Internal Communications About Plan Benefits

117.    After the spin-off, employees' confusion about the impact of the spin-off on Plan benefits continued.

118.    On June 6, 2019, Fitzpatrick (then Corteva's Retirement Benefits Leader) emailed colleagues that the Plan's call center was "reporting a lot of calls from upset pensioners who claim they did not know that DuPont was sending their pension to Corteva and they are very upset."  Ex.

---

[14] But employees were not necessarily all "terminated."  See supra n.5, 6.

D-92.  Fitzpatrick clarified that her use of "pensioners" in this email referred to people who were already receiving their pensions and thus were not impacted by the spin-off.  9/24/24 Day 5 Tr. Trans. 99:16–23, ECF 280.

119.    On November 7, 2019, another Human Resources employee emailed White that "a group of bargaining employees along with a union representative" were "stating that they are now being told that because they weren't 50 at the time of spin they must be 65 to get full benefits." Ex. D-94.  The employee continued that he "can't put [his] fingers on anything that we shared at the time that spelled this out" and asked whether "there any way you can refresh my memory of what we shared at the time."  Id.  White responded by emailing back the FAQ document, and noted that the FAQ document "did not get into details but the treatment is consistent with the FAQs." White wrote:

> The pension plan defines early retirement eligibility as 50 and 15.  If employees were not 50 and 15 at spin, then they were not eligible for early retirement and can't age into early retirement.  They are eligible for a vested benefit but the reduction factors work differently.  This has always been the case.

Id.

### xi.    Release

120.    At the end of their employment with Specialty Products, multiple employees, including Major, signed a Release.

121.    The Release released all claims against Specialty Products and its:

> parent corporation, affiliates, subsidiaries, divisions, predecessor, insurers, successors and assigns, . . . their employee benefit plans and programs and their administrators and fiduciaries. . . of and from any and all claims, known and unknown, asserted or unasserted, which the Employee has or may have against Releasees as of the date of execution of this Agreement, including, but not limited to, any alleged violation of the following, as amended . . . The Employee Retirement Income Security Act of 1974 ('ERISA')," as well as "any public policy, contract, tort, or common law, including, without limitation . . . misrepresentation, fraud, detrimental reliance . . . .

Ex. D-26 at 1.

122.    The Release carved out claims for vested or accrued employee benefits.  Id. at 1–2.

123.    Under § 4(a) of the Release, the employee releases certain parties from claims "including . . . any alleged violation of . . . The Employee Retirement Income Security Act of 1974 ("ERISA") (except for any vested benefits under any tax qualified benefit plan).  Id. at 1 (emphasis added).

124.    Under § 4(b) of the Release, certain claims are listed as not released.  Excluded from the Release are an employee's claim to "his/her own vested or accrued employee benefits under Employer's health, welfare, or retirement plans as of the Separation Date."  Id. at 2 (emphasis added).

125.    In exchange for signing the Release, Major received severance benefits.  Id.

126.    Seventy-eight other members of the Optional Retirement class signed the Release. See, e.g., Ex. D-49.

**c.   WITNESSES**

127.    Plaintiffs called eight witnesses in their case-in-chief: named Early Retirement Plaintiff Robert Cockerill, named Optional Retirement Plaintiffs Oliver Major and Darrell Benson, unnamed Early Retirement Class Member Daniel Barish, unnamed Optional Retirement Class Member Bruce Carter, New DuPont Chief Executive Officer Ed Breen (called as-of-cross), Corteva Benefits Director Mark Durkovic (called as-of-cross), and a senior employee in New DuPont's Human Resources Department Lisa White (called as-of-cross).  Plaintiffs also presented testimony by Mary Dineen, a senior manager for Global Employee Benefits, through a video designation of her deposition.

128.    Defendants called four witnesses in their case-in-chief: Patty Yang, a former Corteva employee who was responsible for Global Employee Benefits financials; Kelly Lantange, a former Historical DuPont Leader of North American Training and Communications; Megan

34

Fitzpatrick, a Retirements Benefits Delivery Manager at Corteva; and Lawrence Sher, an expert on pension and actuary issues. Defendants also presented testimony by Ian Altman, who is Plaintiffs' expert, through a video designation of parts of his deposition.

129.    The parties jointly designated two depositions as trial testimony from DowDuPont Chief Financial Officer Nicholas Fanandakis, ECF 255-2, and Mary Dineen, a former senior benefits manager, ECF 255-1.

130.    Each of Plaintiffs' witnesses who was a named class representative or Class Member—Cockerill, Major, Benson, Barish, and Carter—testified credibly. Notably, none of the testimony by Plaintiffs' witnesses as to specific facts that took place which impacted them were contradicted by the testimony of Defendants' witnesses. As noted infra, while Defense witness Fitzpatrick testified to two interpretations of language that were aligned with Defendants' case; none of Fitzpatrick's testimony disputed any of the facts asserted and testified to by the class representatives and class members who testified. In this sense, the factual record is—at least as to the experience of the class representatives and class members—not in dispute.

131.    After reviewing the live and written testimony, this Court finds the Plaintiffs testified credibly on their employment, understanding of Plan benefits before and after the spin-off, and content of Defendants' benefits communications in the lead up to the spin-off.

132.    This Court also generally finds that Defendant employees testified credibly, with two noted caveats. First, Breen, while credible, was clearly uninvolved in the relevant communications about Plan benefits, rendering his conclusory opinions regarding communications or Plan interpretations unpersuasive. Second, while Defendants' employees White, Durkovic, Fitzpatrick, and Dineen were generally credible, they were at times evasive, particularly when asked specifics about how the Administrative Committee arrived at its interpretation that the

Optional Retirement Benefit was inapplicable to the spin-off and what specific, written provisions of the Plan supported that interpretation. Without exception, all of Defendants' testifying employees who were present at the November 8, 2018, meeting could not recall the circumstances for calling the meeting or details of discussions at the meeting.

### i.    Plaintiffs' Case-in-Chief

### a.    Robert Cockerill

133. Robert Cockerill is a named representative of the Early Retirement Class. Cockerill v. Corteva, Inc., 345 F.R.D. 81, 104 (E.D. Pa. 2023). The Early Retirement Class is defined as:

> All Plan participants who were less than age 50, with at least 15 years of service under Title I of the Plan as of May 31, 2019, and were employed by Historical DuPont or any other participating employer of Title I of the Plan, and who continued to be employed, post spin-off, by New DuPont or one of its subsidiaries that did not participate in Title I of the Plan until they reached age 50, and beneficiaries or estates of such participants.

Id.

134. Cockerill, a third-generation DuPont employee, began working for Historical DuPont in 1992 as a Process Engineer. 6/25/24 Day 1 AM Tr. Trans. 58:8–60:25, ECF 240. Cockerill continued working for Historical DuPont, eventually accumulating nearly 28 years of service by May 31, 2019. Id. at 72:11–14. He assumed various leadership roles, such as operations leader, global product manager, strategic planning manager, and marketing manager, and relocated his family seven times across various states during his years of service. Id. at 58:16–60:16.

### 1.    Familiarity With the Plan

135. Historical DuPont provided Cockerill with a Pension and Retirement Plan. Stipulated Facts, Ex. P-83 ¶¶ 5, 7, 12, ECF 238.

136. Cockerill testified that he was familiar with the Plan from periodically reviewing SPDs, using digital modeling tools on internal portals, and observing his father commence Early

Retirement Benefits at age 59.  6/25/24 Day 1 AM Tr. Trans. 61:1–11, 66:25–67:4, ECF 240. Cockerill's father retired using the Rule of 85, a guideline that Cockerill testified he relied on[15] in conjunction with other information from SPDs, to model his benefits for ten years preceding the spin-off.  Id. at 61:3–16, 71:13–72:14; 6/25/24 Day 1 PM Tr. Trans. 73:8–11, 74:1–5, ECF 245.

137.    Cockerill testified that prior to the spin-off, he kept track of the Plan's eligibility and applicability changes, such as the "Hard Freeze."  6/25/24 Day 1 AM Tr. Trans. 62:2–63:8, ECF 240.

138.    Cockerill knew "at least a year before the spin-off that following the spin-off Specialty Products and New DuPont would be separate entities from Historical DuPont and Corteva" and that he would "be employed by Specialty Products and New DuPont after the spin-off."  6/26/24 Day 2 AM Tr. Trans. 58:4–7; 64:4–8, ECF 241.

## 2.  Communications Regarding Retirement Benefits

139.    Cockerill testified that communication from Historical DuPont regarding Plan benefit changes was previously "a strength" of Historical DuPont, which had been "extremely diligent in communication" on these topics.  Id. 62:20–24, 66:7–13.  He testified that, in the past, changes were "very clearly communicated . . . . [across] many platforms both with in-person

---

[15] Other DuPont employees also testified to familiarity with and reliance on the Rule of 85. Early Retirement Class Member Daniel Barish testified to understanding the Rule of 85 as a policy that permitted employees whose age and years of service equaled or exceeded 85 to receive a full-pension benefit before retirement age.  6/26/24 Day 2 PM Tr. Trans. 39:5–9, ECF 246.  He further testified that he believed, according to the Rule of 85, that he was entitled to unreduced Early Retirement Benefits at age 58 and interpreted Breen's language "continuing to fulfill our obligations to the plan" in his November 1, 2018, email as including the Rule of 85.  Id. 50:16–18, 72:17–22.  Plaintiff Darrell Benson also testified that he was familiar with the Rule of 85.  6/27/24 Day 3 PM Tr. Trans. 38:20–39:5, ECF 247.  He further testified that he had contacted his employer about retiring in accordance with the Rule of 85 in 2022, after the spin-off, because he believed he could still retire with an unreduced benefit under the Rule of 85.  Id.

meetings with HR, Q&As that go out.  Letters that go out.  Sit downs with group leaders [and] managers."  Id. 63:11–14.

140.    Cockerill further testified to receiving and thoroughly reviewing end-of-year notices regarding material changes in the Plan and attending meetings where Human Resources "very clearly explained" these changes with "numerous examples, different cases and scenarios of employees [and] always the opportunity to ask questions."  Id. 63:16–64:5, 65:20–22, 66:7–13.

141.    DowDuPont sent digital communications to all employees about the spin-off in November 2018.  Ex. J-17(b).  DowDuPont also provided FAQs and PowerPoint Presentations hyperlinked on emails and within internal portals,[16] such as the DuPont Leaders Portal and DuPont Connection Portal, that Cockerill could access.  Ex. P-8; 6/25/24 Day 1 AM Tr. Trans. 64:24–65:4, ECF 240; 6/25/24 Day 1 AM Tr. Trans. 82:25–83:4, ECF 240.  Cockerill did not recall if he had followed the hyperlinks to the FAQs in the 2018 communications, but testified that he likely did. 6/26/24 Day 2 AM Tr. Trans. 89:19–91:14, ECF 241.

142.    Cockerill acknowledged "there were a number of communications telling employees about the spin-off," "employee meetings," "email communications," and "communications . . . posted to those electronic portals."  6/26/24 Day 2 AM Tr. Trans. 64:9–17, ECF 241.  For example, on September 1, 2017, Ed Breen sent a letter to "DuPont U.S. Pension and Retirement Plan Participants" which "encourage[d] you to visit the www.retiree.dupont.com for the most up-to-date news and information for retirees, or www.dow-dupont.com for the latest

---

[16] Defendants' communications to Plan participants frequently referred to and provided links to multiple portals.  These portals were yet another source of information and further highlights Defendants' lack of a definitive source to communicate the impact of the spin-off to Plan participants, resulting in confusion.  See supra ¶ 76.

Corporate news," but Cockerill had no "recollection of visiting those websites." 6/26/24 Day 2 PM Tr. Trans. 19:18–20:8, ECF 246; Ex. P-4.

143.    On February 9, 2018, two Human Resources employees sent Cockerill a letter containing hyperlinks to pension websites, but Cockerill testified he did not "have any specific recollections" of accessing the website links. 6/26/24 Day 2 PM Tr. Trans. 20:9–21:4, ECF 246.

144.    On May 30, 2019, Cockerill received an email from his "communications leader," Tara Stewart, forwarding him a copy of Q&As related to the impact of the spin-off. 6/25/24 Day 1 PM Tr. Trans. 109:5–12, ECF 245. The Q&A stated:

> As of June 1, we cease referring to our company as the "New DuPont" or "The Future DuPont." Going forward, we are simply DuPont, same name as prior to the merger but it is a completely different company, streamlined and focused on businesses with more opportunities for innovation. This was the purpose behind the process. As of June 1, we also changed our registered parent name from DowDuPont to DuPont de Nemours, Incorporated. As to DuPont employees' day-to-day work and responsibilities, nothing changes.

Ex. J-30 at 3.

145.    Cockerill knew that the SPDs were located "in DuPont Connection" and believed the SPD was the "official document" to consult. 6/25/24 Day 1 AM Tr. Trans. 80:22–25, ECF 240; 6/25/24 Day 1 PM Tr. Trans. 92:7–10, ECF 245; 6/26/24 Day 2 AM Tr. Trans. 68:4–10, ECF 241. He knew the SPD "says you can contact DuPont Connection" with any questions and also contained the "DuPont Connection site" and "1-800 number you can call with any questions you have about your own personal benefit." 6/26/24 Day 2 AM Tr. Trans. 69:23–70:6, ECF 241.

146.    Cockerill did not read the June 2019 SPD in or around the time of the spin-off. 6/25/24 Day 1 AM Tr. Trans. 74:6–11, ECF 240. He also neither "called that 1-800 number listed for DuPont Connection" "[p]rior to January of 2020" to ask "how the spin-off might affect [his] personal benefit," nor "contacted the plan administrator about questions [he] had about the plan until after the spin-off." 6/26/24 Day 2 AM Tr. Trans. 70:25–6, 75:4–6, ECF 241.

147.    Once Cockerill reviewed the June 2019 SPD, he noticed the SPD said "Corteva" and "was not surprised" by that.  6/25/24 Day 1 AM Tr. Trans. 75:5–7, ECF 240.  But Cockerill testified he did not know the Plan sponsor Historical DuPont "became a subsidiary of Corteva." Id. 76:22–25.

148.    As a manager, Cockerill had access to additional communications and materials— such as the Leader's Portal—to help him communicate information to employees who reported to him.  6/25/24 Day 1 AM Tr. Trans. 64:11–65:13, ECF 240; 6/26/24 Day 2 AM Tr. Trans. 66:6– 11, ECF 241.  Cockerill testified that "nothing triggered me to have fear that I needed to be looking at these things and rerunning my models" as a leader responsible for knowing the details of the Plan for himself and his employees.  6/25/24 Day 1 AM Tr. Trans. 67:9–18, ECF 240.

149.    Cockerill believed, based on the SPDs and emails from Breen, that he could receive an unreduced Early Retirement Benefit under the DuPont Pension and Retirement Plan beginning at age 58.  6/25/24 Day 1 PM Tr. Trans. 74:18–25, ECF 245.

150.    On March 20, 2019, Cockerill received an email with links to PowerPoint Presentations describing his benefits.  Ex. J-25.  Cockerill admitted he never clicked on the PowerPoint Presentations linked in the email because he did not "have time to read every posted document on the DuPont websites."  6/26/24 Day 2 AM Tr. Trans. 100:6–21, ECF 241.  Cockerill explained that "had I read this presentation prior to spin, that would have set off alarm bells because what they are reporting and how they are defining things in this presentation clearly supports the DuPont position that I am no longer eligible for that [Early Retirement] benefit."  6/26/24 Day 2 PM Tr. Trans. 16:1–5, ECF 246; Ex. J-28.

151.    Cockerill testified that only years after the spin-off and after this case began did he become aware of the PowerPoint Presentations DuPont made for Term Vested Employees to learn

about the impact of the spin-off on benefits.  6/26/24 Day 2 PM Tr. Trans. 14:4–6, ECF 246; Ex. D-85.  He further testified that he sent the PowerPoint slides to other employees asking if they had ever seen the information.  6/26/24 Day 2 PM Tr. Trans. 15:12–14, 17:3–7, ECF 246; Ex. J-28.

### i. Purportedly Misleading Communications

152.    Cockerill testified that he was reassured by Defendants' communications and interpreted Defendants' language to mean that employees "were not losing any benefits during the process" of the spin-off.  6/25/24 Day 1 PM Tr. Trans. 78:5–10, ECF 245.  He interpreted statements including Breen's "your accrued benefit can't and won't be reduced" and "continuing to fulfill our obligations to plan participants is a top priority" to indicate that the spin-off would not affect his benefits.  Id. 77:10–79:6.

153.    Cockerill identified four communications by Defendants that he believed were misleading: (1) Ed Breen's November 1, 2018, email (Ex. J-17(c)); (2) the FAQs linked in Breen's email (Ex. P-8); (3) the SPD; and (4) a "2006 Excel spreadsheet pension calculator."  6/26/24 Day 2 AM Tr. Trans. 78:7-80:11, ECF 241; 2018 SPD, Ex. J-10.

154.    **11/1/2018 Breen Email (Ex. J-17(c))** – Cockerill testified that the second paragraph of Breen's email was "misleading or not as fulsome as [he]'d like it to be."  6/26/24 Day 2 AM Tr. Trans. 81:9–13, ECF 241.  The second paragraph stated:

> As always, continuing to fulfill our obligations to plan participants is a top priority and we have given careful and diligent thought to the structure of the U.S. DuPont Pension and Retirement Plan (the "Plan") with the best interests of our pensioners in mind, including assignment of the retirement program obligations.

Ex J-17(c).

155.    The Breen email later stated: "As we've communicated with you before, if you are currently receiving a pension benefit, the amount of your benefit will not change.  If you have not started receiving your pension, your accrued benefit can't, and won't, be reduced."  Id.  Cockerill

testified his accrued benefit of $5,072.93 did not change as a result of the spin-off.  6/26/24 Day 2 AM Tr. Trans. 84:23-25, ECF 241.

156.    In addition to receiving the Breen email, Cockerill received a copy of the Breen email from Human Resources on November 2, 2018.  See Ex. D-51; 6/26/24 Day 2 AM Tr. Trans. 90:3–92:1, ECF 241.  Cockerill understood he was supposed to click on the links contained in Breen's email and read the materials.  6/26/24 Day 2 AM Tr. Trans. 90:25–91:8, ECF 241. Cockerill asked no questions after receiving the Breen email.  Id. 91:25–92:1.

157.    **FAQs linked in the November 1, 2018, Breen Email (Ex. P-8)** – Cockerill admitted that he did not recall reviewing the FAQ document before the spin-off.  Id. 92:19–20. Cockerill testified that after reading the document, he "understood [the document] means people over 50 with at least 15 years of service would actually be able to start taking their benefit while still employed by New DuPont" and even had employees under him who would be in a position to work at New DuPont while collecting their pension and were "excited about that" "[b]ecause they got to double dip."  Id. 96:9–97:4.  Cockerill agreed that the FAQs were "telling the Corteva employees you cannot double dip . . . while you're still working for Corteva . . . because they didn't have a true termination of employment like the New DuPont employees had."  Id. 97:5– 98:2.

158.    "Prior to January 2020 when [Cockerill] spoke to Ms. White" he "did not" ask any questions about the FAQs.  Id. 98:5–7.

159.    **September 2018 SPD's Definition of Eligibility Service** – Cockerill testified that the definition of eligibility service in the 2018 SPD was misleading.  Cockerill "presumed my benefits would be what they always had been. At the age of 50, I could have retired with a 35

percent, I believe, reduction factor from the year 58." 6/25/24 Day 1 AM Tr. Trans. 71:23–72:3, ECF 240.

160.    **Pension Calculator** – Cockerill testified the pension calculator tool was misleading because it "included an option as to early retirement." 6/26/24 Day 2 AM Tr. Trans. 98:12–15, ECF 241.  Cockerill agreed that the tool was "not guaranteeing you continued employment . . . [or] that you would actually achieve any of the benefits," "was based on assumptions that you were making and putting into the model," and that "things could change." Id. 98:19–99:7.

### 3.    Post Spin-Off Impact on Cockerill's Benefits

161.    On May 31, 2019, Cockerill's employer, Specialty Products, became a subsidiary of New DuPont following the spin-off.  Stipulated Facts, Ex. P-83 ¶ 4, ECF 238.  Historical DuPont, Cockerill's previous employer and the Plan sponsor, became a subsidiary of Corteva. 6/27/24 Day 3 PM Tr. Trans. 13:10–12, ECF 247.

162.    Cockerill knew that after the spin-off, he was "going to be working for Specialty Products." 6/26/24 Day 2 AM Tr. Trans. 40:7–15, ECF 241.  But Cockerill testified that he did not know the Plan Sponsor, Historical DuPont, "became a subsidiary of Corteva." 6/25/24 Day 1 AM Tr. Trans. 76:22–25, ECF 240.

163.    Cockerill testified that, according to Historical DuPont, he was terminated from Historical DuPont on May 31, 2019.  Id. 94:21–24.  As such, with 49 years of age and 9 months and 27.9 years of service, Cockerill was terminated for purposes of the Plan.  Id. 95:20–24; Robert Cockerill Level I and Level II Appeals and Denials, Ex. J-2 at 703.  Cockerill testified that he was not informed of his termination from Historical DuPont and had no reason to believe termination had occurred because he continued to do the same work, in the same building, with the same salary and supervisor after the spin-off.  6/26/24 Day 2 AM Tr. Trans. 39:6–8, ECF 241; 6/25/24 Day 1 PM Tr. Trans. 94:21–95:2, 100:5–101:1, ECF 245.  Cockerill first discovered he was terminated

and would never receive Early Retirement Benefits when he created a Corteva Connections account months after the spin-off.  6/25/24 Day 1 PM Tr. Trans. 81:3–8, ECF 245.

164.    Cockerill discussed interpretations of the corporate spin-off and its effects on Plan benefits with his co-workers.[17]  Id. 102:6–12.

165.    Cockerill explained, via an email sent at spin-off, that employees were told to refer to the post spin-off corporation not as "New DuPont," but simply "DuPont"—the same name he used to refer to his employer for his nearly-28 years of employment.  Id. 110:2–8; Ex. J-30.

166.    On July 30, 2019, Cockerill received a "Statement of Deferred Vested Benefit Pension and Retirement Plan" statement.  See Ex. D-4.  Cockerill agreed the statement informed him that he would not be eligible to "take the unreduced amount" until "August 1, 2034 . . . when you turn 65," and that he was "not eligible for early retirement."  6/26/24 Day 2 AM Tr. Trans. 85:2–25, ECF 241.  Cockerill acknowledged that nothing "in this document that says you can take unreduced benefit earlier than age 65."  Id. 87:4-6.  "So I understand this document, as it's written, to say exactly what DuPont's interpretation of this process was to be, that I no longer had the early retirement benefit."  Id. 88:8–14.

167.    He further testified that if he knew that he would no longer be eligible for Early or Optional Retirement Benefits, he would have sought "an opportunity to be employed by Corteva" to remain eligible for these benefits.  6/25/24 Day 1 PM Tr. Trans. 95:25–96:13, ECF 245.  Cockerill admitted that he had "never worked in the agricultural business of Historical DuPont" that went to Corteva, never "looked to determine if there was any new positions available at

---

[17] Carter, an Optional Retirement Class Member, testified that he was unaware of his termination and the impact of the spin-off on his benefits until speaking with Cockerill and his counsel.  6/26/24 Day 2 AM Tr. Trans. 4:23–5:16, ECF 241.  Barish, an Early Retirement Class Member, testified that he "didn't know [the pension] was changing" until speaking with Cockerill about six months after the spin-off.  6/26/24 Day 2 PM Tr. Trans. 53:14–54:7, ECF 246.

Corteva," did not know if "Corteva was even hiring" before the spin-off and "never applied for a position at Corteva even to this day."  6/26/24 Day 2 PM Tr. Trans. 24:1–15; 24:24–25:1, ECF 246.  Cockerill acknowledged that there was "likely" a freeze which would have prevented him from securing a job at Corteva even if a position was available.[18]  Id. 25:16–20.

168.    On January 22, 2020, Cockerill met with White.  6/25/24 Day 1 PM Tr. Trans. 83:8–24, ECF 245; Ex. P-37.  This meeting informed Cockerill that as an employee of New DuPont, he could never become eligible for Early Retirement because the sponsor of his Pension and Retirement Plan, Historical DuPont, was now a subsidiary of Corteva, an entirely separate entity.  Ex. P-37.  Cockerill credibly testified that he expressed that he was disappointed with the company's decision and that White responded "Yeah, you and 7,000 other people.  6/25/24 Day 1 PM Tr. Trans. 87:23–88:5, ECF 245.  This statement caught Cockerill's attention because it highlighted the scale and intention of the spin-off's effects on Plan benefits for employees.  Id. 88:6–13.  However, as White testified, the 7,000 number is incorrect as far fewer employees were negatively impacted by the spin-off.

169.    After the meeting, Cockerill emailed White a question, to which she responded by directing Cockerill to "question 4 of the Q&As dated from November of 2018" that Cockerill acknowledged receiving in November of 2018.  6/25/24 Day 1 PM Tr. Trans. 88:22–25; 104:6–9, ECF 245; see also Exs. P-37, P-8; 6/26/24 Day 2 PM Tr. Trans. 32:9–34:14, ECF 246.

170.    "[I]n January of 2020, [Cockerill] did call Corteva Connection" who told Cockerill he was "not eligible for early retirement."  6/26/24 Day 2 AM Tr. Trans. 71:7–16, ECF 241.

---

[18] Employees were "ring fenced" as of October 1, 2018, meaning they could not transfer between business units.  Thus, Cockerill could not have actually applied for a job at Corteva.  See 6/26/24 Day 2 PM Tr. Trans. 25:16–20, ECF 246.

171.    Cockerill exhausted Corteva's internal claims procedure for Early and Optional Retirement Benefits.  Robert Cockerill Level I and Level II Appeals and Denials, Ex. J-2.  His claims were denied.  Id.  Cockerill's involuntary termination from Historical DuPont before reaching age 50 was cited as barring his eligibility for Early Retirement Benefits.  Id.  That Cockerill's termination was due to "the divestiture and not due to lack of work" was cited as barring his eligibility for Optional Retirement Benefits.  Id. at 10.

### b.  Darrell Benson

172.    Darrell Benson is a named representative of the Optional Retirement Class. Cockerill, 345 F.R.D. at 105.  The Optional Retirement Class is defined as follows:

> All Plan participants who were over age 50, with at least 15 years of service under Title I of the Plan as of May 31, 2019, and who were employed by Historical DuPont or any other participating employer of Title I of the Plan, and who continued to be employed, post spin-off, by New DuPont or one of its subsidiaries that did not participate in Title I of the Plan, and the beneficiaries or estates of such participants. The class does not include anyone who received or was eligible for unreduced Early Retirement Benefits at the time of the spin-off. The class does not include anyone whose Early Retirement Benefits, at spin-off or through present, would be equal to, or greater than their Optional Retirement Benefit.

Id.

173.    Benson began working for Historical DuPont in 1996 as a Top Finisher at the Yerkes plant.  6/27/24 Day 3 PM Tr. Trans. 32:3–18, 33:10–34:19, ECF 247.  Benson continued working for Historical DuPont, accumulating approximately 23 years of service by May 31, 2019. Id. 45:13–18.  He progressed through various roles and worked both "21-Shifts" and "15-Shifts," which entailed a schedule where "your sleep is interrupted weekly, daily."  Id. 34:15–19, 39:6–15.

### 1.  Familiarity With the Plan

174.    Historical DuPont provided Benson with a Pension and Retirement Plan.

175.    Benson testified that he viewed Historical DuPont emails about the Plan and other work matters using the DuPont Info Net.  6/27/24 Day 3 PM Tr. Trans. 39:19–40:20, 41:24–42:1,

ECF 247. These digital resources were only available on Historical DuPont computers. Id. 39:22–40:5. Benson testified that access to these computers was limited since there were only three devices for seventy employees and employees could only access the shared devices at work, where they received two 15-minute breaks and one 45-minute lunch period. Id. 40:6–41:22.

### 2. Familiarity With the Spin-Off and Communications Regarding Retirement Benefits

176.    Benson testified that he learned about the spin-off in a town hall meeting at the Yerkes plant where Breen and Plant Manager Warren Hoy assured employees that the spin-off was "purely administrative" and that benefits "would not be affected whatsoever." Id. 35:11–37:20. Benson further testified that he believed that the different names of the post spin-off entities were "just semantics." Id. 76:1–4.

177.    Benson testified that, while he received documents in the mail from Defendants, he did not receive documents regarding the effects of the spin-off on his benefits. Id. 43:5–12.

178.    Benson believed from contacting DuPont that he believed could receive unreduced benefits at age 60 under the Rule of 85. Id. 38:20–25, 75:13–19. Benson initially sought to retire in 2022 to better manage his chronic blood cancer. Id. 34:15–19, 39:6–15. Benson agreed that he had always sought "to retire as soon as [his] pension benefit" was "fully unreduced[.]" 6/27/24 Day 3 PM Tr. Trans. 52:9–19; 53:1–3, ECF 247. Benson testified that he has never been interested in retiring with a reduced pension benefit. Id. 53:18–54:2.

### 3. Post Spin-Off Impact on Benson's Benefits

179.    On February 1, 2019, Benson's employer changed from Historical DuPont to Specialty Products (a subsidiary of Historical DuPont). 6/27/24 Day 3 PM Tr. Trans. 51:7–13; 52:2-6, ECF 247. On May 31, 2019, Plaintiffs' employer, Specialty Products, became a subsidiary of New DuPont following the spin-off. Stipulated Facts, Ex. P-83 ¶ 4, ECF 238. Historical

DuPont, Benson's previous employer and the Plan sponsor, became a subsidiary of Corteva.  Id.; 6/27/24 Day 3 PM Tr. Trans. 13:6–12, ECF 247.

180.    Benson admitted he was aware that his employer changed from Historical DuPont to Specialty Products as of February 2019.  6/27/24 Day 3 PM Tr. Trans. 51:7–21, ECF 247.

181.    Benson, like many DuPont employees, was familiar with the "Rule of 85."  Id. 39:3–5.  He testified that "since the inception of my employment, I have been told that we were allowed to retire when our service years and our age reach the number of 85."  Id.  He testified that he relied on the Rule of 85 when planning his retirement and first contacted his employer about retiring in January of 2022, once he had obtained the necessary sum of service and age years under the Rule of 85.  Id. 38:20–25.  But Benson later clarified that he "need[ed] to keep working after [he] made the phone call" in January 2022 because of "personal financial circumstances and health circumstances" which required him to "keep working . . . ."  Id. 74:23–75:2; 60:1–9.

182.    Benson credibly testified that he did not receive communications in the mail either prior to or following the spin-off about the effects of the spin-off on his Plan benefits.  Id. 43:5–9.  However, Benson testified that he did not recall reading more general documents he "probably did receive . . . in the mail" regarding his Plan benefits or seeking out the online resources referenced within those documents.  Id. 61:19–62:3; Benson Pension Benefit Statement, Ex. D-3.  Benson further testified that he did not recall reading several documents that he was shown at his deposition, such as e-mails from leadership and SPDs, or visiting digital portals with information on retirement benefits.  6/27/24 Day 3 PM Tr. Trans. 65:11–66:1, 70:14–17, ECF 247.

183.    Benson first discovered he was deemed terminated from Historical DuPont and would never be able to utilize the Rule of 85 when he contacted a Corteva Connections representative about retiring in 2022.  Id. 42:2–14.  Benson testified that, according to Historical

DuPont, he was terminated on May 31, 2019, at the time of spin-off, with 56.8 years of age and 23 years of service.  Id. 43:24–25, 45:13–18, 49:5–15.  Benson did not recall being notified that he was terminated from Historical DuPont or that he now worked for New DuPont, which was no longer a participating employer in the Plan.  Id. 42:22–43:4, 49:5–15.

184.    Benson testified that, like many of his fellow employees, he referred to DuPont simply as "DuPont" both before and after the spin-off because he had the same job and received the same salary.  Id. 47:1–10, 44:1–12.

185.    Benson exhausted Corteva's internal claims procedure for Early and Optional Retirement Benefits, though not in the exact manner as stated in the SPD.  Darrell Benson Level I and Level II Appeals and Denials, Ex. J-3.  Benson testified that he "relied on counsel" to handle his appeals claim.  6/27/24 Day 3 PM Tr. Trans. 68:4–14, ECF 247.  His claims were denied.  Darrell Benson Level I and Level II Appeals and Denials, Ex. J-3.  Benson's continual "working at the same 'site' in conjunction with the sale of [his] employer" was cited as barring his eligibility for Optional Retirement Benefits that are available for age 50 employees with 15 years of experience who are involuntarily terminated and not terminated for dishonesty, insubordination, or other misconduct.  Id.  The Appeals Committee chair stated that "Benson was not terminated from Specialty Products for a reason other than "discharge for dishonesty, insubordination, or other misconduct," but rather that he "remained employed by Specialty Products both before and after the Spin-Off."  Id.

186.    On cross examination, Benson was questioned about his deposition testimony, in which he previously testified that Early Retirement and Optional Retirement "sound[ed] the same" to him.  Id. 69:3–16.  At trial, Benson explained that at the time "of my deposition" he was "not aware of optional retirement benefits," at all.  Id. 68:21–69:2, ECF 247.  Benson testified that had

he been aware of Optional Retirement Benefits for involuntarily terminated employees, he would have attempted to receive those benefits or find alternative employment so he could continue accruing Plan benefits.  Id. 46:5–7, 49:19–50:10.

187.    Benson testified that he did not understand that he was eligible to receive Early Retirement as of the spin-off.  6/27/24 Day 3 PM Tr. Trans. 54:15–18, ECF 247.  On cross examination, Defendants questioned Benson about his reason for first contacting Corteva about his Plan benefits after the spin-off by playing Benson's recorded phone call with Corteva Connections.  Id. 55:3–56:6, 58:22–59:17; Exs. D-131, D-132.  In the phone call, Benson inquired about "double-dipping," the colloquial term used to describe Plan participants with age 50 and 15 criteria at the time of the spin-off who commenced their Early Retirement Benefit while continuing to work for New DuPont.  6/27/24 Day 3 PM Tr. Trans. 65:1–6, ECF 247.  Benson did not attempt to commence his Early Retirement Benefit at that time.  Id. 59:15–60:9.  Despite the testimony detailed above, the Court finds that Benson's testimony was generally credible.

### c.  Oliver Major

188.    Oliver Major is a named representative of the Optional Retirement Class. Cockerill, 345 F.R.D. at 105.  The Optional Retirement Class is defined as follows:

> All Plan participants who were over age 50, with at least 15 years of service under Title I of the Plan as of May 31, 2019, and who were employed by Historical DuPont or any other participating employer of Title I of the Plan, and who continued to be employed, post spin-off, by New DuPont or one of its subsidiaries that did not participate in Title I of the Plan, and the beneficiaries or estates of such participants. The class does not include anyone who received or was eligible for unreduced Early Retirement Benefits at the time of the spin-off. The class does not include anyone whose Early Retirement Benefits, at spin-off or through present, would be equal to, or greater than their Optional Retirement Benefit.

Id.

189.    Major began working for Historical DuPont in 1997 as a manufacturing operator. 6/28/24 Day 4 AM Tr. Trans. 37:16–25, ECF 243.  Major continued working for Historical

DuPont, accumulating nearly 22 years of service by May 31, 2019.  Id. at 37:18–20.  He assumed various leadership roles, such as manufacturing supervisor, site training manager, a role in Human Resources, and global talent acquisition manager.  Id. at 37:21–38:17.

### 1.  Familiarity with the Plan

190.    Historical DuPont provided Major with a Pension and Retirement Plan.  Stipulated Facts, Ex. P-83 ¶¶ 5, 20, ECF 238.  Major testified that he was familiar with the Plan from periodically reviewing SPDs, attending town hall meetings, and accessing digital resources. 6/28/24 Day 4 AM Tr. Trans. 40:15–42:20, ECF 243.

191.    Prior to spin-off, Major kept track of his Plan benefits by accessing the DuPont Intranet and looking at SPDs on internal websites "from time to time."  Id. 40:15–41:9, 58:4–9.

192.    Major testified that he understood what "ring-fencing" was and agreed it "was essentially a freeze on employees transferring between the three companies that were going to be [']spun out['] as of the spin-off."  Id. 74:20–75:13.

### 2.  Communications Regarding the Impact of the Spin-Off on Benefits

193.    Major testified that he attended town hall meetings at Defendants' Delaware corporate headquarters where leaders such as Breen would share information including "what's going on with a spin."  Id. 41:16–42:8.  Major likely first learned about the spin-off in 2018.  Id. 39:21–24.

194.    Major testified that he trusted that Historical DuPont would make any major changes to Plan benefits clear to employees.  Id. 58:21–59:3.  Major testified that he had experienced as much at previous inflection points where DuPont provided "examples of scenarios of folks" that "would always be very helpful."  Id. 59:1–3.

51

195.    DowDuPont sent digital communications to all employees about the spin-off in November 2018.  Ex. J-17(b).  DowDuPont also provided FAQs and PowerPoint Presentations hyperlinked on bulk emails and within internal portals, such as the DuPont Leaders Portal, that Major could access.  Ex. P-8; 6/28/24 Day 4 AM Tr. Trans. 78:2–19, ECF 243.  Major could not recall if he had clicked on the hyperlinks in the 2018 communications that led to the FAQs document.  6/28/24 Day 4 AM Tr. Trans. 66:12–67:1, ECF 243.

196.    Major also could "not recall reading those FAQs." Id. 67:9-10. 232.

197.    Major agreed that "the leaders' portal" "had important communications about the merger" and "the impact of the spin-off on employees," but Major could not recall reading any of the communications in that portal.  6/28/24 Day 4 AM Tr. Trans. 78:2–21, ECF 243.

198.    Major could not recall if he had seen the November 1, 2018, Ed Breen email communications, but thought "I probably have." Id. 66:15–19.

199.    Major "did not" recall "clicking on the link to see any presentations" in the March 2019 email and testified he had never seen the PowerPoint Presentations marked as Ex. D-84.  6/28/24 Day 4 AM Tr. Trans. 78:25– 79:14.  Major acknowledged that the PowerPoint Presentations stated, "New DuPont will no longer be a participating employer in the pension plan," but testified he did not know this because he did not recall reviewing the PowerPoint Presentations. Id. 80:25–81:12; Ex. D-84.

200.    Major was familiar with the resources available and testified there "was an internal website in which you could go look—you could seek out benefits.  You could seek out communications.  You could seek out what's happening in various businesses.  So it was a way to, you know, access those types of material."  6/28/24 Day 4 AM Tr. Trans. 41:1–5, ECF 243.

201.    Major testified that he was reassured by the SPDs and Defendants' town hall communications.  Id. 42:3–20.  He testified that positive language such as, "[t]here's nothing . . . to worry about in terms of pension" evoked a "collective sigh of relief."  Id.  He believed he "had no reason to believe that anything had changed because nothing else in my environment or world was changing" such as his office location and health benefits.  Id. 44:20–45:2.  Major testified that he had no "trigger or alarm to go seek out" further information regarding changes in his Plan benefits given these reassurances.  Id.

202.    Major believed from DuPont's representations that he could receive unreduced benefits under the Plan beginning at age 59.  Id. 43:10–18.

203.    When asked what communications were misleading, Major acknowledged on cross examination that he "didn't identify the Ed Breen letter" and "didn't identify any town hall meeting" as misleading.  6/28/24 Day 4 AM Tr. Trans. 68:15–70:11, ECF 243.  Major also "d[id]n't know what version of the SPD [he] read" prior to this lawsuit.  Id. 73:12–14.

### 3.  Post Spin-Off Impact on Major's Benefits

204.    On May 31, 2019, Major's employer, Specialty Products, became a subsidiary of New DuPont following the spin-off.  Stipulated Facts, Ex. P-83 ¶ 4, ECF 238.  Historical DuPont, Major's previous employer and the Plan sponsor, became a subsidiary of Corteva.  6/27/24 Day 3 PM Tr. Trans. 13:10–12, ECF 247.

205.    As of at least September 26, 2019, Major knew Corteva managed the Plan because it "was communicated" to him.  6/28/24 Day 4 AM Tr. Trans. 83:10–84:4, ECF 243; Ex. D-93.

206.    Major was aware that he was "spun off to New DuPont or Specialty Products on May 31, 2019," but claimed he did not know he "was terminated [from Historical DuPont] on May 31, 2019."  6/28/24 Day 4 AM Tr. Trans. 47:10–19, 48:7, ECF 243.  Major was terminated under the Plan with 54 years of age and 21.75 years of service.  Id. 56:13–18.  Major testified that he was

not informed of his termination from Historical DuPont and had no reason to believe a separation had occurred because he continued to complete the same work, in the same building, with the same salary and supervisor after the spin-off.  Id. 51:13–25, 57:16–19.

207.    Major first discovered that he thought the date on which he could obtain his full unreduced pension benefits would be pushed out by almost 5 years when he called a Corteva Connections phone line in early 2020, after the spin-off.  Id. 43:1–8.  On cross examination, Major admitted he was wrong about his unreduced pension date being pushed out 5 years.  Id. 62:11–64:17.  Initially, Major testified he "ended up learning [his unreduced pension] was [pushed out] by 4.8 years."  Id. 43:1–8.  He explained he was "54 years old" and believed he had "21.75 years" of service at the spin-off on May 31, 2019.  Id. 56:13–16.  Assuming the spin-off did not occur and Major's age and service continued to accrue, he would have been 56 years old and had 23.75 years of service at the time he was laid off from New DuPont on September 30, 2021.  Id.  As he admitted on cross examination, "56 plus 23.75 is less than 85"—the combined years needed for a "Rule of 85" unreduced pension.  Id.  As such, assuming the spin-off never occurred, Major still would have been approximately 5 years shy of an unreduced pension benefit when he was laid off.

208.    Nonetheless, Major agreed that his pension "amount has not changed," that he "knew that [he] could start an early retirement benefit if needed," that he "chose to defer" his Early Retirement "because [his] personal financial situation permitted that," and that he has been receiving pension payments since "[t]he beginning of 2023."  Id. 62:1–3; 62:4–10; 89:24–90:8.

209.    Major testified that he worked "in close proximity to" and sometimes completed "joint work" with members of the Administrative Committee.  Id. 53:14–54:23.  This included "Pam Murray and Mark Durkovic and Megan Fitzpatrick," whom he knew because he "was in corporate HR with them."  Id. 53:14–54:23.  He also worked with Mary Dineen and Lisa White,

who he testified he "knew . . . the best." Id. 54:6–17.  He testified that he was not aware that those colleagues had met on November 8, 2018, and determined that Optional Retirement Benefits would not be available following the spin-off.  Id. 54:24–55:7.

210.    Major agreed he never "ask[ed] anyone what affect the spin-off would have on [his] pension" despite admitting he "had access to people who worked on [his] floor" such as Dineen White.  Id. 44:20–22, 81:13–20.  Major admitted he "did not" go "to any of the folks that worked with [him] on the HR floor at Historical DuPont to ask them about how the spin-off might impact [him] in particular."  Id. 82:10–13.

211.    Major first discovered that he would never receive Optional Retirement Benefits when he called Corteva Connections after his position was eliminated from New DuPont on September 30, 2021.  Id. 44:8–19.

212.    Major exhausted Corteva's internal claims procedure, claiming he was owed Optional Retirement due to being laid off from New DuPont in September of 2021.  Oliver Major Level I and Level II Appeals and Denials, Ex. J-4.  Major's Optional Retirement Benefit claims were denied.  Id.  Major's termination—deemed "not involuntary terminat[ion] due to lack of work"—was cited as barring his eligibility for Optional Retirement Benefits, which are available for age 50 employees with 15 years of experience who are involuntarily terminated for reasons other than dishonesty, insubordination, or other misconduct.  Id.

### 4.  Communication Regarding Termination and Release

213.    Major testified that past communications from DuPont regarding terminations were "very different."  6/28/24 Day 4 AM Tr. Trans. 53:6–7, ECF 243.  Major testified that when his position was eliminated in 2021 from New DuPont, he received Career Transition Plan documents about severance and "what to expect" moving forward.  Id. 52:19–53:5.  Major further testified

that he had attended a one-on-one meeting to learn about his September 2021 termination.  Id. 53:3–5.

214.    After being terminated on September 30, 2021, Major signed a Release in exchange for a severance package.  Id. 87:7–88:19; Ex. D-26.  By its language, the Release released Major's "[e]mployer, its parent corporation, affiliates, subsidiaries, divisions, predecessors, insurers, successors, and assigns, and their current and former employees, attorneys, officers, directors and agents, whether now in existence or hereafter created, both individually and in their business capacities, and their employee benefit plans and programs and their administrators and fiduciaries" from "any and all claims, known or unknown," excluding ERISA claims for "vested benefits under any tax qualified plan" and claims to "vested or accrued employee benefits under Employer's health, welfare, or retirement plans as of the Separation Date."  Ex. D-26 at 1–2.

### d.  Bruce Carter

215.    Bruce Carter is an Optional Retirement Class Member.  He was hired by Historical DuPont on July 2, 2001, and as of May 31, 2019, was 53 years old and had almost 18 years of service with Historical DuPont.  6/26/24 Day 2 AM Tr. Trans. 8:12–21, ECF 241.  Carter became an employee of New DuPont after the spin-off.

216.    Carter first learned he was considered "terminated" from Historical DuPont in a conversation with class counsel in May 2024.  Id. 5:14–16, 11:23–12:4.  Carter did not recall being told by anybody at DuPont—New or Historical—that he was terminated, nor did he receive any documents telling him that the spin-off would terminate his employment with Historical DuPont. Id. 12:12–14, 14:13–15.  Carter also testified that he was never told he was terminated for "reasons other than dishonesty, insubordination, or other misconduct."  Id. 11:16–19.

### 1. Post Spin-Off Impact on Carter's Benefits

217.    In November 2022, Carter's "division was acquired by Celanese" ending his employment with New DuPont.  Id. 6:12–13; 11:4–8.

218.    Carter believed he was entitled to an unreduced Early Retirement Benefit when he reached age 61 based on his service with New DuPont after the spin-off.  Id. 8:22–9:2.  However, when he contacted Corteva Connections in November 2023, he learned that he could not receive an unreduced Early Retirement Benefit until age 65.  Id. 9:22–10:10.

219.    Applying the Optional Retirement Benefit reduction factor chart, Ex. P-3, Carter explained that he would have received a pension benefit reduced to 65 to 67 percent as of the spin-off, 6/26/24 Day 2 AM Tr. Trans. 13:11–14:9, ECF 241.  However, under the Early Retirement Benefits reduction factor chart, Carter was only entitled to a 50 percent reduced pension benefit at spin-off.  Id. 13:21–23.  Carter stated he was not aware of the possibility of the Optional Retirement Benefit at spin-off.  Id. 14:10–12.

220.    Like Major, Benson, and Cockerill, Carter continuously referred to his employer as simply "DuPont" both before and after the spin-off, and his job responsibilities and pay remained the same before and after spin-off.  Id. 14:16–15:14, 27:22–28:4.

### 2. Communications Regarding the Impact of the Spin-Off on Benefits

221.    Carter testified that Defendants never told him or sent him a communication which stated that the spin-off would not "trigger" Optional Retirement Benefits.  Id. 18:11–14, 21:21–23.  On cross examination, Carter recalled reviewing some communications about the spin-off before May 31, 2019.  Id. 28:22–24.  Carter did not believe that the communications were "misleading," in that they did not have "an intentional element" to "provide[] misdirection," but testified that the communications were "vague and opaque" because they provided "less

information or less clarity in communication." Id. 19:18–20, 28:25–31:20. However, Defendants'
counsel impeached Carter using his previous testimony that he did not believe any communications
were misleading. Id. 30:15–25.

222.    Carter was "aware of a prior spin-off that Historical DuPont did of its Chemours
business in 2015." Id. 36:17–25. Carter stated he was not aware of anyone involved in the
Chemours spin-off receiving Optional Retirement Benefits. Id. 38:5–12.

223.    Carter also said he was aware that individuals who had reached the 50 and 15
criteria as of the spin-off could begin collecting Early Retirement Benefits because the Plan had
moved to Corteva. Id. 43:23–44:24. When pressed whether he knew the spin-off had created a
"separation of service for the purposes of the plan," Carter answered, "[w]e understood it as the
pension was with Corteva; so the pension had moved, not us." Id. Carter's understanding of a
"separation of service" was based on his review of the SPD. Id. 34:16–18. Indeed, Carter knew
people "who went to go work for Specialty Products as part of New DuPont after the spin-off, who
did turn on their early retirement option" and were able to double-dip—"have their job at Specialty
Products, [and] they were also able to collect their monthly plan benefit." Id. 43:23–44:10. He
understood this was possible because the Plan moved to Corteva—which he knew "based on
communications from leadership." Id. 44:11–45:5.

224.    Before this lawsuit, Carter decided not to commence Early Retirement, but to wait
until his pension is unreduced. Id. 45:6–21; 46:16–47:15.

225.    Carter did not file any appeal or claim for Optional Retirement through the internal
claims process. Id. 49:3–15.

### e.  Daniel Barish

226.    Daniel Barish began working full-time for Historical DuPont in 1992. 6/26/24 Day
2 PM Tr. Trans. 37:22–38:1, ECF 246. He was familiar with the Rule of 85 and periodically

reviewed the SPDs.  Id. 39:5–40:13; Ex. J-11.  Barish remained continually employed with Historical DuPont or a subsidiary until the spin-off.  6/26/24 Day 2 PM Tr. Trans. 38:5–16, ECF 246

227.    On November 1, 2022, Barish's division of Specialty Products (then a subsidiary of New DuPont) was divested and he began working for Celanese with the same boss as he had at Specialty Products.  Id. 44:14–25; 45:1–12.

### 1.  Post Spin-Off Impact on Barish's Benefits

228.    As of the spin-off, Barish was 49 years old with approximately 28 years of service.  Id. 45:22–24, 50:4–5.  Barish believed that based on his age and years of service, he could receive an unreduced Early Retirement Benefit at age 58, via the Rule of 85.  Id. 50:10–18.

229.    At spin-off, Barish did not believe that the spin-off impacted his Early Retirement Benefit.  Id. 40:21–41:2.  Barish learned that he was no longer eligible for Early Retirement Benefits six to seven months after the spin-off.  Id. 44:10–13.

230.    The difference in value between Barish's Deferred Vested Benefit and Early Retirement Benefit is approximately $300,000.  Id. 56:8–10.

231.    At the time of trial, Barish had not claimed Early Retirement Benefits and acknowledged that "[a]s of May 31st, 2019 . . . I did not qualify for early retirement."  Id. 70:5–71:11.

### 2.  Communication Regarding Termination

232.    Like the other Plaintiffs, Barish was not aware of any documents or communications that informed him he was terminated from Historical DuPont as of the spin-off.  Id. 41:15–19, 45:25–46:6.

233.    As the others did, Barish referred to his employer as "DuPont" both before and after spin-off, and continued in the same role, with the same supervisor and same responsibilities.  Id. 42:4–7, 43:17–44:9, 46:7–10.

### 3.    Communications Regarding Plan Changes

234.    In Barish's view, Defendants' communications leading-up to the spin-off were operational in nature, driving home the point that there would be an agricultural science company comprised of parts of Dow and Historical DuPont.  Id. 47:15–24.

235.    Barish testified that Defendants "definitely could have done a better job to tell us that we would not have been eligible" for an unreduced Early Retirement Benefit.  Id. 51:21–52:10.  Defendants' communications only affirmed to Barish that "generally salary, vacation, time and service and benefits would all continue as they were" before spin-off.  Id. 53:4–7.  Barish testified that "[n]obody has ever communicated that [the Early Retirement benefit] was taken away.  And [] everything else was communicated, that things were continuing as they were staying with DuPont."  Id. 56:18–20.  But Barish "knew the resources were there" to consult if he had any questions. 6/26/24 Day 2 PM Tr. Trans. 69:1-8, ECF 246.

236.    Barish knew he was being paid by Specialty Products as early as June 2018.  Id. 42:11–15.  Barish "understood DuPont and Corteva would be separate legal entities after the spin. Id. 59:20–23; Ex. J-30.  Indeed, Barish received a January 9, 2019, email (Ex. D-39) from "HR Direct Service Center" requiring him to acknowledge via "DocuSign" that there were "legal entity changes that are occurring on February 1, 2019."  6/26/24 Day 2 PM Tr. Trans. 76:17–77:13, ECF 246; see also Ex. D-39.  The February 1, 2019, email stated that "[s]hould you have any questions, please contact the HRDirect Service Center at 1-844-387-6684," but Barish testified he "did not call that service center."  Ex. D-39.

237.    Barish explained that he was informed about the Dow-DuPont merger "through town hall meetings and e-mail" and "first learn[ed] about the spin-off" "through a town hall meeting."  6/26/24 Day 2 PM Tr. Trans. 41:20–42:3; 59:6–12, ECF 246.  Indeed, Barish explained "[t]here was a series of meetings and communications" with "[s]everal communications about the spin and what would happen to those legal entities and the employees."  Id. 59:13–17; 59:24–60:5.

238.    Barish testified that "information about pension and retirement benefits [was available] through our HR portal" and that the "Leaders Portal was another website or SharePoint site that information was put on for those that had people responsibilities . . . ."  Id. 46:17–47:22; 62:7–9; 63:4–13; 66:12–20.   Barish testified that in the Leaders Portal, there were links "to documents such as FAQs."  Id. 63:22–64:1; see also Ex. D-52.  He accessed Leaders Portal "occasionally," and testified that it contained "[i]nformation that was presented at town halls or sent out through e-mails, such as the progression of the merger—the journey to three merger and spin activities."  6/26/24 Day 2 PM Tr. Trans. 47:5–14, ECF 246.  Barish described the communications "as focused on the DowDuPont merging and then spinning out into three different companies, with the main point being to get a new agricultural or an agricultural science company together with agricultural pieces of DuPont and with Dow."  Id. 47:15–22.

239.    Barish also acknowledged having access to "Inside the Oval [that] had information regarding announcements, links to HR materials and general information about what was going on at DuPont," including "various articles and links to PowerPoints and different types of information."  Id. 74:2–11.

240.    On November 5, 2018, Barish's "HR representative in our business team" sent him and a few others an email (Ex. D-51) with one sentence stating: "Links to the US Pension communications for both Dow and DuPont, including FAQs, are below."  Id. 79:4–17.

241.    Barish "recall[ed] receiving" an email from Human Resources (Ex. J-25) that made clear neither Cockerill nor Barish were eligible for Early Retirement—according to Cockerill— but Barish never clicked the links or reviewed the PowerPoint Presentations.  Id. 75:16–76:16.

242.    Barish additionally received a two-page "Benefits News" communication (Ex. J-29) informing him that "the [Historical] DuPont U.S. pension and retiree benefit obligations . . . will be assumed fully by Corteva Agriscience following separation of the Specialty Products and agricultural divisions" and that "[e]mployees who participate in the pension and retirement plan should have received an e-mail from HR direct to go into the presentations on www.DuPontbenefits.com."  6/26/24 Day 2 PM Tr. Trans. 77:14–78:10, ECF 246.  Barish testified "I don't recall clicking the link" and that "I did not call the 1-800 number."  Id. 78:20–24.  Barish agreed that nothing in the document was false.  Id. 78:25–79:3.

243.    On cross examination, Barish discussed the Breen November 2018 email, hyperlinked FAQ, and March 20, 2019, email.  Barish interpreted Breen's email to signal that his benefits were not changing at spin-off.  Id. 72:5–22; Ex. J-17(c); Ex. J-25.  Barish remembered receiving the March 20, 2019, email, but did not recall following the hyperlinks or know where to find the PowerPoint Presentations.  6/26/24 Day 2 PM Tr. Trans. 75:19–76:16, ECF 246.  Barish acknowledged that the FAQs and PowerPoints "were made available in various way to myself and others . . . if you went and found them through these various links and you'd have to go, as you mentioned, [to] multiple different sites to get those details, as opposed to what was broadly provided in communications at town halls and in our team meetings and those sorts of verbal forms."  Id. 80:6–13.  But Barish testified that he never reviewed the PowerPoint Presentations or knew where they were digitally housed prior to Cockerill sending them to him after the spin-off.  Id. 78:7–19.

244.    When the Court asked Barish if he "ma[d]e any suggestions to anybody at DuPont about more communications or different kind of communications?," Barish testified that he never discussed purported changes to his benefits except when he spoke to Cockerill.  Id. 53:14–55:7.

### f.  Ed Breen

245.    Ed Breen was the CEO of Historical DuPont prior to the merger beginning in 2015 and became the CEO of New DuPont after the spin-off.  6/25/24 Day 1 PM Tr. Trans. 11:2–4, 13:1–8, ECF 245.

246.    Called as-of-cross, Breen was initially unfamiliar with the corporate entity DuPont de Nemours, Inc. ("New DuPont"), the corporation he heads, until counsel referred to the corporation colloquially as New DuPont.  Id. 4:1–14.  He later testified to his uncertainty about whether he personally moved from "New DuPont or Old DuPont" as of the spin-off.  Id. 20:3–9.

247.    Breen could not recall whether Historical DuPont became a subsidiary of Corteva as of the spin-off.  Id. 7:7–11.  Breen confused E. I. DuPont de Nemours ("Historical DuPont") with DuPont de Nemours, Inc. ("New DuPont") when discussing how many employees New DuPont retained after the spin-off and as of the date of his testimony.  Id. 7:20–9:20.

248.    Breen testified that after the merger and before the spin-off, the Historical DuPont division of DowDuPont continued to operate independently from Dow, using its own sales team, employees, product lines, and logos.  Id. 14:24–15:18.

249.    When asked about his role in the Plan, Breen acknowledged he did not have a role in appointing members of the Administrative Committee or know the duties of a fiduciary to Plan participants.  Id. 25:17–26:3, 26:24–28:11.

250.    Breen could not recall reviewing two of the communications he signed regarding the Plan or communications sent by other DowDuPont employees regarding the Plan.  Id. 33:10–17, 35:4–21; Exs. J-17(c), J-20.  When questioned about whether his communications clearly

explained how the spin-off would impact benefits, Breen responded that in "every document that was sent out under my name, there was a hyperlink you can go to to get excruciating detail on everything." 6/25/24 Day 1 PM Tr. Trans. 42:12–16, ECF 245. He clarified that while he did not know how many portals and documents there were, "we are very good about putting out extra link-spans to detail questions for people on all kinds of topics" and was "pretty certain we did it on [the benefits in this lawsuit] also." Id. 42:22–43:4.

251.   Overall, Breen stated that as CEO of a "$130 billion company," the issue of some employees becoming ineligible for benefits as a result of spin-off "would not get to [his] level." Id. 45:20–46:4.

252.   Breen credibly explained why DowDuPont chose to put the entire Plan with Corteva, rather than splitting the Plan's obligations and assets among the spin-off companies to correspond with where the employees worked after the spin-off. Id. 64:14–65:8. According to Breen, to do so "would have been a total nightmare to try to administer," and would have become more complex if New DuPont engaged in future spin-offs after June 2019. Id. 65:2–8. He testified Corteva was "the number one out of the three with the strongest balance sheet," so it made the most sense to put the pension Plan with a strong company. Id. 59:1–2.

253.   Breen further explained:

> [W]e were going to do the best to make it the strongest pension, probably one of the strongest in the country. And that's why we made the moves we made. We put it with Corteva because it was going to be a long-lasting, stable company, one of only three major agricultural players in the world. We were expecting New DuPont would be doing many more deals. And it would be a smaller company eventually, that would not be good. It was also the company going to have the highest credit rating by the rating agencies. And nothing would happen to the company because the industry was already consolidated. And that was generally the reason that we did it. And then we funded it about, voluntarily, by 4 billion dollars.

Id. 37:14–38:2.

254.    Breen stated he never visited the Yerkes facility or made a benefits presentation at the facility.  Id. 69:3–7.

### g.  Mark Durkovic

255.    Mark Durkovic began working for Historical DuPont over 20 years ago, and has worked mostly as a benefits administrator.  6/26/24 Day 2 PM Tr. Trans. 98:4–14, ECF 246.  After the spin-off, he became the Benefits Director of Corteva.  Id. 97:17–98:3.  Durkovic has substantial knowledge of the Plan due to his role.  Id. 99:12–14.

256.    At one time, Durkovic worked for Dineen while working in benefits at Historical DuPont.  Id. 98:15–99:5.

257.    Durkovic began serving on the Administrative Committee in 2016 and continued to serve through trial.  Id. 100:1–15.  Durkovic received "fiduciary training" as part of his role on the "Administrative Committee."  6/26/24 Day 2 PM Tr. Trans. 100:16–19, ECF 246.  The other members (except for one person) of the Administrative Committee were "employees of the HR department at Historical DuPont."  6/27/24 Day 3 AM Tr. Trans. 74:5–11, ECF 242.

258.    Durkovic also "serve[s] on the benefit appeals committee" which "reviews claims for benefits.  Typically second-level claims for benefits."  Id. 72:10–23. "First-level appeals are primarily reviewed and responded to by our third-party administrators or recordkeepers for the particular benefit" which is "Alight."  Id. 73:1–6.  The other members of the Appeals Committee were "Megan Fitzpatrick, [Lisa White], Michelle Reilly (sic), Tiana Milovanovic (sic) . . . Laura Spencer and Holly Bergman" who were Human Resources employees.  Id. 74:12–24; Ex. J-34.

259.    Durkovic explained that none of "the committee members get paid anything [extra] to sit on the committee[s]."  6/27/24 Day 3 AM Tr. Trans. 74:25–75:2, ECF 242.

### 1. Plan Participants

260.    Durkovic explained the Plan had "over 100,000" participants at the time of the spin-off, of which "[l]ess than 10 percent" were active employees.  Id. 75:11–16.  Of these active employees, "about 40 percent" stayed with Historical DuPont or Corteva, "[r]oughly 5 percent" went to New Dow, and the "remainder," about 55%, went "to New DuPont."  Id. 75:14–25.

261.    Durkovic testified that "the legal entities ultimately had to be aligned based on the companies that would be spun off. . . . whether they were going to be in the ag business [Corteva] or in the Specialty Products [New DuPont] business or in Matco [New Dow], had to be ultimately, in some cases, moved into an entity that would be in the correct."  Id. 76:5–12.  And "[i]f you have the transfer of employment to a new employer . . . you would have received an offer of—essentially an offer of employment, or at least an acceptance, that you were being transferred to another legal entity" via "DocuSign."  Id. 76:16–77:1.

262.    "As of May 31, 2019," "Specialty Products cease[d] participating in the plan as a participating employer" because it became a subsidiary of New DuPont, but the Plan stayed with Historical DuPont (which became a subsidiary of Corteva).  Id. 77:9–11.

### 2. Interpretation of the Plan

263.    Durkovic testified that Plan participants received copies of the SPDs, but did not receive the Plan document unless they requested it.  6/26/24 Day 2 PM Tr. Trans. 102:6–103:5, ECF 246.  Durkovic testified that "the SPD is the document that is sent to all of the plan participants" and is "the primary place they get their information about their plan benefits." 6/27/24 Day 3 AM Tr. Trans. 14:11–17, ECF 242.

264.    Durkovic testified that he believed a participant's eligibility for Early Retirement Benefits "is measured at your date of termination or separation from service."  Id. 10:1–9.

Durkovic testified that to be eligible for an Early Retirement Benefit, a participant needed to meet the 50 and 15 requirements at the time of termination or separation.  Id. 10:1–9, 15:1–17.

265.    Durkovic admitted he did not know if the Plan document defined a full-service employee as a present employee (versus a former employee) for the purposes of Early Retirement Benefits.  Id. 18:22–19:7.  Further, Durkovic acknowledged that the definition of full-service employee in the SPD did not explain that employees could commence Early Retirement Benefits long after they stopped working for Historical DuPont.  Id. 20:20–21:19.

266.    Durkovic explained that employees could access portals that included information about their benefits and highlighted two portals that hosted information about Plan benefit changes. Id. 32:3–22.  Durkovic did not appear to know where the PowerPoint Presentations were specifically hosted within those portals.  Id. 32:23–33:11.

### 3.    November 8, 2018, Administrative Committee Meeting

267.    Durkovic testified that the Administrative Committee "was asked to make a formal interpretation" of the language in Title I of the Plan at its November 8, 2018, meeting to "include corporate spin-offs as an exception to the applicability of Optional Retirement, regardless of the particular corporate form of the spin-off."  Id. 42:8–19.  Prior to the meeting, the Administrative Committee was provided with a memorandum to review.  Id. 41:16–19; Ex. J-52.  Durkovic did not testify to who requested the meeting, what he was told about the meeting in advance, or who requested that this particular interpretation be made—though this request was reflected on the pre-meeting memorandum, Ex. J-52.

268.    The Administrative Committee meeting lasted fifteen minutes.  6/27/24 Day 3 AM Tr. Trans. 41:25–42:7, ECF 242; Ex. J-46(b).  The Administrative Committee made a formal interpretation that the spin-off was a Business Exception to Optional Retirement.  6/27/24 Day 3 AM Tr. Trans. 46:10–13, ECF 242.

269.    Durkovic justified the Administrative Committee's decision because the Business Exceptions to the Optional Retirement Benefit in the Plan, including "sale of the business, joint venture, if somebody was moved to a subsidiary company, or in the case where work was outsourced to a service provider" were "similar in circumstances" to the spin-off.  Id. 47:1–11. "My opinion is, under the optional provision, that it is similar to those transactions and the other transactions that are defined as exceptions to optional benefits."  Id. 7:18–20.  Namely, there was no "termination of employment. There was no lack of work. . . . People continued to have their same jobs [at Specialty Products] that they were doing."  Id. 47:6–9.

270.    As it relates to Chemours, Durkovic could not recall any of the Administrative Committee's contemporaneous discussion about the "intent of the plan provisions" in making that interpretation for the Chemours spin-off.  Id. 47:20–48:3.  Durkovic did not know whether the Administrative Committee made a formal Plan interpretation that the 2015 Chemours spin-off would not trigger the Optional Retirement Benefit because he was not a member of the Administrative Committee at that time.  6/27/24 Day 3 PM Tr. Trans. 8:6–13, 11:1–16, ECF 247.

271.    Durkovic testified "[t]he [Administrative C]ommittee discussed the Chemours spin-off [at the November 8, 2018 meeting] because it was very similar. And also discussed, as I mentioned, the fact that, in other business transactions that the committee felt were analogous, optional was not available, such as joint venture, sale of a business."  6/27/24 Day 3 AM Tr. Trans. 86:5–10, ECF 242.

272.    Durkovic testified that he believed the Administrative Committee was asked to make a formal interpretation in November 2018 because the magnitude of the spin-off was larger than the Chemours spin-off.  6/27/24 Day 3 PM Tr. Trans. 9:5–18, 11:1–16, ECF 247.

####  4.  Communications Regarding the Impact of the Spin-Off on Benefits

273.    Durkovic listed several employees who were responsible for communications about benefits in relation to the spin-off, including himself, White, Dineen (who "had primary responsibility"), and Fitzpatrick.  6/27/24 Day 3 AM Tr. Trans. 51:25–53:10, ECF 242.

274.    Durkovic stated that no one communicated the Administrative Committee's interpretation of the Optional Retirement Benefit in relation to the spin-off to Plan participants because it was merely a re-affirmation of a prior construction of the Plan document and because the Administrative Committee did not typically communicate to participants information about benefits to which they were not eligible.  Id. 54:3–7, 53:25–54:7.  Durkovic further testified that "[h]ad there been a change to the Plan, we would have issued a summary of material modifications."  Id. 53:25–54.

275.    Durkovic testified that a March 20, 2019, email (Ex. J-25) "was sent to anyone who was a pension plan participant, so they were participating in the pension plan at that time, who was part of Specialty Products who would move and become New DuPont."  Id. 56:7–11. The email provided two links to "Presentations detailing pension benefits."  Ex. J-25; 6/27/24 Day 3 AM Tr. Trans. 88:10–16, ECF 242.

276.    Durkovic agreed that the PowerPoint Presentation for employees under age 50 (Ex. D-84) "tells the reader that New DuPont will no longer be a participating employer in the pension plan as of June 1, 2019" and that "future service with New DuPont will not be recognized in determining eligibility for pension benefits as of June 1, 2019."  6/27/24 Day 3 AM Tr. Trans. 89:22–90:5, ECF 242.

277.    Durkovic also agreed that the PowerPoint Presentation for employees over age 50 with 15+ years of service (Ex. D-85) "tells the reader that New DuPont will no longer . . . be a

participating employer in the pension plan as of June 1, 2019" and "that future service with New DuPont will not be recognized in determining eligibility for pension benefits as of June 1, 2019." Id. 92:22–93:20.

278.    Durkovic testified the PowerPoint Presentations sought "to communicate to employees what the impacts would be on their pension benefits, and so that they could take actions–other actions that needed to be taken to commence benefits" and were made "available to the employees to watch at their convenience on the various electronic portals that were set up." Id. 93:15–20. Durkovic testified that "[f]or people who are familiar with coming to the site [linked in the email] and the information there" they would understand that some information is for existing retirees and their benefits and some is for active employees and their benefits and would know where to locate the relevant information.  Id. 26:16–21.

279.    When asked about the March 20, 2019, email, Durkovic testified that there was no requirement for employees to click on the links to the PowerPoint Presentations.  Id. 58:5–6. Durkovic did not know if there was a record of how many people followed the links.  Id. 58:2–4.

280.    When presented with the SharePoint website that housed the PowerPoint Presentations, Durkovic was not familiar with the webpages and could not testify how an employee would navigate to the PowerPoint Presentations.  Id. 58:22–64:08.  However, Durkovic later noted that he believed a separate website listed in the email would have led employees to the PowerPoint Presentations.  Id. 88:2–16.

281.    Durkovic testified that Alight Solutions, a third-party administrator, operated the Corteva Connection portal and the call center for Plan benefits and appeals.  Id. 73:4–16.

### 5. Post Spin-Off Impacts on Benefits

282.    Durkovic was not aware of any Plan participant who was under age 50 when his employer ceased participating in the Plan that was able to "age in" to Early Retirement.  Id. 78:7–

14.   Durkovic testified that for the purposes of determining eligibility for Optional, Early, or Deferred Benefits, the employee's eligibility was always measured at the time "the person terminates or separates from service."  Id. 81:25–82:25.

283.    Durkovic also explained that New DuPont employees with the 50 and 15 criteria at spin-off could commence their Early Retirement Benefits immediately after the spin-off and "double-dip" while still working for New DuPont (which was not a participating employer in the Plan).  Id. 91:8–21.  Approximately 2,000 employees in this category had begun commencing their benefit at some time after spin-off.  Id. 91:22–92:7.

284.    Durkovic testified that Historical DuPont continued to employ individuals after the spin-off, but, as of October 2021, Historical DuPont—a subsidiary of Corteva—does not currently employ any workers.  Id. 70:22–71:12; 6/27/24 Day 3 PM Tr. Trans. 13:19–25, ECF 247. Historical DuPont remains the Plan sponsor as a subsidiary of Corteva, but Historical DuPont has no employees.  6/27/24 Day 3 PM Tr. Trans. 13:16–18, ECF 247.

285.    Durkovic testified that the Appeals Committee determined that Cockerill was not entitled to Early Retirement because at the time of the spin-off, he was not 50 years old when he began working for New DuPont. 6/27/24 Day 3 AM Tr. Trans. 84:9–15, ECF 242.  Durkovic said that Major and Benson could not receive Optional Retirement Benefits because the Administrative Committee interpreted the spin-off as not triggering Optional Retirement Benefits.  Id. 84:20– 85:25.  Durkovic testified that the administrative records for Benson, Cockerill, and Major contained all the information submitted by each individual in their appeals process and provided to the Appeals Committee.  Id. 94:08–97:21, 101:5–102:7.

### h.  Lisa White

286.    Lisa White began working for Historical DuPont in 1987 and joined the Human Resources Department in 2010.  6/27/24 Day 3 PM Tr. Trans. 79:22–80:7, ECF 247.

71

287.    White was on the Benefits Appeals Committee "for a few years leading up to the spin-off." Id. 17:15–19.

288.    White was responsible for drafting SPDs. Id. 81:13–82:6. White would circulate drafts SPDs, including the 2018 SPD, to members of the Human Resources Department and legal counsel. Id. 85:7–19.

289.    White could not recall being aware that Corteva would assume the Plan when she was drafting the 2018 SPD. Id. 87:22–88:4; Ex. P-3. She did not remember speaking with anybody in DowDuPont leadership about Corteva taking over the Plan before publishing the 2018 SPD. Id. 88:20–89:12. White also did not recall discussing whether the 2018 SPD's description of Early Retirement Benefits was a sufficient representation of available benefits in light of the spin-off. 6/27/24 Day 3 PM Tr. Trans. 92:21–93:10, ECF 247.

290.    White did not review the Optional Retirement provisions in the 2018 SPD from the time of its publishing through the spin-off because it "had not changed." Id. 96:18–98:9.

291.    White could not recall from what part of the Plan document she generated the "Eligibility Service" subsection of the 2018 SPD or why she included this section in the SPD. Id. 91:11–92:7.

292.    Regarding the November 8, 2018, Administrative Committee meeting, White could not recall any specific discussions despite attending. Id. 100:5–12; Ex. J-46(a). White testified that someone from the legal department may have asked the Administrative Committee to make a formal interpretation and that "[i]t may have been suggested that it would be important to have this as part of the Administrative "[C]ommittee record." 6/28/24 Day 4 AM Tr. Trans. 8:17–9:19. In preparation for the November 8, 2018, meeting, White helped draft a document, circulated to the Administrative Committee before November 8, asking that the Administrative Committee

make an interpretation of the Plan language that the spin-off would not trigger Optional Retirement. Id. 7:2–17, 10:4–23; Ex. J-52.

293.    White testified that the Administrative Committee looked to the Plan document and past practice to determine the intent of the Optional Retirement provision. 6/27/24 Day 3 PM Tr. Trans. 100:20–101:18, ECF 247.

294.    White could not recall whether the Administrative Committee made a formal Plan interpretation that the Chemours spin-off did not "trigger" Optional Retirement Benefits. Id. 102:21–103:3.

295.    White characterized her understanding of the Plaintiffs' employment status due to the spin-off by stating that "there [was] no separation in terms of a termination from their employer, but they terminated from the employer that was sponsoring the plan." 6/28/24 Day 4 AM Tr. Trans. 14:6–10, ECF 243.

296.    White testified that she became an employee of Specialty Products (a subsidiary of Historical DuPont) as of February 1, 2019, and then became an employee of Specialty Products (a subsidiary of New DuPont) as of the spin-off. Id. 17:20–18:12. She learned of her transfer to Specialty Products (a subsidiary of Historical DuPont) in the summer of 2018 and formalized it through a DocuSign sent to all transferring employees that required electronic acknowledgement. Id.

297.    White did not believe Plan benefits changed because of the spin-off. Id. 34:11–14. The Court does not find this conclusion credible for reasons detailed below.

298.    White testified that participants received communications directing them to look at PowerPoint Presentations. Id. 25:24–27:5. One of those communications was the Benefits News which White "probably did help draft" and stated that "[e]mployees who participate in the [P]lan

should have received an email from HR Direct with a link to presentations on www.dupontbenefits.com." 6/28/24 Day 4 AM Tr. Trans. 33:4–5, ECF 243.  When asked about the accuracy of the statement in the Benefits News communication, "[a]s an employee going to the new DuPont, you'll experience very few changes to your benefits because of the spin" was "an accurate statement," White testified that she believed the statement was accurate.  Id. 33:20–34:2.

299.    On January 22, 2020, Cockerill emailed White to ask her questions about the Plan. Id. 19:7–12; Ex. P-37.  At that time, White was an employee of Specialty Products (a subsidiary of New DuPont) with no "responsibility for the pension plan" given the Plan was with Historical DuPont and Corteva.  6/28/24 Day 4 AM Tr. Trans. 19:16–20:4, ECF 243.  Nonetheless, White responded to Cockerill by providing him with a snippet of the definition of "Eligibility Service" from the "September 2018" SPD.  Ex. P-37; 6/28/24 Day 4 AM Tr. Trans. 20:12–18; 22:8–9; 22:20–21, ECF 243.  Generally, though, when employees would email White about the Plan, she would "refer them to Corteva Connection."  Id. 35:22–25.

### i.  Mary Dineen

300.    Mary Dineen testified by video designation of her deposition.  Plaintiffs played eight minutes of testimony from Mary Dineen.  9/25/24 Day 6 Tr. Trans. 75:17–18, ECF 281. Since Dineen's deposition was designated, ECF 255-1, her testimony need not be summarized.

### ii.  Defendants' Case-in-Chief

### a.  Patty Yang

301.    Patty Yang worked for Corteva was responsible for the financials of the Global Employee Benefits program, and has been an enrolled actuary since the early 2000s.  9/24/24 Day 5 Tr. Trans. 6:25–7:2, 7:18–21, ECF 280.

302.    Before the spin-off, Yang worked for Historical DuPont beginning in 1991.  Id. 9:12–14.  After the spin-off, Yang worked for Corteva.  Id. at 6:25–7:18; 9:15–17.  Yang testified that her role after the spin-off was similar to her role before the spin-off.  Id. 9:9–11.

303.    Yang worked closely with AON, the Plan's consultant who was retained by Defendants.  Id. 8:25–9:4.  Yang's responsibilities included reviewing the Form 5500s prepared by AON.  Id. 11:2–8, 11:19–22.  No representative of AON testified at trial.

304.    Yang testified that the "[m]ajority of the [P]lan's obligation [are] from retired participants and beneficiaries receiving payments."  Id. 12:2–4.

305.    Yang testified that an estimated $100 million would be spent by the Plan to make additional payments for Plan participants who went to New Dow and New DuPont after the spin-off who could receive their pension payments while still working for the companies.  Id. 19:10–15, 22:16–22; Ex. P-63 at 35.

306.    Yang testified that Corteva estimated that Plan payments would end by 2069.  9/24/24 Day 5 Tr. Trans. 20:18–21:19, ECF 280; Ex. P-63 at 35.

### b.  Kelly Lantagne

307.    Prior to the spin-off, Kelly Lantagne was employed by Specialty Products (a subsidiary of Historical DuPont) as the North America Training and Communications Leader.  9/24/24 Day 5 Tr. Trans. 25:7–14, ECF 280.  Lantagne sent mass communications—some related to the impact of the spin-off on Plan benefits—to Plan participants.  Id. 25:15–20.

308.    Lantagne personally sent out the March 20, 2019, email from HR Shared Services.  Id. 26:2–10; Ex. J-25.  Lantagne testified that, as was part of her normal practice, she checked the hyperlinks in the email to ensure they were working before sending the email.  9/24/24 Day 5 Tr. Trans. 26:11–16, ECF 280.  Lantagne was provided with a distribution list of email addresses of Historical DuPont employees who were moving to New DuPont, to whom she sent the March 20,

2019, email.  Id. 26:17–27:4; Ex. D-45.  Lantagne confirmed during the course of this litigation

that Cockerill, Major, Benson, and Barish were on the distribution list for the March 20, 2019,

email.  9/24/24 Day 5 Tr. Trans. 28:8–19, 38:4–11, ECF 280; Ex. D-45.

309.    Lantagne did not receive any "bounce back" emails in response to the March 20

email.  9/24/24 Day 5 Tr. Trans. 46:21–24, ECF 280

310.    Lantagne testified that the March 20, 2019, email was not sent with a return receipt

or high priority tag because doing so was not part of normal processes.  Id. 39:4–40:4.  Lantagne

also testified that she did not track how many recipients of the email clicked certain links in the

email because it was not part of her role, nor did she know if anyone had done so.  Id. 41:19–42:3.

### c.  Megan Fitzpatrick

311.    Megan Fitzpatrick is the Retirement Benefits Delivery Manager for Corteva, and

previously worked for Historical DuPont from March 2001 until September 2021.  Id. 59:23–

60:2, 60:25–61:4, 61:24–62:1.

312.    Fitzpatrick stated that before the spin-off, she administered Historical DuPont's

benefit plans and that her tasks included reviewing Plan communications, reviewing 5500s, and

working with third-party administrators, among other things.  Id. 62:13–63:1.

### 1.  Fitzpatrick's Membership on the Administrative and Appeals Committees

313.    Fitzpatrick has served on two fiduciary Committees for the Plan: the Administrative

Committee and the Benefits Appeals Committee.  Id. 63:16–21.  Fitzpatrick testified that she was

appointed to the Administrative Committee in 2014 and was a voting member.  Id. 63:22–25, 64:4–

6. Fitzpatrick testified that she became a member of the Appeals Committee at some point in 2019

after the spin-off.  Id. 64:1–3.

314.    Fitzpatrick testified that when she was appointed to each Committee, she received training on the Committee Charter and then periodic fiduciary training.  Id. 65:12–24, 87:17–19. Fitzpatrick testified that she was not paid for sitting on either Committee.  Id. 65:2–8.

315.    Fitzpatrick explained that the Administrative Committee has monthly meetings at which it discusses "topics that come up as part of the regular course of business" and then "from time to time" has special meetings "as needed," for example, "if there is a topic that needs to be resolved timely and can't wait for a regularly scheduled meeting."  Id. 64:7–65:1, 102:22–103:2.

316.    On cross examination, Fitzpatrick testified that she serves as a fiduciary in her Committee roles and that the Committees are responsible for interpreting the Plan.  Id. 88:1–11. Fitzpatrick was asked about whether, as a fiduciary, she was required to follow the written terms of the Plan, to which she responded that the Committees "review the written terms of the [P]lan to help with our interpretation" and agreed that if Committees' interpretation conflicted with the Plan's written terms, the written terms controlled.  Id. 88:6–20.

### 2.    Corporate Events Since January 1, 2013

317.    Fitzpatrick testified that since January 1, 2013, she has been involved in sixteen corporate sales, spin-offs, or reorganizations by Historical DuPont or Corteva, and that her role in such transactions was typically to draft communications to impacted employees and prepare third-party administrators to answer questions from impacted employees.  Id. 76:13–25, 84:1–5; Ex. D-121.  Fitzpatrick testified that in "several" of these transactions, a participant's employer stopped participating in the Plan after the transaction, and that participants who were under age 50 at the time that the employer stopped participating were not permitted to "age in" to their retirement benefits.  9/24/24 Day 5 Tr. Trans. 77:17–78:3, ECF 280.

318.    Fitzpatrick discussed the Chemours spin-off and movement of 4,000 employees that occurred on July 1, 2015, with which she was personally involved in and during which she

was a member of the Administrative Committee. Id. 78:7–10, 78:14–23, 78:24–79:3, 80:1–3. Fitzpatrick testified that the Administrative Committee "determined that a company spin-off [of Chemours] would meet the criteria to be excluded" from Optional Retirement benefits. Id. 79:4– 18. She explained that the Administrative Committee "reviewed the [P]lan language in Section 4 that talks about the exceptions for optional retirement and determined that a company spin-off would meet the criteria to be excluded"—meaning that "that optional retirement benefits were not made available to individuals who were part of the Chemours business that was spun off into a separate public company. Id. 79:9–17. She confirmed "[t]hat was the same treatment for plan participants who were spun off and part of New DuPont here." Id. 79:19–22. On cross examination, Fitzpatrick admitted that she did not recall whether the Chemours determination was written down. Id. 109:10–19.

319. Fitzpatrick testified that employees who went from Historical Dupont to "Chemours on July 1st of 2015 who had 15 years of service but were not yet age 50 were not allowed to age into an early retirement benefit." Id. 78:10–13.

320. In addition to Chemours, Fitzpatrick discussed two prior transactions after which employees under age 50 were not eligible for Early Retirement and Optional Retirement was not made available. Id. 81:9–82:13; 84:6–16. She testified that for both of these transactions, employees had a job before and after the corporate transaction. Id. 83:12–21.

### 3. November 8, 2018, Administrative Committee Meeting

321. Fitzpatrick testified that there was a special meeting of the Administrative Committee which lasted for fifteen-minutes on November 8, 2018, to render an interpretation of the Plan that spin-offs were an exception to the right to Optional Retirement Benefits, which she attended. Id. 103:9–13, 103:21–104:1; Ex. J-46. Fitzpatrick could not recall who asked the Administrative Committee to make this interpretation or whether someone at the meeting asked

the Administrative Committee to make it.  9/24/24 Day 5 Tr. Trans. 105:18–24, ECF 280.  She

could not recall why the November 8, 2018, meeting was called or who called it.  Id. 103:14–20.

322.   On cross examination, Fitzpatrick was shown a document memorializing the

November 8, 2018, Administrative Committee meeting.   Ex. J-46; 9/24/24 Day 5 Tr. Trans.

104:21–105:2, ECF 280.   Fitzpatrick could not recall whether the Administrative Committee

discussed any of the sixteen instances of previous corporate events (excluding Chemours) at the

meeting or whether the reference to "past practice" in the meeting minutes referred to instances

other than Chemours.  9/24/24 Day 5 Tr. Trans. 106:6–25, 107:15–19, ECF 280; Ex. J-46.

323.   Fitzpatrick testified that she reviewed Ex. J-52 prior to the November 8, 2018,

meeting, which included the relevant portion of the Plan language, to supplement her general

familiarity with the Plan.  9/24/24 Day 5 Tr. Trans. 110:11–16, ECF 280.

324.   On cross examination, Fitzpatrick testified that the Administrative Committee

relied on Title I § IV.D.(1)(c) of the Plan (which outlined the exceptions to Optional Retirement),

excerpted in Ex. J-52, to make its decision, along with the rest of the language on Optional

Retirement in the Plan.  Id. 110:17–111:4.  Fitzpatrick could not recall a particular portion of §

IV.D.(1)(c) that was discussed at the November 8 meeting or any discussion that occurred therein.

Id. 111:12–15.  Fitzpatrick acknowledged that the words "spin-off" and "business reorganization"

are not included in § IV.D.(1)(c).  Id. 114:3–11.

### 4.  DowDuPont Merger and Preparation for Spin-Off

325.   Fitzpatrick testified that the merger was widely announced within Historical

DuPont, including an announcement of the intent to spin-off into three companies."  Id. 66:5–14.

326.   Fitzpatrick testified that she was involved in the reorganization process of

DowDuPont into three companies resulting from the spin-off related to the movement of

employees.  Id. 66:15–19.  As part of the spin-off, New Dow and New DuPont were "stood up"

began operating on February 1, 2019, and the standing up of these entities was communicated within Historical Dupont. Id. 66:23–68:5.

327. Fitzpatrick testified that some employees were reassigned to new employers, including Specialty Products, as part of the spin-off. Id. 68:6–9. Fitzpatrick testified that employees who were "reassigned" to Specialty Products (a subsidiary of New DuPont) continued to participate in the Plan until May 31, 2019, when Specialty Products stopped participating in the Plan. Id. 68:19–69:7.

328. Fitzpatrick testified that no one told her they were unfamiliar with the spin-off or were confused about the spin-off. Id. 67:24–68:5.

### 5. Post Spin-Off Impact on Employee Benefits

329. Fitzpatrick testified that no eligibility criteria for Plan benefits were changed nor were accrued benefits altered as part of the spin-off. Id. 69:21–70:2.

330. Fitzpatrick agreed that employees under age 50 were still eligible to receive an unreduced benefit at normal retirement. Id. at 170:7–13.

### i. Optional Retirement Benefits

331. Fitzpatrick testified that Optional Retirement Benefits are available to people "over age 50 with at least 15 years of service, if they lose their job and their income, let's say, through no fault of their own," but that there are exceptions for business reorganization. Id. 72:22–73:8.

### ii. Early Retirement Benefits

332. Fitzpatrick testified that to commence the Early Retirement Benefit, "a participant has to have at least 15 years of service and be at least age 50." Id. 70:13–15. Fitzpatrick testified that this meant an individual who was under the age of 50 at the spin-off could not be eligible for Early Retirement Benefits at the spin-off since the "Plan says you have to be at least age 50." Id. 70:16–25.

333.    Fitzpatrick noted that an individual like Cockerill, who was under the age of 50 at the spin-off, was still eligible for a Vested Deferred Benefit.  Id. 72:2–6.

334.    Fitzpatrick was not aware of any instance where a Plan participant who was under age 50 when their employer stopped participating in the Plan was nonetheless permitted to "age into early retirement."  Id. 71:17–72:1.  On cross examination, Fitzpatrick was given a copy of the Plan, with which she was "very familiar," and was asked: "Where in the plan does it say that you have to be age 50 at termination in order to be eligible for an early retirement?"  Id. 89:22–90:18; Ex. P-1.  Fitzpatrick responded by explaining that "when you stop working for a participating employer, you have to meet two criteria: You have to be at least age 50 and you have to have at least 15 years of service."  9/24/24 Day 5 Tr. Trans. 91:1–4, ECF 280.  She later clarified that this reference to being age 50 at termination is in Section 4(b)(1) of the Plan, but indicated that the language does not say "that you still have to be with the participating employer," but that this is implied through the fact that someone is not an employee under the Plan if they are not working for a participating employer.  Id. 92:1–93:22, 95:5–10.

335.    On cross examination, Fitzpatrick was asked about the Plan's definition of "employee."  Fitzpatrick testified that she believed her testimony about the meaning of employee is encompassed in the Plan's definition, but she acknowledged that the section did not say "terminated."  Id. 95:22–96:17.  Fitzpatrick testified that "termination" meant "when you stop being employed by a participating employer" and that this "could happen because you're terminated voluntarily or involuntarily.  Or it could happen because your employer decides to stop

participating in the plan." Id. 92:3–7.  This testimony supports the Court's finding in ¶ 67 and n.6 that the word "terminate" was confusing as used by Defendants.

336.    Fitzpatrick testified that she imagined the fact that employees with more than 15 years of service and who were under the age of 50 on May 31, 2019, and went to work for New DuPont on June 1, 2019, would not be eligible for Early Retirement Benefits could be of concern to those individuals and that they might be upset.  Id. 97:17–98:6.  Fitzpatrick was further shown emails which indicated that she communicated to colleagues about these individuals being upset. Id. 98:25–99:23; Ex. D-92.

### 6.  Communications Regarding Retirement Benefits

337.    Fitzpatrick testified that leading up to the spin-off, Plan participants who were eligible for unreduced benefits as of June 1, 2019, were sent retirement kits, but individuals who were eligible for reduced benefits were sent retirement kits only if they requested one.  9/24/24 Day 5 Tr. Trans. 73:9–74:19, ECF 280.  Fitzpatrick testified that "the vast majority" of Plan participants who qualified for an unreduced benefit returned their kits and started collecting pension payments at the spin-off, id. 73:22–74:1, and that "many" who were eligible for reduced benefits did so, too, id. 180:12–20.

338.    The Court questioned Fitzpatrick about Plaintiffs' Demonstrative 1:



THE COURT: . . . I would like you to tell me if you believe that, based on your involvement in the spin-off, that DuPont stated any of these items.  So the first one is: On May 31, 2019, you will be deemed terminated by E. I. Dupont de Nemours and Company, the plan sponsor, since 1904.  Was that fact stated to the participants?

THE WITNESS: Yes, I believe it was.

THE COURT: In what format?

THE WITNESS: Well, it was in some question-and-answer formats and it was in the pension presentations that were given to employees.

THE COURT: The next one is: On June 1st, 2019, you will be working for DuPont de Nemours and Company, [which] does not participate in your pension plan.  Was that fact ever stated to the employees as part of the spin-off?

THE WITNESS: Yes, it was.

THE COURT: In what format?

THE WITNESS: The same set I mentioned.

THE COURT: The third one: If you are under 50 on May 31st, 2019, and [moving] to DuPont de Nemours, Inc., you are not eligible for an early retirement and you never will be.  Was that fact stated?

THE WITNESS: Yes, it was.

THE COURT: In the same fashion?

THE WITNESS: Well, in those pension presentations that was stated.

. . .

THE COURT: Okay. The fourth one states: You are not eligible for an optional retirement because the plan fiduciaries have decided that optional retirement does not apply in the corporate spin-off.  First of all, is that a correct statement?

THE WITNESS: Yes, that is a correct statement.

THE COURT: Was that stated to people affected by the spin-off?

THE WITNESS: I don't believe it was because our practice has been to -- we don't communicate to people what you're not eligible for; we communicate what you are eligible for.

Id. 119:8–121:10.

339.    On March 20, 2019, DowDuPont's Human Resources department emailed employees moving from Historical DuPont to New DuPont and informed them that they "may be eligible" to receive benefits at the time of the spin-off.  Ex. J-25.  This email provided employees with links to portals that hosted, among other things, PowerPoint Presentations discussing the spin-off's effect on pension benefits.  See Exs. D-89(a), D-84(a), D-85(b).

340.    Fitzpatrick testified that she clicked on the links in the March 20, 2019, email to ensure they worked and went to the linked websites to ensure that the documents were there. 9/24/24 Day 5 Tr. Trans. 130:11–22, ECF 280.

341.    Fitzpatrick testified that she did not have a way to track how many people clicked on the March 20, 2019, email or the links included therein.  Id. 122:20–124:6.  Fitzpatrick also testified that the March 20, 2019, email was sent from an unmonitored mailbox, meaning that if a person replied to the email, they would not get a response.  Id. 129:19–130:3; Ex. J-25.

342.    Fitzpatrick was asked about the language in the March 20, 2019, email: "If you are unsure of the eligibility requirements for a reduced or unreduced pension, please refer to the presentations noted above or your Pension Summary Plan Description."  9/24/24 Day 5 Tr. Trans.

84

124:16–19, ECF 280; Ex. J-25.  Fitzpatrick did not recall whether that sentence was added at her request.  9/24/24 Day 5 Tr. Trans. 124:22–24, ECF 280.  Plaintiffs' counsel effectively impeached Fitzpatrick by showing her comments that she sent on a draft of what became the March 20 email in which Fitzpatrick noted concern that employees would not know whether they were reduced or unreduced.  Id. 125:19–126:5; Ex. P-27.  Fitzpatrick agreed that the sentence "could have been" added to the March 20 email to address her concern.  9/24/24 Day 5 Tr. Trans. 129:1–5, ECF 280.

343.    Fitzpatrick was shown a screenshot of DuPontbenefits.com and testified that she believed this webpage was hyperlinked in the March 20, 2019, email.  Ex. J-48(a); 9/24/24 Day 5 Tr. Trans. 139:9–140:18, ECF 280.  Fitzpatrick testified that to get to the PowerPoint Presentations referenced in the March 20, 2019, email, an employee needed to click the link in the email, scroll to the bold headers pictured in Ex. J-48, and click on the relevant headers to get to the PowerPoint Presentations.  9/24/24 Day 5 Tr. Trans. 141:19–142:10, ECF 280.

344.    Fitzpatrick testified that the relevant headings on the DuPontbenefits.com webpage, Ex. J-48(a), were "DuPont Eligible Employees Title I" and "Dupont Term-Vested," and that each section included PowerPoint Presentations, 9/24/24 Day 5 Tr. Trans. 146:10–13, ECF 280.  Fitzpatrick testified that the two PowerPoint Presentations under the DuPont Eligible Employees Title I section are the same presentation in different formats—one PDF and one voiceover presentation.  Id. 147:14–23.

345.    When asked which heading and PowerPoint Presentation an employee would go to if they were retirement eligible and over or under the age of 50, Fitzpatrick testified that the employee could click on either presentation and that a slide about whether it applies would appear and it would be clear.  Id. 146:16–19.  Fitzpatrick agreed that an employee would not know from the DuPontbenefits.com landing page, Ex. J-48, whether a given presentation applied to employees

who were over or under 50.  Id. 146:20–147:5, 147:11–13.  But Fitzpatrick testified that she believed "employees understood if they were retirement eligible or not."  Id. 147:2–4.

346.  Fitzpatrick testified that there were two PowerPoint Presentations containing the information in the first three questions of Plaintiffs' Demonstrative 1 which were hosted on DuPontbenefits.com and SharePoint, which were linked in the March 20, 2019, email.  Ex. J-25; 9/24/24 Day 5 Tr. Trans. 119:8–121:10, 122:12–19, 155:24–155:1, ECF 280.  Fitzpatrick was shown PDF versions of the PowerPoint Presentations, each of which were accessible by clicking the links in the March 20, 2019, email.  9/24/24 Day 5 Tr. Trans. 153:13–155:1, ECF 280; Ex. J-25.

347.  Fitzpatrick was shown Ex. D-85(a), and testified that the first three questions on Plaintiffs' Demonstrative 1 were answered in this presentation.  Id. 154:24–155:1.

348.  After the above answers to the Court's questioning regarding Plaintiffs Demonstrative 1, Fitzpatrick testified in response to a number of questions from the Court and counsel about the language used in the "formats" and "presentations" which she had mentioned as providing the facts in response to the questions in Plaintiff's Demonstrative 1.  Id. 119:17–20.

349.  The Court finds that Fitzpatrick's responses to questions were neither clear nor credible because she relied on numerous other confusing communications from Defendants about the spin-off and its impact on class representatives, as stated supra ¶¶ 131–233.

350.  On re-direct, Fitzpatrick was referred to certain slides in these PowerPoint Presentations, which she stated were intended to inform Defendants' employees whether the presentation applied to them and explained whether they could commence their benefits.  Id. 168:5–169:2, 146:14–19; Exs. D-85(a) at 3, D-85(b), D-84(c) at 2.

351.    Fitzpatrick testified to the resources that an employee could use if they had questions or confusions regarding the spin-off, including a call center, websites, human resources individuals, FAQ documents, PowerPoint Presentations, and summary plan descriptions.  9/24/24 Day 5 Tr. Trans. 173:5–174:6, ECF 280.

352.    On redirect, Fitzpatrick noted that the FAQs which accompany Breen's November 2018 email stated:

> [Question] I am currently a participant in DuPont's U.S. pension plan and will be an employee of Speciality [sic] Products in the U.S. How does this affect my pension?
>
> [Answer] At spin, future service for Speciality [sic] Products' employees who participate in the plan will no longer be recognized in determining eligibility for pension benefits and any applicable early retirement reduction factors.

Id. 181:22–182:18; see Ex. P-8.

353.    Fitzpatrick testified that this language communicated that after the spin-off, people who worked for Specialty Products (a subsidiary of New DuPont) would no longer have their future years of service recognized for eligibility.  9/24/24 Day 5 Tr. Trans. 182:5–183:1, ECF 280.

354.    The Court questioned Fitzpatrick about Ex. D-84(c) and its use of the word "retiring," noting that the slide "says 'retiring,' but actually [Fitzpatrick] said they were transferred.  As the plaintiffs [stated,] in the exhibit, they say 'terminated' . . . . retiring, to me, it sounds like something that's voluntary" and "means that somebody stops working."  Id. 166:11–15, 177:10–18, 181:6–7.  Fitzpatrick testified in response to the Court that she believed the slide stated that people were eligible to start their retirement benefits based on the language:

> If you meet the eligibility requirements, age 50 with at least 15 years of eligible service as of May 31st, 2019, you are automatically considered a retiree under the plan.  No action on your part is required. However, you must decide whether to commence your pension benefit as you transition to New DuPont, or whether to defer commencement of your benefit to a later date.

Id. 178:2–9; Ex. D-84(c).

355.    Fitzpatrick also testified that the third slide asked, "Does this presentation apply to you" and that read "this version of the presentation applies to you if you obtain at least age 50 with 15 years of service as of May 31st."  9/24/24 Day 5 Tr. Trans. 175:12–21, ECF 280.

356.    Fitzpatrick testified that employees who were considered retirees under this definition were also active employees of New DuPont, and thus could receive pension benefits while also being paid their salary, and that this "was well understood amongst employees," who were "thrilled" by this policy. Id. 178:20–179:14.  This policy was referred to as "double-dipping."

357.    New DuPont was no longer a participating employer under the Plan as of June 1, 2019, and certain employees who moved from Historical DuPont to New DuPont and were considered "retirees" received benefits while also being paid their salaries ("double-dipping") had rights that other employees of New DuPont did not know about and could never receive.

### d.  Ian Altman

358.    Ian Altman is Plaintiffs' expert.  Defendants played spliced excerpts of Altman's deposition during their case-in-chief. Id. 189:13.  This Court did not find this testimony useful.

### e.  Lawrence Sher

359.    Lawrence Sher testified as Defendants' expert on actuarial science and pension consulting.  9/25/24 Day 6 Tr. Trans. 20:25–21:2, ECF 281.

360.    Sher has been a "licensed enrolled actuary" for "[a]bout 40 years." Id. 16:9–14. He has been the chief actuary at three firms wherein he "had both [his] own clients and [he] assisted other actuaries in [his] firm with their clients." Id. 17:14–16, 18:5–8.  He has received several awards, including "a lifetime achievement award . . . from the Conference of Consulting Actuaries" Id. 19:6–13.  He has spoken at many conferences and been published on actuarial and pension topics. Id. 19:14–20.  Sher has assisted companies with administering pension plans and regularly "review[s] plan documents such as an SPD or the actual plan itself" to advise clients. Id. 20:5–16.

361.    As noted at trial, based on Sher's qualifications the Court believes Sher is a qualified expert on actuarial pension issues and as a pension consultant. Id. 16:1–3.

362.    First, Sher discussed early retirement type benefits.  Sher testified that he had extensive experience working with pension plans that included early retirement type benefits, and that virtually all pension plans he has worked with have an equivalent provision similar to what was in the Plan.  Id. 25:9–17.  Sher testified that an early retirement plan determines eligibility based on a combination of age and service with a participating employer.  Id. 25:24–26:2.  Sher testified that he had never seen an early retirement provision where an employee working for a participating employer who then started working at a non-participating employer was permitted to "age in" to early retirement.  Id. 26:15–27:2.

363.    Second, Sher discussed optional retirement type benefits.  Sher recalled only one situation where a transaction he had seen involved a spin-off and did not recall whether that plan had an optional retirement type provision.  Id. 33:5–10.  The Court strikes Sher's testimony on optional retirement type benefits because he was unfamiliar with a company where spin-off led to this same result and thus, he lacks the experience to provide testimony on this topic.

364.    Third, Sher testified that, in his opinion, the Plan incurred significant costs because after the spin-off, certain Plan participants could start collecting pensions while continuing to work full time at New DuPont, and thus the Administrative Committee's interpretation of the Plan regarding spin-off was not a cost-saving measure.  See id. 25:2–6, 36:1–38:24.  There were 1,022 employees who were "treated as retirees . . . because they were no longer working for a plan sponsor" and who commenced receiving their benefits and collected salaries from their non-participant employer.  Id. 37:6–38:1.  Sher testified, however, that he relied in part on factual assumptions and data from DuPont, did not independently verify the data, and did not do a rigorous

calculation of the costs incurred by Historical DuPont or Corteva by allowing some participants—who are not class members—to commence early retirement benefits at spin-off while also being paid for their current work.  Id. 50:8–23, 51:15–18, 53:2–55:3, 54:18–55:1.

**d.  <u>ADDITIONAL FINDINGS OF FACT</u>**

365.    The Administrative Committee and the Appeals Committee have interpreted the Early Retirement Benefit and Optional Retirement Benefit in the Plan in the past, including in relation to the 2015 Chemours spin-off.  Ex. J-52; 9/24/24 Day 5 79:4–22, 81:22–82:7, 107:20–25, ECF 280.  But Defendants did not, in trying to support the argument that the 2019 spin-off was consistent with the Administrative Committee's interpretation of the Plan in the past, introduce any evidence to demonstrate how, in 2015, the Administrative Committee interpreted the Plan in light of the Chemours spin-off.  Indeed, the denial of Optional Retirement Benefits to Bilbo after the Chemours spin-off did not rely on the Business Exceptions for its denial.  Ex. D-118 at 2.

366.    Without exception, all of Defendants' testifying employees who were members of the Administrative Committee or present at the November 8, 2018, meeting could not recall the specifics of the meeting.

367.    Without exception, all of Defendants' testifying employees who were members of the Administrative Committee or present at the November 8, 2018, meeting could not recall the circumstances for calling the meeting.

368.    Defendants' testifying employees who were members of the Administrative Committee or present at the November 8, 2018, meeting largely could not recall who asked the Administrative Committee to make a formal interpretation regarding the spin-off.  The only witness who mentioned anyone specific was White, who testified that someone from the legal department may have asked the Administrative Committee to make a formal interpretation. 6/28/24 Day 4 AM Tr. Trans. 8:17–9:19.

369.    While the testifying employees could not recall who asked the Administrative Committee to make an interpretation, the record is clear that <u>someone</u> asked for an interpretation that the spin-off was a Business Exception to Optional Retirement, which was reflected in the memorandum White helped put together.    <u>Id.</u> 7:2–17.    In advance of the meeting, the Administrative Committee was provided with a memorandum which specifically notes that the "Committee is asked to make an interpretation of the pension plan language with respect to the applicability of the Optional Retirement provision in a spin-off."  Ex. J-52; 9/24/24 Day 5 Tr. Trans. 107:20–25, ECF 280.   And not only does this memorandum notify the Administrative Committee that they <u>should</u> make a determination—it also advises them <u>which</u> determination to make: the memorandum states that the "Committee is asked to make a formal interpretation of the plan language [included in the memorandum] to include corporate spin-offs as one of the exceptions to the applicability of Optional Retirement, consistent with past practice and the intent of the plan provisions."  Ex. J-52 at 2.  The memorandum provides the precise analysis that it suggests the Administrative Committee use to justify its decision, noting that "[a]lthough Section IV.D.(1)(c) does not specifically reference a spin-off, past practice has been to treat spin-offs the same as a divestiture, sale, or joint venture, etc.  We did interpret the Plan to include the spin-off of Chemours as falling under this corporate transaction exception to the Optional Retirement provision . . . ."  Ex. J-52 at 1.  Notably, when Defendants questioned these employee witnesses, Defendants did not ask whether anyone provided these employees with instructions about how to interpret the spin-off with regard to Optional Retirement Benefits.

370.    The Plan had a consultant, AON, that was retained by Defendants.  9/24/24 Day 5 Tr. Trans. 8:25–9:4, ECF 280.  Despite AON being responsible for, <u>inter alia</u>, preparing Form

5500s for the Plan, id. 11:2–8, 11:19–22, no party in this case called a witness from AON or admitted any evidence from AON.

371.    Class Members testified at trial that they did not know of a single employee who was permitted to "age into" eligibility for Early Retirement Benefits after "separating" their employment from an employer who participated in the Plan.  See, e.g., 6/26/24 Day 2 PM Tr. Trans. 227:15–28:12, ECF 246.

372.    Plan participants did not have a decision to make with respect their employment— that is, employees could not choose which of the three companies they wanted to work for or whether to stay employed by an employer participating in the Plan.  6/27/24 Day 3 AM Tr. Trans. 100:11–101:1, ECF 242. This is because Defendants instituted a freeze on all internal job transfers (known as "ring-fencing") in October 2018 in anticipation of the spin-off.  See, e.g., 6/26/24 Day 2 PM Tr. Trans. 24:16–20, 27:7–11, ECF 246.

373.    The Court finds that there was evidence of some efforts by Defendants to mitigate structural conflict of interest.  6/27/24 Day 3 AM Tr. Trans. 74:25–75:2, ECF 242; 6/26/24 Day 2 PM Tr. Trans. 100:16–101:1, ECF 246.  Defendants distributed fiduciary duties among two Committees and a third-party claims administrator.  6/27/24 Day 3 AM Tr. Trans. 32:3–13; 72:13– 74:1, ECF 242.  Committee members were not compensated for their service.  Id. 74:25–75:2. Committee members received ERISA fiduciary trainings.  9/24/24 Day 5 Tr. Trans. 65:9–24, ECF 278.

374.    Defendants communicated to Class Members—and Class Members could access— information related to the impact of the spin-off on Plan benefits, including but not limited to SPDs, a call center, FAQs, human resources personnel, PowerPoint Presentations, and various portals.  See, e.g., 2018 SPD, Ex. J-10; Exs. J-54, P-8, P-11, P-12; 9/24/24 Day 5 Tr. Trans. 25:10-

28:19, ECF 278.  Notably, however, the SPD was silent on the spin-off or its impacts on Plan

benefits.  See 2018 SPD, Ex. J-10 at 3–28; Robert Cockerill Level I and Level II Appeals and

Denials (including 2019 SPD), Ex. J-2 at 414–501; supra ¶ 103.

375.    Class members acknowledged they had access to many of the communications, but

testified they largely did not review these communications.  See, e.g., 6/28/24 Day 4 AM Tr. Trans.

44:8-16, ECF 243.   At trial, the Court heard testimony from five Plan participants: Robert

Cockerill, Daniel Barish, Darrell Benson, Oliver Major, and Bruce Carter.  With the exception of

some SPDs, the participants generally testified that they did not read the communications from the

Plan, Plan sponsor, or their employers prior to the spin-off.  6/26/24 Day 2 AM Tr. Trans. 58:4–7;

64:4–8, ECF 241; 6/26/24 Day 2 PM Tr. Trans. 69:1–8, ECF 246; 6/27/24 Day 3 PM Tr. Trans.

51:7–13; 52:2–6, ECF 247; 6/28/24 Day 4 AM Tr. Trans. 76:19–77:1, ECF 243.  But this Court

finds, in agreement with numerous Class Members who testified at trial, that the Plan owed them

more information about their benefits after the spin-off and that Defendants' communications were

often unclear, inconsistent, and misleading.

376.    The Court finds that even if Plaintiffs had reviewed all of the communications and

Plan documents from Defendants, trial testimony shows it is unlikely they would have clearly

understood the impact of the spin-off on their benefits due to the confusing and unclear nature of

the communications.  See, e.g., supra n.5, 6, 7, 8, 16; supra ¶¶ 76–78, 113, 117–119, 333, 347.

377.    Prior to the spin-off, Historical DuPont transferred a portion of its business, assets,

and employees to Specialty Products. 6/26/24 Day 2 AM Tr. Trans. 58:4–7; 64:4–8, ECF 241.

Specialty Products later became a subsidiary of New DuPont on June 1, 2019, as part of the spin-

off.  6/27/24 Day 3 PM Tr. Trans. 51:7–13; 52:2–6, ECF 247.  Employees were notified that they

were being transferred via an email requiring the employees to acknowledge their new employer via DocuSign.  Stipulated Facts, Ex. P-83 ¶ 4, ECF 238.

378.    It was within Defendants' discretion to engage in corporate restructuring, including the spin-off, for business reasons.  6/25/24 Day 1 PM Tr. Trans. 37:4–38:02, 62:1–62:13, ECF 245; Fanandakis Dep. 58:1–59:3, ECF 255-2.

379.    Defendants left the Plan with Historical DuPont, which became a subsidiary of Corteva, because Corteva would likely be the most stable of the spun-off companies and splitting up the Plan among business divisions would not be administratively feasible.  Fanandakis Dep. 130:10–130:15, 131:10–131:24, ECF 255-2.  There was no evidence that employees remained as employees of an employer participating in the Plan (i.e., sent to Corteva) or separated from the Plan (i.e., sent to New DuPont or Specialty Products) based on eligibility (or lack of eligibility) for Early Retirement or Optional Retirement, but rather the evidence showed that employees were placed with their new post spin-off employer based on their business divisions.  Ex. D-32.

380.    The Plan was not formally amended as part of the merger or the spin-off.  6/27/24 Day 3 AM Tr. Trans. 71:13–24, ECF 242.

## II.    CONCLUSIONS OF LAW RE: LIABILITY

### a.    Counts I And II—Denial of Benefits

#### i.    Overview of Counts I and II

381.    Counts I and II are brought under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).  Second Am. Compl. ¶ 119, ECF 102.

382.    For Count I, Plaintiffs, on behalf of the Early Retirement Class, seek clarification that Early Retirement Benefits are available to individuals who were under age 50 with at least 15 years of service with Historical DuPont and transferred to New DuPont at the time of spin-off, and that the Administrative Committee abused its discretion in interpreting the Plan to prevent those

individuals from aging into Early Retirement Benefits following the spin-off.  Id. ¶ 121.

383.    For Count II, Plaintiffs, on behalf of the Optional Retirement Class, seek clarification that they are entitled to Optional Retirement Benefits after the spin-off since their employment with Historical DuPont was terminated at spin-off under the Plan.  ECF 136 at 14.

### ii.    Legal Standard

#### a.    Claims for Benefits Based on ERISA Plan Terms

384.    Under 29 U.S.C. § 1132(a)(1)(B), plan participants may sue to reinstate improperly denied benefits.  A claim for benefits under ERISA § 502(a)(1)(B) is an assertion of a contractual right.  Burstein v. Ret. Account Plan for Emps. of Allegheny Health Educ. & Rsch. Found., 334 F.3d 365, 381 (3d Cir. 2003); see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112–13 (1989).  Thus, claims for benefits based on a plan's terms are governed by federal common law contract principles.  Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 76 (3d Cir. 2011).

385.    The Court must adhere to the ERISA record rule, under which judicial review of an ERISA fiduciary's discretionary adverse benefit decision is confined to the information contained in the administrative record.  Noga v. Fulton Fin. Corp. Emp. Benefit Plan, 19 F.4th 264, 271 (3d Cir. 2021) (citing Howley v. Mellon Fin. Corp., 625 F.3d 788, 793 (3d Cir. 2010).

386.    Where plan documents grant discretionary authority to an administrator or fiduciary "to determine eligibility for benefits or to construe the terms of the plan, then the Court reviews the administrator's decision on a more deferential basis"—arbitrary and capricious review—rather than de novo review.  Dowling v. Pension Plan for Salaried Emps. of Union Pac. Corp. & Affiliates, 871 F.3d 239, 245 (3d Cir. 2017) (internal quotations and citations omitted); Saltzman v. Indep. Blue Cross, 384 F. App'x 107, 111 (3d Cir. 2010) (non-precedential) (citing Gritzer v. CBS, Inc., 275 F.3d 291, 295 (3d Cir. 2002)).  Here, the Plan grants discretionary authority to, inter alia, the Administrative Committee, and thus arbitrary and capricious review applies.

Plaintiffs have not proven that there was a breach of discretionary authority.

387.    Contract principles require that the Court first look at the plan's plain language.  Bill Gray Enters. v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001), abrogated on other grounds by Hawks v. PNC Fin. Servs. Grp. Inc., 2024 WL 3664599 (3d Cir. Aug. 6, 2024) (non-precedential).

388.    If the plan language is unambiguous, the administrator's interpretation controls so long as the interpretation does not controvert the plain language of the plan.  Gaines v. Amalgamated Ins. Fund, 753 F.2d 288, 289 (3d Cir. 1985).  When plan terms are clear, the Court must consider whether the administrator or fiduciary's interpretation was arbitrary and capricious by considering "whether the administrator acted within the scope of the plan's unambiguous terms" Bergamatto v. Bd. of Trustees of the NYSA-ILA Pension Fund, 933 F.3d 257, 264 n.12 (3d Cir. 2019) (internal quotations and citations omitted), and whether the interpretation is reasonably consistent with the Plan's text.  Dowling v. Pension Plan for Salaried Emps. of Union Pac. Corp. & Affiliates, 871 F.3d 239, 245 (3d Cir. 2017) (quoting Fleisher v. Standard Ins. Co., 679 F.3d 116, 121 (3d Cir. 2012)).  In sum, an administrator's interpretation is not arbitrary if it is "reasonably consistent with unambiguous plan language." Fleisher, 679 F.3d at 121 (quoting Bill Gay Enters., 248 F.3d at 218).

389.    If the plan language is ambiguous based on the principles of contract interpretation—meaning it is subject to reasonable alternative interpretations—the Court must evaluate whether the administrator's interpretation of the plan was arbitrary and capricious. Bergamatto, 933 F.3d at 264.  The Court will defer to the administrator's interpretation unless it is arbitrary and capricious. Id. Numerous factors guide this evaluation including:

(1) whether the interpretation is consistent with the goals of the Plan;
(2) whether it renders any language in the Plan meaningless or internally inconsistent;
(3) whether it conflicts with the substantive or procedural requirements of the ERISA statute;
(4) whether the relevant entities have interpreted the provision at issue consistently; and
(5) whether the interpretation is contrary to the clear language of the Plan.

Howley, 625 F.3d at 795.

390.    Additionally, as part of the "arbitrary and capricious" analysis, the Court should consider structural conflicts of interest.  Howley, 625 F.3d at 793.  "When the same entity administers a plan and pays the benefits due under the plan, it has a structural conflict of interest." Noga, 19 F.4th at 276.  While the Court is bound to the administrative record for Counts I and II, it may consider evidence outside the administrative record if bias or conflict of interest information is omitted from the administrative record.  Id. at 273–76.  The existence of a "conflict alone does not render a fiduciary's adverse benefit determination an abuse of discretion."  Id. at 276.  Rather, a conflict is one factor to consider, particularly where procedural irregularities align with an administrator's financial incentives.  Id. (quoting Firestone Tire & Rubber Co., 489 U.S. at 115).

### iii.    Count I—Early Retirement Benefits

391.    Count I is brought under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Second Am. Compl. ¶ 119, ECF 102.  Plaintiffs, on behalf of the Early Retirement Class, seek clarification that Early Retirement Benefits are available to individuals who were under age 50 with at least 15 years of service with Historical DuPont and transferred to New DuPont at the time of the spin-off, and ask this Court to find that the Administrative Committee abused its discretion in interpreting the Plan to prevent Early Retirement Class Members from aging into Early Retirement Benefits following the spin-off.  Id. ¶ 121.

392.    This Court finds, based on the administrative record, that the term "employee" in the Plan is ambiguous as a matter of law, but that Defendants' interpretation of "employee" in the context of the Early Retirement Benefit was not arbitrary and capricious.  This Court finds against Plaintiffs on Count I.

### a.   "Employee" Is Ambiguous

393.    This Court begins where its Memorandum on summary judgment left off—the term "employee" is ambiguous.  See Cockerill v. Corteva, Inc., 2024 WL 3049553, at *8 (E.D. Pa. June 17, 2024) (Baylson, J.)

394.    The term "employee" is subject to multiple interpretations, including former and/or current employees.  See supra ¶¶ 332–333.  The Plan defines an employee as "all employees of [Historical DuPont] hired on or before December 31, 2006."  Historical DuPont Pension and Retirement Plan, Ex. P-1 at Title I § Title IX.A(1)(a).  That language is similar to ERISA's statutory definition of "employee," which the Supreme Court has unsparingly determined is "circular and explains nothing."  Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992).  The Supreme Court and various district courts have found that the term "employee" is ambiguous with respect to current or former employees.  Robinson v. Shell Oil Co., 519 U.S. 337, 341–44 (1997); see Colburn v. Hickory Springs Mfg. Co., 448 F. Supp. 3d 512, 525–27 (E.D.N.C. 2020) (applying Robinson's holding in the ERISA context).

395.    Defendants' main argument—that the word "employees" in the Early Retirement section of the Plan only refers to current employees—is that some sections of the Plan distinguish between current and former employees, whereas the Early Retirement section of the Plan only refers to current employees.  However, those sections in which the Plan distinguishes between employees and former employees are not at issue here, and reinforce, rather than resolve the ambiguity.

98

396.     Indeed, once "it is established that the term 'employees' includes former employees in some sections [of a document], but not in others, the term standing alone is necessarily ambiguous." Robinson, 519 U.S. at 343; see Colburn, 448 F. Supp. 3d at 525–27.

397.     Title I § IV of the Plan refers to "employees" who have retired.  Historical DuPont Pension and Retirement Plan, Ex. P-1 at Title I §§ IV.D, IV.E.  This language plainly includes some former employees within the definition of "employees."  Id.  Thus, at least some former Historical DuPont employees are encompassed by the term "employee" in the Plan, rendering the use of "employees" in the Early Retirement section ambiguous.  Robinson, 519 U.S. at 343; see Colburn, 448 F. Supp. 3d at 525–27.

398.     Under the "Normal Retirement" provision of the Plan, an "employee will be eligible for Normal Retirement after reaching age 65 with at least 15 years of service."  Historical DuPont Pension and Retirement Plan, Ex. P-1 at Title I § IV.A(1).  Defendants do not contest that the named Plaintiffs are eligible for "Normal Retirement," even though Defendants consider the named Plaintiffs to be former employees of Historical DuPont.  By Defendants' own position, at least some former employees of Historical DuPont are encompassed by the term "employee" in some sections of the Plan.  Robinson, 519 U.S. at 343; see Colburn, 448 F. Supp. 3d at 525–27.

399.     Only one page later, also in Title § IV, the Plan describes the Early Retirement Benefit in strikingly similar language—"[a]n employee will be eligible for Early Retirement after reaching age 50 and prior to reaching age 65 with at least 15 years of service."  Pension and Retirement Plan, Ex. P-1 at Title I § IV.B(1).  Yet when considering the Early Retirement Benefit, Defendants take the opposite position:  "employee" in  Title I § IV.B(1) means only current employees.  See 9/24/24 Day 5 Tr. Trans. 93:2–95:10, ECF 280; supra ¶¶ 333, 333.

400.    Based on Defendants' interpretation of the Plan, the term "employee" in Title I § IV.B(1) does not include former employees, whereas the term "employee" in Title I § IV.A(1) includes both current and former employees.  This renders the use of "employee" ambiguous in the Plan.  <u>Robinson</u>, 519 U.S. at 343.  Further, there is no language in the Plan which unambiguously defines "employees" as currently employed.  <u>Id.</u> 95:23–96:17.  The term "employee" in the Plan is ambiguous as a matter of law.  <u>See id.</u> at 341–44.[19]

### b.  Defendants' Interpretation of "Employee" Was Not Arbitrary and Capricious

401.    Because the term "employee" is ambiguous in the Plan, the Court must evaluate whether the Administrative Committee's interpretation of the term "employee" was arbitrary and capricious.  <u>Bergamatto</u>, 933 F.3d at 264.  Based on the <u>Howley</u> factors and the insignificance of structural conflict, the Court defers to the administrator's interpretation of "employee" for the Early Retirement Benefit, and holds that it was not arbitrary and capricious.

402.    The Court's analysis applies an arbitrary and capricious standard of review to Defendants' interpretation. <u>Dowling</u>, 871 F.3d at 24.  Moreover, since the Plan grants discretionary authority to the Administrative Committee "to determine eligibility for benefits or to construe the terms of the plan," the Court reviews the Administrative Committee's decision "on a more deferential basis." <u>Dowling,</u> 871 F.3d at 245 (internal quotations and citations omitted).

403.    The Court holds that it was reasonable for Defendants to interpret the term "employee" as used in relation to the Early Retirement Benefit as meaning only current employees.  Early Retirement Benefits are "triggered" only once an employee reached age 50 with at least 15 years of experience while still working for Historical DuPont or a participating employer.

---

[19] Having noted that, the term "employee" is by no means unambiguous in favor of Plaintiffs' position either.

### 1. <u>Howley</u> Factors

404.     Four of the five <u>Howley</u> factors heavily favor Defendants.

405.     First, and importantly, a fulsome review of the Plan's language and structure favors Defendants' position under factors one and two of <u>Howley</u>.  While "employee" is ambiguous, <u>see supra</u> ¶¶ 390–397, the architecture of the Plan's benefits and the Plan's language suggests Early Retirement is only available once a <u>current</u> employee reaches age 50.

406.     Title I § V of the Plan describes the "Vested Right to Deferred Pension."  A Vested Deferred Pension benefit is available for an employee whose employment is "terminated" with Historical DuPont who (1) "has had at least 5 years of service" or (2) "has reached [age 65.]" Historical DuPont Pension and Retirement Plan, Ex. P-1 at Title I § V.A(1).  Critically, employees with 15 or more "years of service <u>at termination</u>" are eligible for a reduced Vested Deferred Pension benefit beginning at age 50.  <u>Id.</u> (emphasis in original).  As the Plan document describes, the reduction factors for the Deferred Pension benefit are categorically worse for a Plan participant than Early Retirement.  <u>Id.</u> at Title I § V.B(1).  For Early Retirement Class Members, the difference in those benefits could have amounted to hundreds of thousands of dollars.  <u>See supra</u> ¶¶ 41, 164, 217, 228.

407.     But reading the Plan holistically, the existence of the Vested Deferred Pension Benefit reveals that Defendants' interpretation of the Plan aligns with its intent, which was for Early Retirement to "trigger" only for employees who attain age 50 and 15 years of service while still working under the Plan (thus qualifying as "current" employees).

408.     If an employee under age 50 with 15 years of service could leave Historical DuPont and commence the Early Retirement Benefit once he or she later reached 50 while working for another employer, the Deferred Vested Benefit would be superfluous.  Given the difference in the

amount benefits, see supra ¶ 403, that hypothetical employee with over 15 years of service under the Plan would never elect for the Vested Deferred Benefit over the Early Retirement Benefit.

409.    Under Early Retirement, a 58-year-old plan participant with at least 27 years of service under the Plan could receive a full, unreduced pension benefit.  With the Deferred Benefit, that same participant would need to reach age 65 before receiving an unreduced benefit. Defendants' offered distinction to explain why one employee would be eligible for Vested Deferred Benefits, and another Early Retirement Benefits, is that Early Retirement only "kicks in" when an employee reaches age 50 while still working for Historical DuPont (or a participating employer).  2018 SPD, Ex. J-10 at 21–22.  This is a logical explanation, and is not arbitrary and capricious.  Thus, Howley factors one and two strongly favor Defendant's interpretation.

410.    Factor five of the Howley test also favors Defendants because this interpretation is not contrary to Plan language, which as stated supra ¶¶ 390–397, is ambiguous as to "employee."

411.    Nor did Plaintiffs introduce evidence to support a conclusion that the term "employee" was interpreted in this way to prevent the Early Retirement Class from obtaining Early Retirement Benefits.[20]  Rather, Defendants established that denying the Early Retirement Benefit to spun-off employees who had not reached age 50 as of May 31, 2019, was consistent with past practice.  Early Retirement under the Plan has consistently been afforded only to employees who reached age 50.  Defendants' employees Durkovic, Dineen, Fitzpatrick, and White credibly testified that Early Retirement was only available to employees who remained with Historical DuPont through age 50.  See supra ¶¶ 119, 280, 315, 317–318, 332; 9/24/24 Day 5 Tr. Trans.

---

[20] As discussed infra, the only evidence that Plaintiffs point to in order to support the claim that Class Members were transferred to New DuPont—no longer was a participating employer— for the purpose of denying Early Retirement Benefits was Breen's testimony.  11/25/24 Oral Arg. Trans. 23:19–26:19, ECF 308.

71:17–72:1, 78:5–13, 81:9–14; 84:6–12, ECF 280; 6/27/24 Day 3 AM Tr. Trans. 10:1–9, 15:1–17,

78:7–14, 84:9–15, ECF 242.  All Plaintiffs who testified agreed that they were not aware of an

employee who had left Historical DuPont before age 50 who "aged into" Early Retirement.  See

supra ¶ 368; see, e.g., 6/26/24 Day 2 PM Tr. Trans. 27:15–29:14, 81:1–5 ECF 246.

412.    The Administrative Committee's interpretation of the term "employee" was not

arbitrary and capricious where it was consistent with past practice.

### 2.  Structural Conflict of Interest

413.    While a structural conflict of interest is present—Defendants are responsible for

both administering and financing the Plan—it cannot make out Plaintiffs high burden to show that

Defendants' denial of the Early Retirement Benefit was arbitrary and capricious.  A structural

conflict of interest is weighed together with "procedural irregularities" which "gain significance

the more closely . . . they align with the financial incentives that create a structural conflict of

interest."  Noga, 19 F.4th at 276.

414.    Without considering the Plan's finances—which the parties agreed is irrelevant—

Plaintiffs only extrinsic evidence for evaluating a structural conflict of interest was that this

interpretation of "employees" was a money-saving measure since around 50% of active plan

participants went to New DuPont at spin-off, thus ceasing their participation in the Plan, while

only 40% active participants went to Corteva, the continuing sponsor.[21]  See supra ¶ 0; 6/25/24

Day 1 PM Tr. Trans. 61:6–17, ECF 245; 6/27/24 Day 3 AM Tr. Trans. 75:11–25, ECF 242.

415.    The Court finds this structural conflict of interest negligible, and notes that it does

not heavily favor Defendants or Plaintiffs.

---

[21] As noted, the Court is permitted to consider extrinsic evidence in evaluating a structural
conflict of interest.  See Noga v. Fulton Fin. Corp. Emp. Benefit Plan, 19 F.4th 264, 272–76 (3d
Cir. 2021).

416.    The record is scant for procedural irregularities in denying Plaintiffs' claim to outweigh the Howley considerations.  The explanation for the denial of Early Retirement Benefits remained consistent—employees who had not reached age 50 while working for Historical DuPont were not eligible for Early Retirement.  Defendants clearly intended this result before the spin-off and provided the same rationale post spin-off in Cockerill's internal appeal process.  See supra ¶ 169; c.f., Noga, 19 F.4th at 276–79.

### c.    Even if "Employee" Is Unambiguous, the Administrative Committee's Interpretation Does Not Controvert the Plan's Plain Language

417.    Notably, even if "employee" as used in the Plan was unambiguous, the Administrative Committee's interpretation of the term "employee" controls because it does not controvert the plain language of the Plan.  Gaines, 753 F.2d at 289.

418.    If the term "employee" was clear, this Court would still find that the Administrative Committee's interpretation of "employee" as meaning only a current employee was not an arbitrary and capricious interpretation.  In considering "whether the administrator acted within the scope of the plan's unambiguous terms," this Court finds that the Administrative Committee's denial of Early Retirement Benefits to employees under age 50 at the time of the spin-off was "straightforward Plan execution" based on an interpretation within the scope of the Plan's unambiguous terms.  Bergamatto, 933 F.3d at 264 n.12 (internal quotations and citations omitted).

419.    Plaintiffs failed to present sufficient evidence to show that the spin-off was designed or intended to precent employees from being able to obtain Early Retirement Benefits.

### iv.    Count II—Optional Retirement Benefits

420.    Count II is brought under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Second Am. Compl. ¶ 119, ECF 102.  Plaintiffs, on behalf of the Optional Retirement Class, seek clarification that they are entitled to Optional Retirement Benefits after the spin-off since their

employment with Historical DuPont was terminated at spin-off under the Plan.  ECF 136 at 14.

421.    Defendants concede that the Plan language does not unambiguously support their position.[22]  This Court finds that the Plan language unambiguously requires Optional Retirement Benefits and that the Administrative Committee's interpretation of Optional Retirement Controverts the Plan's plain language.  This Court finds in favor of Plaintiffs on Count II.[23]

### a. The Plan Language Unambiguously Requires Optional Retirement

422.    The Optional Retirement Benefit criteria are clear and the Plan's language on Optional Retirement Benefit is unambiguous.  An employee who meets the "50 and 15" criteria is eligible for Optional Retirement "if his employment would otherwise be involuntarily terminated for reasons other than discharge for dishonestly, insubordination or other misconduct."  Historical DuPont Pension and Retirement Plan, Ex. P-1 at Title I § IV.D(1)(a).

423.    The Plan carves out four exceptions to Optional Retirement.  "[A]n employee will not be eligible for Optional Retirement" when:

> (1) as of October 15, 1994, "the employee is offered and accepts employment with the buyer of joint venture at the site [of employment] in conjunction with a sales agreement between [Historical DuPont] and a buyer of company assets or in conjunction with the formation of a joint venture; or"
>
> (2) "the employee is offered and refuses employment with the buyer or joint venture at the site [of employment] . . . unless the offer is less than 80% of the employee's [Historical DuPont] wage or salary level or the rejection results in a job for another employee who would otherwise have been terminated for lack of work."
>
> (3) "the employee is transferred to or employed by a wholly-owned subsidiary of [Historical DuPont], or is transferred to or employed by a subsidiary of [Historical DuPont] or a joint venture in which [Historical DuPont] participates that recognizes [Historical DuPont] service[;]" or,

---

[22] The Plan does not reference "spin-offs" as a Business Exceptions to triggering Optional Retirement Benefits.

[23] As discussed <u>infra</u>, even were the Optional Retirement language in the Plan ambiguous, the Administrative Committee's interpretation was arbitrary and capricious.

> (4) as of April 15, 1997, "the employee is offered and accepts similar employment at the site with a service provider which is providing or will provide services to [Historical DuPont] pursuant to a service agreement with [Historical DuPont]; or the employee is offered and refuses similar employment at the site [of employment] . . . unless the offer is less than 80% of the employee's [Historical DuPont] wage or salary level or the rejection results in a job for another employee who would otherwise have been terminated for lack of work.

Id. Title I § IV.D(1)(c)–(d).

424.    Finally, Title I § XIII of the Plan exempts seven business transactions from the exceptions to Optional Retirement, meaning that the specified transactions still permit Optional Retirement.[24]  That is, these seven transactions would otherwise fall into one of the exceptions to Optional Retirement (asset or business sales, servicing agreements), but Defendants chose to amend the Plan to allow employees involved in these transactions to remain eligible for Optional Retirement Benefits.  Id. Title I § XIII.

425.    The Plan language does not mention corporate spin-offs, and thus necessarily does not differentiate a spin-off from other events like asset sales, joint ventures, or parent-subsidiary agreements, which are unambiguously delineated exceptions to Optional Retirement in Title I § IV.D(1)(c)–(d) of the Plan.

426.    Unlike asset sales, joint ventures, or servicing agreements—which involve third party buyers engaging in a business mechanism—a spin-off is an internal reorganization that retains ownership within the same corporate group, Tronox Inc. v. Kerr McGee Corp., 503 B.R. 239, 255–59 (Bankr. S.D.N.Y. 2013) (discussing differences between a sale and spin-off); see B. Bittker & J. Eustice, FEDERAL INCOME TAXATION OF CORPORATIONS AND SHAREHOLDERS ¶ 11.01[2][a] (Warren, Gorham & Lamont, 7th ed. 2000) (noting that a "spin-off" is a transaction in which a corporation distributes to all its shareholders, pro rata, the stock of a subsidiary); Gada v.

---

[24] See supra n.2.

U.S., 460 F. Supp. 859, 863–64 (D. Conn. 1978) ("[F]ollowing a spin off, the shareholders as a group own the same bundle of assets as they did prior to the spin off, but in a different corporate form.").

427.    Defendants did not and cannot identify any Plan language or evidence in the administrative record that qualifies the spin-off as included within any written terms like "asset sale," "joint venture," or "parent-subsidiary."  See Bohler-Uddeholm, 247 F.3d at 94 n.3.

428.    The Court concludes, for the reasons stated above, that Optional Retirement is available to the Optional Retirement Class Members who lost employment with Historical DuPont due to the spin-off, which simply was not a business sale, joint venture, or parent-subsidiary transaction under the unambiguous language in the Plan.

### b. The Administrative Committee's Interpretation of Optional Retirement Controverts the Plain Language of the Plan

429.    Since this Court finds that the Plan language is unambiguous, it must next evaluate whether the Administrative Committee's interpretation of the Optional Retirement Benefit controverts the plain language of the Plan.  Gaines, 753 F.2d at 289.  It does.[25]

430.    Here, the Administrative Committee's interpretation was not within the scope of the Plan's unambiguous language.  Bergamatto, 933 F.3d at 264.  The Plan's language and the administrative record do not align with Defendants' interpretation.  A contract cannot "hide elephants in mouseholes."  Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001).  The Plan document is silent as to spin-offs, let alone any corporate transaction as transformative as the merger and spin-off that occurred between 2017 and 2019.  The Administrative Committee's

---

[25] "While review under the arbitrary and capricious standard is extremely deferential, it is not without 'some teeth' and does not mean 'no review.'"  Schlear v. Carpenters Pension & Annuity Fund of Phila. & Vicinity, 2023 WL 3569971, at *4 (E.D. Pa. May 18, 2023) (citing Clauss v. Geisinger Health Plan, 196 F. Supp. 3d 463, 474 (M.D. Pa. 2016)).

interpretation of the Business Exceptions in the Plan document, last updated in 2015, to include an event as substantial as the merger and spin-off is, at best, a post-hoc rationalization.

431.    Defendants cannot point to anything specific in the administrative record—whether Plan language or otherwise—indicating that Optional Retirement Benefits were meant only for employees who suffered an "actual" employment loss.  The Plan is, once again, silent.  Rather, undercutting Defendants' position, an Optional Retirement eligible employee who lost his job at Historical DuPont but acquired work elsewhere could "double-dip" under the terms of the Plan. 9/24/24 Day 5 Tr. Trans. 178:20–179:14, ECF 280.  This means that an employee could work in a new job while collecting an Optional Retirement Benefit, indicating that the purpose of Optional Retirement reached much further than only providing enhanced pensions to employees who had "actual" employment loss.

432.    In no way is the Administrative Committee's interpretation of the Plan as excluding spin-offs from the Optional Retirement Benefit "reasonably consistent with unambiguous plan language," which makes clear that only the designated business transactions are Business Exceptions to Optional Retirement.  Fleisher, 679 F.3d at 121 (quoting Bill Gay Enters., 248 F.3d at 218).  Thus, the Administrative Committee's interpretation of the Optional Retirement Benefit was arbitrary and capricious since it is not "reasonably consistent with unambiguous plan language."  Fleisher, 679 F.3d at 121 (quoting Bill Gay Enters., 248 F.3d at 218).

### c.  Even if the Plan Language Were Ambiguous, Defendants' Denial of Optional Retirement to Class Members Was Arbitrary and Capricious

433.    While this Court believes, for the reasons stated above, that the Optional Retirement language in the Plan is unambiguous, this Court would come to the same result—that Defendants are liable under Count II—even if the Plan language were ambiguous.

434.    If the Plan language were ambiguous, Defendants' denial of the Optional Retirement Benefit was arbitrary and capricious considering the <u>Howley</u> factors and Defendants' structural conflict of interest, significant procedural irregularities, changing bases for denying Optional Retirement, and denial of Optional Retirement Benefits.  The most potent seeds of Defendants' abuse of discretion germinate in their varied, shifting, and contradictory justifications for denying the Optional Retirement Benefit.  These procedural irregularities, coupled with the financial conflict of interest discussed <u>supra</u>, reveal bias.

435.    Inconsistencies were rampant throughout and following the spin-off.

436.    When Cockerill made a claim for an Optional Retirement Benefit, Defendants first denied his claim because he was "terminated due to the divestiture and not due to lack of work[.]"  Robert Cockerill Level I and Level II Appeals and Denials, Ex. J-2 at 703.  However, in response to Cockerill's appeal, the Appeals Committee changed its tune.  In denying Cockerill's appeal, the Appeals Committee stated that it

> reviewed the applicability of the Optional Retirement provision . . . and determined that Optional Retirement is not applicable when employment is terminated in connection with a corporate spin-off, consistent with the intent of the Plan provisions and consistent with past practice.  You are therefore not eligible for the Optional Retirement benefit as you did not terminate employment due to lack of work, but due to the corporate spin-off activity.

<u>Id.</u> at 720–21.

437.    Similar discrepancies dot Major and Benson's claims for Optional Retirement Benefits.  For Major, the Appeals Committee denied him Optional Retirement Benefits because he was not involuntarily terminated "due to lack of work."  However, by the language of the Plan itself, for a Plan participant like Major ("50 and 15"), involuntary termination triggered Optional Retirement so long as it was not for dishonesty, insubordination, or other misconduct, or subject to a Business Exception.  Oliver Major Level I and Level II Appeals and Denials, Ex. J-4 at 1–4,

99–100.  Once again, the Appeals Committee did not rely on its spin-off interpretation to explain Major's denial of Optional Retirement Benefits.

438.    Only Benson, who applied for Optional Retirement in mid-2023—after Plaintiffs filed this lawsuit—received a denial consistent with Defendants' explanation at trial that the Administrative Committee interpreted spin-offs as a Business Exception.  See Darrell Benson Level I and Level II Appeals and Denials, Ex. J-3 at 4–6, 22–27.

439.    The Administrative Committee's interpretation of "spin-off" in relation to Title I § IV.D.(1)(c) of the Plan contradicts Defendant's own internal description of the spin-off.  The weight of evidence shows that Defendants abused their discretion in denying the Optional Retirement Benefit to the Optional Retirement Class Members.

### b.  Count IV—Breach of Fiduciary Duty[26]

#### i.    Overview of Count IV

440.    Count IV is brought under ERISA §§ 404(a) and 405(a), 29 U.S.C. §§ 1104–05. Second Am. Compl. ¶¶ 135–143, ECF 102.

441.    Under Count IV, Plaintiffs assert, on behalf of the Early Retirement Class and Optional Retirement Class, that Defendants breached their fiduciary duties by misinforming Plaintiffs and omitting information that would have explained the effect of the spin-off on Early Retirement and Optional Retirement Benefits to Plaintiffs.  29 U.S.C. §§ 1104–05.

---

[26] As noted in its Summary Judgment Memorandum, See Cockerill v. Corteva, Inc., 2024 WL 3049553, at *14 (E.D. Pa. June 17, 2024) (Baylson, J.), and Class Certification Memorandum, Cockerill v. Corteva, Inc., 345 F.R.D. 81, 116–17 (E.D. Pa. 2023) (Baylson, J.), this Court rejected Defendants' argument that Plaintiffs Benson, Major, and certain Class Members, must have not exhausted administrative remedies.  Counts IV and V do not require exhaustion, nor does Plan require exhaustion.  Exhaustion would be futile for all Class Members because Defendants adopted a fixed policy to deny certain to all Class Members.  Id. at 115–17.

442.     According to Plaintiffs, "ERISA Section 405(a), 29 U.S.C. § 1105(a), imposes

liability on a fiduciary, in addition to any liability under any other provision of ERISA, for a breach

of fiduciary responsibility of another fiduciary with respect to the same plan if the fiduciary knows

of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach" and

"ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a plan participant to file suit to

obtain injunctive or other appropriate equitable relief to remedy violations of ERISA." Id. ¶ 138.

443.     Count IV is pled in the alternative to Counts I and II.[27]  Second Am. Compl. ¶¶

135–143, ECF 102.  While Defendants argue that this Court's ruling on Count II moots Counts

IV, V, and VI with regard to the Optional Retirement Class, ECF 314 at 2, neither the Supreme

Court nor the Third Circuit have held that this Court is required to remain silent on these alternative

counts.  The Third Circuit has stated that  "a plaintiff who 'presents a number of alternative legal

theories, but whose recovery is limited to only one of them, has only a single claim." Allegheny

Cnty. Sanitary Auth. v. U.S.E.P.A., 732 F.2d 1167, 1172 (3d Cir. 1984) (citing Page v.

Preisser, 585 F.2d 336, 339 (8th Cir. 1978)).  But the Third Circuit has not prohibited district courts

---

[27] Although Plaintiffs pled Count IV (among other Counts) in the alternative to Counts I and II, neither the Supreme Court nor the Third Circuit has held that "claims for recovery of benefits under § 1132(a)(1)(B) [Counts I and II] and equitable relief under § 1132(a)(3) [Count IV] are mutually exclusive." Parente v. Bell Atl. Pa., 2000 WL 419981, at *2 (E.D. Pa. Apr. 18, 2000) (Reed, J.); see Trechak v. Seton Co. Supplemental Exec. Ret. Plan, 2010 WL 5071273, at *5 (E.D. Pa. Nov. 24, 2010) (Baylson, J.) ("The Courts of Appeals disagree as to whether [Varity v. Howe, 516 U.S. 489 (1996)] prohibits a plaintiff from simultaneously pursuing equitable relief pursuant to Section 502(a)(3) and benefits due under the terms of the plan pursuant to Section 502(a)(1)(B).  The Third Circuit has not ruled on the issue . . . .").  As Judge Reed wrote:
> Section 1132(a)(3) provides that an action may be brought 'by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief.' Because plaintiff in this case does not seek to enjoin any of defendants' practices, the issue is whether she seeks 'appropriate equitable relief.'  Nothing in the language of § 1132(a)(3) provides that a plaintiff may not bring a claim under both § 1132(a)(1)(B) and (a)(3).

Parente, 2000 WL 419981, at *2.

from addressing the validity of the alternative theory of liability during the liability portion of a bifurcated trial.[28]

444.    This Court finds that for the reasons stated below, Defendants breached their fiduciary duties to both Classes.  While Plaintiffs are not permitted to recover twice for the same injury, "a plaintiff is only precluded from seeking equitable relief under § 1132(a)(3) when a court determines that plaintiff <u>will certainly receive</u> or <u>actually receives</u> adequate relief for her injuries under § 1132(a)(1)(B) or some other ERISA section."  <u>Parente v. Bell Atl. Pa.</u>, 2000 WL 419981, at *3 (E.D. Pa. Apr. 18, 2000) (Reed, J.) (emphasis in original).  This debate as to recovery for the Optional Retirement Class under Counts II and IV is best addressed during the damages portion of this trial, and is a question on which this Court reserves judgment.  <u>See Lash v. Reliance Standard Life Ins. Co.</u>, 2017 WL 1232177, at *6 (E.D. Pa. Apr. 4, 2017) (Padova, J.) (interpreting <u>Varity v. Howe</u>, 516 U.S. 489 (1996) "to stand for little more than the unremarkable proposition that a plaintiff cannot recover equitable relief under § 1132(a)(3) if she is fully compensated for her loss under § 1132(a)(1).").

### ii.    Legal Standard

445.    "The origin of fiduciary duties has religious and secular roots. These roots were wed by canon lawyers in the medieval era."  Mary Szto, <u>Limited Liability Company Morality: Fiduciary Duties in Historical Context</u>, 23 Quinnipiac L. Rev. 61, 86 (2004-2005).  The U.S. legal system has "proved to be fertile ground for application and development of fiduciary principles."

---

[28] Defendants cite <u>Chase Manhattan Bank v. Iridium Afr. Corp.</u>, 474 F. Supp. 2d 613, 616 (D. Del. 2007) in support of their argument.  But in <u>Chase Manhattan Bank</u>, the District Court noted that it was "not <u>required</u> to address Chase's alternative theories of recovery"—not that it was not <u>permitted</u> to.  <u>Id.</u> (emphasis added); <u>see also</u> <u>Precision Indus. Equip. v. IPC Eagle</u>, 2016 WL 192601, at *10 (E.D. Pa. Jan. 14, 2016) (O'Neill, J.) ("I <u>need not</u> assess defendant's alternate theory of liability for the same damages under an account stated claim because defendant cannot recover those damages twice." (emphasis added)).

Deborah A. DeMott, <u>Beyond Metaphor: An Analysis of Fiduciary Obligation</u>, 37 Duke L.J. 879, 882 (1988).

446.     "Congress enacted ERISA after "almost a decade of studying the Nation's private pension plans" and other employee benefit plans." <u>Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.</u>, 472 U.S. 559, 569 (1985).  "One of Congress' central purposes in enacting this complex legislation was to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid . . . ." <u>Nachman Corp. v. Pension Ben. Guar. Corp.</u>, 446 U.S. 359, 374 (1980).  And, to ensure this tragedy was not suffered, Congress implemented, through ERISA, a "comprehensive and reticulated statute." <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 251 (1993).

447.     As part of implementing ERISA's comprehensive protections, Congress included in ERISA a fiduciary duty framework which seeks to assure "the equitable character" of plans through "strict standards." <u>Cent. States, Se. & Sw. Areas Pension Fund</u>, 472 U.S. at 570–71.  A "fiduciary's duties go beyond mere fairness and honesty; they oblige him to act to further the beneficiary's best interests."  DeMott, <u>Beyond Metaphor: An Analysis of Fiduciary Obligation</u>, 37 Duke L.J. at 882.  As part of these duties, a fiduciary's obligation to disclose material information "is [at] the core of" their duties under ERISA.  <u>Bixler v. Cent. Pa. Teamsters Health & Welfare Fund</u>, 12 F.3d 1292, 1300 (3d Cir. 1993).

448.     In drafting and enacting ERISA, Congress "relied upon the common law of trusts to define the general scope of [the fiduciaries'] authority and responsibility." <u>In re Unisys Corp. Retiree Med. Benefits ERISA Litig.</u>, 579 F.3d 220, 227 (3d Cir. 2009) (internal quotations and citations omitted).  Several of those fiduciary responsibilities, codified in ERISA § 404,[29] prohibit

---

[29] "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
(A) for the exclusive purpose of:

a fiduciary from "materially mislead[ing] those to whom the duties of loyalty and prudence are owed." Id. at 228 (quoting Adams v. Freedom Forge Corp., 204 F.3d 475, 492 (3d Cir. 2000)).

449.    A fiduciary's responsibility is "not only a negative duty not to misinform, but also an affirmative duty to inform when the [fiduciary] knows that silence might be harmful." Id. (quoting Bixler, 12 F.3d at 1300). "When a fiduciary speaks, it must speak truthfully, and when it communicates with plan participants and beneficiaries it must convey complete and accurate information that is material to their circumstance." Id. (internal quotations and citations omitted).

450.    Detrimental reliance is no longer required for an ERISA breach of fiduciary claim. Cockerill, 345 F.R.D. at 109–10. The Third Circuit has held that a fiduciary's duty may arise even without a plan participant's request. Glaziers & Glassworkers Union Loc. No. 252 Annuity Fund v. Newbridge Sec., Inc., 93 F.3d 1171, 1181 (3d Cir. 1996). Some courts have held that a fiduciary duty may arise even without express examination of Plan documents by participants. Est. of Ritzer by Ritzer v. Nat'l Org. of Indus. Trade Unions Ins. Tr. Fund Hosp., Med., Surgical Health Ben., 822 F. Supp. 951, 955 (E.D.N.Y. 1993) ("While many employees may never in fact study [SPDs], they are likely to learn of the provision as explained in the description through conversations with fellow employees and their employer."). Therefore, plan participants' "failure to inquire is not fatal to [their] breach of fiduciary duty claim." Tieri v. Bd. of Trs. of Heavy & Gen. Laborers' Loc. Union 472, 2007 WL 9782941, at *3 (D.N.J. Feb. 21, 2007).

451.    For an ERISA breach of fiduciary duty claim, Plaintiffs must prove that Defendants (1) acted as fiduciaries; (2) made affirmative misrepresentations or failed to adequately inform

---

(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1).

plan participants; and (3) that the misrepresentations or omissions were material. Id. "A misleading statement or omission by a fiduciary" is material if "'there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision,'" Harte v. Bethlehem Steel Corp., 214 F.3d 446, 452 (3d Cir. 2000) (quoting In re Unisys Corp. Retiree Medical Ben. ERISA Litig., 57 F.3d 1255, 1264 (3d Cir. 1995)), or "a harmful decision regarding benefits," Daniels v. Thomas & Betts Corp., 263 F.3d 66, 76 (3d Cir. 2001).[30]

### iii.    Relevant Facts Related to Early Retirement Communications

452.    For ease of understanding, the Court will summarize the relevant findings of fact discussed supra related to Defendants' communications about the impact of the spin-off on Plan benefits for Count IV, specifically as it relates to Early Retirement.

453.    Defendants point to principally two communications that they allege explained that New DuPont employees under age 50 at the time of spin-off could never receive Early Retirement: The FAQ linked in Breen's November 1, 2018, email and the PowerPoint Presentations.

### a.    The FAQ

454.    The first communication, which Human Resources employee White referred Cockerill to in his initial claim for benefits, was a portion of the FAQ hyperlinked in Breen's email:

> 4.  I am currently a participant in DuPont's U.S. Pension Plan and will be an employee of Specialty Products in the US.  How does this affect my pension?
>
> The spin of DuPont and Corteva Agriscience will impact Specialty Products employes as follows:
>
> Since Corteva Agriscience will be the ongoing sponsor of the Plan, Specialty Products employees who participate in the Plan will be eligible to commence their

---

[30] Prior to the Supreme Court's decision in CIGNA Corp. v. Amara, the Third Circuit required plaintiffs to prove detrimental reliance. 563 U.S. 421 (2011); see In re Uniysis Corp. Retiree Med. Benefits ERISA Litig., 579 F.3d 220, 228 (3d Cir. 2009).  As noted in the Class Certification Memorandum, this Court finds that, post-Amara, detrimental reliance is no longer an element of an ERISA § 404(a)(1) cause of action.  Cockerill v. Corteva, Inc., 345 F.R.D. 81, 109–10 (E.D. Pa. 2023) (Baylson, J.).

<u>pension, at spin, if they meet the Plan commencement requirements in terms of age and service.</u>

At spin, future service for Specialty Products employees who participate in the Plan will no longer be recognized in determining eligibility for pension benefits and any applicable early retirement reduction factors. For those employees who qualify for retirement by meeting the Plan's age and service requirements, growth in age will continue to be recognized allowing those participants to age into an improved reduction factor prior to commencing their pension.

Ex. D-33 at 3 (emphasis added). According to Defendants, the underlined language makes clear that "future service" with Specialty Products, now part of New DuPont, is irrelevant for, not only determining an employee's years of service under the Plan, but also their ability to reach the Early Retirement threshold of 50 years old.

### b. The PowerPoint Presentations Linked In The March 2019 Email

455. The second communication which Defendants pointed to as explaining that New DuPont employees under age 50 at the time of the spin-off could never receive Early Retirement Benefits was the March 2019 PowerPoint Presentations. These communications were clearer.

456. The PowerPoint was sent in an email that began with an advertisement, not warning: "As a pension eligible employee moving to 'New' DuPont, you may be eligible to begin collecting your pension benefit as of 6/1/2019 from" the Plan. Ex. J-25.

457. Then, after listing a link to the web portal with the PowerPoints, the email "encourage[d employees] to read the material carefully and consider the best time for [them] to commence [their] pension payment." <u>Id.</u> But for employees who were "unsure of the eligibility requirements" for pension benefits, the email referred them to "the presentations noted above <u>or</u> [the SPD]." <u>Id.</u> (emphasis added). The PowerPoint Presentations were only digitally available, and Defendants presented no evidence of in-person meetings to discuss the impact of the spin-off on benefits.

458.    In the Vested Eligible Presentation, Defendants explained that a Plan participant was "term vested" if they had "**NOT** reached age 50 with at least 15 years of eligible service as of May 31, 2019, when New DuPont is no longer a participating employer in the Plan." Ex. D-85 at 3 (emphasis in original). This presentation then included a slide explaining that "term vested" employees were eligible for Deferred Pension, not Early Retirement benefits. Ex. D-85 at 7–9.

459.    Cockerill testified that when he eventually reviewed this PowerPoint, "alarm bells" went off because he believed it clearly communicated that he would not be eligible for Early Retirement. 6/26/24 Day 2 PM Tr. Trans. 16:1–5, ECF 246; Ex. J-28.

460.    Multiple Human Resources employees reported that employees were not clear on how the spin-off impacted under age 50 employees' benefits and that employees often did not venture into the portals hosting the PowerPoint Presentations. Exs. J-37; D-91, D-92, D-94.

461.    Defendants betrayed their awareness of the confusion by using markedly different language in how they trained their internal customer services representatives, versus how they communicated to plan participants.[31]

### iv.    Analysis

462.    Defendants' testifying employees generally believed that the benefits communications were clear. But the question is whether Defendants misled or omitted material information that would have "mislead a reasonable employee" in "making an adequately informed" about their employment. Horvath v. Keystone Health Plan East, Inc. 333 F.3d 450, 461 (3d Cir. 2003) (internal citations and quotations omitted). Defendants did not inform Class

---

[31] See supra 33 and footnotes. To Alight customer service representatives fielding pensioner calls, New DuPont employees were "terminated" as of spin-off; to Plan participants, "nothing change[d]" at spin-off. Exs. D-120, J-30 at 3. Further, while the Administrative Committee noted that employees moving to New DuPont were not being "terminated" from their employer, Ex. J-46(a), see 9/24/24 Day 5 Tr. Trans. 166:5–7, ECF 280, employees were elsewhere referred to as "terminated," Ex. D-120 at 5, 8, 10–11.

Members how the spin-off would affect their benefits in a manner that a reasonable employee could understand, and therefore, breached their fiduciary duties under ERISA.[32]

463.    The most important document widely available to Plan participants, the SPD, was silent on the spin-off or its impacts on Plan benefits.  See supra ¶ 261.  The SPD simply does not reference the DowDuPont merger or spin-off.  2018 SPD, Ex. J-10 at 3–28.  In contrast, the SPD clearly defines and explains the November 30, 2018, "Benefit Freeze."  Id. at 9, 15.

464.    According to the SPD, the dispositive moment for benefits is the age of the employee "when [you] terminate employment."  Id. at 12.  The plain meaning of the phrase means that benefits are calculated based on the age at the time of termination of employment  A reasonable employee would surely interpret these phrases as Plaintiffs did, losing his or her job.

465.    Defendants only bolstered Plaintiffs' reasonable of this language understanding by soothing them repeatedly with reassurances that the spin-off would have "very few changes to your benefits" and characterizing the spin-off as an internal corporate restructure with no

---

[32] The Third Circuit is familiar with ERISA "same desk" scenarios.  In these cases, as here, the defendant corporation engages in a transaction resulting in its employees terminating service under their pension plan while continuing to work in effectively the same job, at the "same desk."  See Gillis v. Hoechst Celanese Corp., 4 F.3d 1137 (3d Cir. 1993); Dade v. North Am. Philips Corp., 68 F.3d 1558 (3d Cir. 1995); Hein v. F.D.I.C., 88 F.3d 210 (3d Cir. 1996).  Employees who had reached their respective early retirement age at the time of the corporate transaction sued under ERISA to allow them to "age into" the early retirement benefit. Hein, 88 F.3d 216-19.

In the trilogy of relevant cases, the Third Circuit held that ERISA does not require employers to allow participants to "age into" early retirement after a separation of service, even if the participants remained at the "same desk."  Dade, 68 F.3d at 1561–63 (3d Cir. 1995).  After first indicating some support for such a rule in Gillis, the Third Circuit clarified that "a plan spin-off is permissible" so long as "the participants would receive no less on a hypothetical termination of the plan just after the spin-off than they would have received on a hypothetical termination just before the spin-off."  Dade, 58 F.3d at 1163.

This case, while factually similar to these "same desk" cases, is legally distinct. The import of Dade and Hein is that ERISA does not prevent employers from ending participants' service because of a corporate transaction, regardless of whether the employees occupy the "same desks" before and after the event.  However, those cases do not address, as this Court now does, an employer's fiduciary obligation to explain the impacts of a spin-off on benefits to Plan participants.

substantial effects on employment, Ex. D-110 at 1, coupled with the fact that Plaintiffs remained in the same job, with the same yearly salary, at the same desk, in the same building post and pre-spin-off. Would the reasonable employee believe he was terminated from E.I. du Pont de Nemours ("Historical DuPont") and now worked for the entirely distinct DuPont de Nemours, Inc. ("New DuPont"), let alone understand the Plan benefit implications? Certainly not. Indeed, even Breen himself, had difficulty distinguishing between the corporate nomenclature of the two entities. 6/25/24 Day 1 PM Tr. Trans. 4:1–11, 7:20–9:10, 20:3–9, ECF 245.

466.    Defendants argue in their supplemental post-trial brief filed December 16, 2024, that Plaintiffs did not prove that more or better disclosures would have cured their benefit ineligibility. ECF 314 at 3. But this is not the standard for a breach of fiduciary duty, nor do Defendants cite any cases purporting to stand for this premise. A "misleading statement or omission by a fiduciary" is material if "there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision" or "a harmful decision regarding benefits." In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 579 F.3d at 228. This language is telling: there must be a "substantial likelihood that it would mislead a reasonable employee"—not that it actually did. Id. (emphasis added); see Warth v. Seldin, 422 U.S. 490, 500 (1975) ("The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . . .'" (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617 n.3 (1973))).

467.    Moreover, as to Optional Retirement, it is quite possible that injunctive relief to the Optional Retirement Class could require Defendants to reoffer the Plan to those employees who were eligible to choose Optional Retirement and would have if the Administrative Committee had not decided that the spin-off was a Business Exception. Whether such equitable relief will be

sought or granted will depend on further proceedings in this case. In addition, there are several Supreme Court and Third Circuit decisions discussed infra which have shown an expansive endorsement of injunctive relief under ERISA when the facts require. This Court believes this may be such a case, without making any specific findings in advance of the further proceedings to take place. It is also possible under the breach of fiduciary duty, Count IV, that injunctive relief, whether under the ability of a court under ERISA to order that Defendants "clarify" might be followed by damages and/or an award of attorneys' fees.

468. At the core of this debate is the concept of harm. ERISA § 502(a)(3), the portion under which Plaintiffs seek relief for Count VI, see Second Am. Compl. ¶¶ 138, ECF 102, does not set a "relevant standard of harm," CIGNA Corp. v. Amara, 563 U.S. 421, 426 (2011). Instead, the Supreme Court has noted that the standard of harm "will depend upon the equitable theory by which the District Courts sets relief." Id.

469. Defendants argue that there is no duty to disclose where a participant was not harmed as a result of the misrepresentation or omission, and defines harm as requiring the ability to make a benefit decision.[33] This is not the meaning of harm. As the Supreme Court has noted, "Congress' purpose in enacting the ERISA disclosure provisions" was "ensuring that 'the individual participant knows exactly where he stands with respect to the plan,'" Firestone Tire & Rubber Co., 489 U.S. at 118 (citing H.R.Rep. No. 93–533, 93rd Cong., 1st Sess. 11 (1973)). The Third Circuit has consistently read this language broadly, and thus District Judges must have a broad understanding of "harm" in this context. See CIGNA Corp, 563 U.S. at 444 (noting that

---

[33] Defendants mischaracterize Horvath v. Keystone Health Plan E., Inc., 333 F.3d 450, 456 (3d Cir. 2003). Horvath held that the plaintiff's claims for "restitution and disgorgement . . . require[d] her to demonstrate individual loss," id. (emphasis added), meaning that she "sought monetary relief for herself" based on "her firm overpa[ying] for the healthcare she received." Edmonson v. Lincoln Nat. Life Ins. Co., 725 F.3d 406, 416 (3d Cir. 2013).

harm under § 502(a)(3) is required, but understanding harm broadly to include "the loss of a right protected by ERISA or its trust-law antecedents").

470.    In <u>Gillis v. Hoechst Celanese Corp.</u>, 4 F.3d 1137, 1148 (3d Cir. 1993), the Third Circuit analyzed the language from <u>Firestone Tire & Rubber Co.</u> to support a finding that a plan participant need not demonstrate harm to obtain an injunction to comply with a disclosure requirement.[34] <u>Horvath</u>, reiterates—and Defendants' briefing is silent on—the fact that a plaintiff seeking injunctive relief requiring that a fiduciary "satisfy its statutorily-created disclosure or fiduciary responsibilities" need not show "actual harm."  333 F.3d at 456 (citing <u>Gillis</u>, 4 F.3d at 1148).

471.    Defendants cannot avoid consequences for their breach of fiduciary duties by claiming that the breach was irrelevant because Plaintiffs had no benefits decision to make.  ECF 206-1 at 13.  The Supreme Court has imagined liability under § 502(a)(3) in a similar scenario:

> [I]t is not difficult to imagine how the failure to provide proper summary information, in violation of the statute, injured employees even if they did not themselves act in reliance on summary documents—which they might not themselves have seen—for they may have thought fellow employees, or informal workplace discussion, would have let them know if, say, plan changes would likely prove harmful. We doubt that Congress would have wanted to bar those employees from relief.

<u>CIGNA Corp.</u>, 563 U.S. at 1870.

472.    The import of a participant knowing "exactly where he stands with respect to the plan" cannot be understated.  <u>Firestone Tire & Rubber Co.</u>, 4 F.3d at 1148.  And such knowledge does not necessarily require that an employee had a benefit decision to make.  Indeed, the Supreme Court noted in <u>Varity</u> that the plaintiffs, who had no benefits due to them under § 502(a)(1)(B),

---

[34] This Court reserves judgment on the appropriate damages for the damages portion of this bifurcated trial, noting that actual harm is not required to seek injunctive relief.  ERISA permits the Court to restore benefits to certain individuals through injunctive relief.  <u>See</u> <u>CIGNA Corp. v. Amara</u>, 563 U.S. 421, 439 (2011) (noting that injunctive relief may be included in § 502(a)(3)).

could still proceed under § 502(a)(3) to pursue a breach of fiduciary duty claim because granting a remedy where one would otherwise be available "is consistent with the literal language of the statute, [ERISA]'s purposes, and pre-existing trust law."  Varity, 516 U.S. at 515.  This is particularly relevant to the Early Retirement Class.

### a. Early Retirement Communications

473.    A reasonable Plan participant would not understand the significance or implications of the Early Retirement communications or SPD on their Plan benefits.

474.    As noted, the relevant language in the FAQ states: "Since Corteva Agriscience will be the ongoing sponsor of the Plan, Specialty Products employees who participate in the Plan will be eligible to commence their pension, at spin, if they meet the Plan commencement requirements in terms of age and service."  Ex. D-33 at 3.

475.    First, the plain language is nowhere near as clear as Defendants suggest.  While it does begin by describing how "future service" with New DuPont will not be recognized in determining "eligibility for pension benefits and any applicable early retirement reduction factors," the next sentence muddies the water.  Id.  Because, "[f]or those employees who qualify for retirement by meeting the Plan's age and service requirements, growth in age will continue to be recognized allowing those participants to age into an improved reduction factor prior to commencing their pension."  Id. (emphasis added).  Notably, this does not say "for those employees who qualify for retirement, at spin-off, by meeting the Plan's age and service requirements."  The sentence leaves open the possibility that "growth in age" continues to be relevant for employees to "age into an improved [Early Retirement] reduction factor prior to commencing their pension," id., when in fact this was not true.

476.    Second—and in contrast to the testimony of Defendants' testifying employees—Defendants' internal communications reveal that its employees, including the architect of these

communications, did not believe the FAQs clearly explained the import of the spin-off.  See supra ¶ 31 (citing Ex. J-37 at 1) (discussing Dutton's email inquiring about additional communications because there was "a lot of confusion" of how the spin-off would affect benefits among employees); supra ¶ 85 (citing Dineen Dep. 287:13–288:12, 308:11–309:2, ECF 255-1) (discussing Dineen's acknowledgement that the FAQs were imprecise).

477.    Plan participants are left with one clear communication on Early Retirement—the PowerPoint Presentations.  The question is whether a reasonable participant would have had reason to review that presentation.  Cockerill and Barish both testified that they had not seen the PowerPoint Presentation before the spin-off.  E.g., 6/26/24 Day 2 PM Tr. Trans. 16:1–5, ECF 246.  But should they have?

478.    As a matter of law, reviewing the entirety of the benefits communication, a reasonable employee could not have been expected to review the PowerPoint.  In light of Defendants' history of good communication and repeated reassurances that minimal changes to Plan benefits would occur as a result of the spin-off,[35] a reasonable employee would not be expected to review the PowerPoint.

479.    Thus, in the context of the SPD and other communications before the spin-off, Defendants' March 2019 email, which contained links to the PowerPoint Presentations, was

---

[35] As discussed supra, prior to March 2019, Plan participants received numerous communications about the spin-off which reassured them that little, if anything, was changing because of the spin-off.  6/25/24 Day 1 PM Tr. Trans. 78:5–10, ECF 245  6/28/24 Day 4 AM Tr. Trans. 42:3–20, ECF 243.  Repeatedly in the years leading up to the spin-off, Defendants told employees that fulfilling pension obligations was a top priority, regardless of which company administered the Plan.  Ex. J-20; Ex. D-34; see supra ¶¶ 55, 66, 145.  Then, on November 1, 2018, when Breen announced Corteva would assume the Plan, he reiterated Defendants' commitment to meeting Plan obligations and that nobody would lose their accrued benefit.  Ex J-17(c).  Even after the spin-off was announced, Defendants represented that "[a]s of June 1, we cease referring to our company as 'the new DuPont' or the 'future DuPont.' Going forward we are simply DuPont." Ex. J-30 at 3.  And "for DuPont employees' day-to-day work responsibilities, nothing changes."  Id.

woefully insufficient to notify a reasonable Plan participant of the spin-off's effect on Early Retirement Benefits.

480.    Far from a disclosure that hundreds of employees were losing eligibility to receive Early Retirement Benefits, the March 2019 email that linked the PowerPoints reads as an anodyne notice advertising a perk for the employees who could begin their Early Retirement Benefit at the spin-off (the 50 and 15 employees).  And the plain text explicitly directs employees with pension questions to either the PowerPoint Presentations or the SPD, logically implying that the SPD was an adequate resource to describe the changes.  Yet, the SPD did not explain the effect of the spin-off on Early Retirement.

481.    A reasonable Plan participant he would have little reason to click through to the PowerPoint Presentations, even assuming he could find them given the copious number of portals, and navigate to the applicable one.  The presentations were not mandatory, and the email explained to him that he could simply refer to the SPD, which, like the tenor and content of the surrounding communications, suggested little would change about employment at spin-off.  In the only other bulletin referencing the PowerPoints, Defendants downplayed them as guides for understanding "how to access your benefits after spin," not the singular explanation for how the spin-off would affect thousands of employees.  Ex. D-110 at 2.

482.    Clearly, here, the "fiduciary, as an objective matter, knew or should have known that a beneficiary would be confused" by how the spin-off would affect Early Retirement benefits and failed to adequately convey its effect.  In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 579 F.3d at 229 (quoting Burstein, 334 F.3d at 384).  That conclusion stems not only from an objective review of the communications, but also from the feedback Defendants received

(including the emails from employees) which show Defendants' knowledge that their employes were confused about the spin-off's impact on their benefits. <u>Daniels</u>, 263 F.3d at 73.

483.    As to the Early Retirement Class, Defendants breached their fiduciary "affirmative duty to inform when the [fiduciary] knows that silence might be harmful." <u>In re Unisys Corp. Retiree Med. Benefits ERISA Litig.</u>, 579 F.3d at 227 (quoting <u>Bixler</u>, 12 F.3d at 1300).

### b.  Optional Retirement Communications

484.    Unlike for the Early Retirement Benefit, Defendants never even informed Plan participants in any communications before spin-off that the Optional Retirement Benefit would no longer be available due to the spin-off.

485.    The complete omission of any explanation of how the spin-off affected the Optional Retirement Benefit, coupled with repeated reassurances to employees that their employment and benefits were not changing, also constituted a breach of fiduciary duty owed to the Optional Retirement Class.

486.    For one, the Business Exceptions that Defendants relied upon for their Plan interpretation were absent from the SPD. Such an exclusion of material information is neither a "clear, simple communication," as SPDs should be, <u>CIGNA Corp.</u>, 563 U.S. at 437, nor "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." <u>Burstein</u>, 334 F.3d at 379.

487.    The Optional Retirement Class Members, based on a reasonable interpretation of the SPD, would think themselves eligible for Optional Retirement after the spin-off due to any "involuntary termination (for reasons other than dishonesty, insubordination, or other misconduct)." Ex. J-10 at 19. "[T]here is a substantial likelihood that" the SPD, as written, "would mislead a reasonable employee in making an adequately informed retirement decision . . ." <u>In re</u>

Unisys Corp. Retiree Med. Ben. ERISA Litig., 57 F.3d at 1264 (quoting Fischer v. Phila. Elec. Co., 994 F.2d 130, 135 (3d Cir. 1993)).

488.    Defendants' failure to explain to Plan participants—whether through the SPD or otherwise—why the spin-off did not constitute an involuntary termination "triggering" Optional Retirement Benefit was a material omission and breach of fiduciary duty.  And, while pointing to the Chemours spin-off as an instance which made the interpretation of this spin-off consistent with past practice, Defendants also ignore the inconsistent justifications for why participants were not eligible for Optional Retirement Benefits.[36]

489.    Defendants breached their fiduciary duties to the Optional Retirement Class.

### c.    Plaintiffs Had No Burden to Inquire

490.    Defendants attempt to shift the burden of disclosure to Plaintiffs, arguing that they should have inquired or asked about their benefits.  But the duty to inform belongs to Defendants when they know, as they did here, "that silence might be harmful."  Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Skinner Engine Co., 188 F.3d 130, 149 (3d Cir. 1999).  In this Circuit, "it is clear that circumstances known to the fiduciary can give rise to this affirmative obligation [to disclose] even absent a request by the beneficiary."  Glaziers & Glassworkers Union Loc. No. 252 Annuity Fund, 93 F.3d at 1181.

491.    Under those circumstances, "a request for information" is not a "condition precedent" for fiduciary liability because "absent such information, the beneficiary may have no reason to suspect that it should make inquiry into what may appear to be a routine matter."

---

[36] See supra ¶ 44.  Chemours employee Michael Bilbo applied for Early and Optional Retirement Benefits after the Chemours spin-off.  Ex. D-118.  The Appeals Committee denied Bilbo's claims and noted in its denial that, with respect to the Optional Retirement Benefits, the Appeals Committee upheld the denial because Bilbo was not terminated "due to a lack of work," as required by the Plan to obtain Optional Retirement Benefits.  Id. at 2.  Notably, the Appeals Committee did not rely on the Business Exceptions for its denial.

<u>Horvath</u>, 333 F.3d at 461 (internal citations and quotations omitted).  The fiduciary obligations under ERISA to disclose material information "is the core of a fiduciary's responsibility."  <u>Bixler</u>, 12 F.3d at 1300.  Absent such information, the beneficiary "may have no reason to suspect that it should make inquiry into what may appear to be a routine matter."  <u>Glaziers & Glassworkers Union Loc. No. 252 Annuity Fund</u>, 93 F.3d at 1181.

492.    Such was the case here, where Defendants were aware of Plaintiffs' confusion and, rather than resolve it, amplified their message that little would change at spin-off.  And such "knowledge" need not be proven directly, but rather, can be proven through inference based on circumstantial evidence.  <u>See</u> <u>Intel Corp. Inv. Pol'y Comm. v. Sulyma</u>, 589 U.S. 178, 189 (2020)

493.    Plaintiffs are not bound by a lack of inquiry; they had no reason to ask.  <u>See</u> <u>also</u> <u>Daniels</u>, 263 F.3d at 76 (noting that the "[m]ost frequent" ERISA fiduciary breach claims are those when an employer "has failed to provide the employee information which the employer knows the employee needs in order to protect himself from harm.").  Defendants never clearly communicated to the Early Retirement Class that they were "terminated" under the meaning of the Plan until it was too late, and never even told the Optional Retirement Class that the spin-off was not an involuntary termination and rather was interpreted to be included in the Business Exceptions to Optional Retirement Benefits.

494.    While Dineen, who crafted communications to Plan participants about the impact of the spin-off on their benefits, believed Plaintiffs "had no choice" and were not "making decisions based on [the communication] material," that determination was not hers to make.  Dineen Dep. 308:23–309:2, ECF 255-1.  Rather, fiduciaries breach their duties when, through misrepresentation or omission, "there is a substantial likelihood that it would mislead a reasonable

employee in making an adequately informed retirement decision." <u>Jordan v. Fed. Exp. Corp.</u>, 116 F.3d 1005, 1015–16 (3d Cir. 1997).  Here, that was the case.

495.    Defendants attempt to argue that because thousands of individuals who were impacted by the spin-off commenced benefits, the communications about the impact of the spin-off was clear.  11/25/24 Oral Arg. Trans. 56:2–7, ECF 308.  But as Plaintiffs highlight, Defendants did not put on testimony from any Plan participant who stated that they understood the impact of the spin-off on their benefits.  <u>Id.</u>  Rather, for both Early Retirement and Optional Retirement, through misrepresentation and omission, there was a substantial likelihood that the communications would mislead reasonable employees.  <u>Jordan</u>, 116 F.3d 1015–16.

### d.  Summarizing the Breach of Fiduciary Duties

496.    The crux of the fiduciary breach is clear.  Defendants' action constitute a breach of fiduciary duty to the Optional Retirement Class and Early Retirement Class (even in light of this Court's denial of Count I).

497.    In the years leading up to the spin-off Defendants assured Plaintiffs their employment would not substantively change, that "DuPont" was and would remain their employer, that they would suffer no termination, while harboring a clear idea that employment, for the purposes of the Plan, was ending on May 31, 2019.  Indeed, Defendants <u>knew</u> they were ending 60% of active Plan members employment under Plan at spin-off.  But instead of clearly informing them of that decision, which eliminated the possibility of Early Retirement Benefits for hundreds of employees (which Defendants could have and should have done), Defendants assured them they were continuing to work for "DuPont."

498.    The Administrative Committee, in a fifteen-minute meeting, promulgated a tortured Plan interpretation that, in essence, "terminated" employment for the purposes of Early

Retirement Benefits, but not Optional Retirement Benefits.[37]    In the same breath, the Administrative Committee formally interpreted the spin-off as anything but a "termination" for New DuPont Plan participants, while simultaneously conveying that exact message when denying them the Optional Retirement Benefit.[38]  See supra n.6.  What's more, Plan participants were never notified of this interpretation (which is, as noted, contradicted by internal communications about the spin-off).  As Defendants' employees testified, "we don't communicate to people what you're not eligible for; we communicate what you are eligible for."  9/24/24 Day 5 Tr. Trans. 119:8–121:10, ECF 280; see also 6/27/24 Day 3 AM Tr. Trans. 54:3–7, 53:25–54, ECF 242 (Durkovic testimony that the Administrative Committee did not typically communicate to participants information about benefits to which they were not eligible).

499.    This "termination" tight-rope smacks this Court of the proverbial "having their cake and eating it too."  As Defendants have argued, employees could not be both terminated for the purposes of Early Retirement but not terminated for the purposes of Optional Retirement.[39]  This

---

[37] Neither the Plan nor SPD discusses a distinction between "separating from the . . . group sponsoring the [Plan]" and "terminat[ion] under the [Plan]." Ex. J-46(b). The Administrative Committee seemingly invented this semantic distinction at its November 8, 2018, meeting.

[38] See Ex. D-120 at 5, 8, 10–11 (Customer service representative were given scripts that described New DuPont employees as "terminated" as of the spin-off); Robert Cockerill Level I and Level II Appeals and Denials, Ex. J-2 at 10 (Cockerill denial stating he "was terminated" as of spin-off(emphasis added)); id. at 667 (Appeals Committee stating that "Cockerill was terminated from the company due to divestiture on May 31, 2019" (emphasis added)); id. at 677 (same); id. at 707 (Cockerill benefits statement listing his "Age at Termination" at spin-off (emphasis added)); Darrell Benson Level I and Level II Appeals and Denials, Ex. J-3 at 37 (Benson benefits statement stating his "Date of Termination" as May 31, 2019 (emphasis added)); Oliver Major Level I and Level II Appeals and Denials, Ex. J-4 at 2 (Appeals Committee stating Major's "time of termination" was May 31, 2019 (emphasis added)).

[39] Defendants advanced this argument at class certification and summary judgment to attack Plaintiffs' ability to recover on both Early and Optional Retirement Benefits. However, as is clear from this finding, both Classes can prevail on different causes of action. As a matter of contract interpretation, Plaintiffs were involuntarily terminated at spin-off, entitling the Optional Retirement Class Members to benefits under the Plan. See supra discussion of Count II. However, because Defendants' communications and the SPD would not inform Early Retirement Class

129

inconsistency and contradiction is materially misleading and constitutes a breach of fiduciary duties.

500.    While this Count denied relief to the Early Retirement Class under ERISA §1132(a)(1)(B) (Count I), the Early Retirement Class is not foreclosed from recovering for breach of fiduciary duties (Count IV). Defendants have not cited any cases to the contrary, nor is this Court aware of any such cases. The Court holds, in denying Count I, that while the Plan was ambiguous, the Administrative Committee's interpretation was not arbitrary and capricious. Nonetheless, under Count IV, Defendants breached their fiduciary duties to the Early Retirement Class (as well as the Optional Retirement Class) since Defendants' communications and the SPD would not inform an Early Retirement Class Member of the fact that they were terminated. In sum, while the Plan interpretation was not unreasonable, Defendants nonetheless breached their duties to communicate that Plan interpretation clearly to the Early Retirement Class, thus breaching their fiduciary duties.

501.    Nor are the Optional Retirement Class Members necessarily forbidden from recovering under both under ERISA § 1132(a)(1)(B) (Count II) and a breach of fiduciary duty framework (Count IV).[40] However, this is an issue to be determined during the damages portion of this bifurcated trial. See Parente, 2000 WL 419981, at *2 (noting that in Varity, the Supreme Court "contemplated the practice of plaintiffs asserting overlapping claims for recovery of benefits and breach of fiduciary duty" and did not draw a bright-line rule for recovery); supra ¶ 441. For

---

Members that their employment was terminated under the Plan, those Plaintiffs have established that Defendants breached their fiduciary duties.

[40] Notably, the bases of the counts are different. The basis of Count II is the denial of benefits while the basis of Count IV is the omission or misrepresentation of material information.

the purposes of this Memorandum, the Court notes only that the Optional Retirement Class succeeds on Count IV for the purposes of establishing liability.

502.    In sum, Defendants' attempt to terminate employment for one benefit but not another is not only inequitable, but leaves this Court with the firm impression that, between November 8, 2018, through the spin-off, Defendants shirked their ERISA fiduciary duties to Plaintiffs, the "highest known to law" that "must be made with an eye single to the interest of the participants and beneficiaries." Su v. RiversEdge Adv. Ret. Sols., LLC, 2024 WL 1193858, at *8 (W.D. Pa. Feb. 20, 2024) (citing Johnson v. Couturier, 572 F.3d 1067, 1082 (9th Cir. 2009) & Pegram v. Herdrich, 530 U.S. 211, 235 (2000)).

503.    On Count VI, the Court finds in favor of Plaintiffs.

### c.    Count V—Interference With Benefit Attainment

#### i.    Overview of Count V

504.    Count V is brought under ERISA § 510, 29 U.S.C. § 1140.  Second Am. Compl. ¶¶ 144–47, ECF 102.  Count V is pled in the alternative to Counts I and II.  Id.

505.    Under Count V, Plaintiffs assert, on behalf of the Early Retirement and Optional Retirement Classes, that Defendants' intent in assigning Historical DuPont employees to New DuPont at the spin-off was to prevent Plaintiffs from attaining Optional and Early Retirement Benefits in violation of 29 U.S.C. § 1140.

506.    But Plaintiffs have failed to demonstrate that Defendants' purported explanations are pretext.  Defendants have succeeded in defeating Count V.

#### ii.    Legal Standard

507.    Under ERISA § 510, it is unlawful for an employer to discharge or discriminate against a plan participant to prevent them from attaining benefits which they may become entitled under the plan.  Congress enacted § 510 to prevent employers from interference with employees'

pension rights.  <u>Dewitt v. Penn-Del Directory Corp.</u>, 106 F.3d 514, 522 (3d Cir. 1997) (citing <u>Haberern v. Kaupp Vascular Surgeons Ltd. Defined Ben. Pension Plan</u>, 24 F.3d 1491, 1501 (3d Cir. 1994)).

508.    Pension liability avoidance programs, in which employees are terminated to prevent vesting of pension benefits, are illegal under § 510.  <u>Gavalik</u>, 812 F.2d at 852–57.

509.    An employee bringing a § 510 claim need only prove that the employer made a "conscious decision to interfere" with benefits with specific intent, and need not "prove that the only reason that he or she was terminated was an intent to interfere with pension benefits." <u>Jakimas v. Hoffmann-La Roche, Inc.</u>, 485 F.3d 770, 785 (3d Cir. 2007) (citing <u>Gavalik</u>, 812 F.2d at 851).

510.    The Third Circuit has provided "very clear" legal standards for a § 510 claim. <u>DiFederico v. Rolm Co.</u>, 201 F.3d 200, 204 (3d. Cir. 2000).  To state a <u>prima facie</u> case in the absence of direct evidence, Plaintiffs must demonstrate (1) employer conduct (2) taken for the purpose of interfering (3) with the attainment of a right to which the employee may become entitled.  <u>Dewitt</u>, 106 F.3d at 521 (citing <u>Gavalik</u>, 812 F.2d at 852).  Neither proof that an employee "lost benefits because of termination" or that "termination prevented the employee from accruing benefits" alone shows intent.  <u>Id.</u> (citing <u>Turner v. Schering-Plough Corp.</u>, 901 F.2d 335, 348 (3d Cir. 1990)).  But when terminations result in sufficiently sized "savings to the employer," they "may be realistically viewed as a motivating factor." <u>Turner</u>, 901 F.2d at 348.

511.    If Plaintiffs establish a <u>prima facie</u> case, Defendants must then articulate a legitimate, nondiscriminatory reason for the conduct. <u>DiFederico</u>, 201 F.3d at 205 (citing <u>Gavalik</u>, 812 F.2d at 851–53).  If Defendants carry their burden, the Plaintiffs must persuade the court by a preponderance of the evidence that the proffered legitimate reason is pretextual.  <u>Id.</u> at 205 (citing <u>Texas Dep't of Cmty. Affs. v. Burdine</u>, 450 U.S. 248, 252–53 (1981)).

### iii.    Analysis

512.    As discussed in this Court's summary judgment memorandum, Cockerill, 2024 WL 3049553, at *12, Plaintiffs presented sufficient evidence of a prima facie ERISA § 510 violation. See id.; DiFederico, 201 F.3d at 204–05 (applying Title VII burden shifting framework to ERISA § 510 claims).

513.    This Court asked Defendants to answer the following question at trial: why would a corporation, Corteva in this case, take on billions of dollars of underfunded liabilities to unaffiliated, unrelated employees, the New DuPont class members, for any legitimate profit-reaping business reason, and not merely a pretextual one?  Cockerill, 2024 WL 3049553, at *12. In response, Defendants provided several legitimate, nondiscriminatory business reason to explain why they placed the Plan with Corteva.  See DiFederico, 201 F.3d at 205.  At its core, Defendants' rebuttal to Plaintiffs prima facie case follows two premises.

514.    First, of the three companies that resulted from the spin-off, Corteva was in the best position financially to sponsor the Plan long-term.

515.    Breen and Fanandakis testified that the corporation decided to assign the Plan to Corteva, after the spin-off, because Corteva would be in the best position, financially, to remain a stable steward of the Plan. 6/25/24 Day 1 PM Tr. Trans. 37:4–38:2, 62:1–62:13, ECF 245; Fanandakis Dep. 58:1–59:3, ECF 255-2.  Specifically, the relatively consolidated agricultural industry would allow Corteva to face less competition, and instability.  Fanandakis Dep. 59:4–10, ECF 255-2.  In contrast, New DuPont was the conglomeration of many "unrelated" businesses and was susceptible to future divestitures, sales, and spin-offs.  6/25/24 Day 1 PM Tr. Trans. 37:14–38:2, 62:1–62:13, ECF 245; Fanandakis Dep. 59:4–10, ECF 255-2.  If those were to occur, the weighty size of the Plan might become too cumbersome for a smaller, reduced New DuPont entity to sponsor and manage effectively.  Fanandakis Dep. 59:4–59:18, ECF 255-2.

516.    Second, splitting the Plan such that each post spin-off company would sponsor the Plan for its employees was administratively too burdensome.

517.    When asked why the Defendants could not split the Plan's obligations and assets among the spin-off companies to correspond with where the employees worked post spin-off, Breen testified that doing so "would have been a total nightmare to try and administer," and would have become more complex if New DuPont engaged in future spin-offs after June 2019.  6/25/24 Day 1 PM Tr. Trans. 64:14–65:8, ECF 245.  Fanandakis did not remember evaluating "the possibility" of splitting the Plan, but could not "conceive of how that would even be done." Fanandakis Dep. 127:15–128:20, ECF 255-2.  Indeed, Fanandakis testified that it would be "ludicrous" to "try to divide a plan up" between employees at New DuPont and Corteva after the spin-off.  Id. 60:16–23.

518.    Fatal to their § 510 claims, Plaintiffs failed to persuade the Court that Defendants' two proffered legitimate reasons are pretextual.  DiFederico, 201 F.3d at 205 (citing Texas Dep't of Cmty. Affs., 450 U.S. at 252–53).

519.    Plaintiffs did not offer evidence at trial as to how much money Defendants saved on a class-wise basis by preventing the Early Retirement plaintiffs from receiving the Early Retirement Benefit nor the Optional Retirement plaintiffs from receiving that benefit.  This Court rejects any contention that it can or should determine the actual savings after the spin-off.  Plaintiffs offered no estimate for the aggregate value of the Early Retirement Class's benefit vis-à-vis the Vested Deferred Pension benefit they receive such that this Court could consider the savings a motivating factor.  Turner, 901 F.2d at 348.  Nor did Plaintiffs present estimates of damages for the Optional Retirement Benefit compared to their current payout.

520.    Plaintiffs left Defendants' premise—that Corteva was the best steward of the Plan—uncontested at trial.  And regarding the feasibility of splitting the Plan, Plaintiffs offered no competing testimony or exhibits to undermine Defendants' "administrative nightmare" justification.  While this Court is admittedly wary of Defendants' financial motives, it is persuaded that Defendants chose Corteva as the Plan sponsor for legitimate business reasons, and that splitting the Plan was not feasible or necessary.  Without contesting Defendants' reasons, Plaintiffs interference with benefits claim must fail because Plaintiffs fail to demonstrate that Defendants' proffered reasons for placing the Plan with Corteva are pretext.

521.    On Count V, the Court finds against Plaintiffs.

### d.  Count VI—Anti-Cutback

#### i.    Overview of Count VI

522.    Count VI is brought under ERISA § 204(g), 29 U.S.C. § 1054(g).  Second Am. Compl. ¶¶ 148–52, ECF 102.

523.    Under Count VI, Plaintiffs assert, on behalf of the Optional Retirement Class, that Defendants amended the Plan through interpretation of the spin-off to cut back Plaintiffs' Optional Retirement Benefits in violation of ERISA § 204(g).  Count VI tracks Count II.  Cockerill, 2024 WL 3049553, at *7.

#### ii.    Legal Standard

524.    § 204(g), known as the anti-cutback rule, "is crucial to ERISA's central object of protecting employees' justified expectations of receiving the benefits that they have been promised . . . ."  Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 739–40 (2004) (citing Lockheed Corp. v. Spink, 517 U.S. 882, 887 (1996)).  The anti-cutback rule "prohibits an employer from decreasing or eliminating a participant's accrued benefits by plan amendment."  Bellas v. CBS, Inc., 221 F.3d 517, 522 (3d Cir. 2000).  The anti-cutback rule "can protect an entitlement to

benefits, but it cannot create an entitlement to benefits when no entitlement exists under the terms of the Plan." Hein v. FDIC, 88 F.3d 210, 217 (3d Cir. 1996). But even in the absence of a formal amendment to the text of a plan, certain erroneous interpretations of a plan's text that result in the improper denial of benefits to a plan participant may be construed as an "amendment." Id. at 216.

### iii.    Analysis

525.    The Administrative Committee's interpretation of the spin-off vis-à-vis the Optional Retirement Benefit—which was arbitrary and capricious—had the effect of amending the Plan and cutting back Optional Retirement Class Members' benefits.

526.    The Third Circuit's decisions on what constitutes an amendment to a pension plan have been broad to protect pension recipients. See, e.g., Hein, 88 F.3d at 216; Cottillion v. United Ref. Co., 781 F.3d 47, 58 (3d Cir. 2015). The critical question in the absence of a formal plan amendment—as is the case here—is whether the "interpretation of the Plan improperly denied accrued benefits to" Optional Retirement Class Members. Cottillion, 781 F.3d at 58 (citing Hein, 88 F.3d at 216).

527.    The Administrative Committee interpreted the Plan's Business Exceptions to include the spin-off and decided that the spin-off was a "Business Exception" which did not entitle Optional Retirement Class Members to Optional Retirement Benefits. As noted, a straightforward reading of the Plan leads to the conclusion that the Optional Retirement Class Members were entitled to Optional Retirement Benefits at the time of the spin-off. This erroneous interpretation resulted in the improper denial of the Optional Retirement Class Members' Optional Retirement Benefits, see supra discussion of Count II, was, in effect, an "amendment." Hein, 88 F.3d at 216. This "amendment" violated ERISA's anti-cutback rule "eliminating a participant's accrued benefits . . . ." Bellas, 221 F.3d at 522. The facts relating to this determination were "material," leading to the denial of Optional Retirement Benefits, and may lead to Class Members recovering

damages.

528.    On Count VI, the Court finds in favor of Plaintiffs.

**e.   Implications of the Release on Counts II, VI, V, and VI**

529.    Valid releases can bar an individual from bringing certain ERISA causes of action.

See Romero v. Allstate Ins. Co., 1 F. Supp. 3d 319, 367 (E.D. Pa. 2014) (Buckwalter, J.).

530.    Seventy-nine members of the Optional Retirement class—including Major—signed near-identical Releases.  Exs. D-26 at 1–2; D-49.  Each of the Releases signed by Class Members include the same language as Major's release, which is analyzed below, and thus is referred to generally in this Memorandum as the "Release."  Exs. D-26 at 1–2; D-49.

531.    Under § 4(a) of the Release, the employee releases certain parties from claims "including . . . any alleged violation of . . . The Employee Retirement Income Security Act of 1974 ("ERISA") (except for any vested benefits under any tax qualified benefit plan).  Ex. D-26 at 1 (emphasis added).  This means that under § 4(a), the Release carves out—and thus permits—claims under ERISA "for any vested benefits under any tax qualified benefit plan."  Id.

532.    Under § 4(b) of the Release, certain claims are listed as not released.  Excluded from the Release are an employee's claim to "his/her own vested or accrued employee benefits under Employer's health, welfare, or retirement plans as of the Separation Date."  Id. at 2 (emphasis added).  This means that under § 4(b), the Release carves out—and thus permits—claims to "vested or accrued employee benefits under Employer's health, welfare, or retirement plans as of the Separation Date."  Id. (emphasis added).

533.    The Release is governed by Delaware law.  Id. at 7.  This Court must interpret the Release according to its plain language,  Wastak v. Lehigh Valley Health Network, 342 F.3d 281, 289 (3d Cir. 2003), and seek to effectuate the intent of the parties, see JFE Steel Corp. v. ICI Americas, Inc., 797 F. Supp. 2d 452, 469 (D. Del. 2011) (citing Lorillard Tobacco Co. v. Am.

Legacy Found., 903 A.2d 728, 739 (Del. 2006)).

534.    According to the Third Circuit, an "accrued benefit" under ERISA is the amount of "annual benefit commencing at normal retirement age . . . which must be subject to calculation using a 'formula under which each participant's actual accrued benefit under the plan can be determined in each plan year.'" Ashenbaugh v. Crucible Inc., 1975 Salaried Plan, 854 F.2d 1516, 1523-24 (3d Cir. 1988) (citing 29 U.S.C. 10012(23)(A) and quoting Internal Revenue Service Technical Information Release No. 1403 (Sept. 17, 1975)). A "vested benefit" on the other hand, is a benefit that is "nonforfeitable." Id. In theory, these benefits can be negated by a release—but not under the plain text of this Release.

### i.    Liability and Damages Under Counts II and IV Cannot Be Barred By The Release

535.    As this Court has noted, the Release could not apply to Counts II or IV. Cockerill, 2024 WL 3049553, at *14. These claims "are, by their nature, plan [not individual] claims." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 594 (3d Cir. 2009). These claims can be brought against any Defendant.

536.    While Defendants argue that the Release bars Count IV because it is not a benefit under the Plan, ECF 314 at 10, the Third Circuit has held otherwise. See In re Schering Plough Corp. ERISA Litig., 589 F.3d at 593–94 (3d Cir. 2009) ("[A]n individual release or covenant not to sue merely settles an individual dispute without altering a fiduciary's statutory duties and responsibilities.").

### ii.    Count VI Is Not Barred By The Release

537.    This Court previously noted that whether the Release barred Count VI was an issue

of fact depending on whether each Count involved benefits under the Plan.[41] Cockerill, 2024 WL 3049553, at *14; Ex. D-26 at 1–2.

538.    Count VI, the anti-cutback claim, is specifically carved-out of the Release, as it is an ERISA claim that involves a benefit under the Plan. Ex. D-26 at 1–2. Defendants argue that the Release bars Count VI because Count VI is not a claim for a benefit under the Plan, but cite no binding precent that an anti-cutback claim is not included in the language of §§ 4(a)–(b) of the Release. Under the anti-cutback claim, ERISA "prohibits an employer from decreasing or eliminating a participant's accrued benefits by plan amendment." Bellas, 221 F.3d at 522 (3d Cir. 2000). The Supreme Court has described this rule as "crucial" to ERISA's goal of protecting employees' justified expectations. Cent. Laborers' Pension Fund, 541 U.S. at 744. The anti-cutback rule seeks to ensure that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment," 29 U.S.C. § 1054(g)(1), and the basis of the claim is an entitlement to a benefit under the Plan.[42]

539.    Liability and damages under Count VI are carved-out of the Release. Major and other Optional Retirement Class Members who signed similar releases can recover under Count VI. And, because Count VI is carved-out from the Release, Defendants can be liable for Count VI regardless of whether they are included as released parties.

540.    As of this verdict, the Court finds a basis for liability as to Court VI, regardless of the Release and whether Count VI is a vested or accrued benefit. But developments in Phase II of

---

[41] As discussed in relation to Count IV, this Court need not avoid evaluating Count VI and reserves the right to determine whether recovery under Counts II and IV is appropriate during the damages portion of this bifurcated trial. See supra ¶¶ 440–441, 498 and accompanying footnotes.

[42] In its Summary Judgment memorandum, the Court did not make a final ruling on the effect of the Release or whether Count VI was carved out of the Release. Cockerill, 2024 WL 3049553, at *14.

this trial may result in a different conclusion after further proceedings because the Release language is unclear since it carved out different rights to benefits under §§ 4(a)–(b).

**III.**    **<u>CONCLUSION</u>**

541.    For the foregoing reasons and specifically as it relates to liability, this Court finds in favor of Plaintiffs on Counts II, IV, and VI, and finds that Defendants have succeeded in defeating Counts I and V.  An appropriate order follows.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 21\21-3966 Cockerill et al v. Corteva, Inc\21-3966 Memo Finding of Facts & Conclusions of Law.docx